Rebecca Peterson-Fisher (SBN 255359)
Jennifer Liu (SBN 279370)
C. Leah Kennedy (SBN 346306)
KATZ BANKS KUMIN LLP
150 California Street, 16th Floor
San Francisco, CA 94111
Tel: 415.813.3260
Fax: 415.813.2495
Email: Peterson-Fisher@katzbanks.com
Liu@katzbanks.com
Kennedy@katzbanks.com

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVEN MILLER, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>RED ROBIN INTERNATIONAL, INC. dba RED ROBIN BURGER AND SPIRITS EMPORIUMS, and DOES 1-100, inclusive,<br><br>        Defendants. | Case No. 22-CV-02574-JCS<br><br>**DECLARATION OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT**<br><br>Before the Hon. Joseph C. Spero<br><br>Hearing: January 5, 2024, 9:30 AM<br>Location: Courtroom D, 15th Floor<br>Filed: April 27, 2022 |

**DECLARATION  OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT**

I, Rebecca Peterson-Fisher, declare as follows:

1.       I am an attorney admitted to practice law in California, a member of the bar of this Court, and a Partner at Katz Banks Kumin LLP, counsel of record for Plaintiff and the proposed Class.

2.       I am one of the lawyers primarily responsible for prosecuting Plaintiff's claims on behalf of the proposed Class.

3.       I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Motion for Order Provisionally Certifying Settlement Class and Preliminarily Approving Class and PAGA Settlement.

**Background and Experience**

4.       I received my J.D. from New York University School of Law in 2007, *cum laude*, and my B.A. from the University of California at Berkeley with highest honors (*summa cum laude* equivalent) in 2001.  During law school, I was selected as an Arthur Garfield Hays Civil Liberties Fellow, and upon graduation I was awarded the Vanderbilt Medal for leadership, vision, and outstanding contributions to New York University School of Law.  After graduation, I clerked for the Honorable Michael H. Dolinger, United States Magistrate Judge in the Southern District of New York, for one year.

5.       I was admitted to the California bar in 2008 and to the New York bar in 2009.  After relocating to California, I resigned from the New York bar.

6.       From 2008 to 2011, I worked for legal service organizations representing indigent clients.  At the Brooklyn Family Defense Project (now Brooklyn Defender Services), I served as court-appointed counsel for parents charged with abuse or neglect of children, including in emergency hearings and bench trials.  At Neighborhood Legal Services of Los Angeles, I

1

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT CASE NO. CV-22-2574-JCS

represented clients in administrative proceedings and litigation relating to public benefits, and engaged in policy advocacy and outreach.

7.     In 2011, I joined Traber & Voorhees, a prominent civil rights law firm in Los Angeles of counsel to the firm now known as Hadsell Stormer Renick and Dai, LLP.  As an associate at Traber & Voorhees, I represented employees in individual discrimination matters and complex class action litigation.  I served as counsel in, among other matters, *Kimberly Murphy v. Caremark CVS Corp. et al*, Case No. BC464785, Los Angeles Superior Court (statewide class action on behalf of nonexempt empoyees alleging off the clock security checks); *Quezada v. Schneider Logistics Transloading and Distribution*, No. CV-12-2188 CAS, 2014 WL 12584436 (C.D. Cal. May 12, 2014) (class action on behalf of forklift drivers alleging invalid alternative workweek election, unpaid overtime, and other wage and hour claims); *Hernandez v. Goliath*, No. BC 462953, Los Angeles Superior Court (class action on behalf of dancers alleging violations of minimum wage, overtime, and rest and meal break laws); *Grobeson v. City of Los Angeles*, Los Angeles Superior Court Case No. BC150151 (trial counsel for retrial representing first openly gay police officer in LAPD with retaliation claims); *Reyna Garcia v. New Albertson's Inc., et al.,* Case No. 2:13-cv-05941-CAS (claims for failure to accommodate pregnancy-related disability and failure to engage in the interactive process); and *Frost v. Hesperia School District*, CIVDS1313980, San Bernardino County Superior Court (claims for sexual orientation discrimination and retaliation, co-counseled with Lambda Legal).

8.     In 2015, Theresa Traber was appointed to the bench in Los Angeles County Superior Court, and Traber & Voorhees dissolved.  I became a Senior Staff Attorney at Equal Rights Advocates ("ERA"), a San Francisco nonprofit organization dedicated to protecting and advancing the rights of women, girls, and people of all gender identities.  At ERA, I became an expert in Title IX law and policy, and frequently commented in local and national news media on Title IX-related matters.  I served as co-counsel in *Jane Doe v. The Board of Trustees of The Leland J. Stanford, Jr. University*, Case No. 3:16-cv-06973 in the Northern District of California, a high-profile Title IX case, and represented several students in parallel proceedings through the U.S. Department of

2

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT CASE NO. CV-22-2574-JCS

Education Office for Civil Rights.  I was also lead or co-lead author on amicus briefs in Title IX cases of national importance, *Ross v. University of Tulsa* (10th Cir. 2017) 859 F.2d 1280 (with SurvJustice) and *Fryberger v. University of Arkansas* (8th Cir. 2018) 889 F.3d 471 (with National Women's Law Center).

9.     In 2017, I joined The Liu Law Firm, P.C. ("LLF") as a Partner.  As a Partner at LLF, I served as counsel in three class actions, *Borrego, et al. v. Raley's Family of Fine Stores*, Case No. 34-2015-00177687 (Sacramento Super. Ct. July 23, 2020) (statewide pregnancy discrimination class action on behalf of grocery store employees); *Houston, et al. v. Braavos, Inc., et al.*, Case No. CFC-17-562019 in San Francisco Superior Court (N.D. Cal.) (nationwide wage and hour class and collective action on behalf of security guards), and *Villanueva v. Dech Foods, LLC et al.*, Case No. CGC-16-555202 in San Francisco Superior Court (statewide wage and hour class action on behalf of fast food workers), and as lead counsel in a multi-plaintiff Title IX case against Stanford University filed on behalf of female athletes from five varsity teams, *Keesing et al. v. The Board of Trustees of The Leland J. Stanford University*, Case No. 5:21-cv-03555-BLF in the Northern District of California.  In addition to complex litigation, I represented individual clients in litigation, arbitration, and settlement negotiation, both on a contingency basis and on an hourly basis.

10.     In Decmber 2021, Jennifer Liu and I formed Liu Peterson-Fisher LLP ("LPF"), and I continued to litigate class and individual employment cases.  LPF gained national recognition, and was selected as one of the Best Law Firms in America for 2022 by *U.S. News – Best Lawyers* in 2022.  In 2023, LPF became part of with Katz Banks Kumin LLP, a nationally prominent whistleblower and employment discrimination firm headquartered in Washington, D.C., with offices in Philadelphia and now, San Francisco.  I continue to represent all of my LPF clients, including Plaintiff, as a Partner with Katz Banks Kumin LLP.

11.     I was named to the Daily Journal's Top 75 Labor and Employment Lawyers in California list in 2022 and 2023 and to the national Lawdragon 500 Plaintiff Employment Lawyers guide from 2021-2023.  I have been recognized as a Northern California Super Lawyer by Super

3

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT CASE NO. CV-22-2574-JCS

Lawyers magazine from 2020-2023, and previously as a Southern California Rising Star in 2015 and 2016 and as a Northern California Rising Star in 2018 and 2019.

12.     I am a member of the National Employment Lawyers Association ("NELA"), the California Employment Lawyers' Association ("CELA") and the Alameda County Bar Association ("ACBA"). I served as the Vice Chair of the ACBA's Labor & Employment Section Executive Committee in 2020, and as the Chair in 2021. In 2021, I also served on CELA's Nominating Committee and on its Fair Employment and Housing Council Committee. I now serve on the ACBA's Appellate Section Executive Committee. I frequently speak on employment law-related matters, and my speaking engagements have included NELA's national conference and the American Bar Association Annual Meeting.

13.     Jennifer Liu received her J.D. from Stanford Law School in 2008, and a Master in Business Administration and Management from the Stanford Graduate School of Business in the same year. She clerked for the Honorable John G. Koeltl of the U.S. District Court for the Southern District of New York. She has been a member of the New York bar since 2010 and the California bar since 2011.

14.     From October 2009 to January 2015, Ms. Liu was an Associate at Outten & Golden LLP, a 50+ attorney plaintiffs' employment firm with offices in New York, Illinois, and California. There, she served as class counsel in numerous wage and hour class actions, including the following: *McCue v. MB Financial, Inc.*, No. 15 Civ. 988, 2015 WL 1020348 (N.D. Ill. Mar. 6, 2015); *Puglisi v. TD Bank, N.A.*, No. 13 Civ. 637, 2015 WL 574280 (E.D.N.Y. Feb. 9, 2015); *Aboud v. Charles Schwab & Co., Inc.*, No. 14 Civ. 2712, 2014 WL 5794655 (S.D.N.Y. Nov. 4, 2014); *Mills v. Capital One, N.A.*, No. 14 Civ. 1937, Docket No. 28 (S.D.N.Y. Aug. 1, 2014); *Zeltser v. Merrill Lynch & Co., Inc.*, No. 13 Civ. 1531, 2014 WL 2111693 (S.D.N.Y. May 12, 2014); *Clem v. Keybank, N.A.*, No. 13 Civ. 789, 2014 WL 1265909 (S.D.N.Y. Mar. 27, 2014); *Yuzary v. HSBC Bank USA, N.A.*, No. 12 Civ. 3693, 2013 WL 1832181 (S.D.N.Y. Apr. 30, 2013); *Beckman v. Keybank, N.A.*, No. 12 Civ. 7836, Docket No. 13 (S.D.N.Y. Dec. 11, 2012); *Hernandez v. Merrill Lynch & Co.*, Inc., No. 11 Civ. 8472 2012 WL 5862749 (S.D.N.Y. Nov. 15, 2012);

*Palacio v. E\*TRADE Fin. Corp.*, No. 10 Civ. 4030, 2012 WL 1058409 (S.D.N.Y. Mar. 12, 2012); and *Alli v. Boston Market Corp.*, No. 3:10-cv-00004, 2011 WL 6156938 (D. Conn. Dec. 9, 2011).

15. In January 2015, Ms. Liu founded The Liu Law Firm, P.C., an employment and civil rights firm that litigates on behalf of employees and civil rights plaintiffs across the country, and the predecessor firm to LPF.  As Managing Partner of LLF and LPF, she has served as class counsel and/or co-lead counsel in numerous employment class and/or collective actions, including:

- *Quinby, et al. v. ULTA Salon, Cosmetics & Fragrance, Inc.*, Case No. CV-15-4099-WHO, Docket No. 46 (N.D. Cal. Sept. 22, 2016) (class counsel in statewide wage and hour class action);

- *Sunner v. Kenneth R. Turnage II General Contractor, Inc., et al.*, Case No. RG15772244 (Alameda Super. Ct. Oct. 18, 2016) (class counsel in local wage and hour class action);

- *Tighe, et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.*, Case No.: 50-2017-CA-012909-XXXX-MB (Fla. Cir. Ct. Dec. 29, 2017) (co-lead counsel in nationwide collective action);

- *Brown v. Frontpoint Security Solutions, LLC*, Case No. 2017-14845 (Va. Cir. Ct. Dec. 8, 2017) (co-lead counsel in statewide wage and hour collective action);

- *Pena, et al. v. U.S. Bancorp*, Case No. CGC-17-556646 (San Francisco Super. Ct. Mar. 21, 2019) (class counsel in statewide wage and hour class action);

- *Watson, et al. v. The Jones Financial Companies LLLP, et al.*, Case No. 34-2019-00255234 (Sacramento Super. Ct. June 15, 2020) (class counsel in statewide wage and hour class action);

- *Galbraith, et al. v. Drybar Holdings LLC*, Case No. 19STCV16305 (Los Angeles Super. Ct. June 25, 2020) (class counsel in statewide wage and hour class action);

- *Borrego, et al. v. Raley's Family of Fine Stores*, Case No. 34-2015-00177687 (Sacramento Super. Ct. July 23, 2020) (class counsel in pregnancy discrimination class action);

- *Amirian, et al. v. Umpqua Holdings Company d/b/a Umpqua Bank*, Case No. BC674115 (Los Angeles Super. Ct. Apr. 1, 2021) (class counsel in statewide wage and hour class action);

- *Villanueva, et al. v. DECH Foods, LLC*, Case No. CGC-16-555202 (San Francisco Super. Ct. Oct. 29, 2021);

- *Hamilton, et al. v. The Vail Corp.*, Case No. SC20210148 (El Dorado Super. Ct. Feb. 1, 2022) (co-lead class counsel in nationwide wage and hour class and collection action);

- *Arciaga v. Snowflake, Inc.*, Case No.: 21-CIV-06144 (San Mateo Super. Ct. Mar. 3, 2022) (co-lead class counsel in multi-state wage and hour class and collective action);

- *Gordon, et al. v. Braavos, Inc., et al.*, Case No. 3:17-cv-06310-WHA (N.D. Cal. Mar. 10, 2022) (co-lead class counsel in nationwide wage and hour class and collective action);

- *Ayyad v. PowerSchool Group, LLC*, Case No. 34-2022-00316882 (Sacramento Super. Ct. May 23, 2022) (co-lead counsel in multi-state wage and hour class and collective action)

16.     In September 2023, Ms. Liu became a Partner with Katz Banks Kumin LLP.  During her career, Ms. Liu has litigated dozens of cases in federal and state courts across the country and has helped recover over $150 million on behalf of workers and employees.  She has named one of the Best Lawyers in America by *U.S. News - Best Lawyers* from 2020 to 2022, and a Lawdragon 500 Leading Plaintiff Employment Lawyer from 2020 to 2023.  I have been named by the *Daily Journal* to its list of the top 75 labor and employment attorneys in the State of California for 2019, 2020, 2022, and 2023.  She was also named a Super Lawyer by *Super Lawyers Magazine* from 2021-2023, and was previously named a Rising Star from 2017 to 2020.

17.     Ms. Liu is a member of the American Bar Association ("ABA"), the National Employment Lawyers Association ("NELA"), and the California Employment Lawyers

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT CASE NO. CV-22-2574-JCS

Association ("CELA").  She  has held numerous leadership positions with the ABA Section of Labor & Employment Law, including serving as Employee Co-Chair of the Committee on Equal Employment Law and Employee Vice Chair for the Diversity, Equity and Inclusion in the Legal Profession Committee, and Employee Co-Chair for the Flash e-Newsletter Committee.  She has also served on the NELA Annual Convention Committee and on the CELA Wage & Hour Committee.

18.    Ms. Liu speaks frequently on employment law matters, including on employment discrimination and class action topics.  She has published numerous articles on these topics as well.

19.    Leah Kennedy is a 2022 graduate of Stanford Law School with highest pro bono distinction.  At Stanford, Ms. Kennedy was involved in disability justice, immigrant rights, and worker rights causes, and served as a judicial extern for Judge Robert E. Bacharach for the U.S. Circuit Court of Appeal for the Tenth Circuit.  Ms. Kennedy joined LPF as an associate in 2022, and became an associate with Katz Banks Kumin LLP when the firms merged in September 2023. Ms. Kennedy is admitted to the bar in California.

**Facts and Procedural Background**

20.    Plaintiff seeks preliminary approval of a $3,200,000 class action and PAGA representative action settlement on behalf of a class of Assistant Manager, Kitchen Managers, and Assistant General Managers ("Salaried Managers or "SMs"") who worked at Red Robin restaurants in California, whom Plaintiff alleges were misclassified as exempt employees. The proposed settlement includes a class of 205 SMs who did not sign arbitration agreements, 110 of whom are included in the PAGA settlement, and 47 SMs who signed arbitration agreements, but who are included in the PAGA settlement.  The average settlement award per class member, excluding PAGA payments, is estimated to be $11,105.  The Settlement Agreement is attached hereto as Exhibit A.  The Proposed Class Notice, which has been approved by Defendant, is attached hereto as Exhibit B.

21.    Defendant Red Robin International, Inc. operates a national chain of burger

restaurants, approximately 59 of which are located in California.  Plaintiff alleges that like many chain restaurants, Red Robin uses a lean staffing model at its restaurants to extract long hours from salaried Assistant Managers, Asistant General Managers, and Kitchen Managers (collectively, "Salaried Managers").  Red Robin classifies these employees as exempt even though Plaintiff alleges they spend most of their days performing physically demanding non-exempt work, such as cooking, bussing tables, seating customers, serving customers, cleaning, and delivering food. Salaried Managers are routinely scheduled to work 50 hours a week, but often work far longer, and do not receive overtime pay.  Due to the demands of the position, Plaintiff alleges they do not receive legally-compliant rest or meal breaks, but they do not receive any compensation for missed meal and rest breaks from Red Robin.

22.     Plaintiff Steven Miller  was employed by Red Robin from 2013 until April 28, 2021, holding, at different times the job titles Assistant Managers, Kitchen Manager, and Assistant General Manager.  Plaintiff worked at three different Red Robin restaurants in California.  Plaintiff spent the substantial majority of his time performing non-managerial tasks that were the same as the duties performed by non-exempt workers and thus did not meet the quantitative test for the administrative exemption or executive exemption. As a result of his misclassification, he was not provided with meal or rest breaks and he was not paid overtime premium pay for overtime hours, though he regularly worked 50 hours or more per week, often 60 hours.  Plaintiff did not receive legally-compliant rest or meal breaks, nor did he receive any compensation for missed breaks, and he was required to make supply runs and was not reimbursed for mileage. There is no antagonism or conflict of interest between Miller and the absent class members.

23.     On February 7, 2022, Plaintiff filed a Private Attorneys General Act ("PAGA") letter with the Labor Workforce Development Agency on behalf of all Assistant Managers, Kitchen Managers, and Assistant General Managers who worked at Red Robin restaurants in the State of California.  ECF No. 1, Exhibit A.

24.     On April 27, 2022, Plaintiff filed the Complaint in this matter, which defined the proposed Class as "all current and former Assistant Managers, Assistant General Manager, and

Kitchen Managers (collectively 'Secondary Managers') employed by Red Robin in California at any time between April 27, 2018 through the final disposition of this action," and alleged six causes of action: (1) Labor Code Sections 510 and 1194 and IWC Wage Order No. 5-2001 (unpaid overtime wages); (2) Labor Code Sections 218.5, 226.7, 512 and 1198, and IWC Wage Order No. 5-2001 (meal and rest periods); (3) Labor Code Sections 201-203 (unpaid earned wages upon discharge); (4) Labor Code Sections 226, 1175, and 1174.5 (wage statements); (5) Business and Professions Code Sections 17200, *et seq.* ("Unfair Competition Law" or "UCL"); and (6) Labor Code Sections 2698, *et seq.* ("Private Attorneys General Act" or "PAGA").  ECF No. 1.

25.     Plaintiff asserted overtime claims based on allegations that Defendant misclassified SMs as exempt employees, that SMs regularly worked in excess of 40 hours in a workweek and 8 hours in a workday, and that Defendant did not pay SMs overtime premium pay for overtime hours worked, which Plaintiff alleged violated Labor Code Sections 510 and 1194 and IWC Wage Order No. 7-2001.  *Id.*  ¶¶ 38-43.  Plaintiff asserted meal and rest break claims based on allegations that Defendant did not afford SMs with legally-compliant meal and rest periods because of its determination that SMs were exempt employees, which Plaintiff alleged violated Labor Code Sections 218.5, 226.7, 512 and 1198 and IWC Wage Order No. 7-2001.  *Id.* ¶¶ 44-48.  Plaintiff asserted waiting time claims based on allegations that Class Members who had not been employed by Defendant for at least thirty days had not yet received all wages earned, which Plaintiff alleged violated Labor Code Sections 201-203.  *Id.* ¶¶ 49-53.  Plaintiff asserted wage statement claims based on allegations that Defendant failed to provide accurate wage statements and records of all hours worked, which Plaintiff alleged violated Labor Code Sections 226, 1174, and 1174.5.  *Id.* ¶¶ 54-58.  Plaintiff also alleged that the aforementioned violations served as predicates for claims under Business and Professions Code Section 17200, *et seq.* ("Unfair Competition Law" or "UCL") and Labor Code Section 2698, *et seq.* ("PAGA").  *Id.* ¶¶ 59-63.  Class Counsel learned in the course of their investigation that SMs were also regularly required to use their personal vehicles for supply runs and deliveries without reimbursement.   As part of the settlement, Plaintiff has filed concurrently herewith a First Amended Complaint that asserts a seventh cause of action for

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT CASE NO. CV-22-2574-JCS

violations of Labor Code § 2802.  ECF No. 50 (Stipulated First Amended Complaint).  Defendant denies Plaintiff's allegations and contends SMs are correctly classified as exempt under the administrative and/or executive exemptions.

26.     At the initial case management conference on September 9, 2022, the parties agreed to private mediation.  Shortly thereafter, a mediation was scheduled with mediator Todd Smith for May 18, 2023.

27.     Between September 2022 and May 2023, Plaintiff conducted both formal and informal discovery.  Plaintiff served two sets of requests for production and two sets of interrogatories on Defendant, seeking information and documents pertaining to both the merits of his claims and to class certification.  Defendant produced over 5,000 pages of documents, including job descriptions, handbooks, compensation policies, training documents, reference materials, and memoranda.  *Id.*  Through written discovery, Plaintiff obtained critical documents and Defendant's positions on key issues: SMs' job descriptions and related training and reference documents, job descriptions for all restaurant employees, Defendant's policies regarding labor budgeting and staffing, Defendant's policies regarding meal and rest periods and timekeeping for SMs, Defendant's policies regarding compensation for SMs, Defendant's arbitration agreements with some SMs, changes to Defendant's operational model for its restaurants due to COVID-19 and the implementation of the TgX ("Total Guest Experience") model, and the impact of Defendant's decisions to eliminate the Busser and Expeditor positions in early 2018.

28.     Two rounds of *BelAire-West* notice were sent: the first on an opt-in basis to 10% of the members of the class as originally pled (inclusive of individuals with arbitration agreements, based on Defendant's original class size estimate), and the second on an opt-out basis to another 10% of the class as originally pled.  Defendant produced detailed payroll data and, if applicable, arbitration agreements, for class members who opted-in in the first round of *BelAire-West* notice or who did not opt-out in the second round of *BelAire-West* notice.  Defendant also produced dates of employment and compensation data for each pay period for every class member, the aggregate number of workweeks for class members without arbitration agreements, and the aggregate number

10

of pay periods for class members with and without arbitration agreements employed during the PAGA period.

29.     Class Counsel conducted in-depth interviews with approximately three dozen members of the original proposed class, some of whom had arbitration agreements, and obtained seventeen declarations. The interviews included details of their SM's job duties and hours worked; training; the level of discretion and independent judgment entailed in various tasks classified by Red Robin as managerial (e.g., scheduling employees, taking inventory, ordering supplies, and running reports); the amount of time they spent performing duties also performed by hourly employees; the impacts of Defendant's labor budgeting system and the elimination of the Busser and Expeditor positions on the time they spent performing nonexempt tasks; whether, how often, and under what conditions they took meal or rest breaks; and how many overtime hours they worked. The declarations provide class member testimony on all of these topics. Attached hereto as Exhibit C are four of the seventeen declarations Class Counsel obtained, as examples to illustrate the categories of information collected. Ex. C (Sample Declarations). Because most interviewees worked at multiple Red Robin locations, Plaintiff obtained detailed information regarding the working conditions for SMs at 54 of Defendant's California restaurants.

30.     During the discovery period, Class Counsel learned of two class action settlements with overlapping class definitions: *Bautista v. Red Robin International, Inc.*, San Joaquin County Superior Court Case NO. STK-cv-UOE-2018-2270 ("*Bautista*") and *Outlaw v. Red Robin International, Inc.*, Eastern District of New York Case No. 2:18-cv-03457-GRB-LGBD. A true and correct copy of the *Bautista* settlement agreement is attached hereto as Exhibit D. The *Bautista* settlement released wage and hour claims for Kitchen Managers employed by Red Robin in California between February 26, 2014 and February 17, 2019. Ex. D, Section I(I). For individuals who held multiple job titles during the *Bautista* class period, the settlement released claims only for workweeks during which they worked as Kitchen Managers. *See* Ex. D, Section I(E). A true and correct copy of the memorandum of points and authorities filed in support of the motion for final approval of the *Bautista* settlement setting forth key terms of the agreement, including the estimated

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY
CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT
CASE NO. CV-22-2574-JCS

per-class member payment at page 1, is attached hereto as Exhibit E.  A true and correct copy of the Order Granting Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement, Attorneys' Fees, Costs, General Release Payment, and Entering of Final Judgment in the *Bautista* case is attached hereto as Exhibit F.

31. A true and correct copy of the *Outlaw* Settlement Agreement is attached hereto as Exhibit G.  The *Outlaw* settlement released state and federal wage and hour claims for 543 FLSA opt-in plaintiffs nationwide, including some in California, for the period August 2, 2012 to March 31, 2020.  Ex. G at 1.7.  A true and correct copy of the memorandum of points and authorities filed in support of the motion for final approval of the *Outlaw* settlement, which states the number of participants at page 2 and the average award per participating member at page 9 is attached hereto as Exhibit H.  A true and correct copy of the Final Approval Order and Judgment in *Outlaw* settlement is attached hereto as Exhibit I.

32. In 2017, Red Robin defeated a motion for class certification on behalf of a similar class of allegedly misclassified "Intermediate Managers" in *Smith v. Red Robin International*, No. 14CV01432 JAH-BGS, 2017 WL 1198907 (S.D. Cal., Mar. 31, 2017).  A true and correct copy of the Order Denying Plaintiff's Motion for Class Certification in *Smith* is attached hereto as Exhibit J.

**Settlement Negotiations and Key Terms of Settlement**

33. On May 22, 2023, the Parties attended a full-day mediation session with Todd Smith, Esq., a well-known mediator with substantial experience in California wage and hour class actions. Although the Parties did not reach a settlement on the day of mediation, the Parties continued to discuss settlement and agreed to accept a mediator's proposal to settle the case for $3,200,000 on or around June 12, 2022.  Over the following months, the Parties negotiated the remaining terms of settlement, and the Parties executed the proposed Settlement Agreement on October 27, 2023.  At all times, settlement negotiations were conducted vigorously and on an arm's-length basis.

34. A copy of the fully-executed Settlement Agreement was filed with California's Labor and Workforce Development Agency on November 30, 2023, proof of submission of which

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT CASE NO. CV-22-2574-JCS

1   is attached to hereto as Exhibit K.

2       35.     Defendant's Counsel Adam Siegel has represented to me that Defendant's Counsel

3   will notify the appropriate federal and state officials of the settlement in accordance with the Class

4   Action Fairness Act within ten days of the filing of Plaintiff's Motion for Order Provisionally

5   Certifying Settlement Class and Preliminarily Approving Class and PAGA Settlement.

6       36.     As part of the Settlement, Plaintiff filed a Stipulated First Amended Complaint which

7   adds a cause of action violations of Labor Code Section 2802 and narrows the class definition

8   consistent with the definition in the Settlement Agreement.    ECF No. 50 (First Amended

9   Complaint).

10      37.     The Settlement Class is comprised of all employees who are currently or have been

11  employed by Defendant in the State of California for workweeks during which those individuals

12  work or worked as Assistant General Managers ("AGM"), Kitchen Managers ("KM"), or Assistant

13  Managers ("AM") (collectively, "Salaried Managers") at any time during the Class Period,

14  excluding: (1) any workweeks any Salaried Managers who did not opt out of the settlement in

15  *Armando Bautista v. Red Robin International, Inc.*, Case No. STK-CV-UOE-2018-0002270,

16  Superior Court of the state of California, San Joaquin County ("*Bautista*") worked as KMs during

17  the period between April 27, 2018 and February 17, 2019; (2) any workweeks any Salaried Manager

18  who consented to join a prior settlement in *Outlaw v. Red Robin International, Inc.*, Case No. 2:18-

19  cv-04357, United States District Court for the Eastern District of New York ("*Outlaw*") worked

20  during the period between April 27, 2018 and March 31, 2020; and (3) any Salaried Manager who

21  signed an arbitration agreement with Defendant.  Ex. A § 1(E).

22      38.     Class Counsel agreed to exclude individuals with arbitration agreements from the

23  Settlement Class based on our assessment of the enforceability of arbitration agreements produced

24  by Defendant in the litigation.  Defendants produced arbitration agreements pursuant to the *BelAire-*

25  *West* process.  A true and correct exemplar arbitration agreement is attached hereto as Exhibit L.

26  Plaintiff's counsel analyzed those agreements and concluded that Defendants would likely be

27  successful in excluding individuals with arbitration agreements at the class certification stage. The

28

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY
CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT
CASE NO. CV-22-2574-JCS

arbitration agreements vest the court with the exclusive authority to interpret them and determine their enforceability, specify the AAA Employment Arbitration Rules and the Federal Rules of Civil Procedure as governing the arbitration, state the arbitrator has the authority to award any legal or equitable relief available in court, and provided the ability to opt-out.  Based on those factors, proving procedural and substantive unconscionability would be challenging.  *See Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) (holding that provision in agreement permitting drivers to opt-out of arbitration was not illusory, and thus the agreement was not procedurally unconscionable).

39.    Class Counsel also analyzed the settlement documents in *Bautista* and *Outlaw*.  With respect to *Bautista*, Plaintiff's counsel concluded all relevant claims had been released for weeks during which Class Members worked as Kitchen Managers during the *Baustista* settlement period, but not for weeks during which they held other job titles.  With respect to *Outlaw*, Plaintiff engaged an appellate specialist and explored the possibility of filing a Rule 60 motion seeking relief from the judgment to the degree that it released California state law claims along with federal claims without additional consideration for California employees.  Ultimately, Class Counsel concluded that the likelihood of success on such a motion was low, and the delay it would entail was not in the interests of the class.  Plaintiff therefore agreed to exclude workweeks covered by the *Outlaw* releases for Class Members who participated in that settlement.

40.    The Settlement Agreement creates a non-reversionary common fund of $3,200,000 to settle claims against Defendant ("Gross Settlement Amount").  Ex. A § 1(Q).  The Gross Settlement Amount covers Class Members' settlement awards, Plaintiff's service award, attorneys' fees and costs, the Settlement Claims Administrator's fees and costs, and all amounts to be paid to the LWDA.  The Gross Settlement Amount does not include the employer's share of payroll taxes, which shall be paid separately from the Gross Settlement Amount by Defendant.  *Id*.  Neither Class Members nor PAGA Members are required to make a claim or take any action in order to receive their individual settlement share if they do not opt out.  If a Class Member does not sign and cash their Settlement Check within 180 days from the date checks are issued ("Acceptance Period"), the

funds will be tendered to the to the California State Controller's Office's Unclaimed Property Division in the name of the Participating Class Member to whom the check was payable. *Id.* § 11(A). Individual Settlement Shares will be determined on a pro rata basis according to the number of workweeks each Class Member worked during the Class Period and each PAGA Member worked during the PAGA period.  Ex. A § 10.  The Settlement Administrator will determine the total number of Workweeks worked by each Settlement Class Member and each PAGA Member during the relevant time periods based on information provided by Defendant.  *Id.* § 10(A).  Class Members may challenge the number of workweeks used to calculate their Settlement Awards by contacting the Settlement Claims Administrator.  *Id.* § 9(A)(10).

41.     For tax purposes, thirty-four percent (34%) of Class Members' Settlement Award will be treated as back wages subject to normal tax withholdings and will be reported to taxing authorities on an IRS Form W-2.  Ex. A § 14. Thirty-three percent (33%) will be treated as alleged interest (to be reported on an IRS Form 1099), and thirty-three percent (33%) as alleged civil and statutory penalties (to be reported on an IRS Form 1099).  *Id.*  Each Individual PAGA Payment shall be allocated entirely as penalties.  *Id.*  This allocation is proper because it approximates the proportion of Class Members' total potential recovery that is due to wages versus penalties and/or interest.  Defendant will be responsible for all state and federal payroll taxes, including the employer's share of the FICA tax and any federal and state unemployment tax due, with respect to the amounts treated as wages.

42.     The release of claims includes all claims alleged or which could have been alleged in "Plaintiff's Operative Complaint," defined as the FAC filed concurrently herewith.  Ex. A § 7(A). The claims in the FAC are identical to those in the original Complaint, with the addition of Labor Code § 2802 claims.  Plaintiff analyzed the potential recovery for class members' Labor Code § 2802 claims (along with the claims alleged in the Complaint), and the Gross Settlement Amount includes the reasonable settlement value of those claims.  The Settlement Agreement does not include a waiver under California Civil Code Section 1542 for Settlement Class Members, however, it includes a mutual general release and Section 1542 waiver for the Named Plaintiff.  Ex. A § 7(D).

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT CASE NO. CV-22-2574-JCS

43.     The Settlement Agreement allocates $100,000 to Plaintiff's PAGA claims, which represents approximately 3.1% of the Gross Settlement Amount.  Ex. A § 15.  Of this amount, $75,000 will be paid to the LWDA.

44.     Until September 9, 2023, Plaintiff was represented by Rebecca Peterson-Fisher, Jennifer Liu, and C. Leah Kennedy of Liu Peterson-Fisher LLP.  On September 9, 2023, Ms. Peterson-Fisher, Ms. Liu, and Ms. Kennedy joined the firm Katz Banks Kumin LLP, and Liu Peterson-Fisher LLP ceased practicing law.  Plaintiff consented to the continued representation.

45.     At the Fairness Hearing, Class Counsel will apply for up to 25% of the Gross Settlement Amount (up to $800,000) as attorneys' fees.  This request is consistent with Class Counsel's retainer with the Named Plaintiff, which provides that Class Counsel may apply for up to 33 1/3% of any class settlement as attorneys' fees.  Plaintiff will seek attorneys' fees payable to Katz Banks Kumin, to be divided between Katz Banks Kumin LLP, and Liu Peterson-Fisher LLP on a pro rata basis based on Class Counsel's work on this matter with both firms.  The lodestar cross-check confirms the reasonableness of the fees Plaintiff's Counsel will request.  Class Counsel's lodestar to date is approximately $415,000, and Plaintiff's counsel estimates it will increase by about $50,000 by the time of final judgment in this case due to time spent communicating with class members, additional motion practice, and settlement administration monitoring.  The attorneys' fees requested will result in a moderate 1.72 multiplier, which is justified by the excellent result for the Class.   A summary of Class Counsel's lodestar specifying each attorney and staff member, their hourly rates, and their hours worked on this matter is attached hereto as Exhibit M.

46.     Class Counsel will also apply for reimbursement of litigation costs, currently $11,777.64.  Class Counsel estimates incurring minor additional costs, for a total of approximately $12,000.

47.     Plaintiff will also move for Court approval of a Service Award of $10,000 to Named Plaintiff Steven Miller in recognition of (1) the services he rendered on behalf of the Class, and (2) the release he is agreeing to in the Settlement, which is broader than those of other Class Members.

This enhancement is reasonable in view of the time and effort spent, and the risks undertaken, by the Named Plaintiff.  Mr. Miller's declaration, which details his efforts on behalf of the Class, is attached hereto as Exhibit N.

**Proposed Notice and Settlement Administration**

48.      The Settlement Claims Administrator will be Rust Consulting, Inc. ("Rust"), which Class Counsel selected and Defendant approved.  The Settlement Claims Administrator will be Rust Consulting, Inc. ("Rust"), which Class Counsel selected and Defendant approved.  CPT's quote was higher, and while Simpluris' quote was somewhat lower, both Class Counsel and Defense Counsel have had negative experiences with Simpluris in other matters.  In one of Class Counsel's recent matters, Simpluris made a second distribution to all class members when it should have been made only to class members who had cashed their first checks, which ultimately necessitated court approval for a third distribution.  Rust's not-to-exceed quote is $11,500.

49.      Rust is a well-established class action settlement administrator, and administered both rounds of *Belaire-West* notice competently.  Class Counsel have successfully engaged Rust to administer other class action settlements within the last two years in *Ayyad v. Powerschool Group, LLC,* Sacramento Superior Court Case No. 34-2022-00316882 and *Galbraith v. Drybar Holdings LLC*, Los Angeles Superior Court Case No. 19STCV16305.

50.      Rust's qualifications and a description of the services it will provide are set forth in the Declaration of Andrew Meyer, attached hereto as Exhibit O, and Rust's quote,  a true and correct copy of which is attached hereto as Exhibit P.  A true and correct copy of Rust's system security policies is attached hereto as Exhibit Q.  Rust backs up data daily to two separate geographic locations, maintains a disaster recovery plan which exceeds the requirements of the Department of Justice and the Federal Trade Commission, and adheres to the standards of the National Institute of Standards and Technology of the U.S. Department of Commerce.  *Id.*  Further, Rust protects the confidentiality and integrity of sensitive information, including through firewalls, anti-virus engines, encrypted authentication, and zoned physical security for server rooms.  *Id.*  Finally, Rust accepts responsibility for data it receives and processes and maintains insurance in case of errors.

51. The Proposed Notice will be distributed via email and U.S. mail, and Settlement Class Members will additionally receive a text message notifying them that the Notice has been mailed and emailed to them. The proposed Notice informs class members of (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) that a class member may enter an appearance through an attorney if the member so desires; (5) that the court will exclude from the class any member who requests exclusion; (7) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on members under Rule 23(c)(3). Ex. B (Proposed Class Notice). Moreover, the proposed notice describes the material terms of the settlement, including the attorneys' fees and costs, Claims Adminstrator payment, and service awards that will be requested, and it contains information about each Class Members' estimated individual Settlement Award under the allocation formula, how to challenge the data used in calculating the Settlement Award, and the tax treatment of the Settlement Awards. *Id.* In accordance with the Northern District of Califorma Procedural Guidance for Class Action Settlements, the class notice includes (a) contact information for counsel to answer questions; (b) the address for a website maintained by the claims administrator that lists key deadlines and will have links to the notice, preliminary approval order, motions for preliminary and final approval and any other important documents in the case; (c) instructions on how to access the docket via PACER in person or at the court's locations, consistent with the suggested langauge in the Procedural Guidance; (d) the date and time of the final approval hearing, clearly stating that the date may change without further notice to the class; and (e) a note to advise class members to check the settlement website or the Court's PACER site to confirm that the date has not changed. The Proposed Notice will be distributed in English only. Because fluent spoken and written English are qualifications for the positions held by the Settlement Class members, translation is not necessary.

52. The schedule for settlement administration, per the Settlement Agreement, is set forth below:

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT
CASE NO. CV-22-2574-JCS

| 10 business days after entry of order granting Preliminary Approval of Settlement | Defendant provides the Class List to the Settlement Claims Administrator (Ex. A § 9(A)) |
|---|---|
| 10 business days after receiving the Class List from Defendant or as soon thereafter as is practicable | Settlement Claims Administrator mails Class Notice (*Id.*) |
| After receiving notices for Class Members returned as undeliverable within 45 days of initial notice mailing | Settlement Claims Administrator attempts to obtain a current address by contacting the class member by phone if possible, and undertaking skip tracing.  If successful in obtaining a new address within 45 days of the initial notice mailing, Settlement Administrator will promptly re-mail the Class Notice to the Settlement Class Member. Any Class Notices returned to the Settlement Administrator with forwarding addresses within 45 days of the original Notice mailing shall be promptly re-mailed to the forwarded address (*Id.*) |
| 45 calendar days after Class Notice is mailed | Response Deadline to opt-out, object, or dispute workweek data (*Id.* § 1(PP)) |
| 7 calendar days from Response Deadline | Settlement Administrator to provide Parties with a declaration attesting to completion of notice process, number of attempts to obtain valid mailing address and re-sending of returned Class Notices, and the identities, number of, and copies of all Requests for Exclusion and Objections received. (*Id.* § 9(A)) |
| 75 calendar days after final approval order (10 calendar days after effective date) | Defendant to pay the Gross Settlement Amount and Employer Taxes to Settlement Administrator (*Id.* § 11(B)) |
| 180 days after check issuance | Checks no longer valid and negotiable (*Id.* § 11(A)) |
| 14 days after check expiration | Settlement Administrator will cancel checks and cause funds associated with such checks to be tendered to the California State Controller's Unclaimed Property Division in the name of the Participating Class Member to whom the check was payable. (*Id.*) |

**The Settlement Is the Product of Serious, Informed, Non-Collusive Negotiations**

53.     The proposed settlement is the result of extensive arms-length negotiations informed by substantial investigation and discovery and careful evaluation of the risks of litigation.  The non-collusive nature of the settlement is supported by the fact that the Parties mediated with Todd Smith, Esq., an experienced wage and hour class action mediator.

19

**The Settlement Has No Obvious Deficiencies**

54.     The scope of the release is properly limited to only wage and hour claims that were pleaded or could have been pled in the First Amended Complaint.  The reponse deadline to object or opt-out, 45 days from the mailing of the notice, is consistent with this District's Procedural Guidance for Class Action Settlements requiring a minimum of 35 days.  Class Counsel's request for attorneys' fees of 25% of the common fund is in line with the Ninth Circuit's benchmark for attorneys' fees in class action settlements.  Further, the settlement is non-reversionary, and all unclaimed funds will be tendered to the to the California State Controller's Office's Unclaimed Property Division in the name of the Participating Class Member to whom the check was payable.

**The Settlement Does Not Improperly Grant Preferential Treatment to Class Representatives or Segments of the Class**

55.     The proposed settlement does not grant preferential treatment to the Class Representative or to segments of the class.  The allocation formula provides all Class Members with a pro rata share of the settlement based on the number of workweeks each of them worked as an SM during the class period.  This formula accounts for the fact that Class Members who worked longer periods of time had more unpaid overtime and missed meal and rest breaks, and ensures the settlement distribution is proportional to the actual value of each Class Member's claim.  The proposed $10,000 service award to the Named Plaintiff is in line with service awards in similar cases.

**The Settlement Falls Within the Range of Possible Approval; Maximum Theoretical Recovery and Explanation of Discounts**

56.     By Class Counsel's estimation, the proposed settlement represents 10.3% of the total theoretical maximum recovery of $ 30,987,315.  Based on Class Counsel's assessment of the risks of continuing the litigation, this percentage is fair and reasonable.  Class Counsel calculated the maximum theoretical recovery based on their investigative interviews with Class Members and review of payroll records, estimating 15 overtime hours per week, 1 double time hour per week, 10 missed meal and rest periods per week, and 30 unreimbursed miles driven per week.  Based on

20

detailed compensation information provided by Defendant for each Class Members, Class Counsel calculated the average regular rate of pay for Class Members to be $32.74, which nondiscretionary geographic allowances and bonuses in addition to base salary.  Class Counsel's calculation of PAGA penalties included stacked penalties and subsequent violation penalties, and assumed no discretionary reduction of penalties by the Court.  Class Counsel's maximum theoretical damages analysis by claim is set forth below:

| Claim | Maximum Theoretical Damages/Penalties |
|---|---|
| Unpaid Overtime | $15,285,367 |
| Missed Meal and Rest Breaks | $6,645,812 |
| Inaccurate Wage Statements | $398,882 |
| Unreimbursed Mileage | $633,421 |
| Waiting Time Penalties | $1,061,311 |
| Total without PAGA Penalties | $24,024,793 |
| PAGA Penalties | $6,962,521 |
| Total with PAGA Penalties | $30,987,315 |

57.    Class Counsel assessed the possibility of losing a motion for class certification as substantial for several reasons.  In 2017, Red Robin defeated a motion for class certification on behalf of a similar class of allegedly misclassified "Intermediate Managers" in *Smith v. Red Robin International*, No. 14CV01432 JAH-BGS, 2017 WL 1198907 (S.D. Cal., Mar. 31, 2017).  Since that time, Defendant has eliminated the Busser and Expeditor positions, which strengthens Plaintiff's case, but all of the other challenges to class certification the *Smith* plaintiffs faced remain.  Further, it is well established that Labor Code exemptions often "militate against certification" because they typically require an individualized, fact-intensive inquiry.  While certain factors and common policies in this case supported class certification – specifically, the elimination of the busser and expeditor positions – Plaintiff faced all of the same barriers to certification that are present in misclassification cases generally.

58.    Class Counsel evaluated the probability of losing on the merits as substantial as well.

Plaintiff would argue that certain tasks Defendant considered managerial, including scheduling employees, assigning them to areas for their shifts, and ordering supplies, were so rote that they should be classified as exempt.  But Defendant would undoubtedly characterize these activities as requiring discretion and independent judgment to evalute the operational needs of the restaurant and the strengths and weaknesses of employees and make decisions accordingly.  Further, though all of Plaintiff's declarants alleged they spent the substantial majority of their time performing the same work as hourly employees, Defendant could argue they performed at least some of those tasks for managerial purposes and support their argument with their own declarations.  In support of the executive exemption, Defendant could successfully argue that SMs customarily and regularly directed the work for two or more employees because they assigned staff to tasks and restaurant stations, counseled them, and issued writeups.  Further, Defendant would argue that SMs' recommendations for hiring, firing, and promotion were given "particular weight."

59.    Finally, Class Counsel assessed their probability of recovering the full amount of the maximum theoretical PAGA penalties as low.  It is uncertain whether the Court would find stacking PAGA penalties permissible.  *Posephny v. AMN Healthcare Inc., 2020* WL 13612298, at *3 (N.D. Cal., July 9, 2020, No. 18-CV-06284-KAW); *Smith v. Lux Retail North America*, 2013 WL 2932243, *4 (N.D. Cal. June 13, 2013).  Moreover, some courts have held that subsequent violation amounts are available only after the employer is on notice of an initial violation.  *E.g.*, *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1209 (2008).  Without stacking, Defendant's PAGA exposure would be only $5.6 million.  Without subsequent penalties, Defendant's total PAGA exposure would be only $62,400.  In each scenario, the Court could also exercise its discretion under Labor Code § 2699(e)(2) to further reduce any PAGA awards.

**The Strength of the Plaintiff's Case**

60.    Although Class Counsel believe Plaintiff has a strong case, they recognize the risks involved in continuing litigation, including the risks of class certification being denied, losing on the merits of their claims, and proving damages.  While employers have the burden of proving that an exemption applies, the plaintiff in a class action misclassification case must demonstrate that

22

liability can be determined based on common proof.  Plaintiff can demonstrate centralized control and common policies with regard to labor budgeting, opening and closing tasks, documentation policies, and food preparation and storage policies, and the Class Member declarations establish that SMs performed common tasks across stores, including filling in for hourly employees due to chronic understaffing.  However, Class Counsel anticipate Defendant will argue that individualized inquiries predominate in this case not only because SMs spend different amounts of time on various duties according to store needs, but also because identical tasks can be exempt or nonexempt depending on the purpose for which they are performed.  Thus, Defendant could argue that even as to tasks that are also performed by nonexempt employees, individualized inquiry as to *why* SMs performed those tasks at any given time will be required.  Defendant will undoubtedly contend that not all of its restaurants were understaffed, and that even if they were, the problem of understaffing does not by itself establish what tasks SMs performed or why on any given day.  It is uncertain whether Plaintiff would be able to differentiate this case from *Smith* enough to obtain a different result.

61.    Plaintiff faced a substantial risk of losing on the merits of his claims for the same reasons.  If Defendant successfully argued that many of the tasks Plaintiff contends constitute nonexempt work in fact required discretion and independent judgment, including scheduling, ordering, and assigning staff during shifts, Plaintiff could end up with no recovery at all for him or the Class.   While Class Counsel believe Plaintiff could have ultimately won on the merits of their claims at trial, they also recognize the significant risk of losing.  And even if Plaintiff prevailed on the merits, he still faced obstacles to proving the extent of damages.  Due to Defendant's practice of classifying SMs as exempt employees, Defendant never tracked the amount of time Plaintiff and Class Members worked each day, and Plaintiff and Class Members were not required to keep their own records of time they spent working each day.  In order to prove the amount of unpaid overtime owed to Plaintiff and the Class, Plaintiff would likely have needed to rely on survey data and testimonial evidence to establish the extent of damages, and a jury may have refused to place weight on such evidence.

**The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT CASE NO. CV-22-2574-JCS

62.     If the Parties continued to litigate the case, they would need to conduct further document discovery, including substantial discovery of electronically-stored information, and take numerous depositions of Defendant's corporate representatives, Class Members, and other fact witnesses. Both Parties would likely need to retain experts to opine on liability and/or damages issues. If Plaintiff obtained class certification and survived summary judgment, a fact-intensive trial would still be necessary to determine liability and damages.  A trial would be lengthy and complex and would consume tremendous time and resources for all Parties and the Court.  Any judgment would likely be appealed, further extending the litigation.

**The Risk of Maintaining Class Action Status Through Trial**

63.     Even if Plaintiff had obtained certification of the Class on all claims, Defendant could have sought, and the Court could have granted, decertification of the Class in whole or in part at any point up through the trial date.

**The Amount Offered in Settlement and Comparable Cases**

64.     The $3,200,000 is an excellent result given the risks described above and in comparison to other cases.  In *Smith*, Defendant defeated a motion for class certification.  A comparison of the Settlement with the outcomes of *Bautista* and *Outlaw* is set forth below:

| Case | *Bautista* | *Outlaw* | *Miller* |
|------|-----------|----------|----------|
| Gross Settlement | $695,000 | $2,950,000 | $3,200,000 |
| Scope | California Kitchen Managers | U.S. Assistant Managers, Kitchen Managers (NY opt-out class and national FLSA collective) | California Assistant General Managers, Assistant Managers, Kitchen Managers |
| Number of Participants | 205 | 543 | 205 Class Members (also 47 PAGA-only) |
| PAGA Allocation | $20,000 ($15,000 to LWDA) | $0 | $100,000 |
| Average Award | $1,900.80 | $5,433 | $11,105 (excluding PAGA awards) |
| Attorneys' Fees | $231,435 (no multiplier) | $983,333 (1.55 multiplier) | $800,000 (1.72 multiplier) |
| Litigation Costs | $15,372.88 | $40,865.27 | Estimated at $12,000 |
| Administration Costs | $8,900 | $23,500 cap | $11,500 |

24

| Service Award | $10,000 | $10,000 | $10,000 |
|---|---|---|---|
| Notice Method | Mail | Mail | Email, mail, text notification |
| Cy Pres | $0 (uncashed checks to State Controller Unclaimed Property Fund) | $0 (uncashed NY Class checks revert to Defendant) | $0 (uncashed checks to State Controller Unclaimed Property Fund) |
| Total Exposure | $11,987,580 | Unknown | $30,987,315 |
| Scope of Release | State claims | State, local, and FLSA | State, local FLSA |

This settlement provides an average per-class-member payment of $11,105, more than double the awards in *Outlaw* and nearly six times the awards in *Bautista.*

65.    The PAGA allocation of 3.1% is appropriate considering the risks of litigation, the court's discretion to reduce an award of PAGA penalties when it would be unjust, arbitrary, and oppressive, or confiscatory to impose the full amount, and the potential denial of stacking and subsequent violation penalties.

**The Extent of Discovery Complete and Stage of the Proceedings**

66.    Based on formal written discovery, Defendant's disclosure of compensation date and dates of employment, and Class Counsel's extensive interviews with Class Members, Class Counsel had ample information to assess the strength of the claims and the risks of continued litigation, and to build a sophisticated damages model which enabled a reasoned assessment of the fairness of the proposed Settlement.

**The Experience and Views of Counsel; Comparable Outcomes**

67.    Based on Class Counsel's experience litigating wage and hour class actions, and their analysis of settlements in other similar cases, Class Counsel believe that the proposed settlement represents an excellent monetary result for the Class, particularly in light of the risks of denial of class certification continued litigation and the outcomes in the *Smith*, *Outlaw*, and *Bautista* cases.

**The Presence of a Governmental Participant**

68.    The proposed settlement does not involve the presence of a governmental participant.

**The Reaction of the Class Members to the Proposed Settlement**

69.    Since Class Members have not yet been notified of the settlement, the Court cannot

25

evaluate Class Members' reaction, including the number and substance of objections, or the number of exclusion requests.  However, the Named Plaintiff's signature on the Settlement Agreement is one early indication of Class Members' positive reaction to the proposed settlement.

**The Proposed Notice and Settlement Procedure Are Appropriate**

70.     The detailed information in the Proposed Notice provides far more information than this, and fully complies with the requirements of Rule 23(c)(2)(B).  The Procedural Guidance requires that the notice rely on U.S. mail, email, and/or social media as appropriate, and that if U.S. Mail is used, the envelope be designed to enhance the change that it will be opened.  Defendant has email addresses and phone numbers for Class Members, and accordingly notice will be distributed by email and by U.S. Mail. Ex. A § 9(A).  Additionally, text messages will notify class members that notice has been emailed and mailed to them.  *Id.*  Any returned notices will be skip-traced and remailed.  *Id.*  If the Settlement Claims Administrator is unable to locate Class Members whose Notices are returned as undeliverable, Plaintiff's Counsel will also make attempts to locate such Class Members. The Notice will be provided in English only, which is sufficient in this case because the SM position required SMs to speak and read English.

//

1

2        71.    This robust manner of giving notice complies with Rule 23(c)(2) because it has a

3    likelihood of reaching most, if not all, Class Members.  Although greater efforts could conceivably

4    result in a higher likelihood of reaching all Class Members, such efforts (e.g., hiring private

5    investigators) are not warranted here given that such efforts would likely entail significant cost,

6    Class Members' stake in recovery is limited to the claims asserted in the case, and the average

7    monetary award is relatively modest.  Finally, after entry of final judgment, Plaintiff's Counsel shall

8    be responsible for ensuring that the Settlement Claims Administrator posts on the website for this

9    case that final judgment in the case has been entered, so as to notify Class Members of the same.

10        I declare under penalty of perjury under the laws of the State of California and the United

11    States of America that the foregoing is true and correct.  Executed on December 1, 2023 at

12    Alameda, California.

13

14                                                      _____
                                                              Rebecca Peterson-Fisher
15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF REBECCA PETERSON-FISHER IN SUPPORT OF MOTION FOR ORDER PROVISIONALLY
CERTIFYING SETTLEMENT CLASS AND PRELIMINARILY APPROVING CLASS AND PAGA SETTLEMENT
CASE NO. CV-22-2574-JCS

# EXHIBIT A

DocuSign Envelope ID: 08BD4A18-2648-4421-B779-101FEC55024C

REBECCA PETERSON-FISHER (State Bar No. 255359)
JENNIFER L. LIU (State Bar No. 279370)
LEAH KENNEDY (State Bar No. 346306)
**KATZ BANKS KUMIN LLP**
150 California St., 16th Floor
San Francisco, CA 94111
Telephone: (415) 813-3260
Facsimile: (415) 813-2495
Email: peterson-fisher@katzbanks.com
Email: liu@katzbanks.com
Email: kennedy@katzbanks.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

| | |
|---|---|
| STEVEN MILLER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RED ROBIN INTERNATIONAL, INC. dba RED ROBIN BURGER AND SPIRITS EMPORIUMS, and DOES 1-100, inclusive,<br><br>Defendants. | Case No. 22-CV-02574-JCS<br><br>**STIPULATION REGARDING CLASS ACTION AND PAGA SETTLEMENT**<br><br>Before the Hon. Joseph C. Spero |

1  Adam Y. Siegel (SBN 238568)
   Adam.Siegel@jacksonlewis.com
2  Martin P. Vigodnier (SBN 311834)
   Martin.Vigodnier@jacksonlewis.com
3  **JACKSON LEWIS P.C.**
   725 South Figueroa Street, Suite 2500
4  Los Angeles, California  90017-5408
   Telephone:  (213) 689-0404
5  Facsimile:   (213) 689-0430

6  Philip J. Smith (SBN 232462)
   Philip.Smith@jacksonlewis.com
7  **JACKSON LEWIS P.C.**
   50 California Street, 9th Floor
8  San Francisco, California  94111-4615
   Telephone:  (415) 796-5433
9
   Attorneys for Defendant
10 RED ROBIN INTERNATIONAL, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This Stipulation Regarding Class Action and Private Attorneys General Act ("PAGA") Settlement and Release (hereinafter the "Settlement" or "Agreement") is made and entered into by and between Plaintiff STEVEN MILLER ("Plaintiff"), on behalf of himself as private attorney general for the State of California on behalf of allegedly aggrieved employees, and on behalf of all others similarly situated, and Defendant RED ROBIN INTERNATIONAL, INC. ("Defendant"). Plaintiff and Defendant shall be, at times, collectively referred to as the "Parties". This Agreement is intended by the Parties to fully, finally, and forever resolve the claims as set forth herein, based upon and subject to the terms and conditions of this Agreement.

THE PARTIES STIPULATE AND AGREE as follows:

1. **DEFINITIONS**

Unless otherwise defined herein, the following terms used in this Agreement shall have the meanings ascribed to them as set forth below:

**A.** **"Action"** means *Steven Miller v. Red Robin International, Inc.*, filed on April 27, 2022 in the United States District Court for the Northern District of California, Case No. 22-CV-02574-JCS.

**B.** **"Agreement"** means this Joint Stipulation of Settlement.

**C.** **"Class Counsel"** means: Rebecca Peterson-Fisher, Jennifer L. Liu, and Leah Kennedy of KATZ BANKS KUMIN LLP. The term "Class Counsel" shall be used synonymously with the term "Plaintiff's Counsel."

**D.** **"Class Data" or "Class List"** means a list based on Defendant's business records that identifies each Class Member's name; last known home or mailing address; Social Security number or, as applicable, other taxpayer identification number; and dates of employment.

**E.** **"Class Member(s)", "Settlement Class", or "Settlement Class Member(s)"** means all employees who are currently or have been employed by Defendant in the State of California for workweeks during which those individuals work or worked as Assistant General Managers ("AGM"), Kitchen Managers ("KM"),

or Assistant Managers ("AM") (collectively, "Salaried Managers") at any time during the Class Period and shall exclude: (1) any workweeks any Salaried Managers who did not opt out of the settlement in *Armando Bautista v. Red Robin International, Inc.*, Case No. STK-CV-UOE-2018-0002270, Superior Court of the state of California, San Joaquin County ("*Bautista*") and worked as KMs during the period between April 27, 2018 and February 17, 2019; (2) any workweeks any Salaried Manager who consented to join a prior settlement in *Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357, United States District Court for the Eastern District of New York ("*Outlaw*") worked during the period between April 27, 2018 and March 31, 2020; and (3) any Salaried Manager who signed an arbitration agreement with Defendant.

  **F.**   **"Class Notice"** means and refers to the notice sent to Class Members after preliminary approval of the Settlement in the manner described in Paragraph 9(A) of this Agreement.

  **G.**   **"Class Period"** means the period from April 27, 2018 through the date the Court preliminarily approves the Settlement Agreement or September 30, 2023, whichever is earlier.

  **H.**   **"Class Released Claims"** means the claims being released described in Paragraph 7 below.

  **I.**   **"Court"** means the United States District Court for the Northern District of California.

  **J.**   **"Defendant"** means Defendant Red Robin International, Inc.

  **K.**   **"Defense Counsel"** means counsel for Defendant Adam Y. Siegel, Philip J. Smith, and Martin P. Vigodnier of Jackson Lewis P.C.

  **L.**   **"Disposition"** means the method by which the Court approves the terms of the Settlement and retains jurisdiction over its enforcement, implementation, construction, administration, and interpretation.

  **M.**   **"Effective Date"** means the date when all of the following events have occurred: (1) the Stipulation of Settlement has been executed by all Parties, Class

DocuSign Envelope ID: 0BD4A18-2648-4421-B7E9-101FEC55024C

Counsel, and Defendant's Counsel; (2) the Court has given preliminary approval to the Settlement; (3) the Class Notice has been given to the putative members of the Class, providing them with an opportunity to object to the terms of this Settlement or to opt-out of the Settlement; (4) the Court has held a formal fairness hearing and entered a Final Order certifying the Settlement Class, dismissing the Action with prejudice, and approving the Settlement; (5) 65 calendar days have passed since the Court has entered a Final Order certifying the Settlement Class, dismissing the Action with prejudice, and approving the Settlement; and (6) in the event there are written objections filed prior to the final fairness hearing which are not later withdrawn or denied, the later of the following events: seven business days after the period for filing any appeal, writ or other appellate proceeding opposing the Court's Final Order approving the Settlement has elapsed without any appeal, writ or other appellate proceeding having been filed; or, if any appeal, writ or other appellate proceeding opposing the Court's Final Order approving the Settlement has been filed, seven business days after any appeal, writ or other appellate proceedings opposing the Settlement has been finally and conclusively dismissed with no right to pursue further remedies or relief.

**N.** **"Employer Taxes"** means employer-funded taxes and contributions imposed on the wage portions of the Individual Settlement Payments under the Federal Insurance Contributions Act, the Federal Unemployment Tax Act, and any similar state and federal taxes and contributions required of employers, such as for unemployment insurance.

**O.** **"Final Order Approving Settlement" or "Final Order"** means the final formal court order signed by the Court following the Final Fairness and Approval Hearing in accordance with the terms herein, approving this Agreement.

**P.** **"General Release"** means the broader release of claims by Plaintiff, which is in addition to Plaintiff's limited release of claims as a Participating Class Member.

**Q.** **"Gross Settlement Amount"** means an all-in and non-reversionary sum

3

of THREE MILLION, TWO HUNDRED THOUSAND DOLLARS AND 00/100 ($3,200,000.00) inclusive of all amounts to be paid under the Settlement, including the amounts to the Settlement Class, Plaintiff for Service Award, PAGA penalties to the State of California and PAGA Members, attorney fees and costs, and settlement administration expenses. Under no circumstances will Defendant's payment exceed the Gross Settlement Amount, except that Defendant will make additional payments to the Settlement Administrator representing its share of any employer payroll taxes to be paid in connection with the Settlement (*e.g.*, FICA, FUTA, payroll taxes, or any similar tax or charge).

R. **"Individual PAGA Payment(s)"** means a payment made to a PAGA Member for his or her share of the PAGA Payment, which may be in addition to his or her Individual Settlement Share if he or she is also a Participating Class Member.

S. **"Individual Settlement Payment(s)"** means a payment to a Participating Class Member of his or her net share of the Net Settlement Amount.

T. **"Individual Settlement Share"** means the gross amount of the Net Settlement Amount that a Participating Class Member is projected to receive based on the number of Workweeks that he or she worked as a Settlement Class Member during the Class Period, which shall be reflected in his or her Class Notice.

U. **"LWDA"** means the State of California Labor and Workforce Development Agency.

V. **"LWDA Payment"** means the payment to the LWDA for its seventy-five percent (75%) share of the total amount allocated toward penalties under the PAGA all of which is to be paid from the Gross Settlement Amount. The Parties agree that ONE HUNDRED THOUSAND DOLLARS AND ZERO CENTS ($100,000.00) shall be allocated toward PAGA penalties, subject to approval by the Court, of which SEVENTY-FIVE THOUSAND DOLLARS AND ZERO CENTS ($75,000.00) will be paid to the LWDA and TWENTY-FIVE THOUSAND DOLLARS AND ZERO CENTS ($25,000.00) will be paid to PAGA Members on a pro rata basis based on the

Workweeks worked by the PAGA Members in the PAGA Period (the "PAGA Payment").

**W.** **"Motion for Final Approval"** means Plaintiff's submission of a written motion, including any evidence as may be required for the Court to conduct an inquiry into the fairness of the Settlement as set forth in this Agreement, to conduct a Final Fairness and Approval Hearing, and to enter a Final Order in this Action.

**X.** **"Motion for Preliminary Approval"** means Plaintiff's submission of a written motion, including any evidence as may be required for the Court to grant preliminary approval of the Settlement as required by the Federal Rules of Civil Procedure Rule 23 and Local Rules for the Northern District of California as applicable.

**Y.** **"Named Plaintiff's Released Claims"** means the claims being released described in Paragraph 7 below.

**Z.** **"Net Settlement Amount"** means the portion of the Gross Settlement Amount that is available for distribution to the Participating Class Members after deductions for the Court-approved allocations for Settlement Administration Costs, a Service Award to Plaintiff, an award of attorneys' fees, reimbursement of litigation costs and expenses to Class Counsel, the LWDA Payment and the PAGA Payment.

**AA.** **"Non-Participating Class Member(s)"** means any Class Member(s) who submit to the Settlement Administrator a valid and timely written request to be excluded from the Class pursuant to Paragraph 9 below. Non-Participating Class Member(s) shall still release the PAGA Released Claims and shall receive their pro rata share of the PAGA Settlement Amount, if applicable.

**BB.** **"Operative Complaint"** means the First Amended Complaint to be filed with the Court.

**CC.** **"PAGA"** means the California Private Attorneys General Act of 2004, California Labor Code §§ 2698 *et seq.*

**DD.** **"PAGA Payment"** is the 25% portion of the ONE HUNDRED THOUSAND DOLLARS AND ZERO CENTS ($100,000.00) that is allocated toward

5
STIPULATION REGARDING CLASS ACTION AND PAGA SETTLEMENT

PAGA penalties (TWENTY-FIVE THOUSAND DOLLARS AND ZERO CENTS ($25,000.00)) that, subject to approval by the Court will be paid to PAGA Members on a pro rata basis based on the Workweeks worked by the PAGA Members in the PAGA Period, which will be in addition to their Individual Settlement Payment if they are also Participating Class Members. Settlement Class Members are not permitted to exclude themselves from receiving their pro rata share of the PAGA Payment.

EE.   **"PAGA Member(s)"** means all employees who are currently or have been employed by Defendant in the State of California for workweeks during which those individuals work or worked as Salaried Managers any time during the PAGA Period. PAGA Members shall include employees who signed an arbitration agreement with Defendant.

FF.   **"PAGA Member's Workweeks"** means the number of weeks that a PAGA Member was directly employed by and worked for the Defendant as a non-exempt employee during the PAGA Period in California, based on hire dates, re-hire dates (as applicable), and termination dates (as applicable).

GG.   **"PAGA Period"** means the period from February 7, 2021 through the date the Court preliminarily approves the Settlement Agreement or September 30, 2023, whichever is earlier.

HH.   **"PAGA Released Claims"** means the claims being released as described in Paragraph 7 below.

II.   **"PAGA Workweeks"** means the aggregate number of Workweeks worked by all PAGA Members during the PAGA Period.

JJ.   **"Participating Class Member(s)"** means all Settlement Class Members who do not submit a timely and valid Request for Exclusion and will therefore receive his/her/their share of the Net Settlement Amount automatically; i.e., without the need to return a claim form. Each Participating Class Member will be paid his/her/their Participating Individual Settlement Share.  Settlement Class Members may not exclude

DocuSign Envelope ID: 08BD4A13-3648-4421-B779-101FEC550246

themselves from releasing the PAGA Released Claims and receiving their pro rata share of the PAGA Payment, if applicable.

**KK.** **"Participating Individual Settlement Share"** means the gross amount of the Net Settlement Amount that a Participating Class Member is eligible to receive based on the number of Workweeks that they worked as a Settlement Class Member during the Class Period once all opt-outs have been factored in, excluding any Individual PAGA Payment to which they may be entitled if they are also a PAGA Member.

**LL.** **"Plaintiff", "Named Plaintiff" or "Class Representative"** shall refer to Plaintiff Steven Miller.

**MM.** **"Preliminary Approval Date"** means the date on which the Court enters an Order granting preliminary approval of the Settlement embodied in this Agreement.

**NN.** **"Released Claims"** means the claims being released described in Paragraph 7 below.

**OO.** **"Released Parties"** means Defendant and its present and former parent companies, subsidiaries, divisions, concepts, related or affiliated companies, and its shareholders, owners, partners, officers, directors, employees, agents, attorneys, insurers, successors and assigns, and any other individual or entity that could be liable for any Released Claims, and Defense counsel of record in the Action.

**PP.** **"Response Deadline"** means the deadline for Settlement Class Members to postmark or fax any Requests for Exclusion, Objections, or Workweek Disputes to the Settlement Administrator. The Response Deadline is forty-five (45) calendar days from the date that the Class Notice is first mailed by the Settlement Administrator, unless a Class Member's notice is re-mailed. In such an instance, the Response Deadline shall be fifteen (15) calendar days from the re-mailing, or forty-five (45) calendar days from the date of the initial mailing, whichever is later, in which to postmark a Request for Exclusion, Workweek Dispute or Objection. The date of the postmark shall be the exclusive means for determining whether a Request for

DocuSign Envelope ID: 08BD4A18-2648-4421-B779-101FEC55024C

Exclusion, Objection, or Workweek Dispute was submitted by the Response Deadline.

**QQ.   "Request for Exclusion"** means a written request to be excluded from the Settlement Class pursuant to Paragraph 9(C) below.

**RR.   "Service Award"** means monetary amounts to be paid to Plaintiff of up to TEN THOUSAND DOLLARS AND ZERO CENTS ($10,000.00), which, subject to Court approval, will be paid out of the Gross Settlement Amount.

**SS.   "Settlement Administration Costs"** means all costs incurred by the Settlement Administrator in administration of the Settlement, including, but not limited to the distribution of the Class Notice to the Settlement Class, calculating Individual Settlement Shares, Individual Settlement Payments, Individual PAGA Payments, and Participating Individual Settlement Shares, as well as associated taxes and withholdings, providing declarations, generating Individual Settlement Payment checks and related tax reporting forms, doing administrative work related to unclaimed checks, transmitting payment to Class Counsel for the Court-approved amounts for attorneys' fees and reimbursement of litigation costs and expenses, to Plaintiff for her Service Award, and to the LWDA for the LWDA Payment, providing weekly reports of opt-outs, objections and related information, and any other actions of the Settlement Administrator as set forth in this Agreement, all pursuant to the terms of this Agreement. The Settlement Administration Costs are estimated not to exceed ELEVEN THOUSAND FIVE HUNDRED DOLLARS AND ZERO CENTS ($11,500.00). If the actual amount of the Settlement Administration Costs is less than $11,500.00, the difference between $11,500.00 and the actual Settlement Administration Costs shall be a part of the Net Settlement Amount. If the Settlement Administration Costs exceed $11,500.00 then such excess will be paid solely from the Gross Settlement Amount and Defendant will not be responsible for paying any additional funds in order to pay these additional costs.

**TT.   "Settlement Administrator"** means the Third-Party Administrator mutually agreed upon by the Parties and approved by the Court that will be responsible

DocuSign Envelope ID: 08BD4A18-2648-4421-B779-101FEC55024C

for the administration of the Settlement including, without limitation, the distribution of the Individual Settlement Payments to be made by Defendant from the Gross Settlement Amount and related matters under this Agreement.

**UU. "Workweeks"** means the number of weeks that a Settlement Class Member was directly employed by and worked for the Defendant as a non-exempt employee during the Class Period in California, based on hire dates, re-hire dates (as applicable), and termination dates (as applicable). All Class Members will be deemed to have worked at least one Workweek during the Class Period, and all PAGA Members will be deemed to have worked at least one Workweek during the PAGA Period.

## 2.     BACKGROUND

**A.**     On February 7, 2021, Plaintiff filed with the LWDA and mailed Defendant a notice under Labor Code section 2699.3 stating Plaintiff intended to serve as a proxy of the LWDA to recover civil penalties on behalf of PAGA Members for various alleged Labor Code violations ("PAGA Notice").

**B.**     On April 27, 2022, Plaintiff filed a putative wage-and-hour Complaint in United States District Court for the Northern District of California captioned *Steven Miller v. Red Robin International, Inc.*, Case No. 22-CV-02574-JCS alleging causes of action against Defendant for (1) failure to pay overtime wages; (2) failure to provide meal and rest periods; (3) failure to pay earned wages upon discharge; (4) failure to provide accurate wage statements; (5) unlawful, unfair, and/or deceptive business practices; and (6) civil penalties under PAGA. As part of the terms and conditions of this Settlement, Plaintiff has agreed to amend his Complaint to add a seventh cause for alleged unreimbursed business expenditures or losses under California Labor Code § 2802.

**C.**     Shortly thereafter, the Parties agreed to attend an early mediation. In preparation and anticipation of mediation, the Parties engaged in formal and informal discovery, in which Plaintiff was provided with, among other things, Plaintiff's personnel file and payroll records, the scope of the Class that had and did not have

DocuSign Envelope ID: 08BD4A18-3648-4421-B779-101FEC55024C

signed arbitration agreements with Defendant, anonymized payroll records and dates of employment of the Class Members, all wage and hour policies relevant to the Class Members in effect during the Class Period, the settlement agreement and Plaintiff's endorsed settlement check in *Bautista*, and relevant data points.  Plaintiff also produced documents and responses to Defendant's formal discovery requests, including, among other things, documents in support of the allegations in his Complaint, non-privileged witness or declaration statements concerning allegations in the Complaint, and documents that support his claims for alleged exempt misclassification and failure to provide meal and rest periods.  The Parties also engaged in two rounds of notices sent to a sampling of the Class Members pursuant to *Belaire-West Landscaping, Inc. v. Sup. Ct.*, 149 Cal.App.4th 554 (2007) and the Court's orders.

D.     On May 22, 2023, the Parties participated in a full-day mediation before Todd A. Smith, Esq., a well-regarded mediator experienced in mediating complex labor and employment matters.  With the aid of the mediator's evaluation, the Parties reached the Settlement to resolve the Action via a mediator's proposal, which acknowledged the Parties' agreement that the estimated workweeks associated with the class claims in the Action are 20,324 and the estimated pay periods associated with the PAGA claims in the action are 3,482.

E.     Class Counsel has conducted significant investigation of the law and facts relating to the claims asserted in the Class Action, and the PAGA Notice, and have concluded that that the Settlement set forth herein is fair, reasonable, adequate, and in the best interests of the Settlement Class, taking into account the sharply contested issues involved, the expense and time necessary to litigate the Action through trial and any appeals, the risks and costs of further litigation of the Action, the risk of an adverse outcome, the uncertainties of complex litigation, the information learned through formal and informal discovery regarding Plaintiff's allegations, and the substantial benefits to be received by Settlement Class Members.

STIPULATION REGARDING CLASS ACTION AND PAGA SETTLEMENT

**F.**     Defendant has concluded that, because of the substantial expense of defending against the Action, the length of time necessary to resolve the issues presented herein, the inconvenience involved, and the concomitant disruption to its business operations, it is in its best interest to accept the terms of this Agreement. Defendant denies each of the allegations and claims asserted against it in the Action and the PAGA Notice.  However, Defendant nevertheless desires to settle the Action for the purpose of avoiding the burden, expense and uncertainty of continuing litigation and for the purpose of putting to rest the controversies engendered by the Action.

**G.**     This Agreement is intended to and does effectuate the full, final, and complete resolution of all Class Released Claims of Plaintiff and Participating Class Members, and all PAGA Released Claims of Plaintiffs and, to the extent permitted by law, of the State of California and PAGA Members.

**3.     JURISDICTION**

The Court has jurisdiction over the Parties and the subject matter of the Action. The Action includes claims that, if proven, would authorize the Court to grant relief pursuant to the applicable statutes.  After the Court has granted Final Order Approving Settlement and entered judgment, the Court shall retain jurisdiction over the Parties to enforce the terms of the judgment pursuant to the Local Rules of the Northern District of California, as applicable.

**4.     STIPULATION OF CLASS CERTIFICATION**

The Parties stipulate to the certification of the Settlement Class under this Agreement for purposes of settlement only.

**5.     MOTIONS FOR APPROVAL OF SETTLEMENT**

**A. Motion for Preliminary Approval**

Plaintiff shall promptly submit this Stipulation of Settlement to the United States District Court for the Northern District of California in support of Plaintiff's Motion for Preliminary Approval and determination by the Court as to its fairness, adequacy, and reasonableness.  Plaintiff agrees to provide Defendant the opportunity to review,

DocuSign Envelope ID: 08BD4A18-2648-4421-B729-101FEC550246

and to approve before filing, Plaintiff's Motion for Preliminary Approval.  At the hearing on the Motion for Preliminary Approval, the Parties will appear and support the granting of the motion.  At the hearing on the Motion for Preliminary Approval, the Parties will appear and support the granting of the motion.  Should the Court decline to preliminarily approve material aspects of the Settlement (including but not limited to the scope of release to be granted by Class Members or by PAGA Members, or the binding effect of the Settlement on Class Members or PAGA Members), the Parties shall work together in good faith to address any concerns raised by the Court and propose a revised Settlement for the Court's approval.  Promptly upon execution of this Stipulation of Settlement, Plaintiff shall apply to the Court for the entry of an order preliminarily approving the Settlement in a form that is mutually agreeable between the Parties and also provides for the following: (1) Scheduling a fairness hearing on the question of whether the proposed Settlement, including payment of attorneys' fees and litigation costs, costs of administration and the Class Representative's Service Award should be finally approved as fair, reasonable and adequate as to the members of the Settlement Class; (2) Certifying a Settlement Class, Plaintiff Steven Miller as Class Representative, and Rebecca Peterson-Fisher, Jennifer L. Liu, and Leah Kennedy of KATZ BANKS KUMIN LLP as Class Counsel; (3) Approving as to form and content the proposed Class Notice; (4) Approving the manner and method for Class Members to request exclusion from the Settlement as contained herein and within the Class Notice; (5) Directing the mailing of the Class Notice by first class mail to the Class Members; and (6) Preliminarily approving the Settlement, subject only to the objections of Class Members and final review by the Court and approval of the settlement of PAGA Released Claims; and (7) Enjoining Plaintiff and all Class Members from filing or prosecuting any other cases, claims, suits regarding the Released Class Claims unless and until such Class Members have filed valid Requests for Exclusion with the Settlement Administrator.

STIPULATION REGARDING CLASS ACTION AND PAGA SETTLEMENT

DocuSign Envelope ID: 08BD4A18-2648-4421-B779-101FEC55024C

### B. <u>Motion for Final Approval</u>

Class Counsel agree to return or destroy all confidential documents provided by Defendant; e.g., lists, and data in all forms and formats (originals and copies), including but not limited to documents Defendant informally produced to Class Counsel in anticipation of mediation (e.g., relevant data points) within sixty (60) days after the Effective Date. Prior to filing, Plaintiff agrees to provide Defendant the opportunity to review Plaintiff's Motion for Final Approval, and Plaintiff shall make a good faith effort to incorporate and/or address Defendant's edits and comments. At the hearing on the Motion for Final Approval, the Parties will appear and support the granting of the motion. Should the Court decline to finally approve material aspects of the Settlement (including but not limited to the scope of release to be granted by Class Members or by PAGA Members, or the binding effect of the Settlement on Class Members or PAGA Members), the Parties shall work together in good faith to address any concerns raised by the Court and propose a revised Settlement for the Court's approval. However, an award by the Court of a lesser amount than that sought by Plaintiff and Class Counsel for the Service Award and the Class Counsel's Court-approved attorneys' fees and litigation costs will not constitute a material modification to the Settlement within the meaning of this paragraph. Class Counsel agrees to submit a proposed final order and judgment, in a form that is mutually agreeable between the parties and also provides for the following: (1) Approving the Settlement, adjudging the terms of the Settlement to be fair, reasonable and adequate, and directing consummation of the Settlement's terms and provisions; (2) Approving Class Counsel's application for an award of attorneys' fees and litigation costs; (3) Approving the Service Award to Plaintiff; (4) Approving payment of Settlement administration costs to the Settlement Administrator; and (5) Entering judgment in accordance with the Federal Rules of Civil Procedure, and permanently barring and enjoining all members of the Settlement Class and the PAGA Members from prosecuting against

DocuSign Envelope ID: 08BD4A18-2648-4421-B779-101FE655024C

1  Defendant and the Released Parties any Class Released Claims and PAGA Released
2  Claims.

3  **6.      NO ADMISSION**

4        In entering into this Agreement, Defendant does not admit, and specifically
5  denies, that it violated any federal, state, or local law; violated any regulations or
6  guidelines promulgated pursuant to any statute or any other applicable laws, regulations
7  or legal requirements; breached any contract; violated or breached any duty; engaged
8  in any misrepresentation or deception; or engaged in any other unlawful conduct with
9  respect to its employees. Neither this Agreement, nor any of its terms or provisions, nor
10  any of the negotiations connected with it, will be construed as an admission or
11  concession by Defendant of any such violations or failures to comply with any
12  applicable law.

13  **7.      RELEASE OF CLAIMS**

14        **A. Release by All Participating Class Members**

15        Upon the date Defendant transfers the Gross Settlement Amount, Plaintiff and
16  Participating Class Members release the Released Parties from any and all claims
17  alleged or that could have been alleged in Plaintiff's Operative Complaint based on the
18  facts alleged, which arose during the Class Period, including but not limited to (1) all
19  claims failure to pay overtime wages; (2) all claims for failure to provide meal and rest
20  periods; (3) all claims for failure to pay earned wages upon discharge; (4) all claims for
21  failure to provide accurate wage statements; (5) all claims for unlawful, unfair, and/or
22  deceptive business practices California Business & Professions Code section 17200, *et*
23  *seq.* arising out of the Labor Code violations referenced in the Operative Complaint;
24  and (6) all claims for failure to reimburse necessary business expenditures or losses
25  under California Labor Code § 2802 (the "Class Released Claims").

26        **B. Release by All PAGA Members**

27        Upon the date of funding the Gross Settlement Amount, the State of California
28  and PAGA Members release the Released Parties from all claims exhausted in

Plaintiff's notice(s) sent to the LWDA and alleged in the Operative Complaint and/or based on the Class Released Claims, which arose during the PAGA Period, regardless of whether PAGA Members opt out of the Class Settlement, including claims for PAGA penalties pursuant to Labor Code sections 210, 226.3, 256, 558, 1174.5, 1197.1, and 2699 in connection with alleged violations of Labor Code sections 201, 202, 203, 204, 210, 226, 226.3, 226.7, 510, 512, 558, 1174, 1194, 1197, 1197.1, 1198, 2802, 2699 ("PAGA Released Claims").  The Class Released Claims and PAGA Released Claims shall be referred to herein as the "Released Claims".

### C. **Claims Not Released**

The releases above expressly exclude all other claims, including claims for vested benefits, wrongful termination, unemployment insurance, disability, social security, workers' compensation, and any other claims outside of the Class Released Claims of Participating Class Members arising during the Class Period and the PAGA Released Claims of PAGA Members (and, to the extent permitted by law, the State of California) arising outside of the PAGA Period.

### D. **Plaintiff's General Release of All Known and Unknown Claims**

Upon the date of funding of the Gross Settlement Amount, in addition to the claims being released by all Participating Class Members, the named Plaintiff will release and forever discharge the Released Parties, to the fullest extent permitted by law, of and from any and all claims, known and unknown, asserted and not asserted, which the Named Plaintiff has or may have against the Released Parties as of the date of execution of this Agreement ("Named Plaintiff's Released Claims").  The Named Plaintiff's Released Claims include, but are not limited to, all of the Released Claims, the PAGA Released Claims and any other claims arising under the California Labor Code; any claim arising out of the California common law of contract; the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and federal common law; all claims for lost wages and benefits, emotional distress, retaliation, punitive damages, and attorneys' fees and costs arising under federal, state, or local laws for discrimination, harassment, and wrongful

termination, including but not limited to, 42 U.S.C. section 1981, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the California Fair Employment and Housing Act, the California Labor Code, and the law of contract and tort. This release excludes the release of claims not permitted by law. Likewise, Defendant will release the Named Plaintiff to the fullest extent permitted by law from any and all claims, known and unknown, asserted and not asserted, which Defendant has or may have against the Named Plaintiff as of the date of execution of this Agreement ("Defendant's Released Claims").

The Named Plaintiff's Released Claims and Defendant's Released Claims include all claims, whether known or unknown. Even if the Named Plaintiff or Defendant discovers facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Named Plaintiff's Released Claims or Defendant's Released Claims, those claims will remain released and forever barred. To effect a full and complete general release as described above, the Named Plaintiff and Defendant expressly waive any and all rights and benefits conferred upon him by the provisions of Section 1542 of the California Civil Code or similar provisions of applicable law which are as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Thus, notwithstanding the provisions of section 1542, and to implement a full and complete release and discharge of the Named Plaintiff and Released Parties, the Named Plaintiff and Defendant expressly acknowledge this Agreement is intended to include in

DocuSign Envelope ID: 08BD4A18-2648-4421-B729-101FEC550246

its effect, without limitation, all claims the Named Plaintiff or the Defendant does not know or suspect to exist in the Named Plaintiff's or Defendant's favor at the time of signing this Agreement, and that this Agreement contemplates the extinguishment of any such claims. The Named Plaintiff and Defendant warrant that they have read this Settlement, including this waiver of California Civil Code section 1542, and that they have consulted with or had the opportunity to consult with counsel of their choosing about this Agreement and specifically about the waiver of section 1542, and that they understand this Agreement and the section 1542 waiver, and so they freely and knowingly enter into this Agreement.  The Named Plaintiff and Defendant further acknowledge that the Named Plaintiff or Defendant later may discover facts different from or in addition to those the Named Plaintiff or Defendant now know or believe to be true regarding the matters released or described in this Agreement, and even so the Named Plaintiff agree that the releases and agreements contained in this Agreement shall remain effective in all respects notwithstanding any later discovery of any different or additional facts. The Named Plaintiff and Defendant expressly assume any and all risk of any mistake in connection with the true facts involved in the matters, disputes, or controversies released or described in this Agreement or with regard to any facts now unknown to the Named Plaintiff or Defendant relating thereto.

## 8.    **SETTLEMENT ADMINISTRATOR**

Plaintiff and Defendant, through their respective counsel, have selected Rust Consulting to administer the Settlement, which includes but is not limited to, distributing and responding to inquiries about the Class Notice and calculating all amounts to be paid from the Gross Settlement Amount.  Charges and expenses of the Settlement Administrator, currently estimated to be ELEVEN THOUSAND FIVE HUNDRED DOLLARS AND ZERO CENTS ($11,500.00) will be paid from the Gross Settlement Amount.  If the actual amount of the Settlement Administration Costs is less than $11,500.00, the difference between $11,500.00 and the actual Settlement Administration Costs shall be a part of the Net Settlement Amount. If the Settlement

DocuSign Envelope ID: 00BD4A18-2648-4421-B779-101FEC55024C

Administration Costs exceed $11,500.00, then such excess will be paid solely from the Gross Settlement Amount and Defendant will not be responsible for paying any additional funds in order to pay these additional costs.

## 9.   NOTICE, WORKWEEK DISPUTE, OBJECTION, AND EXCLUSION PROCESS

### A. Notice to the Settlement Class Members

Within ten (10) business days after the Preliminary Approval Date, Defense Counsel shall provide the Settlement Administrator with the Class List.  The Settlement Administrator shall perform an address search using the United States Postal Service National Change of Address ("NCOA") database and update the addresses contained on the Class List with the newly-found addresses, if any.  Within ten (10) business days of receiving the Class List from Defendant, or as soon thereafter as is practicable, the Settlement Administrator shall mail the Class Notice to the Settlement Class Members via first-class regular U.S. Mail using the most current mailing address information available and email the Class Notice to the Settlement Class Members using the last-known email address provided by Defendant, if any.  The Settlement Administrator shall also send a text message to the Settlement Class Members using the last-known telephone number provided by Defendant, which shall alert them that the Class Notice has been mailed and emailed to them.  The Settlement Administrator shall maintain the Class List and digital copies of all the Settlement Administrator's records evidencing the giving of notice to any Settlement Class Member, for at least four (4) years from the Effective Date.

The Class Notice will set forth the following:

(1)   the Settlement Class Member's estimated Individual Settlement Payment and Individual PAGA Payment, and the basis for each;

(2)   the information required by Rule 23 of the Federal Rules of Civil Procedure;

(3)   the material terms of the Settlement;

DocuSign Envelope ID: 08BD4A18-2648-4421-B729-101FEC550240

(4)     the proposed Settlement Administration Costs;

(5)     the definition of the Settlement Class;

(6)     a statement that the Court has preliminarily approved the Settlement;

(7)     how the Settlement Class Member can obtain additional information, including contact information for Class Counsel;

(8)     information regarding opt-out and objection procedures;

(9)     the date and location of the Final Fairness and Approval Hearing; and

(10)    that the Settlement Class Member must notify the Settlement Administrator no later than the Response Deadline if the Settlement Class Member disputes the accuracy of the number of Workweeks as set forth on his or her Class Notice ("Workweek Dispute").  If a Settlement Class Member fails to timely dispute the number of Workweeks attributed to him or her in conformity with the instructions in the Class Notice, then he or she shall be deemed to have waived any objection to its accuracy and any claim to any additional settlement payment based on different data.

If a Class Notice from the initial notice mailing is returned as undeliverable within 45 days of the initial notice mailing, the Settlement Administrator will attempt to obtain a current address for the Settlement Class Member to whom the returned Class Notice had been mailed, within five (5) calendar days of receipt of the returned Class Notice, by: (1) contacting the Settlement Class Member by phone, if possible, and (2) undertaking skip tracing.  If the Settlement Administrator is successful in obtaining a new address within 45 days of the initial notice mailing, it will promptly re-mail the Class Notice to the Settlement Class Member.  Further, any Class Notices that are returned to the Settlement Administrator with a forwarding address before the Response Deadline shall be promptly re-mailed to the forwarding address affixed thereto.

No later than seven (7) calendar days from the Response Deadline, the Settlement Administrator shall provide counsel for the Parties with a declaration attesting to the completion of the notice process, including the number of attempts to obtain valid mailing addresses for and re-sending of any returned Class Notices, as well as the identities, number of, and copies of all Requests for Exclusion and Objections received by the Settlement Administrator.

## B. <u>Objections</u>

Only Participating Class Members may object to the Settlement. To object, the Participating Class Member shall file a written objection and a notice of intention to appear at the hearing on the Motion for Final Approval with the Clerk of the United States District Court for the Northern District of California. Any written objection should state each specific reason in support of the objection and any legal support for each objection, and state whether it applies only to the objector, to a specific subset of the class, or to the entirety of the class. The individual must state his or her full name, address, date of birth, and, if applicable, the dates he or she worked as an employee for Defendant. To be valid and effective, any written objections to approval of the Settlement must be filed with the Clerk of the Court or delivered to the Settlement Administrator, Class Counsel, and/or Defense Counsel no later than the Response Deadline. Class Counsel and Defense Counsel may respond to any objection lodged with the Court up to five (5) court days before the hearing on the Motion for Final Approval. Objections may be made at the hearing on the Motion for Final Approval without a written objection being submitted only with the Court's express permission. If the Court rejects the objection, the individual will be bound by the terms of the Settlement. PAGA Members shall have no right to object to the PAGA Released Claims or any portion of the Settlement pertaining to the PAGA Released Claims.

## C. <u>Requesting Exclusion</u>

Any Settlement Class Member may request exclusion from (*i.e.*, "opt out" of) the Settlement by mailing a written request to be excluded from the Settlement

("Request for Exclusion") to the Settlement Administrator, postmarked on or before the Response Deadline. To be valid, a Request for Exclusion must be timely submitted and also include: (1) the Class Member's name; (2) the Class Member's Social Security Number; (3) the Class Member's signature; and (4) the following statement: "Please exclude me from the Settlement Class in the *Steven Miller v. Red Robin International, Inc.* matter" or any statement of similar meaning standing for the proposition that the Class Member does not wish to participate in the Settlement. The Settlement Administrator shall immediately provide copies of all Requests for Exclusion to Class Counsel and Defense Counsel and shall report the Requests for Exclusions that it receives, to the Court, in its declaration to be provided in advance of the Final Fairness and Approval Hearing. Any Settlement Class Member who requests exclusion using this procedure will not be entitled to receive any payment from the Settlement and will not be bound by the Settlement Agreement or have any right to object to, appeal, or comment on the Settlement. Any Settlement Class Member who does not opt out of the Settlement by submitting a timely and valid Request for Exclusion will be bound by all terms of the Settlement, including those pertaining to the Class Released Claims, as well as any Judgment that may be entered by the Court if Final Order Approving Settlement is granted. A Settlement Class Member cannot submit both a Request for Exclusion and an objection. If a Settlement Class Member submits an Objection and a Request for Exclusion, the Request for Exclusion will control and the Objection will be overruled. Settlement Class Members who worked during the PAGA Period that submit a valid Request for Exclusion will still be deemed PAGA Members, will still receive their Individual PAGA Payments, and will be bound by the release of the PAGA Released Claims.

### D. **Disputes Regarding Settlement Class Members' Workweek Data**

Each Settlement Class Member may dispute the number of Workweeks attributed to him or her on his or her Class Notice ("Workweek Dispute"). Any such disputes must be mailed to the Settlement Administrator by the Settlement Class

Member, postmarked on or before the Response Deadline. The Settlement Administrator shall immediately provide copies of all disputes to Class Counsel and counsel for Defendant and shall immediately attempt to resolve all such disputes directly with relevant Settlement Class Member(s) with the assistance of Defendant and Class Counsel. If the dispute cannot be resolved in this manner, the Court shall adjudicate the dispute.

**10.** **INDIVIDUAL SETTLEMENT PAYMENTS AND INDIVIDUAL PAGA PAYMENTS**

Individual Settlement Payments will be calculated and distributed to Participating Class Members from the Net Settlement Amount on a pro rata basis, based on the Participating Class Members' respective number of Workweeks during the Class Period. Individual PAGA Payments to PAGA Members will be calculated and distributed to PAGA Members from the PAGA Payment on a pro rata basis based on PAGA Members' respective number of Workweeks during the PAGA Period. Specific calculations of the Individual Settlement Shares and Individual PAGA Payments to PAGA Members will be made as follows:

**A.** The Settlement Administrator will determine the total number of Workweeks worked by each Settlement Class Member during the Class Period ("Class Member's Workweeks"), as well as the aggregate number of Workweeks worked by all Settlement Class Members during the Class Period ("Class Workweeks"). Additionally, the Settlement Administrator will determine the total number of Workweeks worked by each PAGA Member during the PAGA Period ("PAGA Member's Workweeks"), as well as the aggregate number of Workweeks worked by all PAGA Members during the PAGA Period ("PAGA Workweeks").

**B.** To determine each Participating Class Member's Participating Individual Settlement Share, the Settlement Administrator will determine the aggregate number of Workweeks worked by all Participating Class Members during the Class Period ("Participating Class Workweeks") and use the following formula: Individual

DocuSign Envelope ID: 08BD4A18-2648-4421-B779-101FE655024C

Settlement Share = (Participating Class Member's Workweeks ÷ Participating Class Workweeks) × Net Settlement Amount.

**C.** The net amount of the Participating Individual Settlement Share is to be paid out to Participating Class Members by way of check and is referred to as "Individual Settlement Payment(s)".

**D.** To determine each PAGA Member's Individual PAGA Payment, the Settlement Administrator will use the following formula: PAGA Member's Individual PAGA Payment = (PAGA Member's Workweeks ÷ PAGA Workweeks) x $100,000.00 (the PAGA Payment).

**E.** Individual Settlement Payments and Individual PAGA Payments shall be paid to Participating Class Members and/or PAGA Members by way of check. When a Participating Class Member is also an PAGA Member, one check may be issued that aggregates both the Individual Settlement Payment and the Individual PAGA Payment.

**11. <u>DISTRIBUTION OF PAYMENTS</u>**

**A. <u>Distribution of Individual Settlement Payments</u>**

Participating Class Members will receive an Individual Settlement Payment and PAGA Members will receive an Individual PAGA Payment. Individual Settlement Payment and Individual PAGA Payment checks shall remain valid and negotiable for one-hundred and eighty (180) calendar days after the date of their issuance. Within fourteen (14) calendar days after expiration of the 180-day period, the Settlement Administrator shall cancel checks for such payments and shall cause funds associated with such checks to be tendered, or initiate the process for tendering, to the California State Controller's Office's Unclaimed Property Division in the name of the Participating Class Member to whom the check was payable. In the event a Participating Class Member fails to cash/deposit his or her Individual Settlement Payment, the Participating Class Member shall nevertheless remain bound by the Settlement.

DocuSign Envelope ID: 08BD4A18-3648-4421-B779-101FEC55024C

### B. <u>Funding of Settlement</u>

Defendant shall, within ten (10) calendar days of the Effective Date, make payment of the Gross Settlement Amount and Employer Taxes to the Settlement Administrator pursuant to Internal Revenue Code section 1.468B-1 for deposit in an interest-bearing qualified settlement account ("QSA") with an FDIC insured banking institution, for distribution in accordance with this Agreement and the Court's Orders and subject to the conditions described herein.

### C. <u>Time for Distribution</u>

Within ten (10) calendar days after payment of the full Gross Settlement Amount and Employer Taxes by Defendant, or as soon thereafter as practicable, the Settlement Administrator shall distribute Payments from the QSA for: (1) the Service Award to Plaintiff as specified in this Agreement and approved by the Court; (2) the Attorneys' Fees and Cost Award to be paid to Class Counsel, as specified in this Agreement and approved by the Court; (3) the Settlement Administrator Costs, as specified in this Agreement and approved the Court; (4) the LWDA Payment, as specified in this Agreement and approved by the Court; and (5) Individual PAGA Payments as specified in this Agreement and approved by the Court. The balance remaining shall constitute the Net Settlement Amount from which Individual Settlement Payments shall be made to Participating Class Members, less applicable taxes and withholdings. All interest accrued shall be for the benefit of the Class Members and distributed on a pro rata basis to Participating Class Members based on the number of Workweeks worked by them in the Class Period.

### D. <u>Tax Liability and Circular 230 Disclaimer</u>

Defendant makes no representation as to the tax treatment or legal effect of the payments called for hereunder, and the Named Plaintiff and Participating Class Members are not relying on any statement, representation, or calculation by Defendant or by the Settlement Administrator in this regard. Participating Class Members and Class Counsel understand and agree that they shall be responsible for the payment of all

taxes and penalties assessed on the payments specified herein, and shall hold the Parties, Class Counsel and Defense Counsel free and harmless from and against any claims resulting from treatment of such payments as non-taxable, including the treatment of such payments as not subject to withholding or deduction for payroll and employment taxes.

EACH PARTY TO THIS AGREEMENT (FOR PURPOSES OF THIS SECTION, THE "ACKNOWLEDGING PARTY" AND EACH PARTY TO THIS AGREEMENT OTHER THAN THE ACKNOWLEDGING PARTY, AN "OTHER PARTY") ACKNOWLEDGES AND AGREES THAT (1) NO PROVISION OF THIS AGREEMENT, AND NO WRITTEN COMMUNICATION OR DISCLOSURE BETWEEN OR AMONG THE PARTIES OR THEIR ATTORNEYS AND OTHER ADVISERS, IS OR WAS INTENDED TO BE, NOR WILL ANY SUCH COMMUNICATION OR DISCLOSURE CONSTITUTE OR BE CONSTRUED OR BE RELIED UPON AS, TAX ADVICE WITHIN THE MEANING OF UNITED STATES TREASURY DEPARTMENT CIRCULAR 230 (31 CFR PART 10, AS AMENDED); (2) THE ACKNOWLEDGING PARTY (A) HAS RELIED EXCLUSIVELY UPON HIS, HER, OR ITS OWN, INDEPENDENT LEGAL AND TAX COUNSEL FOR ADVICE (INCLUDING TAX ADVICE) IN CONNECTION WITH THIS AGREEMENT, (B) HAS NOT ENTERED INTO THIS AGREEMENT BASED UPON THE RECOMMENDATION OF ANY OTHER PARTY OR ANY ATTORNEY OR ADVISOR TO ANY OTHER PARTY, AND (C) IS NOT ENTITLED TO RELY UPON ANY COMMUNICATION OR DISCLOSURE BY ANY ATTORNEY OR ADVISER TO ANY OTHER PARTY TO AVOID ANY TAX PENALTY THAT MAY BE IMPOSED ON THE ACKNOWLEDGING PARTY; AND (3) NO ATTORNEY OR ADVISER TO ANY OTHER PARTY HAS IMPOSED ANY LIMITATION THAT PROTECTS THE CONFIDENTIALITY OF ANY SUCH ATTORNEY'S OR ADVISER'S TAX STRATEGIES (REGARDLESS OF WHETHER SUCH LIMITATION IS LEGALLY BINDING) UPON DISCLOSURE

BY THE ACKNOWLEDGING PARTY OF THE TAX TREATMENT OR TAX STRUCTURE OF ANY TRANSACTION, INCLUDING ANY TRANSACTION CONTEMPLATED BY THIS AGREEMENT.

**12.** **ATTORNEYS' FEES AND LITIGATION COSTS**

Class Counsel shall apply for, and Defendant shall not oppose, an award of attorneys' fees of up to 25% of the Gross Settlement Amount, which amounts to EIGHT HUNDRED THOUSAND DOLLARS AND ZERO CENTS ($800,000.00). Class Counsel shall further apply for, and Defendant shall not oppose, an application or motion by Class Counsel for reimbursement of actual costs associated with Class Counsel's prosecution of this matter as set forth by declaration testimony in an amount up to TWENTY-FIVE THOUSAND DOLLARS AND ZERO CENTS ($25,000.00). Awards of attorneys' fees and costs shall be paid out of the Gross Settlement Amount, for all past and future attorneys' fees and costs necessary to prosecute, settle, and obtain Final Order Approving Settlement in the Action.  The "future" aspect of the amounts stated herein includes, without limitation, all time and expenses expended by Class Counsel (including any appeals therein).  There will be no additional charge of any kind to either the Settlement Class Members or request for additional consideration from Defendant for such work. Should the Court approve attorneys' fees and/or litigation costs and expenses in amounts that are less than the amounts provided for herein, then the unapproved portion(s) shall be a part of the Net Settlement Amount.

Class Counsel shall be solely and legally responsible to pay all applicable taxes on the award of attorneys' fees.  Class Counsel shall provide the Settlement Administrator with properly completed and signed copies of IRS Form W-9 in order for the Settlement Administrator to process such fees approved by the Court.  The Settlement Administrator shall issue an IRS Form 1099 to Class Counsel for the Class Counsel Award.

**13.    SERVICE AWARD TO PLAINTIFF**

Plaintiff shall seek, and Defendant shall not oppose, a Service Award in an amount not to exceed TEN THOUSAND DOLLARS and ZERO CENTS ($10,000.00) to Plaintiff, for participation in and assistance with the Action.  Any Service Award awarded to Plaintiff shall be paid from the Gross Settlement Amount and shall be reported on an IRS Form 1099.  If the Court approves the Service Award to Plaintiff in less than the amounts sought herein, then the unapproved portion(s) shall be a part of the Net Settlement Amount.

The Named Plaintiff will be solely and legally responsible to pay any and all applicable taxes on the Service Award and shall hold harmless Defendant, Class Counsel and Defense Counsel from any claim or liability for taxes, penalties, or interest arising as a result of payment of the Service Award.  Any amount requested by the Named Plaintiff for the Service Award and not awarded by the Court shall become part of the Net Settlement Amount and shall be distributed to Participating Class Members as part of their Individual Settlement Payment.

**14.    TAXATION AND ALLOCATION**

Each Individual Settlement Share shall be allocated as follows: 34% as alleged unpaid wages (to be reported on an IRS Form W-2); 33% as alleged interest (to be reported on an IRS Form 1099); and 33% alleged civil and statutory penalties (to be reported on an IRS Form 1099).  Each Individual PAGA Payment shall be allocated entirely as penalties. The Parties agree that the employees' share of taxes and withholdings with respect to the wage-portion of the Individual Settlement Share will be withheld from the Individual Settlement Share in order to yield the Individual Settlement Payment. The amount of federal income tax withholding will be based upon a flat withholding rate for supplemental wage payments in accordance with Treasury Regulation § 31.3402(g)-1(a)(2) as amended or supplemented.  Income tax withholding will also be made pursuant to applicable state and/or local withholding codes or regulations.

All monies received by Participating Class Members under the Settlement which are attributable to wages shall constitute income to such Participating Class Members solely in the year in which such monies actually are received by the Participating Class Members.  It is the intent of the Parties that Individual Settlement Payments provided for in this Agreement are the sole payments to be made by Defendant to Participating Class Members in connection with this Settlement, with the exception of the Named Plaintiff, and that the Participating Class Members are not entitled to any new or additional compensation or benefits as a result of having received the Individual Settlement Payments.  Furthermore, the receipt of Individual Settlement Payments by Participating Class Members shall not, and does not, by itself establish any general, special, or joint employment relationship between and among the Participating Class Member(s) and Defendant.

Forms W-2 and/or Forms 1099 will be distributed by the Settlement Administrator at times and in the manner required by the Internal Revenue Code of 1986 (the "Code") and consistent with this Agreement.  If the Code, the regulations promulgated thereunder, or other applicable tax law, is changed after the date of this Agreement, the processes set forth in this Section may be modified in a manner to bring Defendant into compliance with any such changes.

All Employer Taxes will be paid by Defendant separate, apart, and in addition to the Gross Settlement Amount.

Neither Counsel for Plaintiff nor Defendant intend anything contained in this Agreement to constitute advice regarding taxes or taxability, nor shall anything in this Agreement be relied upon as such within the meaning of United States Treasury Department Circular 230 (31 C.F.R. Part 10, as amended) or otherwise.

## 15.    <u>PRIVATE ATTORNEYS' GENERAL ACT ALLOCATION</u>

The Parties agree to allocate ONE HUNDRED THOUSAND DOLLARS AND ZERO CENTS ($100,000.00) of the Gross Settlement Amount toward PAGA penalties. Pursuant to the PAGA, seventy-five percent (75%) of the amount allocated toward

PAGA ($75,000.00) will be paid to the LWDA and twenty-five percent (25%) ($25,000.00) will be distributed to PAGA Members on a pro rata basis based upon their respective Workweeks worked as PAGA Members during the PAGA Period.

**16.** **COURT APPROVAL**

This Agreement is contingent upon an order by the Court granting Final Order Approving Settlement, and that the LWDA does not intervene and object to the Settlement. In the event it becomes impossible to secure approval of the Settlement by the Court and the LWDA, the Parties shall be restored to their respective positions in the Action prior to entry of this Settlement. If this Settlement Agreement is voided, not approved by the Court or approval is reversed on appeal, it shall have no force or effect and no Party shall be bound by its terms except to the extent: (a) the Court reserves any authority to issue any appropriate orders when denying approval; and/or (b) there are any terms and conditions in this Settlement Agreement specifically stated to survive the Settlement Agreement being voided or not approved, and which control in such an event.

**17.** **WITHDRAWAL FROM SETTLEMENT BASED ON REQUESTS FOR EXCLUSION**

Defendant shall retain the option to nullify the Agreement in the event that more than 10% of Class Members submit timely and valid Requests for Exclusion. Defendant must provide written notice to Class Counsel of their withdrawal within thirty (30) calendar days of receiving sufficient information to determine that the opt out rate exceeds 10%.

**18.** **NOTICE OF JUDGMENT**

In addition to any duties set out herein, the Settlement Administrator shall provide notice of the Final Judgment entered in the Action by posting the same on its website for a period of no less than four (4) years.

DocuSign Envelope ID: 08BD4A18-2648-4421-B779-101FEC55024C

**19.** <u>**LIMITATIONS ON USE OF THIS SETTLEMENT**</u>

    **A.** <u>**Non-Evidentiary Use**</u>

Whether or not the Effective Date occurs, neither this Agreement, nor any of its terms, nor the Settlement itself, will be: (a) construed as, offered, or admitted in evidence as, received as, or deemed to be evidence for any purpose adverse to Defendant or any other of the Released Parties, including but not limited to, evidence of a presumption, concession, indication, or admission by any of the Released Parties of any liability, fault, wrongdoing, omission, concession, or damage, or (b) disclosed, referred to, or offered in evidence against any of the Released Parties in any further proceeding in the Action, except for the purposes of effectuating the Settlement pursuant to this Agreement or for Defendant to establish that a Class Member has resolved any of his or her claims released through this Agreement.

    **B.** <u>**Nullification**</u>

The Parties have agreed to the certification of the Class encompassing all claims alleged in the Action for the sole purpose of effectuating this Agreement. If (a) the Court should for any reason fail to certify this Class for settlement, or (b) the Court should for any reason fail to approve this Settlement, or (c) the Court should for any reason fail to enter the Final Order, or (d) the Final Order is reversed, or declared or rendered void, or (e) the Court should for any reason fail to dispose of the Action in its entirety, then (i) this Agreement shall be considered null and void; (ii) neither this Agreement nor any of the related negotiations or proceedings shall be of any force or effect; (iii) all Parties to this Agreement shall stand in the same position, without prejudice, as if the Agreement had been neither entered into nor filed with the Court; (iv) the fact that the Parties were willing to stipulate to class certification of all causes of action pled in the Action as part of the Settlement will have no bearing on, and will not be admissible in connection with, the issue of whether the Class should be certified by the Court in a non-settlement context in this Action or any other action, and in any of those events, Defendant expressly reserves the right to oppose certification of the

Class; and (v) the First Amended Complaint in the Action shall be null and void and of no force or effect, and the Complaint filed in the Action shall thereafter become the operative complaint.

Additionally, should the Settlement not become final for any reason, any Settlement Administration Costs already incurred by the Settlement Administrator shall be split evenly amongst the Parties. If Defendant elect to revoke the Settlement, as specified in Paragraph 17, the Parties and any monies required to be paid under this Settlement shall be returned to their respective statuses as of the date and time immediately prior to the execution of this Settlement, and the Parties shall proceed in all respects as if this Settlement had not been executed, except that any Settlement Administration Costs already incurred by the Settlement Administrator shall be paid to the Settlement Administrator by Defendant.

In the event of a timely appeal from the Final Order, the Final Order shall be stayed and the Gross Settlement Amount shall not be distributed pending the completion of the appeal.

20.   **MISCELLANEOUS PROVISIONS**

**A. Interpretation of the Agreement**

This Agreement constitutes the entire agreement between the Parties with respect to its subject matter.  Except as expressly provided herein, this Agreement has not been executed in reliance upon any other written or oral representations or terms, and no such extrinsic oral or written representations or terms shall modify, vary or contradict its terms.  In entering into this Agreement, the Parties agree that this Agreement is to be construed according to its terms and may not be varied or contradicted by extrinsic evidence.  The Agreement will be interpreted and enforced under the laws of the State of California, both in its procedural and substantive aspects, without regard to its conflict of law provisions.  Any claim arising out of or relating to the Agreement, or the subject matter hereof, will be resolved solely and exclusively in the United States District Court for the Northern District of California, and Plaintiff and Defendant

hereby consent to the personal jurisdiction of the Court in the Action over it solely in connection therewith. The foregoing is only limited to disputes concerning this Agreement. The Parties, and each of them, participated in the negotiation and drafting of this Agreement and had available to them the advice and assistance of independent counsel. As such, neither Plaintiff nor Defendant may claim that any ambiguity in this Agreement should be construed against the other. The Agreement may be modified only by a writing signed by counsel for the Parties and approved by the Court.

**B. <u>Further Cooperation</u>**

The Parties and their respective attorneys shall proceed diligently to prepare and execute all documents, to seek the necessary approvals from the Court, and to do all things reasonably necessary to consummate the Settlement as expeditiously as possible. The Parties agree that they will not take any action inconsistent with this Agreement, including, without limitation, encouraging Class Members to opt out of the Settlement. In the event the Court finds that any Party has taken actions inconsistent with the Settlement, including, without limitation, encouraging Class Members to opt out of the Settlement, the Court may take any corrective actions, including enjoining any Party from communicating regarding the Settlement on an ex parte basis, issuing (a) corrective notice(s), awarding monetary, issue, evidentiary and/or terminating sanctions against that Party, and/or enforcing this Agreement despite the presence of opt-outs and/or objections.

**C. <u>Counterparts</u>**

The Agreement may be executed in one or more actual or non-original counterparts, all of which will be considered one and the same instrument and all of which will be considered duplicate originals.

**D. <u>Authority</u>**

Each individual signing below warrants that he or she has the authority to execute this Agreement on behalf of the Party for whom or which that individual signs.

DocuSign Envelope ID: 08BD4A18-2648-4421-B779-101FEC550246

### E. No Third-Party Beneficiaries

Plaintiff, Participating Class Members, PAGA Members, the State of California, Class Counsel, and Defendant are direct beneficiaries of this Agreement, but there are no third-party beneficiaries.

### F. Deadlines Falling on Weekends or Holidays

To the extent that any deadline set forth in this Agreement falls on a Saturday, Sunday, or legal holiday, that deadline shall be continued until the following business day.

### G. No Public Comment

The Parties and their counsel agree that they will not issue any press releases, initiate any contact with the press, respond to any press inquiry, or have any communication with the press about the fact, amount or terms of the Agreement. Further, Class Counsel will not include, reference or use Defendant's name in any marketing or promotional materials, including but not limited to marketing or promotional efforts directed at current or former Red Robin employees, at any time after the execution of this Agreement. Nothing herein will restrict Class Counsel from including publicly available information regarding this settlement in future judicial submissions regarding Class Counsel's qualifications and experience, and nothing herein will restrict Class Counsel from advising or representing current or former Red Robin employees at any time. It is acknowledged and agreed that this clause does not prohibit Class Counsel from posting information regarding this matter and its resolution on Class Counsel's professional websites and professional social media accounts, provided that such postings do not refer to Red Robin by name or other identifying characteristics, including but not limited to that the Defendant is a national restaurant chain, the generic job titles of the class members, the class size, the nature of the claims, and the settlement amount.

STIPULATION REGARDING CLASS ACTION AND PAGA SETTLEMENT

DocuSign Envelope ID: 08BD4A18-2648-4421-B779-101FEC55024C

**H.  <u>Duty to Support and Defend the Settlement</u>**

The Parties agree to abide by all of the terms of this Agreement in good faith and to support the Settlement fully and to use their best efforts to defend this Settlement from any legal challenge, whether by appeal or collateral attack.

**I.  <u>Jurisdiction of the Court</u>**

The Court shall retain jurisdiction with respect to the interpretation, implementation, and enforcement of the terms of this Settlement Agreement and all orders and judgments entered in connection therewith, and the Parties and their counsel hereto submit to the jurisdiction of the Court for purposes of interpreting, implementing, and enforcing the settlement embodied in this Settlement Agreement and all orders and judgments entered in connection therewith.

**J.  <u>Severability</u>**

In the event that one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall in no way effect any other provision if Defense Counsel and Class Counsel, on behalf of the Parties and the Settlement Class, mutually elect in writing to proceed as if such invalid, illegal, or unenforceable provision had never been included in this Agreement.

\* \* \*

Signatures on next page.

STIPULATION REGARDING CLASS ACTION AND PAGA SETTLEMENT

DocuSign Envelope ID: 08BD4A18-2648-4421-B729-101FEC55024C

1  **IT IS SO AGREED:**

2  **Plaintiff and Class Representative**

3

4  Dated:  10/20/2023

5

6  **Defendant**

7

8  Dated:  10/27/2023

   Sarah Mussetter (Oct 27, 2023 14:17 MDT)

9  RED ROBIN INTERNATIONAL, INC.

10

   By: Sarah Mussetter, Vice President and Secretary

11

12  **APPROVED AS TO FORM:**

13

14  Dated:  October 19, 2023          KATZ BANKS KUMIN LLP

15

16                                    By:

17                                    Rebecca Peterson-Fisher
                                      Jennifer J. Liu
18                                    Leah Kennedy

19                                    Attorneys for Plaintiff STEVEN
                                      MILLER and the Proposed Class
20
                                      27
21  Dated:  October XX, 2023          JACKSON LEWIS P.C.

22
                                      By:
23
                                      Adam Y. Siegel
24                                    Philip J. Smith
                                      Martin P. Vigodnier
25
                                      Attorneys for Defendant
26                                    RED ROBIN INTERNATIONAL,
                                      INC.
27
   4863-1881-2807, v. 2
28

# EXHIBIT B

**NOTICE OF CLASS ACTION SETTLEMENT**
**IMPORTANT LEGAL NOTICE**

*Steven Miller v. Red Robin International, Inc.*

United States District Court, Northern District of California, Case No. 22-cv-02574-JCS

**THIS NOTICE CONTAINS IMPORTANT INFORMATION THAT MAY AFFECT YOU.**

*A court authorized this notice.  This is not a solicitation.*

**TO:** EMPLOYEES WHO WERE EMPLOYED BY RED ROBIN INTERNATIONAL, INC. IN THE STATE OF CALIFORNIA AS ASSISTANT GENERAL MANAGERS ("AGM"), KITCHEN MANAGERS ("KM"), OR ASSISTANT MANAGERS ("AM") (COLLECTIVELY, "SALARIED MANAGERS") DURING THE CLASS PERIOD (APRIL 27, 2018 THROUGH THE DATE THE COURT PRELIMINARILY APPROVES THE SETTLEMENT AGREEMENT OR SEPTEMBER 30, 2023, WHICHEVER IS EARLIER).

The United States District Court, Northern District of California, has granted preliminary approval of the proposed settlement ("Settlement") of the above-captioned action.  Because your rights may be affected by this Settlement, it is important that you read this Notice of Class Action Settlement ("Notice") carefully.  The purpose of this Notice is to provide a brief description of the claims alleged in the Class Action, the key terms of the proposed Settlement, and your rights and options with respect to the Settlement.

***AN ESTIMATE OF YOUR SHARE OF THE SETTLEMENT CAN BE FOUND IN SECTION 7.***

To receive your share, you do not have to file a claim or take any other action.  You must take action only if you have an address change, want to object to the Settlement, or want to opt out from the Settlement.

**YOU MAY BE ENTITLED TO MONEY UNDER THIS PROPOSED SETTLEMENT.**

**PLEASE READ THIS NOTICE CAREFULLY; IT EXPLAINS YOUR LEGAL RIGHTS**.

| *1. Why Did I Receive This Notice?* |
| --- |

A proposed settlement has been reached in a lawsuit involving Red Robin International, Inc. ("Defendant" or "Red Robin") that may affect your rights.

The records of the Defendant indicate that you worked at one or more of their California locations and you are a member of one or more of the following groups:

(A)     "Class Members" are all employees who are currently or have been employed by Defendant in the State of California for workweeks during which those individuals work or worked as Assistant General Managers ("AGM"), Kitchen Managers ("KM"), or Assistant Managers ("AM") (collectively, "Salaried Managers") at any time during the Class Period (April 27, 2018 through the date the court preliminarily approves the settlement agreement or September 30, 2023, whichever is earlier), excluding any Salaried Manager who signed an arbitration agreement with Defendant.  The following workweeks shall be excluded: (1) any workweeks any Salaried Managers who did not opt out of the settlement in *Armando Bautista v. Red Robin International, Inc.*, Case No. STK-CV-UOE-2018-0002270, Superior Court of the state of California, San Joaquin County and worked as KMs during the period between April 27, 2018 and February 17, 2019; and (2) any workweeks any Salaried Manager who consented to join a prior settlement in *Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357, United States District Court for the Eastern District of New York worked during the period between April 27, 2018 and March 31, 2020.

(B)     "PAGA Members" are all employees who are currently or have been employed by Defendant in the State of California for workweeks during which those individuals work or worked as Salaried Managers at any time from February 7, 2021 through the date the Court preliminarily approves the Settlement Agreement or September 30, 2023, whichever is earlier.  PAGA Members shall include employees who signed an arbitration agreement with Defendant.

This means you are a potential Class and/or PAGA Member, and you have a right to know about the Settlement.  The Settlement will resolve all Class Members' Released Claims, as described below, from April 27, 2018 through the date the court preliminarily approves the settlement agreement or September 30, 2023, whichever is earlier ("Class Period"), and will resolve all PAGA Members' Released Claims, as described below, from February 7, 2021 through the date the Court preliminarily approves the Settlement Agreement or September 30, 2023, whichever is earlier ("PAGA Period").

The Preliminary Approval Hearing was held on [DATE].  The Northern District of California conditionally certified the Class for settlement purposes only and directed that you receive this Notice.  The Court will hold a Final Approval Hearing concerning the proposed settlement on [DATE] at [TIME] at the United States District Court of the Northern District of California, San Francisco Courthouse, 450 Golden Gate Ave., San Francisco CA, 94102450 Golden Gate Ave., San Francisco CA, 94102, in Courtroom D on the 15th floor.  You may attend the hearing in person or via Zoom at:

https://cand-uscourts.zoomgov.com/j/1619260804?pwd=RE5qWDhGOTdWWTZUOFlOKzhNc3pjZz09
Webinar ID: 161 926 0804
Password: 050855

The date of the Final Approval Hearing may change without further notice to you and other Class Members. If you plan to attend the hearing, you should check the settlement website or review the Court's docket on the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov to check if the date has changed.  You may also obtain additional information regarding the Settlement and review important documents relating to this case by visiting the settlement website: [website].

## 2. What Is the Lawsuit About?

On April 27, 2022, Plaintiff Steven Miller ("Plaintiff") filed a Class Action Complaint against Defendant Red Robin International, Inc.  Plaintiff brought this Class Action lawsuit on his behalf and other similarly situated employees in California.

In the lawsuit, Plaintiff claimed that Defendant violated the law by misclassifying Class Members as exempt employees, and: (1) failure to pay overtime wages; (2) California meal and rest period violations; (3) waiting time penalties; (4) failure to provide accurate wage statements; and (5) unlawful, unfair, and/or deceptive business practices.  Plaintiff sought unpaid wages, interest, and penalties, injunctive relief, as well as attorneys' fees and costs for himself and Class Members.  The lawsuit also includes a claim for civil penalties under the California Private Attorneys General Act of 2004, California Labor Code §§ 2698 et seq.  ("PAGA"). As part of the terms and conditions of the Settlement, Plaintiff has agreed to amend his Complaint to add a seventh cause for alleged unreimbursed business expenditures or losses under California Labor Code § 2802.

The Court has not made any decision about the claims or allegations in this lawsuit.  By issuing this Notice, the Court is not suggesting that one side would win or lose if this case went to trial. Defendant vigorously denies any liability whatsoever, denies all of the factual and legal allegations, and contends that it fully complied with all applicable laws at all times.  Plaintiff and Defendant have agreed to settle the case as a negotiated compromise.

### 3. What Is a Class Action?

A class action is a legal proceeding where one or more persons sue not just for themselves, but also for other people who have similar claims (forming a "class" or a group of people).

### 4. Background of Settlement

Plaintiff's lawyers ("Class Counsel") have conducted a thorough investigation of the facts in this case, as well as a detailed assessment of Defendant's records. Class Counsel then reached a settlement with Defendant after negotiations with the assistance of a neutral mediator.

Plaintiff and the attorneys for both sides believe the settlement is fair, reasonable, and adequate, and in the best interests of the Class and PAGA Members considering the uncertain outcome, risks, costs, and time involved in further litigation, trial, and possible appeals.

### 5. What Are the Monetary Terms of the Proposed Settlement?

Defendant has agreed to pay $3,200,000.00 (the "Gross Settlement Fund") to settle this case.  This money will be used to pay: (1) the reasonable fees and expenses of the Settlement Administrator to oversee the settlement administration currently estimated at $11,500; (2) a $100,000 settlement under the California Private Attorneys General Act of 2004, California Labor Code §§ 2698 et seq. ("PAGA"), inclusive of a $75,000 payment to the California Labor and Workforce Development Agency ("LWDA"), and a $25,000 payment ("PAGA Fund") to all PAGA Members; (3) a $10,000 service payment to the Plaintiff to compensate him for his services to the Class in bringing and litigating this lawsuit and for a general release of all of his claims against Defendant ("Service Award"); and (4) $800,000 in attorneys' fees and up to $25,000 in costs to compensate Class Counsel for their services to the Class. The remainder of the Gross Settlement Fund after paying these standard costs is the Net Settlement Amount that will be distributed to Class Members who do not opt out of the settlement ("Participating Class Members").

### 6. How Will My Settlement Payment Be Determined?

Participating Class Members' and PAGA Members' payments will be distributed as follows:  The Net Settlement Fund will be distributed to Settlement Class Members and PAGA Members on a proportionate distribution based on each Settlement Class Member's and PAGA Member's weeks worked during the Class Period and the PAGA Period, respectively, as follows:

- $25,000 shall be allocated for proportionate distribution based on weeks worked by the PAGA Members from February 7, 2021 through the date the Court preliminarily approves the Settlement Agreement or September 30, 2023, whichever is earlier. All PAGA Members will receive a proportional share of the $25,000 PAGA Fund, regardless whether they opt out of the Settlement Class.
- The remaining amount in the Net Settlement Fund shall be allocated for proportionate distribution based on weeks worked among the Settlement Class Members from April 27, 2018 through the date the court preliminarily approves the settlement agreement or September 30, 2023, whichever is earlier.

### 7. How Much Can I Expect to Receive from This Settlement?

Your estimated gross distribution from the Net Settlement Amount and the PAGA penalties ("Settlement Payment") is set forth below and based on the following information from Defendant's records:

**Your Dates of Employment and Work Weeks During the Class Period**:

Your dates of employment during the Class Period are: _____ to _____.

You worked __ weeks between February 7, 2021 through the date the Court preliminarily approves the Settlement Agreement or September 30, 2023 (PAGA Group)

You worked ___ weeks between April 27, 2018 through the date the court preliminarily approves the settlement agreement or September 30, 2023 (Class Members)

[X] workweeks have been excluded because of your participation in one or more of the following class action settlements: the settlement in *Armando Bautista v. Red Robin International, Inc.*, Case No. STK-CV-UOE-2018-0002270, Superior Court of the state of California, San Joaquin County or the settlement in *Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357, United States District Court for the Eastern District of New York.

**Estimated Share of Net Settlement Amount**:

Based on this information, your estimated share of the Net Settlement Amount is: $_____.

**YOUR TOTAL ESTIMATED SETTLEMENT PAYMENT BASED ON _ WORKWEEKS WORKED DURING THE PAGA PERIOD AND _ WORKWEEKS WORKED DURING THE CLASS PERIOD (AS REFERENCED ABOVE), BEFORE TAX DEDUCTIONS AND WITHHOLDINGS, IS: $_____.**

**Your actual Settlement Payment may end up being higher or lower than estimated.**

**If you disagree with any of the information above which was used to calculate your Settlement Payment, you may challenge the information by contacting the Settlement Administrator and providing information/documentation to support your challenge. The Settlement Administrator will evaluate the evidence you submit and decide whether your Settlement Payment should be changed.**

For tax purposes, your Settlement Payment shall be allocated between wages and non-wage income as follows: 34% of such consideration shall be allocated to the payment of taxable wages and wage-related payments; 66% of such consideration shall be allocated to the payment of non-wage income consisting of interest on wages, alleged penalties, liquidated damages, and related aspects of the settlement.  From the portion which is wages shall be withheld the employee's share of payroll and income taxes and all other applicable deductions or withholdings required by law or expressly authorized by the Class Member.  From the portions which are allocated as non-wage income shall be withheld all applicable deductions or withholdings required by law or expressly authorized by the Class Member.  To the extent required by law, Class and PAGA Members will receive a Form 1099.  Consult your tax advisor with any questions about the tax consequences of your Settlement Payment.

### *8. When Will I Receive My Payment and What Do I Have To Do?*

The Court will hold a Final Approval hearing on [_____] at the United States District Court, Northern District of California, San Francisco Courthouse, 450 Golden Gate Ave., San Francisco CA, 94102 at [TIME], to determine whether to approve the settlement.  You may also attend the hearing on Zoom at: https://cand-uscourts.zoomgov.com/j/1619260804?pwd=RE5qWDhGOTdWWTZUOFlOKzhNc3pjZz09
Webinar ID: 161 926 0804
Password: 050855

If the Court approves the settlement, there may be appeals after that.  It is always uncertain whether these appeals can be resolved, and resolving them can take time, perhaps more than a year.  Please be patient.  Even if the Court approves the settlement, and there are no appeals, the settlement checks will not be issued until about three months after the date of the fairness hearing at the earliest.  The Settlement Agreement contains the exact details of the payment schedule.  You may obtain a copy of the Settlement Agreement by following the instructions in Section 15 below.

**You must cash each check within 180 days of issuance.**  Checks are void 15 days after the 180-day check cashing deadline.  Any amount remaining 180 days after the Final Approval Order and after any correctable

errors or omissions are covered will be tendered to the California State Controller's Office's Unclaimed Property Division in the name of the Participating Class Member to whom the check was payable.

| 9. What Are My Legal Rights and Options Under the Settlement? | |
| --- | --- |
| **Do Nothing** | If you do nothing, and if the Court grants final approval of the Settlement, you will receive payments under the Settlement.  You will also release (give up your rights) on any and all claims you may have that are covered by the Settlement.  You do not have to do anything to receive payments.  To receive a check, you must ensure that your address is kept up to date. |
| **Challenge the Underlying Data for Your Share** | You may challenge the data used to determine your Settlement Payment if you believe the data is incorrect.  If you wish to challenge the data, you must do so in writing, and can mail the Challenge Form enclosed with this Notice to the Settlement Administrator at the address below on or before _____, 2023, along with any supporting documentation.  Be sure to include your full name.  The Settlement Administrator will attempt to resolve the dispute directly with you, with the assistance of the lawyers for both sides.  If the dispute cannot be resolved, the Court will decide the dispute. |
| **Exclude Yourself or "Opt Out" of the Class Settlement but not the PAGA Settlement** | If you "opt out," you will NOT receive any money from the Settlement and you will NOT release any claims you may have against Defendant.  To opt out, you must complete the Exclusion Form included with this Notice and mail it to the Settlement Administrator at the address below on or before _____, 2023.  Any request for opt-out postmarked after _____, 2023 will be void unless the Court agrees to review the late request.

You cannot opt out of the PAGA portion of the proposed Settlement. PAGA Members will receive a payment from the PAGA Fund and must release (give up their rights) to pursue PAGA penalty claims against Defendant based on the facts alleged in the Action during the PAGA Period. |

| **Participating Class Members Can Object to the Class Settlement but not the PAGA Settlement** | All Class Members who do not opt-out ("Participating Class Members") can object to any aspect of the proposed class settlement, but not the PAGA settlement. If you are a Participating Class Member, you can ask the Court to deny approval by filing an objection. You can't ask the Court to order a different settlement; the Court can only approve or reject the settlement. If the Court denies approval, no settlement payments will be sent out, and the lawsuit will continue. If that is what you want to happen, you should object. |
| --- | --- |
| | To object, you must file a written objection and notice of intention to appear at the hearing on the Motion for Final Approval with the Clerk of the United States District Court for the Northern District of California. If you file a timely written objection, you may, but are not required to, appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney. Objections may be made at the hearing on the Motion for Final Approval without a written objection being submitted only with the Court's express permission. |
| | All written objections must state your full name, address, date of birth, and the dates you worked as an employee for the Defendant. Any written objection should state each specific reason in support of the objection, and state whether it applies only to the objector, to a specific subset of the class, or to the entirety of the class. Written objections and supporting papers must (a) clearly identify the case name and number (*Steven Miller v. Red Robin International, Inc.*, Case No. 22-CV-02574-JCS), (b) be submitted to the Court either by filing them electronically or in person at any location of the United States District Court for the Northern District of California or by mailing them to the Class Action Clerk, United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco CA 94102, and (c) be filed or postmarked on or before _____. |

### 10. What If I Have Questions?

If you have questions, please contact Class Counsel or the Settlement Administrator.

Class Counsel:

**Rebecca Peterson-Fisher**
**Jennifer Liu**
**C. Leah Kennedy**
**Katz Banks Kumin LLP**
150 California Street, 16th Floor
San Francisco, CA 94111
Telephone: (415) 813-3260
Fax: (415) 813-2495
Email: peterson-fisher@katzbanks.com
Website: https://www.katzbanks.com

Settlement Administrator:

| |
|---|
| ***Miller v. Red Robin International, Inc.***<br>c/o RUST CONSULTING.<br>[ADDRESS]<br>Tel. [PHONE]<br>Fax [FAX]<br>Email: [EMAIL] |

DO NOT CONTACT THE COURT OR DEFENDANT'S ATTORNEYS FOR INFORMATION REGARDING THE SETTLEMENT OR THE CLAIM PROCESS.

### 11. Who Is the Settlement Administrator?

The Settlement Administrator is a company hired by the Parties to administer the Settlement. The parties have agreed to use Rust Consulting as the Settlement Administrator.

The Settlement Administrator's duties include calculating settlement payments, processing challenges, objections, and exclusions, making payments to the Class Members, and answering questions you may have.

### 12. How Will the Lawyers and the Representative for the Class Be Paid?

Class Counsel will request Court approval for reimbursement of actual litigation costs up to $25,000 and payment of attorneys' fees of up to no more than 25% of the Gross Settlement Fund. The Court will decide whether or not to award the attorneys' fees requested. The attorneys' fees are for legal services that have been and will be provided to the Classes.

Class Counsel will also ask the Court to approve a Service Award of up to $10,000 for the Plaintiff for the effort, time, and risks he took to bring this case, as well as for his release of all claims against Defendant. If approved, this award would be in addition to the amount Plaintiff receives under the settlement as a Class Member.

### 13. What Is Being Released as Part of the Settlement?

If the Court grants Final Approval of the settlement, the Participating Class Members (those who did not opt out) will fully release Defendant from liability for any and all claims alleged or that could have been alleged in Plaintiff's Operative Complaint based on the facts alleged, which arose during the Class Period, including but not limited to (1) all claims failure to pay overtime wages; (2) all claims for failure to provide meal and rest periods; (3) all claims for failure to pay earned wages upon discharge; (4) all claims for failure to provide accurate wage statements; (5) all claims for unlawful, unfair, and/or deceptive business practices California Business & Professions Code section 17200, *et seq.* arising out of the Labor Code violations referenced in the Operative Complaint; and (6) all claims for failure to reimburse necessary business expenditures or losses under California Labor Code § 2802 (the "Class Released Claims"). Unrelated claims (e.g. workers' compensation, disability, unemployment, wrongful termination, retaliation, and discrimination) are not released. Claims arising from facts and circumstances from before April 27, 2018 or after the court's Preliminary Approval Order are also not released.

PAGA Members who are not Participating Class Members will release only all claims exhausted in Plaintiff's notice(s) sent to the LWDA and alleged in the Operative Complaint and/or based on the Class Released Claims, which arose during the PAGA Period, regardless of whether PAGA Members opt out of the Class Settlement, including claims for PAGA penalties pursuant to Labor Code sections 210, 226.3, 256, 558, 1174.5, 1197.1, and 2699 in connection with alleged violations of Labor Code sections 201, 202, 203, 204, 210, 226, 226.3, 226.7, 510, 512, 558, 1174, 1194, 1197, 1197.1, 1198, 2802, 2699.

| 14. Can I Be Retaliated Against for Participating in the Settlement? |
|---|

The law prohibits Defendant from retaliating against employees for exercising their rights under the law.  This means Defendant may not fire, demote, or harass you, classify you as ineligible for rehire, or retaliate against you in any other way because you choose to participate in the Settlement.

| 15. Getting More Information about the Settlement |
|---|

This notice summarizes the proposed settlement.  For the precise terms of the settlement, please see the settlement agreement available at _____, by contacting Class Counsel or the Settlement Administrator via the contact information provided in Section 10, by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, or by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS.

**IMPORTANT:**

**1.   If you move or change your address, send the Settlement Administrator your new address. It is your responsibility to keep a current address on file with the Settlement Administrator to ensure receipt of your Settlement Payment.**

**2.   It is strongly recommended that you keep a copy of any challenge, request for exclusion and/or objection that you submit, and proof of timely mailing, emailing, and/or faxing, until after the Final Approval hearing.**

## *Your Contact Information*

The Settlement Administrator is using the following contact information for you. If any of your contact information is inaccurate, please correct that information and return a copy of this form to the Settlement Administrator at the address above.

<<Name>>

_____

<<Address>>

_____

<<City>>, <<State> <Zip>>

_____

(___ ___ ___) ___ ___ ___ -- ___ ___ ___ ___

**Home Telephone Number**

(___ ___ ___) ___ ___ ___ -- ___ ___ ___ ___

**Cellular Phone Number**

_____

**Email**

**Complete this Challenge Form only if you wish to challenge the personal information used to calculate your estimated Settlement Payment, as listed above.**

|                                                                                       |
|---------------------------------------------------------------------------------------|
| *Challenge Form*                                                                      |

Check the boxes below ONLY if you wish to challenge the personal information used to calculate your estimated Settlement Payment, as listed above.  You do NOT have to submit this form if this information is accurate.  All fields must be completed for your challenge to be accepted.  **Any challenges must be postmarked or sent, if emailed or faxed, by no later than [DATE].**  Challenges postmarked, emailed, or faxed after this date will not be honored.

☐      I wish to challenge the dates of my employment.

I have included a written statement of what I believe to be my correct information regarding the challenge(s) checked above.  I have also included information and/or documents that support my challenge (for example, paystubs or time records).  I understand that, by submitting this challenge, I authorize the Settlement Administrator to review Defendants' records, to provide a copy of this challenge and my supporting documents or information to Class Counsel and Defense Counsel, and to contact me to attempt to resolve my challenge. If my challenge cannot be resolved, I understand the Court will make a final decision regarding my challenge.

If you have checked any of the boxes above, please sign below, print your name, and provide your Class Member ID number (from the address label on the envelope of this mailing).

_____
Signature

Name of Class Member   ____[NAME]_____

Class Member ID Number (from address label):  _____[mail id]_____


Statement of reasons and documents in support of challenge(s) checked above:

_____

_____

_____

_____

_____

**[Please attach documents and use separate page(s) as necessary]**

4885-3033-0253, v. 1

# EXHIBIT C

1 | JENNIFER L. LIU (State Bar No. 279370)
REBECCA PETERSON-FISHER (State Bar No. 255359)
2 | C. LEAH KENNEDY (State Bar No. 346306)
3 | **LIU PETERSON-FISHER LLP**
1204 Burlingame Ave., Suite 3
4 | Burlingame, CA 94010
Telephone: (650) 461-9000
5 | Facsimile: (650) 460-6967
Email: jliu@liupetersonfisher.com
6 | Email: rpf@liupetersonfisher.com
7 | Email: lkennedy@liupetersonfisher.com

8 | *Attorneys for Plaintiff and the Proposed Class*

9 | **UNITED STATES DISTRICT COURT**

10 | **NORTHERN DISTRICT OF CALIFORNIA**

11 | **OAKLAND DIVISION**

| | |
|---|---|
| 12 STEVEN MILLER, on behalf of himself and all others similarly situated, | Case No. 22-CV-02574-JCS |
| 13 | **DECLARATION OF DEREK DE LEMOS** |
| Plaintiff, | Before the Hon. Joseph C. Spero |
| 14 | |
| 15 v. | |
| 16 RED ROBIN INTERNATIONAL, INC. dba RED ROBIN BURGER AND SPIRITS | |
| 17 EMPORIUMS, and DOES 1-100, inclusive, | |
| 18 Defendants. | |
| 19 | |

## **Declaration of Derek De Lemos**

I, Derek De Lemos, declare as follows:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      I was employed by Red Robin for approximately six years in total.  I worked from 2012 to 2016 as an Assistant Manager/Kitchen Manager, then from 2016 to October 2018 as an Assistant General Manager.  I trained for about eight weeks at the Red Robin restaurant located in Santa Clara at 3906 Rivermark Plaza, Santa Clara, CA 95054 ("the Santa Clara restaurant"). After training, I worked at the Red Robin restaurant in Pleasanton at 4503 Rosewood Drive, Pleasanton, CA 94588 ("the Pleasanton restaurant"); in Newark at 1031 Newpark Mall, Newark, CA 94560 ("the Newark restaurant"); in San Mateo at 2204 Bridgepointe Parkway, San Mateo, CA 94404 ("the San Mateo restaurant"); and in San Bruno at 1274 El Camino Real, San Bruno, CA 94066 ("the San Bruno restaurant").  I also guest managed at the Red Robin restaurant in San Jose at 2200 Eastridge Loop, San Jose, CA 95122 ("the Eastridge restaurant"); in San Jose at 1000 El Paseo de Saratoga, San Jose, CA 95130 ("the Saratoga restaurant"); in Milpitas at 248 Great Mall Drive, Milpitas, CA 95035 ("the Milpitas restaurant"); and at the Santa Clara restaurant.  I was paid approximately $72,000 annually by the end of my employment.

3.      I was classified as a non-exempt employee during my training period at the Santa Clara restaurant.  My training included learning how to do every task that hourly employees perform in Red Robin restaurants and learning how the labor regulator system worked.  During training, I believe I worked ten-hour shifts at the Santa Clara restaurant with 30-minute meal breaks.  I do not recall receiving ten-minute uninterrupted rest breaks.  I was paid some overtime premium pay during training.

4.      After my initial 8-week training period was over, I was classified as an exempt employee throughout the time I worked at Red Robin.  My job duties included performing many of the same duties that hourly employees performed, such as assisting with line setup, hosting, table touches, running expo, refilling sauces, running ice, hooking up sodas, unpackaging deliveries, cleaning menus, waiting tables, cooking in various positions on the line, washing

dishes, bartending, making drinks, bussing tables, and performing cleaning duties.  Both salaried and hourly managers also had to make supply runs to get food supplies from other Red Robin restaurants or a liquor warehouse.  I made the runs myself approximately once a week, using my personal vehicle.  The round-trip mileage was on average about 30 miles, but I was not reimbursed for mileage.  Mostly managers counted money in the safe, but certain hourly employees did that as well.  I estimate I spent about 65 percent of my time performing the same work as hourly employees.

5.      The duties assigned to me that were not shared by most hourly employees included inventory, generating P/L reports, managing the store's finances, forecasting, setting up new drink rollouts, ordering supplies for drinks, generating reports, line checks, scheduling, interviewing prospective employees, entering daily log notes, issuing write-ups, and making food items complimentary ("comping") in response to customer complaints.  Hourly managers did many of these duties as well.  I ordered product (produce, alcohol, and dry goods) a couple times each week and completed inventory once per week.  I created employee schedules once per week, adjusting them as necessary throughout the week, based on the weekly labor budget determined by the software system.  I generated reports, entered log notes, and completed line checks on a daily basis.  I interviewed prospective employees and comped food items as needed.  I also issued write-ups as needed, most often for tardiness and call outs.  I estimate that I spent about 35 percent of my time engaged in duties assigned to me as a manager that were not shared by most hourly employees.

6.      All of my duties were performed according to Red Robin's corporate guidelines.  Red Robin gave me an 18-step pocket guide that was a detailed reference guide which included information about food storage, menu items, and cooking, among other things.  I completed line checks by going through checklists created by Red Robin corporate to make sure everything was clean, at the correct temperature, and ready for opening or closing.  I took inventory primarily for the bar by counting items in the store on Monday mornings.  To determine what to order, I compared my inventory to Red Robin's software's automated projection of what would be sold in the coming days and ordered the product that was needed to make up the difference.  I did not

have any discretion to choose a different vendor or to order any item not approved by Red Robin corporate.  The software system determined the weekly labor budget, which dictated how many people I could place in each position.  Shift times had to be planned to match the graph that the system produced, which sometimes meant phasing employees to side work in the middle of a dinner rush.  I had some discretion to stray from the system from 2012 to 2016, but after 2016, I had no discretion to schedule more employees than the system called for.  If I made the wrong choice about scheduling I was told in no uncertain terms that it was not the right decision.  I understood that if I did not follow the system it would reflect negatively on my performance and promotability.  District Managers especially emphasized following the labor budget.  The content of the reports I generated was predetermined by Red Robin's software system.  The log book I was required to fill out had predetermined fields for different subjects, such as sales, rushes, and weather, which I filled in.

7.      I had limited authority to hire, fire, or promote employees, as those decisions were generally made by the General Manager or HR.  If two managers agreed that someone should be hired, they would be hired.  Firing decisions were made by the General Manager and by Human Resources. I did not handle promotions.

8.      I typically worked about 60 to 65 hours per week, but sometimes it was more.  I was scheduled for 10 hours a day, but I usually worked approximately 13 hours on Mondays because they were inventory days and I had to arrive at 5:00 am and did not leave until around 6:00 pm.  On Fridays, Saturdays, and Sundays, I worked approximately 12 hours.  When I worked the opening shift, I would arrive at 7:00 am and would usually leave around 5:00 pm. When I worked the mid-shift, I would arrive around 11 am and would usually leave around 9 pm. When I worked the closing shift, I would arrive around 2:00 pm or 3:00 pm and leave around midnight or 1:00 am, depending on whether it was a weekend or a weekday.  The shifts I worked were similar in length across locations, though some locations, such as San Bruno, had longer hours due to worse understaffing. There were times when I worked longer than usual because someone called out or the restaurant was especially busy; at least three times a week, I would work more than twelve hours in a day because of staff unavailability.  A few times in 2018, I

worked double shifts, working from opening to closing as the only manager.  I also sometimes had to work the opening shift directly after a closing shift if a manager called out, which meant I did not have time for a decent night's sleep.  The managers called that working the "clopening" shift.  I was generally scheduled to work 5 days a week, but I typically worked six days per week, filling in for 5 to 6 hours on my days off due to understaffing.  At the end of my employment, I was working 7 days in a row for about four weeks, which ultimately led me to put in my notice after my complaints did not lead to sufficient change.

9.      I was not paid overtime premium pay while working at any of the Red Robin restaurants I was assigned to as a manager.

10.     After my training period, I was not provided with 30-minute uninterrupted meal breaks.  I just ate quickly in between doing other tasks or while doing other tasks.  Occasionally, I could take a lunch break if there was another manager on duty, but I was still on-call and expected to be available to respond immediately when needed.

11.     I was not provided with 10-minute uninterrupted rest breaks while I worked at Red Robin.  I was too busy, and even when I could stop working briefly, I was on-call to deal with any need that arose in the restaurant.

12.     To my knowledge, I was not paid premium pay for missed meal or rest breaks.

13.     I was responsible for making sure that hourly employees' job responsibilities were covered when they took breaks, which often meant performing those duties myself.  I estimate that I spent about 1 or 2 hours each shift covering for hourly employees while they were on break.  I also frequently filled in for hourly employees who called out if I could not find coverage.

14.     To my recollection, while I was working at the San Mateo restaurant, the busser position was eliminated and expeditor position was no longer filled reliably.  After these changes, I often performed bussing and expediting duties myself, as did other managers.

15.     To my knowledge, the other managers who worked at my restaurants, whether full-time or as guest managers, had the same responsibilities and worked the same kinds of hours that I did.  Since the San Mateo restaurant was a training location, I trained and kept in contact with

1    many managers who went on to work at other restaurants, and they had the same responsibilities

2    and worked the same kinds of hours that I did.  Managers often complained amongst themselves

3    about staffing issues.  I also made complaints about understaffing to the General Manager and

4    escalated the issue to the District Manager, though nothing ever resulted from my complaints.

5        16.    ███████████████████████████████████████

6    ████████████████████████████████████████████████

7    ██████████████████████████

8

9        I declare under penalty of perjury under the laws of the United States and the State of

10   California that the foregoing is true and correct, and that this declaration is executed at Hayward,

11   California on _____5/15/2023_____.

12

13                                              Derek De Lemos

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JENNIFER L. LIU (State Bar No. 279370)
REBECCA PETERSON-FISHER (State Bar No. 255359)
C. LEAH KENNEDY (State Bar No. 346306)
**LIU PETERSON-FISHER LLP**
1204 Burlingame Ave., Suite 3
Burlingame, CA 94010
Telephone: (650) 461-9000
Facsimile: (650) 460-6967
Email: jliu@liupetersonfisher.com
Email: rpf@liupetersonfisher.com
Email: lkennedy@liupetersonfisher.com

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| STEVEN MILLER, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>      v.<br><br>RED ROBIN INTERNATIONAL, INC. dba RED ROBIN BURGER AND SPIRITS EMPORIUMS, and DOES 1-100, inclusive,<br><br>        Defendants. | Case No. 22-CV-02574-JCS<br><br>**DECLARATION OF TAMARA FRANCHI**<br>Before the Hon. Joseph C. Spero |

DocuSign Envelope ID: DD3D9A82-2B4B-4D21-0856-D98D9CAABC52

## Declaration of Tamara Franchi

I, Tamara Franchi, declare as follows:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     I was employed by Red Robin for approximately seven years in total, and for two years I worked as an exempt manager.  I worked as an Assistant Manager from approximately May 2016 until around May 2018.  I trained for about six weeks at the Red Robin restaurant located in San Jose at 1000 El Paseo de Saratoga, San Jose, CA 95130 ("the Saratoga restaurant").  After training, I worked at the Red Robin restaurant in San Bruno at 1274 El Camino Real, San Bruno, CA 94066 ("the San Bruno restaurant").  I would occasionally guest manage at the Red Robin restaurant in San Mateo at 2204 Bridgepointe Pkwy, San Mateo, CA 94404 ("the San Mateo restaurant) as well as the Saratoga restaurant.  I was paid approximately $65,000 by the end of my employment.

3.     I was classified as a non-exempt employee during my training period at the Saratoga restaurant.  My training included learning how to do every task that hourly employees perform in Red Robin restaurants, and learning how the Watson labor regulator system worked. I believe I worked ten-hour shifts at the Saratoga restaurant with 30-minute meal breaks.  I do not recall receiving ten-minute uninterrupted rest breaks.  I was paid some overtime premium pay during training.

4.     I was classified as an exempt employee throughout the time I worked at the San Bruno restaurant.  My job duties included performing many of the same duties that hourly employees performed, such as assisting with line setup, hosting, table touches, running expo, refilling sauces, running ice, hooking up sodas, unpackaging deliveries, cleaning menus, waiting tables, cooking in various positions on the line, washing dishes, bartending, making drinks, bussing tables, and performing cleaning duties.  Both salaried and hourly managers also had to make supply runs to get food supplies from other Red Robin restaurants or a liquor warehouse.  I made the runs myself approximately once a week, using my personal vehicle.  The round-trip mileage was on average either 22 or 78 miles, depending on which restaurants I was driving

between, but I was not reimbursed for mileage.  Mostly managers counted money in the safe, but certain hourly employees did that as well.  I estimate I spent between 80 and 90 percent of my time performing the same work as hourly employees.

5.     The duties assigned to me that were not shared by most hourly employees included inventory, setting up new drink rollouts, ordering supplies for drinks, generating reports, line checks, scheduling, interviewing prospective employees, entering daily log notes, issuing write-ups, and making food items complimentary ("comping") in response to customer complaints.  Hourly managers did many of these duties as well.  I ordered product (produce, alcohol, and dry goods) a couple times each week and completed inventory once per week.  I created employee schedules once per week based on the weekly labor budget determined by the software system Watson.  I generated reports, entered log notes, and completed line checks on a daily basis.  I interviewed prospective employees and comped food items as needed.  I also issued write-ups as needed, most often for tardiness and call outs.  When the San Bruno restaurant did not have a General Manager, I occasionally took on additional duties as needed.  I estimate that I spent about 10 percent of my time engaged in duties assigned to me as a manager that were not shared by most hourly employees.

6.     All of my duties were performed according to Red Robin's corporate guidelines.  Red Robin gave me an 18-step pocket guide that was a detailed reference guide which included information about food storage, menu items, and cooking, among other things.  I completed line checks by going through checklists created by Red Robin corporate to make sure everything was clean, at the correct temperature, and ready for opening or closing.  I took inventory primarily for the kitchen by counting items in the store on Monday mornings.  To determine what to order, I compared my inventory to Red Robin's software's automated projection of what would be sold in the coming days and ordered the product that was needed to make up the difference.  I did not have any discretion to choose a different vendor or to order any item not approved by Red Robin corporate.  The software system, Watson, determined the weekly labor budget, which dictated how many people I could place in each position.  Shift times had to be planned to match the graph that Watson produced, which sometimes meant phasing employees to side work in the

DECLARATION OF TAMARA FRANCHI
CASE NO. 22-CV-02574 (JCS)

middle of a dinner rush.  I had some discretion to schedule fewer labor hours than the labor regulator system would allocate, which I would do on occasion in order to meet our store's labor budget; however, this required managers to take on more hourly work.  I did not have discretion to exceed the labor budget set by the labor regulator system, and if I made the wrong choice about scheduling I was told in no uncertain terms that it was not the right decision.  I understood that if I did not follow Watson, it would reflect negatively on my performance and promotability.  District Managers especially emphasized following the labor budget.  The content of the reports I generated was predetermined by Red Robin's software system.  The log book I was required to fill out had predetermined fields for different subjects, such as sales, rushes, and weather, which I filled in.

7.      Because the San Bruno restaurant did not have a General Manager for much of the time I worked at the location, I had the authority to hire, fire, and promote employees, and I would consult the District Manager to do so.

8.      I typically worked about 70 to 80 hours per week, but sometimes it was more.  I was scheduled for 10 hours a day but I usually worked approximately 16 hours on Mondays because they were inventory days and I had to arrive very early in the morning and stay late because the San Bruno restaurant was chronically understaffed.  When I worked the opening shift, I would arrive at 7:00 am and would usually leave around 5:00 pm at the San Mateo location and 7:00 pm at the San Bruno location.  When I worked the mid-shift, I would arrive around 11:00 am and would usually leave around 10:00 pm. When I worked the closing shift, I would arrive around 2:00 pm or 3:00 pm and leave around midnight or 1:00 am, depending on whether it was a weekend or a weekday.  The shifts I worked were similar in length across locations, though the San Bruno location tended to have longer hours due to understaffing.  I was generally scheduled to work 5 days a week, but I typically worked 7 days per week, filling in for 3 to 4 hours on my days off due to understaffing.  Approximately 3 to 4 times a week, I would work more than twelve hours, on average approximately 15 hours in a day, because of staff unavailability.  I worked closing to opening shifts ("clopening") approximately 2 to 3 times a

DECLARATION OF TAMARA FRANCHI
CASE NO. 22-CV-02574 (JCS)

DocuSign Envelope ID: D53D9A82-2B4B-4D21-9856-D98D9CAABC52

week at the San Bruno restaurant, and I would work from the opening shift to closing every Monday and occasionally when other managers were unavailable.

9.      I was not paid overtime premium pay while working at the San Bruno restaurant or while I was guest managing at the Saratoga and San Mateo restaurants.

10.      I was not provided with 30-minute uninterrupted meal breaks while I worked at the San Bruno restaurant. I just ate quickly in between doing other tasks or while doing other tasks. Occasionally, I could take a lunch break if there was another manager on duty, but I was still on-call and expected to be available to respond immediately when needed.

11.      I was not provided with 10-minute uninterrupted rest breaks while I worked at the San Bruno restaurant. I was too busy, and even when I could stop working briefly, I was on-call to deal with any need that arose in the restaurant.

12.      To my knowledge, I was not paid premium pay for missed meal or rest breaks.

13.      I was responsible for making sure that hourly employees' job responsibilities were covered when they took breaks, which meant I performed those duties myself for an average of 5 to 6.5 hours a day. I also frequently filled in for hourly employees who called out if I could not find coverage.

14.      To my recollection, while I was working at the San Bruno restaurant, the busser and expediter positions were eliminated. Once these positions were eliminated, I frequently had to perform those duties myself, so the amount of time I spent on hourly tasks increased from 80 percent to 90 percent.

15.      To my knowledge, the other managers who worked at my restaurants, whether full-time or as guest managers, had the same responsibilities and worked the same kinds of hours that I did. Managers often complained amongst themselves about staffing issues. I also made complaints about understaffing to the District Manager, though nothing ever resulted from my complaints.

16.      ████████████████████████████████████████████
████████████████████████████████

DECLARATION OF TAMARA FRANCHI
CASE NO. 22-CV-02574 (JCS)

1    I declare under penalty of perjury under the laws of the United States and the State of

2  California that the foregoing is true and correct, and that this declaration is executed at San

3  Mateo, California on _____.
                          5/18/2023

4

5                                          _____
                                           Tamara Franchi
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JENNIFER L. LIU (State Bar No. 279370)
REBECCA PETERSON-FISHER (State Bar No. 255359)
C. LEAH KENNEDY (State Bar No. 346306)
**LIU PETERSON-FISHER LLP**
1204 Burlingame Ave., Suite 3
Burlingame, CA 94010
Telephone: (650) 461-9000
Facsimile: (650) 460-6967
Email: jliu@liupetersonfisher.com
Email: rpf@liupetersonfisher.com
Email: lkennedy@liupetersonfisher.com

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| STEVEN MILLER, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>RED ROBIN INTERNATIONAL, INC. dba RED ROBIN BURGER AND SPIRITS EMPORIUMS, and DOES 1-100, inclusive,<br><br>        Defendants. | Case No. 22-CV-02574-JCS<br><br>**DECLARATION OF KARL GUIDOTTI**<br>Before the Hon. Joseph C. Spero |

DocuSign Envelope ID: DD06E1BE-EB6A-49E0-895A-BBF1E8B89B3B

## **Declaration of Karl Guidotti**

I, Karl Guidotti, declare as follows:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     I was employed by Red Robin for approximately one year in total.  I worked as an Assistant Manager from around November 2018 until around October or November 2019.  I trained for about four weeks at the Red Robin restaurant located in Folsom at 360 Palladio Pkwy #401, Folsom, CA 95630 ("the Folsom restaurant").  After training, I worked at the Red Robin restaurant in Elk Grove at 8245 Laguna Blvd, Elk Grove, CA 94758 ("the Elk Grove restaurant") for one or two months.  Then I worked at the Red Robin restaurant in Citrus Heights at 7990 Greenback Ln, Citrus Heights, CA 95610 ("the Citrus Heights restaurant").  I was paid approximately $60,000 by the end of my employment.

3.     My training at the Folsom restaurant included learning how to do every task that hourly employees perform in Red Robin restaurants, and learning how the Watson labor regulator system worked.

4.     I was classified as an exempt employee throughout the time I worked at the Elk Grove and Citrus Heights restaurants.  My job duties included performing many of the same duties that hourly employees performed, such as assisting with line setup, hosting, table touches, running expo, refilling sauces, running ice, hooking up sodas, unpackaging deliveries, cleaning menus, waiting tables, cooking in various positions on the line, washing dishes, bartending, making drinks, bussing tables, and performing cleaning duties.  Mostly managers counted money in the safe, but certain hourly employees did that as well.  I estimate I spent about 90 percent of my time performing the same work as hourly employees.

5.     The duties assigned to me that were not shared by most hourly employees included inventory, setting up new drink rollouts, ordering supplies for drinks, generating reports, line checks, scheduling, interviewing prospective employees, entering daily log notes, issuing write-ups, and making food items complimentary ("comping") in response to customer complaints.

DocuSign Envelope ID: DD06E1BF-FB6A-49E0-885A-BBF1E8B89B3B

Hourly manager did many of these duties as well. Both salaried and hourly managers also had to make supply runs to get food supplies from other Red Robin restaurants or a liquor warehouse. I made the runs myself every couple of months, using my personal vehicle. The round-trip mileage was on average about 40 miles, but I was not reimbursed for mileage. I ordered product (produce, alcohol, and dry goods) a couple times each week and completed inventory once per week. I created employee schedules once per week based on the weekly labor budget determined by the software system Watson. I generated reports, entered log notes, and completed line checks on a daily basis. I interviewed prospective employees and comped food items as needed. I also issued write-ups as needed, most often for tardiness and call outs. I estimate that I spent about 10 percent of my time engaged in duties assigned to me as a manager that were not shared by most hourly employees.

6. All of my duties were performed according to Red Robin's corporate guidelines. Red Robin gave me an 18-step pocket guide that described in detail how to do every task in the restaurant. I completed line checks by going through checklists created by Red Robin corporate to make sure everything was clean, at the correct temperature, and ready for opening or closing. I took inventory primarily for the bar by counting items in the store either on Sunday nights or on Monday mornings. To determine what to order, I compared my inventory to Red Robin's software's automated projection of what would be sold in the coming days and ordered the product that was needed to make up the difference. I did not have any discretion to choose a different vendor or to order any item not approved by Red Robin corporate. The software system, Watson, determined the weekly labor budget, which dictated how many people I could place in each position. Shift times had to be planned to match the graph that Watson produced, which sometimes meant phasing employees to side work in the middle of a dinner rush. I had no discretion to schedule differently, and if I made the wrong choice about scheduling I was told in no uncertain terms that it was not the right decision. I understood that if I did not follow Watson it would reflect negatively on my performance and promotability. District Managers especially emphasized following the labor budget. The content of the reports I generated was

DECLARATION OF KARL GUIDOTTI
CASE NO. 22-CV-02574 (JCS)

DocuSign Envelope ID: DD06E1BE-EB6A-49E0-885A-BBF1E8B89B3B

predetermined by Red Robin's software system.  The log book I was required to fill out had predetermined fields for different subjects, such as sales, rushes, and weather, which I filled in.

7.      I did not have the authority to hire, fire, or promote employees.  Those decisions were made by the General Manager or HR.

8.      I typically worked about 55 hours per week, but sometimes it was more.  I was scheduled for 10 hours a day but I usually worked between 11 and 12 hours on Sundays or Mondays because they were inventory days and I had to either stay very late at night or arrive very early in the morning.  I generally worked five days per week.  Once every month or two I would have to work more than twelve hours in a day because of staff unavailability.

9.      I was not paid overtime premium pay while working at the Elk Grove or Citrus Heights restaurants.

10.      I was not provided with 30-minute uninterrupted meal breaks while I worked at the Elk Grove or Citrus Heights restaurants.  I just ate quickly in between doing other tasks or while doing other tasks.  Occasionally, I could take a lunch break if there was another manager on duty, but I was still on-call and expected to be available to respond immediately when needed.

11.      I was not provided with 10-minute uninterrupted rest breaks while I worked at the Elk Grove or Citrus Heights restaurants.  I was too busy, and even when I could stop working briefly, I was on-call to deal with any need that arose in the restaurant.

12.      To my knowledge, I was not paid premium pay for missed meal or rest breaks.

13.      I was responsible for making sure that hourly employees' job responsibilities were covered when they took breaks, which often meant performing those duties myself.  I also frequently filled in for hourly employees who called out if I could not find coverage.

14.      During my employment, the Elk Grove and Citrus Heights restaurants did not have bussers or expediters. I frequently had to perform those duties myself.

15.      To my knowledge, the other managers who worked at my restaurants, whether full-time or as guest managers, had the same responsibilities and worked the same kinds of hours that I did.

DECLARATION OF KARL GUIDOTTI
CASE NO. 22-CV-02574 (JCS)

1    16.   ████████████████████████████████████

2    ████████

3

4        I declare under penalty of perjury under the laws of the United States and the State of

5    California that the foregoing is true and correct, and that this declaration is executed at Elk

6    Grove, California on  4/26/2023            .

7

8                                                    DocuSigned by:

9                                                    Karl Guidotti

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            4
                        DECLARATION OF KARL GUIDOTTI
                        CASE NO. 22-CV-02574 (JCS)

1  JENNIFER L. LIU (State Bar No. 279370)
   REBECCA PETERSON-FISHER (State Bar No. 255359)
2  C. LEAH KENNEDY (State Bar No. 346306)
   **LIU PETERSON-FISHER LLP**
3  1204 Burlingame Ave., Suite 3
   Burlingame, CA 94010
4  Telephone: (650) 461-9000
   Facsimile: (650) 460-6967
5  Email: jliu@liupetersonfisher.com
   Email: rpf@liupetersonfisher.com
6  Email: lkennedy@liupetersonfisher.com
7
8  *Attorneys for Plaintiff and the Proposed Class*

9              **UNITED STATES DISTRICT COURT**

10           **NORTHERN DISTRICT OF CALIFORNIA**

11                    **OAKLAND DIVISION**

12 | STEVEN MILLER, on behalf of himself and   | Case No. 22-CV-02574-JCS
   | all others similarly situated,

13 |                                           | **DECLARATION OF DEBORA LOPEZ**
   |                 Plaintiff,                 | **MARTINEZ**
14 |
15 |          v.                               | Before the Hon. Joseph C. Spero
16 | RED ROBIN INTERNATIONAL, INC. dba
   | RED ROBIN BURGER AND SPIRITS
17 | EMPORIUMS, and DOES 1-100, inclusive,
18 |
   |                 Defendants.
19
20
21
22
23
24
25
26
27
28

### Declaration of Debora Lopez Martinez

I, Debora Lopez Martinez, declare as follows:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      I was employed by Red Robin as a line cook beginning in 2014 and then as a Kitchen Manager, and briefly as an Assistant Manager, from about 2015 until 2019.  I trained for two or three months at the Red Robin restaurant located in Cypress, California at 5461 Katella Avenue, Cypress, CA 90630 ("the Cypress restaurant").  After training, my "home" location was the Red Robin restaurant in West Covina at 428 Plaza Drive, West Covina, CA 91790 ("the West Covina restaurant"), but I also worked at various restaurants in the San Francisco area for a few months, including San Bruno at 1274 El Camino Real, San Bruno, CA 94066 ("the San Bruno restaurant") and San Mateo at 2204 Bridgepointe Parkway, San Mateo, CA 94404 ("the San Mateo restaurant").  I sometimes guest managed at the Red Robin restaurant in Redondo at 1815 Hawthorne Boulevard, Redondo Beach, CA 90278 ("the Redondo restaurant"), the Red Robin restaurant in Lakewood at 112 Lakewood Center Mall, Lakewood, CA 90712 ("the Lakewood restaurant"), and the Cypress restaurant.  I was paid an annual salary of approximately $52,000 or $53,000 at the beginning of my employment, which was raised to approximately $57,000 by the end of my employment.

3.      I was classified as a non-exempt employee during my training period at the Cypress restaurant.  My training included learning how to do every task that hourly employees perform in Red Robin restaurants, including hosting and the proper bussing of tables.  I believe I worked ten-hour shifts at the Cypress restaurant with 30-minute meal breaks.  I received ten-minute uninterrupted rest breaks.  I do not recall if I was paid overtime premium pay during training.

4.      I was classified as an exempt employee throughout the time I worked as a Kitchen Manager and Assistant Manager.  My job duties included performing many of the same duties that hourly employees performed, such as bussing tables, serving tables, greeting guests and hosting, taking orders, table touches, running expo, refilling sauces, running ice, hooking up

sodas, unpackaging deliveries, cleaning menus, deep cleaning the kitchen, power washing, prepping, taking out trash, mopping and scrubbing floors, bartending, waiting tables, cooking in various positions on the line, washing dishes, making drinks, and running to-go orders to cars. I also used my personal car to make trips to other Red Robin restaurants for supplies. These errands happened at least once a week, either before or after my shifts or on my days off, and I was not reimbursed for mileage. I was also responsible for training employees, a task that was also performed by hourly shift supervisors or "leads." I estimate I spent about 60 percent of my time performing the same work as hourly employees after the busser position eliminated. Whenever the labor model changed or hourly labor was cut, I had to fill in the gaps left by the understaffing by performing hourly duties.

5.      The duties assigned to me as a manager that were not shared by hourly employees included setting up shifts, production, and prep lists on a daily basis; orienting new employees; giving annual team members performance reviews; conducting team meetings; inventory; ordering; generating reports; line checks; scheduling; interviewing prospective employees; entering daily log notes; issuing write-ups; and making food items complimentary ("comping") in response to customer complaints. I ordered product (food items, alcohol, and dry goods) three times per week, completed inventory once per week, and created employee schedules once per week, modifying them as necessary throughout the week. I generated reports, entered log notes, and completed line checks on a daily basis. I interviewed prospective employees and comped food items as needed. I also issued write-ups as needed, most often for tardiness and call outs. After the busser position was eliminated, I estimate that I spent about 40 percent of my time on these duties.

6.      All of my duties were performed according to Red Robin's corporate guidelines. Red Robin gave me an 18-step pocket guide that described in detail how to do every task in the restaurant. I completed line checks by going through checklists created by Red Robin corporate to make sure everything was clean, at the correct temperature, and ready for opening or closing. I took inventory by counting every item in the store, usually with another manager. To determine what to order, I compared my inventory to Red Robin's software's automated projection of what

DocuSign Envelope ID: BA91AEB4-D358-45D8-A83B-76F16B5329E4

would be sold in the coming days and ordered the product that was needed to make up the difference. I did not have any discretion to choose a different vendor or to order any item not approved by Red Robin corporate. The General Manager would perform projections using software called Watson. Watson projected a guest count based on the previous year's sales and the sales from the previous week. For example, if the software projected 10 guests from 11 to 11:30, it would grant 1.5 cooks for that time. I would use the projections from my General Manager to schedule hourly employees by matching them to the hour-by-hour graphical projection. The system was difficult in practice because it did not allow me to schedule additional people, even though it was very common for people to call out on the weekends. The content of the reports I generated was predetermined by Red Robin's software system. The log book I was required to fill out had predetermined fields for different subjects, such as sales, rushes, and weather, which I filled in.

7.      I did not have complete authority to hire, fire, or discipline employees. Although I had input and the General Manager usually agreed with my judgment, the General Manager had final say over those decisions, particularly when it came to firing.

8.      I typically worked about 58 hours per week as a Kitchen Manager and Assistant Manager. My shifts ranged in length from nine hours to 14 hours, with longer shifts on Mondays and weekends. When I worked the opening shift, I would arrive around 7:00 am and would usually leave around 5:00 or 6:00 pm. When I worked the mid-shift, I would arrive around noon and would usually leave around 11:00 pm. When I worked the closing shift, I would arrive around 3 pm and leave between 11:30 pm and 1:00 am. I usually worked 11 or 12 hours on Mondays because they were inventory days and I had to arrive around 6:00 am, and I would often take work (such as administrative tasks, scheduling, reviewing inventory numbers, and bookkeeping) home with me. Although I was scheduled for 5 days a week, I worked 6 days in a row approximately once a month and 7 days in a row frequently during the holidays. I also sometimes had to work the opening shift directly after a closing shift if a manager called out, which meant I did not have time for a decent night's sleep. The managers called that working the "clopening" shift.

DECLARATION OF DEBORA LOPEZ MARTINEZ
CASE NO. 22-CV-02574 (JCS)

9.      I was not paid overtime premium pay while working as a Kitchen Manager or Assistant Manager.

10.      I was not provided with 30-minute uninterrupted meal breaks while I worked as a Kitchen Manager or Assistant Manager.  I just ate quickly in between doing other tasks or while doing other tasks, or I did not eat at all.  I did not leave the restaurant to take meal breaks.

11.      I was not provided with 10-minute uninterrupted rest breaks while I worked as a Kitchen Manager or Assistant Manager.  I was too busy, and even when I could stop working briefly, I was on-call to deal with any needs that arose in the restaurant.

12.      To my knowledge, I was not paid premium pay for missed meal or rest breaks.

13.      However, I was responsible for making sure that hourly employees' job responsibilities were covered when they took breaks, which sometimes meant performing those duties myself.  On weekdays, I usually spent an hour to an hour and a half each shift covering for hourly employees while they were on meal breaks; on weekends, I usually spent one and a half to three hours covering for hourly employees.  I also frequently filled in for hourly employees who called out when I could not find anyone to cover the shifts.  For example, if a cook called out, I would step up and cook for that shift.

14.      As I recall, while I worked at the West Covina restaurant, the busser position was eliminated, along with the expeditor position.  As a result of this change, I took on more bussing and expediting duties (or took on more server duties while servers handled bussing), which further increased the amount of time I spent performing hourly tasks.  In general, whenever there were labor cuts, I was expected to fill in the gaps.  For example, if it was Wednesday or Thursday and our store had not hit hours for the week, we would have to trim hours and call team members off.  I would then put in my own time to cover their duties.

15.      I spoke with other managers about the long hours that we worked, the lack of breaks, and not having enough staff.  I complained occasionally to the General Manager, but the most she would do was give me some time and space for a short break.  I also complained to the District Manager, who would visit the store once a month or every other month.  The District Manager would take notes, and one time, she sent something to corporate, and they put an ad out

4

DECLARATION OF DEBORA LOPEZ MARTINEZ
CASE NO. 22-CV-02574 (JCS)

1  on Indeed, which resulted in more applicants for an hourly position.  This happened only once.

2  Otherwise, nothing ever resulted from my complaints.

3      16.   ████████████████████████████████████████

4  █████████████████████████████████████

5

6      I declare under penalty of perjury under the laws of the United States and the State of

7  California that the foregoing is true and correct, and that this declaration is executed at Mobile,

8  Alabama on _____.
   5/11/2023

9

10  _____
                    4D00A8FB99024D8...
    Debora Lopez Martinez

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DEBORA LOPEZ MARTINEZ
CASE NO. 22-CV-02574 (JCS)

# EXHIBIT D

# JOINT STIPULATION AND SETTLEMENT AGREEMENT

Subject to final approval by the Court, this Settlement Agreement is between Armando Bautista ("Plaintiff"), and Defendant Red Robin International, Inc. DBA Red Robin Burger and Spirits Emporiums ("Defendant" or "Red Robin"). Plaintiff and Defendant collectively are referred to in this Agreement as the "Parties."

## I.   DEFINITIONS

In addition to the other terms defined in this Agreement, the terms below have the following meaning:

A.   **Administration Costs**: The costs incurred by the Settlement Administrator to administer this Settlement, which shall not exceed $10,000. All Administration Costs shall be paid from the Gross Settlement Amount.

B.   **Agreement, Settlement Agreement, Joint Stipulation, or Settlement**: The settlement agreement reflected in this document, titled "Joint Stipulation and Settlement Agreement."

C.   **Attorney Fee Award**: The amount, not to exceed 33.33% or $231,435 of the Gross Settlement Amount, finally approved by the Court and awarded to Class Counsel. The Attorney Fee Award shall be paid from the Gross Settlement Amount and will not be opposed by Defendant.

D.   **Case**: Armando Bautista v. Red Robin International, Inc. DBA Red Robin Burger and Spirits Emporiums, San Joaquin Superior Court Case No. STK-cv-UOE-2018-2270.

E.   **Class**: All persons within the State of California who are or were employed by Defendant in the State of California at any time as a Kitchen Manager, or who performed duties as a Kitchen Manager, from February 26, 2014, through the date the Court enters an order granting Preliminary Approval or February 17, 2019, whichever occurs first.

F.   **Class Counsel**: David Mara, Jill Vecchi, and Matthew Crawford of The Turley & Mara Law Firm, APLC.

G.   **Class Member**: Each person eligible to participate in this Settlement who is a member of the Class as defined above.

H.   **Class Notice or Notice**: The Notice of Class Action Settlement, substantially similar to the form attached hereto as **Exhibit A**, subject to Court approval.

I.   **Class Period**: February 26, 2014, through the date the Court enters an order granting Preliminary Approval, or February 17, 2019, whichever occurs first.

1

J..  **Class Representative or Plaintiff:** Armando Bautista..

K.  **Class Representative General Release Payment:** The amount the Court awards to Plaintiff for his execution of a broader general release of claims against Defendant than Participating Class Members, which will not exceed $10,000.00. This payment shall be paid from the Gross Settlement Amount and will not be opposed by Defendant and is being offered in consideration for the Plaintiff executing a general release of claims against Defendant, a release that is broader than any Participating Class Member will provide in consideration for a settlement share.

L.  **Cost Award:** The amount that the Court orders Defendant to pay Class Counsel for payment of actual litigation costs, which shall not exceed $40,000.00. The Cost Award will be paid from the Qualified Settlement Fund and will not be opposed by Defendant. The Cost Award is subject to Court approval. If the Court awards less than the amount requested, any amount not awarded will become part of the Net Settlement Amount for distribution to Participating Class Members.

M.  **Counsel for Defendant:** Lonnie Giamela and Sean Daley of Fisher & Phillips LLP.

N.  **Defendants:** Red Robin International, Inc. DBA Red Robin Burger and Spirits Emporiums.

O.  **Disbursement of the Settlement:** The date on which the Settlement Administrator shall disburse the Gross Settlement Amount as indicated herein. Under the terms of this Settlement Agreement, fifteen (15) business days after the Effective Final Settlement Date, the Settlement Administrator shall disburse: (1) the Net Settlement Amount to be paid to Participating Class Members; (2) the Attorney Fee Award and Cost Award to Class Counsel for attorneys' fees and costs, as approved by the Court; (3) the Class Representative General Release Payment paid to the Class Representative, as approved by the Court; (4) the Administration Costs, as approved by the Court; (5) the PAGA Payment to the LWDA and to Participating Class Members, as approved by the Court; and (6) Defendant's portion of payroll taxes as the Class Members' current or former employer.

P.  **Effective Final Settlement Date:** The effective date of this Settlement will be when the final approval of the settlement can no longer be appealed, or, if there are no objectors and no plaintiffs in intervention at the time the court grants final approval of the settlement, the date the court enters judgment granting final approval of the settlement.

**Q.**   **Funding of Settlement:** Defendant shall wire to the Settlement Administrator the Gross Settlement Amount within ten (10) business days of the Effective Final Settlement Date.

**R.**   **Final Judgment or Final Approval:** The final order entered by the Court finally approving this Agreement.

**S.**   **Gross Settlement Amount or GSA:** The total value of the Settlement is a non-reversionary $695,000. This is the gross amount Defendant can be required to pay under this Settlement Agreement, which includes without limitation: (1) the Net Settlement Amount to be paid to Participating Class Members; (2) the Attorney Fee Award and Cost Award to Class Counsel for attorneys' fees and costs, as approved by the Court; (3) the Class Representative General Release Payment paid to the Class Representative, as approved by the Court; (4) the Administration Costs, as approved by the Court; (5) the PAGA Payment to the LWDA and to Participating Class Members, as approved by the Court; and (6) Defendant's portion of payroll taxes as the Class Members' current or former employer. No portion of the Gross Settlement Amount will revert to Defendant for any reason.

**T.**   **Individual Settlement Share(s):** The amount payable to each Participating Class Member under the terms of this Settlement Agreement. Class Members are not required to submit a claim form to receive their Individual Settlement Shares pursuant to this Agreement. Rather, Participating Class Members will receive an Individual Settlement Share automatically, without the return of a claim form.

**U.**   **LWDA:** California Labor and Workforce Development Agency.

**V.**   **Net Settlement Amount or NSA:** The total amount of money available for payout to Participating Class Members, which is the GSA less the Attorney Fee Award, Cost Award, Class Representative General Release Payments, the portion of the PAGA Payment paid to the LWDA, Defendant's portion of payroll taxes and Administration Costs. In other words, the NSA is the portion of the GSA that will be distributed to Class Members who do not request exclusion from the Settlement. The payment of employee-side taxes on the portion of the settlement shares earmarked as wages shall be paid out of the Net Settlement Amount. Thus, the individual settlement shares that are paid out of the Net Settlement Amount shall be reduced by the employee's tax liability for the share.

**W.**   **PAGA:** The California Labor Code Private Attorneys General Act of 2004 (Cal. Labor Code §§ 2698 *et seq.*).

**X.**   **PAGA Payment:** The PAGA Payment consists of $20,000 of the Gross Settlement Amount allocated to satisfy the PAGA penalties claim as alleged in

3

the in the Complaint. Seventy-five percent (75%) of the PAGA Payment $15,000 shall be paid to the LWDA, and twenty-five percent (25%) $5,000 of the PAGA Payment shall be part of the Net Settlement Amount distributed to Participating Class Members.

Y.   **Participating Class Members**:  All Class Members who **do not** submit a valid and timely request to exclude themselves from this Settlement.

Z.   **Parties**:  Plaintiff Armando Bautista as an individual and as Class Representative, and Red Robin

AA.  **Preliminary Approval or Preliminary Approval Order**: The Court's order preliminarily approving the proposed Settlement.

BB.  **Released Claims**: Putative class members who do not opt out of the settlement will release all known and unknown state law claims that were alleged or that could have been alleged based on the facts of the complaint filed in the matter. The Released Claims shall include a release of claims under California Labor Code Sections 201, 203, 204, 226, 226.3, 226.7, 510, 512, 558,  as well as claims under PAGA through the Effective Date.  Released Claims include, but are not limited to, claims for failure to pay straight time wages, failure to pay overtime and double time wages, failure to provide itemized wage statements, waiting time penalties, failure to provide meal periods, failure to rest periods, failure to reimburse expenses, record keeping violations, unfair competition under Section 17200 of the California Business and Professions Code and statutes providing for the failure to pay minimum wage and providing for liquidated damages or penalties for violations of the California Labor Code. The release will be as to the released parties, which shall include Defendant and its respective parent companies, subsidiaries, affiliates, shareholders, members, agents (including, without limitation, any investment bankers, accountants, insurers, reinsurers, attorneys and any past, present or future officers, directors and employees) predecessors, successors, and assigns. The release only applies to periods of time when Class Members were members of the Class (i.e., excluding periods of time in an exempt position).

CC.  **Released Parties**: Defendant and its past, present and/or future, direct and/or indirect, officers, directors, employees, representatives, administrators, attorneys, agents, parent companies, subsidiaries and affiliated corporations and entities, consultants, insurers, shareholders, joint ventures, predecessors, successors, and/or assigns.

DD.  **Response Deadline**:  Thirty (30) calendar days from the initial mailing of the Notice.

EE.  **Settlement Administration**: The Settlement Administrator will conduct a skip trace for the address of all former employee Class Members. The Settlement

Administrator will mail the Notice by first class U.S. mail to all Class Members at the address Defendant has on file for those Class Members and to all former employee Class Members at the address resulting from the skip trace. The Notice will inform Class Members that they have until the Response Deadline to either object to the Settlement or to opt-out of the Settlement. Any Class Member who does not receive Notice after the steps outlined above have been taken will still be bound by the Settlement and/or judgment.

FF.     **Settlement Administrator**: The third party administrator agreed upon by Parties to administer this Settlement is CPT Group, Inc.

GG.     **Superior Court**: Superior Court of California, for the County of San Joaquin

## II.     **RECITALS**

A.      The Action was filed by Plaintiff Armando Bautista in the San Joaquin County Superior Court on February 26, 2018. The complaint alleged causes of action on behalf of Plaintiff and those similarly situated salaried kitchen managers for failure to provide meal and rest periods, failure to pay all wages worked at the straight and overtime time rate, failure to properly itemize wage statements, and failure to pay for all wages owed at the time of termination, claims under the California Unfair Competition Law, and Private Attorneys General Act.

B.      Defendant Answered the Complaint on April 16, 2018. In its answer Defendant affirmatively denied generally and specifically all claims raised in the complaint.

C.      Plaintiff propounded two rounds of special interrogatories and demands for production of documents to which Defendant responded. Thereafter, Plaintiff conducted the deposition of Defendant's Person Most Qualified to testify on designated subject areas related to the allegations in the complaint.

D.      In addition, Plaintiff reviewed a substantial amount of data and documents relating to the size and scope of the class that permitted an evaluation of the class-wide claims.

E.      The parties attended mediation with Mark Rudy on December 11, 2018, whereupon the parties were able to reach an agreement on settlement following a mediator's proposal.

F.      **Benefits of Settlement to Class Members.** Plaintiff and Class Counsel recognize the expense and length of continued proceedings necessary to continue the litigation against Defendant through trial and through any possible appeals. Plaintiff and Class Counsel also have taken into account the uncertainty and risk of further litigation, the potential outcome, and the difficulties and delays inherent in such litigation. Plaintiff and Class Counsel

have conducted extensive settlement negotiations. Based on the foregoing, Plaintiff and Class Counsel believe the Settlement set forth in this Agreement is a fair, adequate, and reasonable settlement, and is in the best interests of the Class Members.

G.  **Defendant's Reasons for Settlement.** Defendant recognizes that the defense of this litigation will be protracted and expensive. Substantial amounts of time, energy, and resources of Defendant has been and, unless this Settlement is made, will continue to be devoted to the defense of the claims asserted by Plaintiff. Defendant, therefore, has agreed to settle in the manner and upon the terms set forth in this Agreement to put to rest the Released Claims.

H.  **Defendant's Denial of Wrongdoing.** Defendant generally and specifically denies any and all liability or wrongdoing of any sort with regard to any of the claims alleged, makes no concessions or admissions of liability of any sort, and contends that for any purpose other than settlement, the Action is not appropriate for class treatment. Defendant asserts a number of defenses to the claims, and has denied any wrongdoing or liability arising out of any of the alleged facts or conduct in the Action. Neither this Agreement, nor any document referred to or contemplated herein, nor any action taken to carry out this Agreement, is or may be construed as, or may be used as an admission, concession, or indication by or against Defendant or any of the Released Parties of any fault, wrongdoing, or liability whatsoever. There has been no final determination by any court as to the merits of the claims asserted by Plaintiff against Defendant or as to whether a class or classes should be certified, other than for settlement purposes only.

I.  **Plaintiff's Claims.** Plaintiff asserts that Defendant's defenses are without merit. Neither this Agreement nor any documents referred to or contemplated herein, nor any action taken to carry out this Agreement is, may be construed as, or may be used as an admission, concession or indication by or against Plaintiff, Class Members, or Class Counsel as to the merits of any claims or defenses asserted, or lack thereof, in the Action. However, in the event that this Settlement is finally approved by the Court, the Plaintiff, Class Members, and Class Counsel will not oppose Defendant's efforts to use this Agreement to prove that Plaintiff and Class Members have resolved and are forever barred from re-litigating the Released Claims.

III.  **SETTLEMENT TERMS AND CONDITIONS**

A.  **Gross Settlement Amount.** Subject to the terms and conditions of this Agreement, the maximum Gross Settlement Amount, including payroll taxes, that Defendant is obligated to pay under this Settlement Agreement is $695,000

B.  **Class Certification.** Solely for the purposes of this Settlement, the Parties stipulate and agree to certification of the claims asserted on behalf of Class

6

Members. As such, the Parties stipulate and agree that in order for this Settlement to occur, the Court must certify the Class as defined in this Agreement.

C.   **Conditional Nature of Stipulation for Certification.** The Parties stipulate and agree to the certification of the claims asserted on behalf of Plaintiff and Class Members for purposes of this Settlement only. If the Settlement does not become effective, the fact that the Parties were willing to stipulate to certification as part of the Settlement shall not be admissible or used in any way in connection with, the question of whether the Court should certify any claims in a non-settlement context in this Action or in any other lawsuit. The stipulation regarding class certification shall become null and void if approval to this agreement is not given. If the Settlement does not become effective, Defendant reserves the right to contest any issues relating to class certification and liability.

D.   **Appointment of Class Representative.** Solely for the purposes of this Settlement, the Parties stipulate and agree Plaintiff Armando Bautista shall be appointed as representative for the Class.

E.   **Appointment of Class Counsel.** Solely for the purpose of this Settlement, the Parties stipulate and agree that the Court appoint Class Counsel to represent the Class.

F.   **Individual Settlement Share.** Subject to the terms and conditions of this Agreement, the Settlement Administrator will pay an Individual Settlement Share from the Net Settlement Amount to each Participating Class Member.

   1.   **Calculation.**

      a.   **Individual Settlement Share Calculation.** Each Participating Class Member will receive a proportionate share of the Net Settlement Amount that is equal to (i) the number of weeks he or she worked for Defendant in California as a kitchen manager based on the Class data provided by Defendant, divided by (ii) the total number of weeks worked by all Participating Class Members based on the same Class data, which is then multiplied by the Net Settlement Amount. One day worked in a given week as a kitchen manager for Defendant will be credited as a week for purposes of this calculation. Therefore, the value of each Class Member's Individual Settlement Share ties directly to the amount of weeks that he or she worked as a kitchen manager for Defendant in California.

   2.   **Tax Withholdings.** Each putative class member's gross settlement award will be apportioned as follows: 33.3% wages, 33.3% interest, and 33.3%

FPDOCS 34861641.1

penalties. The amounts paid as wages shall be subject to all tax withholdings customarily made from an employee's wages and all other authorized and required withholdings and shall be reported by W-2 forms. Payment of all amounts will be made subject to backup withholding unless a duly executed W-9 form is received from the payee(s). The amounts paid as penalties and interest shall be subject to all authorized and required withholdings other than the tax withholdings customarily made from employees' wages and shall be reported by IRS 1099 forms. Both the employer and employee share of payroll tax withholdings shall be from each persons' Individual Settlement Share.

G. **Constituents of GSA Disbursement.** Subject to the terms and conditions of this Agreement, the Settlement Administrator shall disburse the GSA as directed later on herein to the following:

1. **To the Named Plaintiff:** In addition to his Individual Settlement Share, and subject to the Court's approval, the named Plaintiff, Armando Bautista, will receive up to $10,000 in consideration for providing Defendant a General Release, a release that is broader than the claims released by Participating Class Members. The Settlement Administrator will pay the Class Representative Enhancement/General Release Payment out of the Qualified Settlement Fund. Payroll tax withholdings and deductions will not be taken from the Class Representative General Release Payment. An IRS Form 1099 will be issued to the Plaintiff with respect to his General Release Payment.

2. **To Class Counsel.** Class Counsel will apply to the Court for, and Defendant agrees not to oppose, a total Attorney Fee Award not to exceed 33.33% or $231,435 of the GSA and a Cost Award not to exceed $40,000. The Settlement Administrator will pay the court-approved amounts for the Attorney Fee Award and Cost Award out of the Gross Settlement Fund. Settlement Administrator may purchase an annuity to utilize US treasuries and bonds or other attorney fee deferral vehicles for Class Counsel. Payroll tax withholding and deductions will not be taken from the Attorney Fee Award or the Cost Award. IRS Forms 1099 will be issued to Class Counsel with respect to the Attorney Fee Award. In the event the Court does not approve the entirety of the application for the Attorney Fee Award and/or Cost Award, the Settlement Administrator shall pay whatever amount the Court awards, and neither Defendant nor the Settlement Administrator shall be responsible for paying the difference between the amount requested and the amount awarded. If the amount awarded is less than the amount requested by Class Counsel for the Attorney Fee Award and/or Cost Award, the difference shall become part of the NSA and be available for distribution to Participating Class Members.

3. **To the Responsible Tax Authorities.** The Settlement Administrator will pay the amount of the Participating Class Members' portion of normal payroll withholding taxes out of each person's Individual Settlement Share. Out of each Individual Settlement Share, the Settlement Administrator shall also pay the Defendant's portion of payroll taxes as the current or former employer (including the employer's payment of applicable FICA, FUTA, and SUI contributions, etc.) to the appropriate local, state, and federal taxing authorities. The Settlement Administrator will calculate the amount of the Participating Class Members' and Defendant's portion of payroll withholding taxes and forward those amounts to the appropriate taxing authorities.

4. **To the Settlement Administrator.** The Settlement Administrator - CPT Group, Inc. - will pay to itself Administration Costs (reasonable fees and expenses) approved by the Court not to exceed $10,000. This will be paid out of the Gross Settlement Amount. If the actual amount of Administration Costs is less than the amount estimated and/or requested, the difference shall become part of the NSA and be available for distribution to Participating Class Members.

5. **To the LWDA.** The Settlement Administrator will pay $20,000 of the Gross Settlement Amount allocated to satisfy the PAGA penalties claim as alleged in the First Amended Complaint. Seventy-five percent (75%) of the PAGA Payment shall be paid to the LWDA, and twenty-five percent (25%) of the PAGA Payment shall be part of the Net Settlement Amount distributed to Participating Class Members.

6. **To Class Members.** The Settlement Administrator will pay Participating Class Members according to the Individual Settlement Share calculations set forth above. All payments to Participating Class Members shall be made from the Qualified Settlement Fund.

H. **Appointment of Settlement Administrator.** Solely for the purposes of this Settlement, the Parties stipulate and agree that CPT Group, Inc. shall be retained to serve as Settlement Administrator. The Settlement Administrator shall be responsible for preparing, printing, and mailing the Notice to the Putative Class Members; keeping track of any objections or requests for exclusion from Class Members; performing skip traces and remailing Notices and Individual Settlement Shares to Class Members; calculating any and all payroll tax deductions as required by law; calculating each Class Member's Individual Settlement Share; providing weekly status reports to Defendant's Counsel and Class Counsel, which is to include updates on any objections or requests for exclusion that have been received; providing a due diligence declaration for submission to the Court prior to the Final Approval hearing; mailing Individual Settlement Shares to Participating Class Members; calculating and mailing the PAGA Payment to the LWDA; distributing the Attorney Fee Award and Cost Award to Class Counsel; printing and providing

9

Class Members and Plaintiff with W-2s and 1099 forms as required under this Agreement and applicable law; providing a due diligence declaration for submission to the Superior Court upon the completion of the Settlement; providing any funds remaining in the QSF as a result of uncashed checks to the State Treasury for deposit in the Trial Court Improvement and Modernization Fund and the Equal Access Fund of the Judicial Branch, in the amounts directed per this Settlement, including the administration of related tax reimbursements; and for such other tasks as the Parties mutually agree. The Parties each represent that they do not have any financial interest in CPT Group, Inc. or otherwise have a relationship with CPT Group, Inc. that could create a conflict of interest.

## I. Procedure for Approving Settlement.

### 1. Motion for Preliminary Approval and Conditional Certification.

**a.** Plaintiff will move for an order conditionally certifying the Class for settlement purposes only, giving Preliminary Approval of the Settlement, setting a date for the Final Approval hearing, and approving the Class Notice.

**b.** At the Preliminary Approval hearing, the Plaintiff will appear, support the granting of the motion, and submit a proposed order granting conditional certification of the Class and Preliminary Approval of the Settlement; appointing the Class Representative, Class Counsel, and Settlement Administrator; approving the Class Notice; and setting the Final Approval hearing.

**c.** Should the Court decline to conditionally certify the Class or to Preliminarily Approve all material aspects of the Settlement, the Settlement will be null and void, and the Parties will have no further obligations under it. Provided, however, that the amounts of the Attorney Fee Award, Cost Award, Administration Costs, and Class Representative General Release Payment shall be determined by the Court, and the Court's determination on these amounts shall be final and binding, and that the Court's approval or denial of any amount requested for these items are not conditions of this Settlement Agreement, and are to be considered separate and apart from the fairness, reasonableness, and adequacy of the Settlement. Any order or proceeding relating to an application for the Attorney Fee Award, Cost Award, Administration Costs, and Class Representative General Release Payment shall not operate to terminate or cancel this Settlement Agreement. Nothing in this Agreement shall limit Plaintiff's or Class Counsel's ability to appeal any decision by the Court to award less than the requested Attorney Fee Award, Cost Award, Administration Costs, and Class Representative Enhancements.

FPDOCS 34861641.1

2. **Notice to Class Members.** After the Court enters its Preliminary Approval Order, every Class Member will be provided with the Class Notice in accordance with the following procedure:

    a. Within ten (10) business days after entry of the Preliminary Approval Order, Defendant shall deliver to the Settlement Administrator an electronic database, which will list for each Class Member: (1) first and last name; (2) last known mailing address; (3) social security number; (4) hire and termination dates; and (5) the total number of weeks during which the Class Member was employed as a kitchen manager for Defendant during the Class Period ("Database"). If any or all of this information is unavailable to Defendant, Defendant will so inform Class Counsel and the Parties will make their best efforts to reconstruct or otherwise agree upon how to deal with the unavailable information. The Settlement Administrator will conduct a skip trace for the address of all former Defendant employee Class Members. The Database shall be based on Defendant's payroll, personnel, and other business records. The Settlement Administrator shall maintain the Database and all data contained within the Database as private and confidential.

    b. Within fifteen (15) business days after entry of the Preliminary Approval Order, the Settlement Administrator will mail the Class Notice to all identified Class Members via first-class regular U.S. Mail, using the mailing address information provided by Defendant and the results of the skip trace performed on all former Defendant employee Class Members.

    c. If a Class Notice is returned because of an incorrect address, within five (5) business days from receipt of the returned Notice, the Settlement Administrator will conduct a search for a more current address for the Class Member and re-mail the Class Notice to the Class Member. The Settlement Administrator will use the National Change of Address Database and skip traces to attempt to find the current address. The Settlement Administrator will be responsible for taking reasonable steps to trace the mailing address of any Class Member for whom a Class Notice is returned by U.S. Postal Service as undeliverable. These reasonable steps shall include, at a minimum, the tracking of all undelivered mail; performing address searches for all mail returned without a forwarding address; and promptly re-mailing to Class Members for whom new addresses are found. The Settlement Administrator is unable to locate a better address, the Class Notice shall be re-mailed to the original address. If the Class Notice is re-mailed,

the Settlement Administrator will note for its own records the date and address of each re-mailing.

d. The Settlement Administrator shall provide a weekly status report to the Parties. As part of its weekly status report, the Settlement Administrator will inform Class Counsel and Defendant's Counsel of the number of Notices mailed, the number of Notices returned as undeliverable, the number of Notices re-mailed, and the number of requests for exclusion and objections, if any, received.

e. No later than fourteen (14) calendar days after the Response Deadline, the Settlement Administrator will serve on the Parties a declaration of due diligence setting forth its compliance with its obligations under this Agreement. The declaration from the Settlement Administrator shall also be filed with the Court by Class Counsel no later than ten (10) calendar days before the Final Approval hearing. Before the Final Approval hearing, the Settlement Administrator will supplement its declaration of due diligence if any material changes occur from the date of the filing of its prior declaration.

3. **Objections to Settlement.** The Class Notice will provide that the Class Members who wish to object to the Settlement must do so in writing, signed, dated, and mailed to the Settlement Administrator postmarked no later than the Response Deadline. The timeframe to submit an objection will not be increased for returned mailings.

a. **Format.** Any Objections shall state: (a) the objecting person's full name, address, and telephone number; (b) the words "Notice of Objection" or "Formal Objection;" (c) describe, in clear and concise terms, the legal and factual arguments supporting the objection; (d) list identifying witness(es) the objector may call to testify at the Final Approval hearing; and (e) provide true and correct copies of any exhibit(s) the objector intends to offer at the Final Approval hearing.

b. **Notice of Intent to Appear.** Class Members who timely file valid objections to the Settlement may (though are not required to) appear at the Final Approval Hearing, either in person or through the objector's own counsel, provided the objector has first notified the Settlement Administrator by sending his/her written objections to the Settlement Administrator, postmarked no later than the Response Deadline.

12

FPDOCS 34861641.1

4. **Request for Exclusion from the Settlement ("Opt-Out").** The Class Notice will provide that Class Members who wish to exclude themselves from the Settlement must mail to the Settlement Administrator a written request for exclusion. The written request for exclusion must: (a) state the Class Member's name, address, telephone number, and social security number or employee identification number; (b) state the Class Member's intention to exclude themselves from or opt-out of the Settlement; (c) be addressed to the Settlement Administrator; (d) be signed by the Class Member or his or her lawful representative; and (e) be postmarked no later than the Response Deadline.

   a. **Confirmation of Authenticity.** If there is a question about the authenticity of a signed request for exclusion, the Settlement Administrator may demand additional proof of the Class Member's identity. Any Class Member who returns a timely, valid, and executed request for exclusion will not participate in or be bound by the Settlement and subsequent judgment and will not receive an Individual Settlement Share. A Class Member who does not complete and mail a timely request for exclusion will automatically be included in the Settlement, will receive an Individual Settlement Share, and be bound by all terms and conditions of the Settlement, if the Settlement is approved by the Court, and by the subsequent judgment, regardless of whether he or she has objected to the Settlement.

   b. **Report.** No later than five (5) business days after the Response Deadline, the Settlement Administrator will provide the Parties with a complete and accurate accounting of the number of Notices mailed to Class Members, the number of Notices returned as undeliverable, the number of Notices re-mailed to Class Members, the number of re-mailed Notices returned as undeliverable, the number of Class Members who objected to the Settlement and copies of their submitted objections, the number of Class Members who returned valid requests for exclusion, and the number of Class Members who returned invalid requests for exclusion.

5. **No Solicitation of Objection or Requests for Exclusion.** Neither the Parties nor their respective counsel will solicit or otherwise encourage directly or indirectly any Class Member to object to the Settlement, request exclusion from the Settlement, or appeal from the Judgment.

6. **Motion for Final Approval.**

   a. Class Counsel will file unopposed motions and memorandums in support thereof for Final Approval of the Settlement and the

following payments in accord with the terms of the Settlement: (1) the Attorney Fee Award; (2) the Cost Award; (3) Administrative Costs; (4) the Class Representative General Release Payment; and (5) PAGA Payment. Class Counsel will also move the Court for and order of Final Approval (and associated entry of Judgment) releasing and barring any Released Claims of the Class Members who do not opt out of the Settlement.

b. If the Court does not grant Final Approval of the Settlement, or if the Court's Final Approval of the Settlement is reversed or materially modified on appellate review, then this Settlement will become null and void. If that occurs, the Parties will have no further obligations under the Settlement, including any obligation by Defendant to pay the Gross Settlement Amount or any amounts that otherwise would have been owed under this Agreement. Further, should this occur, the Parties agree they shall be equally responsible for the Settlement Administrator's Administration Costs through that date. An award by the Court of a lesser amount than sought by Plaintiff and Class Counsel for the Class Representative General Release Payment, Attorney Fee Award, Cost Award, will not constitute a material modification to the Settlement within the meaning of this paragraph.

c. Upon Final Approval of the Settlement, the Parties shall present to the Court a proposed Final Approval Order, approving of the Settlement and entering Judgment in accordance therewith. After entry of Judgment, the Court shall have continuing jurisdiction over the Action for purposes of: (1) enforcing this Settlement Agreement; (2) addressing settlement administration matters, and (3) addressing such post-Judgment matters as may be appropriate under Court rules and applicable law.

7. **Waiver of Right to Appeal.** Provided that the Judgment is consistent with the terms and conditions of this Agreement, if Class Members do not timely object to the Settlement, then the Parties and their respective counsel waive any and all rights to appeal from the Judgment, including, but not limited to, all rights to any post-judgment proceeding and appellate proceeding, such as a motion to vacate or set aside judgment, and any extraordinary writ, and the Judgment will become non-appealable at the time it is entered. The waiver of appeal does not include any waiver of the right to oppose any appeal, appellate proceeding, or post-judgment proceeding.

8. **Vacating, Reversing, or Modifying Judgment on Appeal.** If, after a notice of appeal, the reviewing court vacates, reverses, or modifies the Judgment such that there is a material modification to the Settlement, and that court's decision is not completely reversed and the Judgment is not

FPDOCS 34861641.1

fully affirmed on review by a higher court, then this Settlement will become null and void and the Parties will have no further obligations under it. A material modification would include, but not necessarily be limited to, any alteration of the Gross Settlement Amount, an alteration in the calculation of the Net Settlement Amount, and any change to the calculation of the Individual Settlement Share.

9. **Disbursement of Settlement Shares and Payments.** Subject to the Court finally approving the Settlement, the Settlement Administrator shall distribute funds pursuant to the terms of this Agreement and the Court's Final Approval Order and Judgment. The maximum amount Defendant can be required to pay under this Settlement for any purpose is the Gross Settlement Amount. The Settlement Administrator shall keep Defendant's Counsel and Class Counsel apprised of all distributions from the Gross Settlement Amount. The Settlement Administrator shall respond to questions from Defendant's Counsel and Class Counsel. No person shall have any claim against Defendant, Defendant's Counsel, Plaintiff, Class Counsel, or the Settlement Administrator based on the distributions and payments made in accordance with this Agreement.

   a. **Funding the Settlement:** Defendant shall wire to the Settlement Administrator the Gross Settlement Amount within ten (10) business days of the Effective Final Settlement Date.

   b. **Disbursement:** Fifteen (15) business days after the Effective Final Settlement Date, the Settlement Administrator shall disburse: (1) the Net Settlement Amount to be paid to Participating Class Members; (2) the Attorney Fee Award and Cost Award to Class Counsel for attorneys' fees and costs, as approved by the Court; (3) the Class Representative General Release Payment paid to the Class Representative, as approved by the Court; (4) the Administration Costs, as approved by the Court; (5) the PAGA Payment to the LWDA and to Participating Class Members, as approved by the Court; and (6) Defendant's portion of payroll taxes as the Class Members' current or former employer.

   c. **QSF:** The Parties agree that the QSF is intended to be a "Qualified Settlement Fund" under Section 468B of the Code and Treasury Regulations § 1.4168B-1, 26 C.F.R. § 1.468B-1 *et seq.*, and will be administered by the Settlement Administrator as such. The Parties and Settlement Administrator shall treat the QSF as coming into existence as a Qualified Settlement Fund on the earliest date permitted as set forth in 26 C.F.R. § 1.468B-1, and such election statement shall be attached to the appropriate returns as required by law.

15

10. **Uncashed Checks.** Participating Class Members must cash or deposit their Individual Settlement Share checks within one hundred and eighty (180) calendar days after the checks are mailed to them. If any checks are not redeemed or deposited within ninety (90) calendar days after mailing, the Settlement Administrator will send a reminder postcard indicating that unless the check is redeemed or deposited in the next ninety (90) days, it will expire and become non-negotiable, and offer to replace the check if it was lost or misplaced. If any checks remain uncashed or not deposited by the expiration of the 90-day period after mailing the reminder notice, the Settlement Administrator will, within two hundred (200) calendar days after the checks are mailed, tender the remaining funds to the California State Controller as unclaimed property in the name of the payee and amount of the cancelled checks.

11. **Final Report by Settlement Administrator.** Within ten (10) business days after the disbursement of all funds, the Settlement Administrator will serve on the Parties a declaration providing a final report on the disbursements of all funds.

12. **Defendant's Legal Fees.** Defendant is responsible for paying for all of Defendant's own legal fees, costs, and expenses incurred in this Action outside of the Gross Settlement Fund.

**J. Release of Claims.** As of the Effective Final Settlement Date, Class Members who do not submit a timely and valid request for exclusion release the Released Parties from the Released Claims. Participating Class Members agree not to sue or otherwise make a claim against any of the Released Parties for any of the Released Claims.

**K. Plaintiff's Release of Claims and General Release.** As of the Effective Final Settlement Date, and in exchange for the Class Representative General Release Payment to the named Plaintiff in an amount not to exceed $10,000.00. Plaintiff shall for himself and his respective spouse, heirs, successors and assigns, forever release the Released Parties from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties and expenses of any nature whatsoever, from the beginning of time through the date of his signature on this Agreement, known or unknown, suspected or unsuspected, whether in tort, contract, equity, or otherwise, for violation of any federal, state or local statute, rule, ordinance or regulation, including but not limited to all claims arising out of, based upon, or relating to his employment with Defendant or the remuneration for, or termination of, such employment. Plaintiff's Release of Claims also includes a waiver of California Civil Code section 1542, which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT**

16

**TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

This release excludes any release of any claims not permitted to be released by law.

## L.  Miscellaneous Terms

1.  **No Admission of Liability.** Defendant makes no admission of liability or wrongdoing by virtue of entering into this Agreement. Additionally, Defendant reserves the right to contest any issues relating to class certification and liability if the Settlement is not approved. Defendant denies that it has engaged in any unlawful activity, has failed to comply with the law in any respect, has any liability to anyone under the claims asserted in the Action, or that but for the Settlement, a Class should be certified in the Action. This Agreement is entered into solely for the purpose of compromising highly disputed claims. Nothing in this Agreement is intended or will be construed as an admission by Defendant of liability or wrongdoing. This Settlement and Plaintiff's and Defendant's willingness to settle the Action will have no bearing on, and will not be admissible in connection with, any litigation (other than solely in connection with this Settlement).

2.  **No Effect on Employee Benefits.** The Class Representative General Release Payment and/or Individual Settlement Shares paid to Plaintiff and Participating Class Members shall not be deemed to be pensionable earnings and shall not have any effect on the eligibility for, or calculation of, any of the employee benefits (*e.g.*, vacation, holiday pay, retirement plans, etc.) of Plaintiff or the Participating Class Members. The Parties agree that any Class Representative General Release Payment and/or Individual Settlement Share paid to Plaintiff or the Participating Class Members under the terms of this Agreement do not represent any modification of Plaintiff's or Participating Class Members' previously credited hours of service or other eligibility criteria under any employee pension benefit plan or employee welfare benefit plan sponsored by Defendant. Further, any Class Representative General Release Payment shall not be considered "compensation" in any year for purposes of determining eligibility for, or benefit accrual within, an employee pension benefit plan or employee welfare benefit plan sponsored by Defendant.

3.  **Integrated Agreement.** After this Agreement is signed and delivered by all Parties and their counsel, this Agreement and its exhibits will constitute the entire Agreement between the Parties relating to the Settlement, and it will then be deemed that no oral representations, warranties, covenants, or inducements have been made to any party concerning this Agreement or its

17

exhibits, other than the representations, warranties, covenants, and inducements expressly stated in this Agreement and its exhibits.

4. **Authorization to Enter Into Settlement Agreement.** Class Counsel and Defendant's Counsel warrant and represent that they are authorized by Plaintiff and Defendant, respectively, to take all appropriate action required or permitted to be taken by such Parties under this Agreement to effectuate its terms, and to execute any other documents required to effectuate the terms of this Agreement. The Parties and their counsel will cooperate with each other and use their best efforts to effect the implementation of the Settlement. In the event the Parties are unable to reach agreement on the form or content of any document needed to implement this Agreement, or on any supplemental provisions that may become necessary to effectuate the terms of this Agreement, the Parties will seek the assistance of the Court, and in all cases, all such documents, supplemental provisions, and assistance of the Court will be consistent with this Agreement.

5. **Exhibits and Headings.** The terms of this Agreement include the terms set forth in the attached exhibits, which are incorporated by this reference as though fully set forth herein. Any exhibits to this Agreement are an integral part of the Settlement and must be approved substantially as written. The descriptive headings of any paragraphs or sections of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

6. **Interim Stay of Proceedings.** The Parties agree to stay and hold all proceedings in the Action in abeyance, except such proceedings necessary to implement and complete the Settlement, pending the Final Approval hearing to be conducted by the Superior Court.

7. **Amendment or Modification of Agreement.** This Agreement, and any and all parts of it, may be amended, modified, changed, or waived only by an express written instrument signed by counsel for all Parties or their successors-in-interest.

8. **Agreement Binding on Successors and Assigns.** This Agreement will be binding upon, and inure to the benefit of, the successors and assigns of the Parties, as previously defined.

9. **No Prior Assignment.** Plaintiff hereby represents, covenants, and warrants that he has not directly or indirectly, assigned, transferred, encumbered, or purported to assign, transfer, or encumber to any person or entity any portion of any liability, claim, demand, action, cause of action or rights herein released and discharged.

FPDOCS 34861641.1

10. **Applicable Law.** All terms and conditions of this Agreement and its exhibits will be governed by and interpreted according to the laws of the State of California, without giving effect to any conflict of law principles or choice of law principles.

11. **Fair, Adequate, and Reasonable Settlement.** The Parties and their respective counsel believe and warrant that this Agreement reflects a fair, reasonable, and adequate settlement of the Action and have arrived at this Agreement through arms-length negotiations, taking into account all relevant factors, current and potential.

12. **No Tax or Legal Advice.** The Parties understand and agree that the Parties are neither providing tax or legal advice, nor making representations regarding tax obligations or consequences, if any, related to this Agreement, and that Class Members will assume any such tax obligations or consequences that may arise from this Agreement, and that Class Members shall not seek any indemnification from the Parties or any of the Released Parties in this regard. The Parties agree that, in the event that any taxing body determines that additional taxes are due from any Class Member, such Class Member assumes all responsibility for the payment of such taxes.

13. **Jurisdiction of the Court.** The Court shall retain jurisdiction with respect to the interpretation, implementation, and enforcement of the terms of this Agreement and all orders and judgment entered in connection therewith, and the Parties and their counsel hereto submit to the jurisdiction of the Court for purposes of interpreting, implementing, and enforcing the Settlement embodied in this Agreement and all orders and judgments in connection therewith.

14. **Invalidity of Any Provision; Severability.** Before declaring any provision of this Agreement invalid, the Parties request that the Superior Court first attempt to construe the provisions valid to the fullest extent possible consistent with applicable precedents, so as to define all provisions of this Agreement valid and enforceable. In the event any provision of this Agreement shall be found unenforceable, the unenforceable provision shall be deemed deleted, and the validity and enforceability of the remaining provisions shall not be affected thereby.

15. **Cooperation in Drafting.** The Parties have cooperated in the drafting and preparation of this Agreement. This Agreement will not be construed against any Party on the basis that the Party was the drafter or participated in the drafting.

16. **Execution in Counterpart.** This Agreement may be executed in one or more counterparts. All executed counterparts, and each of them, will be deemed to be one and the same instrument provided that counsel for the

FPDOCS 34861641.1

Parties will exchange between themselves original signed counterparts. Facsimile or PDF signatures will be accepted. Any executed counterpart will be admissible in evidence to prove the existence and contents of this Agreement.

## IV.   EXECUTION BY PARTIES AND COUNSEL

The Parties and their counsel execute this Agreement.

Dated: ___3/8/2019___, 2019          **Armando Bautista**

*Armando Bautista*

Dated: __3/15__, 2019          **Red Robin International, Inc. DBA Red Robin Burger and Spirits Emporiums**

Name: MICHAEL L KAPLAN
Title: VP, CHIEF LEGAL OFFICER

Dated: __march 8__, 2019          **THE TURLEY & MARA LAW FIRM, APLC**

David Mara, Esq.
Jill Vecchi, Esq.
Matthew Crawford, Esq.
Attorneys for Plaintiff, on behalf of himself and all others similarly situated

Dated: __3/15__, 2019          **Fisher & Phillips LLP**

Lonnie Giamela, Esq.
Sean Daley, Esq.

**Attorneys for Defendant**

# EXHIBIT E

1  David Mara, Esq. (SBN 230498)
   Jill Vecchi, Esq. (SBN 299333)
2  Matthew Crawford, Esq. (SBN 310230)
   Nikki Trenner, Esq. (SBN 316007)
3  **MARA LAW FIRM, PC**
   2650 Camino Del Rio North, Suite 205
4  San Diego, CA  92108
   Telephone:     619-234-2833
5  Facsimile:     619-234-4048

FILED
SUPERIOR COURT-STOCKTON

2019 SEP 23  PM 1:31

ROSA JUNQUEIRO. CLERK

BY _____
            DEPUTY

6  Attorneys for Plaintiff, ARMANDO BAUTISTA,
7  on behalf of himself, all others similarly situated,
   and the general public.

8

9          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10           **IN AND FOR THE COUNTY OF SAN JOAQUIN**

11

12  ARMANDO BAUTISTA, on behalf of           Case No.   STK-CV-UOE-2018-0002270
    himself, all others similarly situated, and on
13  behalf of the general public,            [Assigned for All Purposes to: Hon. Michael
                                             Mulvihill]
14
    Plaintiff,                               **MEMORANDUM OF POINTS AND**
15                                           **AUTHORITIES IN SUPPORT OF**
    v.                                       **PLAINTIFF'S UNOPPOSED MOTION**
16                                           **FOR FINAL APPROVAL OF CLASS**
                                             **ACTION SETTLEMENT, ATTORNEYS'**
17  RED ROBIN INTERNATIONAL, INC.            **FEES, COSTS, GENERAL RELEASE**
    DBA RED ROBIN BURGER AND                 **PAYMENT, AND ENTERING OF FINAL**
18  SPIRITS EMPORIUMS; and DOES 1-100,       **JUDGMENT**
19
                                             FILE BY FAX
20  Defendants.
                                             Date: October 16, 2019
21                                           Time: 9:00 a.m.
                                             Judge: Hon. Michael Mulvihill
22                                           Dept.: 10C
23
24
25                                           **Complaint Filed: February 26, 2018**
                                             **Trial Date: None Set**
26
27
28

i

1

**TABLE OF CONTENTS**

2 I.     INTRODUCTION............................................................................................... 1

3 II.    INVESTIGATION AND DISCOVERY .......................................................... 3

4 III.   The Parties Agreed to Engage in Settlement Discussions, Which Resulted in the
5       Settlement the Court Preliminarily Approved .................................................. 4
6
7 IV.    THE PROPOSED SETTLEMENT AND THE CLASS MEMBERS' RESPONSE ....... 4

8       a.   The Proposed Settlement...................................................... 4

9       b.   Released Claims ................................................................ 5

10      c.   The Class Members Support the Settlement – No Objections and One (1) Opt-Out Was
11          Received – and 100% of the Settlement Funds Will Be Paid to the Class ............ 6
12
13 V.    ARGUMENT ................................................................................................... 7

14      a.   The Settlement is Fair, Reasonable, and Adequate and Satisfies the Standard for Final
15          Approval ........................................................................ 7

16 VI.   THE COURT SHOULD APPROVE THE REQUESTED FEES AND COSTS............. 8

17      a.   The Requested Fee Award is Fair and Reasonable, Calculated as a Percentage of a
18          Common Fund ................................................................... 8

19      b.   The Requested Attorneys' Fee is Within the Range of Fees Approved in Comparable
20          Common Fund Cases............................................................. 9

21
22      c.   A Lodestar Cross-Check with a Modest Multiplier Confirms the Reasonableness of the
23          Requested Fee .................................................................. 10
24      d.   A Class Counsel's Hourly Rates Are Reasonable .............................. 11
25      e.   Class Counsels' Total Hours are Reasonable .................................. 12
26      f.   Costs of Litigation ............................................................ 13
27
28

VII.    THE CLASS REPRESENTATIVE GENERAL RELEASE PAYMENT IS
        REASONABLE ................................................................................................ 13

VIII.   THE ADMINISTRATION COSTS ARE REASONABLE........................................... 14

IX.     CONCLUSION ................................................................................................ 15

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Bell v. Farmers Ins. Exch.*

4

(2004) 115 Cal. App. 4th 715 ......................................................................... 14

5

*Boeing Co. v. Van Gemert*

6

(1980) 444 U.S. 472, 478 ................................................................................. 8

7

*Boyd v. Bechtel Corp.,*

8

485 F. Supp. 610 (N.D. Cal. 1979) .................................................................. 7

9

*Chavez v. Netflix, Inc.,*

10

162 Cal.App.4th 43 (2008) .............................................................................. 9

11

*Cho v. Seagate Tech. Holdings, Inc.*

12

(2009) 177 Cal. App. 4th 734, 742 43 ............................................................. 7

13

*Chun-Hoon v. McKee Foods Corp.*

14

(N.D. Cal. 2010) 716 F.Supp.2d 848 ............................................................. 11

15

*City and County of San Francisco v. Sweet,*

16

12 Cal.4th 105 (1995) ...................................................................................... 8

17

*Dennis v. Kellogg Co.,*

18

09-CV-1786-L WMC, 2013 WL 6055326, at *7 (S.D. Cal. Nov. 14, 2013) ............ 10

19

*Dunk v. Ford Motor Co.,*

20

48 Cal. App. 4th 1794, 1801 (1996) .............................................................. 7, 8

21

*Flannery v. California Highway Patrol,*

22

61 Cal. App. 4th 629, 632, (1998) .................................................................. 11

23

*Hopson v. Hanesbrands Inc.*

24

(N.D. Cal. Apr. 3, 2009) 2009 U.S. Dist. LEXIS 33900 .................................. 11

25

*In Quinn v. State of California,*

26

15 Cal.3d 162 (1995) ....................................................................................... 8

27

28

1  *In re Cellphone Fee Termination Cases*
2     (2010) 186 Cal. App. 4th 1380 ............................................................................ 14
3  *In re Microsoft I-V Cases,*
4     135 Cal. App. 4th 706, 723 (2006) ......................................................................... 7
5  *In re Portal Software, Inc. Securities Litigation,*
6     2007 U.S. Dist. LEXIS 88886, 2007 WL 4171201, at *16 (N.D. Cal. 2007) ............ 11
7  *Ketchum v. Moses*
8     Cal.4th 1122, 1132-36 (2001) ............................................................................. 10
9  *Kullar v. Foot Locker Retail, Inc.*
10    (2008) 168 Cal.App.4th 116 ................................................................................... 8
11 *Lealao v. Beneficial California, Inc.,*
12    82 Cal.App.4th 19 (2000) ...................................................................................... 8
13 *New York Gaslight Club, Inc. v. Carey*
14    (1980) 447 U.S. 54 .............................................................................................. 12
15 *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.,*
16    688 F.2d 615, 625 (9th Cir. 1982) .......................................................................... 7
17 *PLCM Group, Inc. v. Drexler*
18    (2000) 22 Cal.4th 1084 ................................................................................. 10, 11
19 *Potter v. Pacific Coast Lumber Co. of Cal.,*
20    37 Cal. 2d 592, 602 (1951) .................................................................................... 7
21 *Serrano v. Priest*
22    (1977) 20 Cal.3d 25, 34 ................................................................................. 8, 10
23 *Serrano v. Priest*
24    (1982) 32 Cal.3d 621 ........................................................................................... 12
25 *Smith v. CRST Van Expedited, Inc.,*
26    10-CV-1116- IEG WMC, 2013 WL 163293, *5 (S.D. Cal. Jan. 14, 2013) ............... 10
27
28

*Stambaugh v. Superior Court,*

    62 Cal. App. 3d 231, 236 (1976) ................................................................. 7

*Thayer v. Wells Fargo Bank*

    (2001) 92 Cal.App.4th 819, 834 ................................................................. 10

*Vincent v. Hughes Air West, Inc.*

    (9th Cir. 1977) 557 F.2d 759, 769 ............................................................. 8

*Wershba v. Apple Computer, Inc.*

    (2001) 91 Cal. App. 4th 224, 245 ........................................................... 7, 9

**Other Authorities**

Reagan W. Silber and Frank E. Goodrich, Common Funds and Common Problems: Fee

    Objections and Class Counsel's Response, 17 Rev. Litig. 525, 546 (1998)................................ 9

T. Willging, L. Hooper and R. Niemic, Empirical Study of Class Actions in Four Federal District

    Courts:  Final Report to the Advisory Committee on Civil Rules, 90 (1996) ............................ 9

## I.   INTRODUCTION

This motion seeks final approval of a non-reversionary $695,000 proposed wage and hour class action settlement by Plaintiff Armando Bautista (hereinafter referred to as "Plaintiff") on behalf of himself and two hundred and six (206) persons similarly employed by Defendant Red Robin International, Inc. DBA Red Robin Burger and Spirits Emporiums (hereinafter referred to as "Defendant") as a Kitchen Manager, or who performed duties as a Kitchen Manager in California during the period of February 26, 2014, through February 17, 2019 (the "Class Period") and an order entering judgment. In response to the Class Notice, **zero disputes and zero objections were received from Class Members to the proposed settlement. In addition, only one (1) class member filed a request for exclusion.[1] The settlement will provide Participating Class Members[2] with an average estimated payment of $1,900.80 per Class Member, with the highest estimated award being $3,033.32.[3]**

This case required 507 hours of attorney time from Class Counsel and sought relief for two hundred and six (206) current and former employees of Defendant who were employed as a Kitchen Manager, or who performed duties as a Kitchen Manager in California at any time during the Class Period. This litigation involved investigations with Class Members throughout California, formal written discovery, depositions, the production of documents by Defendant, the informal exchange of information prior to mediation, a full day of mediation, and evaluation of the risk of continuing litigation.

As will be demonstrated herein, Plaintiff's attorneys' fee request of $231,435, which represents 33 1/3% of the Gross Settlement Amount ("GSA"), is fully supported using the percentage fee method. Plaintiff's attorneys' fee request is also supported by the lodestar method. Plaintiff further moves for final approval of litigation costs in the amount of $15,372.88 for costs incurred in litigating this matter.[4]

---

[1] This one (1) request for exclusion represents 0.49% of the two hundred and six (206) member class. Therefore, over ninety-nine percent (99%) of the class will receive a settlement check.
[2] Participating Class Members are all Class Members who do not submit a valid and timely request to exclude themselves from this Settlement.
[3] Declaration of Bryan Valdez of CPT Group, Inc. ("Valdez Dec.") ¶ 13.
[4] Class Counsel's total out of pocket expenses were $15,372.88. Under the settlement agreement, Class Counsel agreed to seek an amount up to but not exceeding $40,000.

1    Plaintiff also moves for final approval of a Class Representative General Release Payment

2    in the amount of $10,000 to compensate the Class Representative for the general release he agreed

3    to and for the time he spent on and the risks absorbed for undertaking this case. Plaintiff played a

4    vital role in representing the other Kitchen Managers in this case and spearheading the lawsuit to

5    seek actual and substantial monetary relief for them.

6        Additionally, Plaintiff moves for final approval of payment of $8,900 (originally estimated

7    not to exceed $10,000) to the Settlement Administrator, CPT Group, Inc., (hereinafter "CPT") for

8    the costs and fees of administering settlement.

9        Further, Plaintiff moves for final approval of payment to the Labor and Workforce

10   Development Agency ("LWDA") under the Labor Code Private Attorneys General Act of 2004

11   ("PAGA") in the amount of $15,000 (75% of $20,000 allocated to PAGA penalties).

12       The requested amount of attorneys' fees, litigation costs, general release payment, and

13   settlement administration costs were fully disclosed to the Class Members when the Class Notice

14   was mailed to them on July 31, 2019.[5] Most importantly, the Settlement and all of its terms

15   received support from Class Members, **not a single Class Member objected to the Settlement**

16   **and only one (1) Class Member submitted a request for exclusion from the settlement. With**

17   **an average and high payout to participating Class Members of $1,900.80 and $3,033.32,**

18   respectively, the Settlement is fair, adequate, and reasonable. The Court is therefore respectfully

19   requested to honor the Class Members' endorsement of the settlement and grant final approval of

20   the settlement, attorneys' fees, litigation costs, class representative general release payment, and

21   costs of settlement administration in the amounts as preliminarily approved by this Court on June

22   21, 2019, as fully disclosed to the Class Members, and as requested herein.

23       As demonstrated below, Class Counsel is convinced that the proposed Settlement is in the

24   best interest of the Class based on the negotiations and a detailed knowledge of the issues present

25   in this action. The length and risks of trial and perils of litigation that affect the value of the claims

26   were all carefully weighed.

27       In addition, the affirmative defenses asserted by Defendant, Defendant's contentions that

28

---

[5] Valdez Dec. ¶ 7.

Plaintiff's Motion for Final Approval                                    Case No. STK-CV-UOE-2018-0002270

their Kitchen Managers were properly classified as exempt, the uncertainty of class certification, the difficulties of complex litigation, and the lengthy process of establishing specific damages and various possible delays and appeals were all carefully considered by Class Counsel in arriving at the proposed settlement.

## II.   INVESTIGATION AND DISCOVERY

Defendant operates a chain of casual dining restaurants with locations throughout the United States, including California. To conduct its business, Defendant employs Kitchen Managers such as Plaintiff, who are classified by Defendant as exempt employees. It is Plaintiff's contention that he along with other Kitchen Mangers are misclassified and should be considered hourly, non-exempt employees.

Plaintiff filed a putative class action complaint in the San Joaquin Superior Court against Defendant on February 26, 2018. Plaintiff's Complaint alleges the following causes of action: 1) failure to pay all straight time wages; 2) failure to pay overtime; 3) failure to provide meal periods; 4) failure to authorize and permit rest periods; 5) knowing and intentional failure to comply with itemized employee wage statement provisions; 6) failure to pay all wages due at the time of termination; 7) violation of the Labor Code Private Attorneys General Act of 2004 ("PAGA);[6] and 8) violation of the Unfair Competition Law.

After filing, the Parties engaged in written and deposition discovery. After filing, Plaintiff propounded two sets of special interrogatories and one set of requests for production of documents. Plaintiff also propounded a deposition notice for Defendant's person most qualified to testify on designated subject areas regarding operations, timekeeping, and payroll, with additional requests for production. (Declaration of David Mara, Esq. ("Mara Dec.") ¶ 9).

This written discovery, in conjunction with the Parties' meet and confer efforts, resulted in the production of over 1,500 documents. These documents included training materials used to train Kitchen Managers; employee handbooks, which included Defendant's wage and hour policies; a job description for Kitchen Managers; guidelines for management positions on overseeing the restaurant and other employees; checklists of tasks for managers to reference during a shift and

---

[6] Plaintiff provided notice to the Labor and Workforce Development Agency ("LWDA") pursuant to the PAGA on December 21, 2017.

1    employee wage statements. (Mara Dec. ¶ 10).

2         In addition, Plaintiff deposed Defendant's person most qualified to testify witness

3    ("PMQ"), Karin Davie, on November 28, 2018. Ms. Davie is Defendant's Human Resources

4    Business Partner. Her territory includes all of California. (Mara Dec. ¶ 11).

5    **III.   The Parties Agreed to Engage in Settlement Discussions, Which Resulted in the
           Settlement the Court Preliminarily Approved**

6         The Parties participated in mediation with experienced wage and hour mediator, Mark

7    Rudy on December 12, 2018. Though the matter did not settle at mediation, the Parties maintained

8    communications with the mediator and were able to reach a settlement shortly thereafter. The

9    Parties met and conferred regarding all the terms of the settlement and finalized their agreement

10   in the Joint Stipulation. The Parties seek final approval of this Joint Stipulation in the instant

11   motion. (Mara Dec. ¶ 12; Ex. 5).

12   **IV.   THE PROPOSED SETTLEMENT AND THE CLASS MEMBERS' RESPONSE**
           **a.  The Proposed Settlement**

13        The Parties have agreed (subject to and contingent upon the Court's approval) that this

14   action be settled and compromised for the non-reversionary total sum of $695,000 ("Gross

15   Settlement Amount" or "GSA") which includes, subject to Court approval: (a) attorneys' fees of

16   up to $231,435 (33 1/3% of the GSA to compensate Class Counsel for work already performed

17   and all work remaining to be performed in documenting the settlement, administrating the

18   settlement and securing Court approval; (b) litigation costs of $15,372.88 (originally estimated not

19   to exceed $40,000); (c) a Class Representative General Release Payment to the named class

20   representative, Armando Bautista, in a sum not to exceed $10,000 in consideration for a general

21   release of his claims against Defendant; (d) claims administration fees and expenses to CPT in the

22   amount of $8,900 (originally estimated not to exceed $10,000); and (e) Labor and Workforce

23   Development Agency ("LWDA") payment of $15,000 (which is 75% of $20,000 allocated to

24   Plaintiff's claims under PAGA.

25        After all Court-approved deductions from the GSA, it is estimated that $389,665[7] ("Net

26   Settlement Amount" or "NSA"), will be distributed to Class Members – **with an average**

27   **settlement share estimated at $1,900.80.** Under no circumstances will any portion of the

28   _____
     [7] Valdez Dec. ¶ 13.

settlement revert to Defendant and one hundred percent (100%) of the NSA is available to be paid to the Class Members and satisfy any payroll related tax obligations. Subject to the terms and conditions of the Settlement, the Settlement Administrator will calculate and issue Individual Settlement Payments based on the following formula:

> Each Participating Class Member will receive a proportionate share of the Net Settlement Amount that is equal to (i) the number of weeks he or she worked for Defendant in California as a kitchen manager based on the Class data provided by Defendant, divided by (ii) the total number of weeks worked by all Participating Class Members based on the same Class data, which is then multiplied by the Net Settlement Amount. One day worked in a given week as a kitchen manager for Defendant will be credited as a week for purposes of this calculation. Therefore, the value of each Class Member's Individual Settlement Share ties directly to the amount of weeks that he or she worked as a kitchen manager for Defendant in California. (Exhibit 1 attached to the Mara Dec. at Section I(BB).

**b. Released Claims**

In exchange for a Settlement Payment, Class Members are informed that, by accepting the payment, they release all known and unknown state law claims that were alleged or that could have been alleged based on the facts of the complaint filed in the matter. The Released Claims shall include a release of claims under California Labor Code Sections 201, 203, 204, 226, 226.3, 226.7, 510, 512, 558, as well as claims under PAGA through the Effective Date.  Released Claims include, but are not limited to, claims for failure to pay straight time wages, failure to pay overtime and double time wages, failure to provide itemized wage statements, waiting time penalties, failure to provide meal periods, failure to rest periods, failure to reimburse expenses, record keeping violations, unfair competition under Section 17200 of the California Business and Professions Code and statutes providing for the failure to pay minimum wage and providing for liquidated damages or penalties for violations of the California Labor Code.  The release will be as to the released parties, which shall include Defendant and its respective parent companies, subsidiaries, affiliates, shareholders, members, agents (including, without limitation, any investment bankers, accountants, insurers, reinsurers, attorneys and any past, present or future officers, directors and employees) predecessors, successors, and assigns. The release only applies to periods of time when Class Members were members of the Class (i.e., excluding periods of time in an exempt position).

1    The release will be as to the released parties, which shall include Defendant and its past, present

2    and/or future, direct and/or indirect, officers, directors, employees, representatives, administrators,

3    attorneys, agents, parent companies, subsidiaries and affiliated corporations and entities,

4    consultants, insurers, shareholders, joint ventures, predecessors, successors, and/or assigns.

5          **c.**    **The Class Members Support the Settlement – No Objections and One (1)**
                **Opt-Out Was Received – and 100% of the Settlement Funds Will Be Paid to**

6                    **the Class**

7            On June 21, 2019, the Court granted preliminary approval, conditionally certified the Class,

8    appointed CPT to act as the Settlement Administrator, approved the notice to be sent to the Class,

9    and directed that the notice be mailed to the Class by First Class U.S. Mail. On July 8, 2019,

10   Defendant provided CPT with a mailing list ("Class List") containing the name, social security

11   number, last known mailing address, last known telephone number, and the number of weeks

12   worked during the Class Period for each Settlement Class Member. The file was uploaded to the

13   CPT database and checked for duplicates and other possible discrepancies. (Valdez Dec. ¶ 5). The

14   Class List contained data for 206 Settlement Class Members. (*Id.*). On July 31, 2019, the Notices

15   were mailed via U.S. first-class mail to all two hundred and six (206) Class Members. (Valdez

16   Dec. ¶ 7).

17           Three (3) Notices were returned by the U.S. Postal Service, none of which had a forwarding

18   address. (Valdez Dec. ¶ 8). A total of two (2) Notices were re-mailed because a better mailing

19   address was found.  (*Id.*). Altogether, one (1) Class Notice was unable to be delivered because a

20   better mailing address could not be found. (*Id.*)

21           Finally, the settlement was received with support from the Class Members. Specifically,

22   **not a single objection or dispute was received**. (Valdez Dec. ¶¶ 11-12). In addition, only one (1)

23   out of two hundred and six (206) Class Members submitted requests for exclusion.[8] (Valdez Dec.

24   ¶ 10). Therefore, two hundred and five (205) Class Members will receive an Individual Settlement

25   Payment.

26   \\

27   \\

28

---

[8] This one request for exclusion represents 0.49% of the two hundred and six (206) Class Members.

## V. ARGUMENT

### a. The Settlement is Fair, Reasonable, and Adequate and Satisfies the Standard for Final Approval

California Rule of Court, Rule 3.769, requires court approval for class action settlements. Cal. R. Ct. 3.769(g). California courts favor settlement. *Stambaugh v. Superior Court* (1976) 62 Cal. App. 3d 231, 236, *Potter v. Pacific Coast Lumber Co. of Cal.* (1951) 37 Cal. 2d 592, 602 ("[T]he law wisely favors settlements"). Accordingly, the Court must give "[due] regard to what is otherwise a private consensual agreement between the parties." *Wershba v. Apple Computer, Inc.* (2001) 91 Cal. App. 4th 224, 245.

In deciding whether to approve a class settlement, a court evaluates whether the proposed settlement is "fair, adequate, and reasonable." *Dunk v. Ford Motor Co.* (1996) 48 Cal. App. 4th 1794, 1801 (citing *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.* (9th Cir. 1982) 688 F.2d 615, 625); *Cho v. Seagate Tech. Holdings, Inc.* (2009) 177 Cal. App. 4th 734, 742 43. A court enjoys broad discretion to make its fairness determination. *Dunk*, 48 Cal. App. 4th at 1801. However, "a presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small." *Dunk*, 48 Cal. App. 4th at 1802; accord *Wershba*, 91 Cal. App. 4th at 245. In addition, a court should consider additional relevant factors, including the strength of the plaintiffs' case compared to the settlement amount; the risk, expenses, complexity, and likely duration of further litigation; and the fair treatment of class members in relation to each other. *Dunk*, 48 Cal. App. 4th at 1802; see also *In re Microsoft I-V Cases* (2006) 135 Cal. App. 4th 706, 723; see also *Boyd v. Bechtel Corp.* (N.D. Cal. 1979) 485 F. Supp. 610, 617.

At the time of preliminary approval, the Court was provided with sufficient information to satisfy three of the four *Dunk* factors, leaving the fourth factor, the number of objectors, unknown until after the Class had an opportunity to respond to the Settlement as explained in the Class Notice.[9] Subject only to the Class' reaction to the Settlement, the Court preliminarily presumed

---

[9] *See* Memorandum of Points and Authorities in Support of Preliminary Approval, pages 12-19, filed on April 24, 2019. In addition to the *Dunk* factors, Class Counsel also detailed the other factors such as the strengths of Plaintiff's case, risks and costs of further litigation, as well as the

1    the Settlement was fair, adequate and reasonable.

2          Following dissemination of the Class Notice, and adequate time provided to the Class to

3    return an object to the Settlement, **not a single objection was asserted or filed by any Class**

4    **Member**. Thus, the proposed settlement is entitled to the presumption that it is fair and in all other

5    respects proper, and should be finally approved.

6    **VI.    THE COURT SHOULD APPROVE THE REQUESTED FEES AND COSTS**
                **a.   The Requested Fee Award is Fair and Reasonable, Calculated as a**
7                      **Percentage of a Common Fund**

8          Class Counsel applies for an award of attorneys' fees in the sum of $231,435 (which is 33

9    1/3% of the Gross Settlement Amount), and litigation costs of $15,372.88. (Mara Dec. ¶ 13).

10   California state and federal courts have recognized that an appropriate method for determining an

11   award of attorneys' fees is based on a percentage of the total value of benefits to Class Members

12   by the settlement, also known as the "common fund" method. *Serrano v. Priest* (1977) 20 Cal.3d

13   25, 34 (*Serrano III*); *Boeing Co. v. Van Gemert* (1980) 444 U.S. 472, 478; *Vincent v. Hughes Air*

14   *West, Inc.* (9th Cir. 1977) 557 F.2d 759, 769. "Despite its primacy, the lodestar method is not

15   necessarily utilized in common fund cases." *Lealao v. Beneficial California, Inc.* (2000) 82

16   Cal.App.4th 19, 27 ["*Lealao*"]; *Dunk*, 48 Cal. App. 4th at 1808 (the percentage method calculates

17   attorney fees as a reasonable percentage of the common fund and may be used where the amount

18   of the settlement is a certain or easily calculable sum of money).

19         The purpose of the common fund/percentage approach is to "spread litigation costs

20   proportionally among all the beneficiaries so that the active beneficiary does not bear the entire

21   burden alone." *Vincent, supra*, 557 F.2d at 769. *In Quinn v. State of California* (1995) 15 Cal.3d

22   162, 167, the Court stated: "[O]ne who expends attorneys' fees in winning a suit which creates a

23   fund from which others derive benefits may require those passive beneficiaries to bear a fair share

24   of the litigation costs."

25         Similarly, in *City and County of San Francisco v. Sweet* (1995) 12 Cal.4th 105, 110, the

26   California Supreme Court recognized that the common fund doctrine has been applied

27   "consistently in California when an action brought by one party creates a fund in which other

28   reasonableness of the GSA amount in light of *Kullar v. Foot Locker Retail, Inc.* (2008) 168
     *Cal.App.4th 116. Id.*

persons are entitled to share." The reasons for applying the common fund doctrine include: "…fairness to the successful litigant, who might otherwise receive no benefit because his recovery might be consumed by the expenses; correlative prevention of an unfair advantage to the others who are entitled to share in the fund and who should bear their share of the burden of its recovery; encouragement of the attorney for the successful litigant, who will be more willing to undertake and diligently prosecute proper litigation for the protection or recovery of the fund if he is assured that he will be properly and directly compensated should his efforts be successful." *Id.*

As there is a defined and clearly traceable benefit to the Class, the Court can base an award of attorneys' fees using a 'common fund' approach to compensate Class Counsel.

### b. The Requested Attorneys' Fee is Within the Range of Fees Approved in Comparable Common Fund Cases

Assessing an appropriate fee based on a percentage of the fund involves taking into account "all of the circumstances of the case." There is sparse case law addressing the evaluation of reasonable attorneys' fees in employee class actions as appellate cases addressing fees arise almost exclusively where awards were challenged by defendants or objectors – the only parties with standing to appeal. *Wershba*, 91 Cal.App.4th at 236.

Several studies of class action fee awards have found that the median common fund fee award is approximately one-third of the total settlement fund. See, e.g., *Chavez v. Netflix, Inc.* (2008) 162 Cal. App. 4th 43, 66, n.11 (numerous studies have shown that "fee awards in class actions average around one-third of the recovery."); Reagan W. Silber and Frank E. Goodrich, Common Funds and Common Problems: Fee Objections and Class Counsel's Response, 17 Rev. Litig. 525, 546 ; T. Willging, L. Hooper and R. Niemic, Empirical Study of Class Actions in Four Federal District Courts:  Final Report to the Advisory Committee on Civil Rules, 90 (1996) (finding that attorneys' fees in class litigation "were generally in the traditional range of approximately one-third of the total settlement").

The requested fee falls in the mid-range of percentage class fee awards, which commonly range from 20% to 50% of a common fund, and constitutes fair compensation for undertaking complex, risky, expensive, and time-consuming litigation on a contingent basis and compensates Class Counsel for their efforts, as well as the result achieved for the benefit of the Class. Numerous

state and federal courts in California routinely approve fee requests equal to or greater than 33% of the common fund. Indeed, some courts have found that an award of 33% of the common fund represents the "benchmark" in California.[10]

In short, Class Counsel's fee request of $231,435 (33 1/3% of the Gross Settlement Amount) is in line with awards in similar cases in California and nationwide and demonstrates that Class Counsel's fee request is consistent with market rates and is reasonable.

### c. A Lodestar Cross-Check with a Modest Multiplier Confirms the Reasonableness of the Requested Fee

Class Counsel's fee request is reasonable when calculated using the lodestar method. Under the lodestar method, a base fee amount is calculated from a compilation of time reasonably spent on the case and the reasonable hourly compensation of the attorney. *Serrano v. Priest* (1977) 20 Cal. 3d 25, 48. The court then enhances this lodestar figure by a "multiplier" to account for a range of factors, such as the novelty and difficulty of the case, its contingent nature, and the degree of success achieved. *Id.* at 49; see also *Ketchum v. Moses* (2001) Cal.4th 1122, 1132-36; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096; *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 834, ("[t]here is no … rule limiting the factors that may justify an exercise of judicial discretion to [adjust the] lodestar").

Class Counsel has worked five hundred and seven (507) hours to date on this case, and has calculated the lodestar fee on those hours at $297,150 at rates reflecting those currently earned in the market place. (Mara Dec. ¶ 14, Exhibit 1, Summary of Time and Costs). All of the work and tasks performed by Class Counsel were reasonable and necessary to the prosecution of this case and are reflected in the result achieved. (Mara Dec. ¶ 15). As Class Counsel's lodestar fee is in excess of their fee request, a multiplier on their lodestar fee is not sought herein. (Mara Dec. ¶ 16). In fact, the requested fee results in a so-called "negative multiplier" which suggests the percentage of the fund amount is reasonable and fair. *See Chun-Hoon v. McKee Foods Corp.* (N.D. Cal. 2010)

---

[10] *Smith v. CRST Van Expedited, Inc.* (S.D. Cal. Jan. 14, 2013) 10-CV-1116- IEG WMC, 2013 WL 163293, *5 ("These percentages compare favorably with both California (33%) and federal (25%) benchmarks."); *Dennis v. Kellogg Co.* (S.D. Cal. Nov. 14, 2013) 09-CV-1786-L WMC, 2013 WL 6055326, at *7 ("This percentage compares favorably with both California (33%) and federal (25%) benchmarks and the requested fee compares well with a lodestar cross-check as well.").

716 F.Supp.2d 848, 854; *In re Portal Software, Inc. Securities Litigation* (N.D. Cal. 2007) 2007 U.S. Dist. LEXIS 88886, 2007 WL 4171201, at *16.

### d. A Class Counsel's Hourly Rates Are Reasonable

Class Counsel's hourly rates are between $400 and $750 and are in line with rates typically approved in wage and hour class action litigation and which rates have been approved by Courts in California in the Los Angeles, Sacramento, San Francisco, Alameda, Orange and San Diego County Superior Courts. (Mara Dec. ¶ 17; Exh. 2, Westlaw Court Express's Legal Billing Report, Volume 14, Number 3, California Region for December 2012; Exh. 4, 2014 Declaration of Richard M. Pearl in *Hohnbaum v. Brinker Restaurant Corp.* SDSC GIC834348; Exh. 5, 2012 National Law Journal Survey of Hourly Billing Rates for Partners and Associates).

A reasonable hourly rate is the prevailing rate charged by attorneys of similar skill and experience in the relevant community. *PLCM Group, Inc* (2000) 22 Cal. 4th 1084, 1095, more recently, *Hopson v. Hanesbrands Inc.* (N.D. Cal. Apr. 3, 2009) 2009 U.S. Dist. LEXIS 33900. When determining a reasonable hourly rate, courts may consider factors such as the attorney's skill and experience, the nature of the work performed, the relevant area of expertise and the attorney's customary billing rates. *Flannery v. California Highway Patrol,* 61 Cal. App. 4th 629, 632, (1998).

Class Counsel's skill and experience support their hourly rates. Their practice is limited exclusively to litigation, focusing on the representation of employees in wage and hour and consumer class action matters. (Mara Dec. ¶¶ 1-8, 20, 24). As leading attorneys in the field of wage and hour class action litigation, Plaintiff's counsel continually monitors the prevailing market rates charged by both defense and plaintiff law firms and set the billing rates of their attorneys and paralegals/law clerks to be consistent with the prevailing market rates in the private sector for attorneys and staff of comparable skill, qualifications and experience. Other wage and hour attorneys working as class counsel before California courts charge comparable if not higher rates. (Mara Dec., Exh. 2, Westlaw Court Express's Legal Billing Report, Volume 14, Number 3, California Region for December 2012; Exh. 3, 2014 Declaration of Richard M. Pearl in *Hohnbaum v. Brinker Restaurant Corp.* SDSC GIC834348; Exh. 4, 2012 National Law Journal Survey of Hourly Billing Rates for Partners and Associates). Therefore, as they are in line with those of the

1   relevant community, Class Counsel's hourly rates are reasonable.

2       **e.   Class Counsels' Total Hours are Reasonable**

3          In determining a lodestar fee, reasonable hours include, in addition to time spent during

4   litigation, the time spent before the action was filed, including time spent interviewing clients,

5   investigating the facts and law, and preparing the pleadings. See *New York Gaslight Club, Inc. v.*

6   *Carey* (1980) 447 U.S. 54, 62. Further, the fee award should include fees incurred to establish and

7   defend the attorneys' fee claim. *Serrano v. Priest* (1982) 32 Cal.3d 621, 639 ("*Serrano IV*").

8          Class Counsel has expended a total of 507 hours on this case. The work performed by Class

9   Counsel in order to achieve a settlement that will provide valuable consideration to the Class,

10  **averaging a $1,900.80 settlement payment per Class Member, with the highest estimated**

11  **award being $3,033.32,** is summarized by Class Counsel in the declarations submitted herewith.

12  (Mara Dec. ¶¶ 18, 21, 24).

13         Class Counsel's many tasks, in summary form, included the following: pre-filing

14  investigation and legal research; communicating with the class representative; interviewing and

15  meeting with putative Class Members throughout the state; research and investigation in

16  California's ever-evolving wage and hour laws regarding compensation, misclassification,

17  overtime, meal and rest periods, itemized wage statements, waiting time penalties, and California's

18  Unfair Competition Law; investigation into Defendant's pay-structures, policies, and, where

19  applicable, for its Kitchen Managers; draft and file PAGA notice to the LWDA; draft and file

20  pleadings; numerous conferences with Defense Counsel regarding a variety of issues throughout

21  the litigation and settlement; review and edit discovery propounded on Defendant; analyze records

22  and data produced by Defendant relating to their policies, pay-structures, and time keeping;

23  prepare for and take deposition of Defendant's person most knowledgeable; review deposition

24  transcript; draft mediation brief and mediation damage and exposure models; prepare for and

25  attend mediation; draft, negotiate, and revise the settlement agreement and the Notice to the Class;

26  draft preliminary approval motion and supporting papers; review, revise, and proof Notice papers

27  from the claims administrator; review weekly status reports from the claims administrator

28  regarding Class participation; review and edit claims administrator's declaration; draft final

---

Plaintiff's Motion for Final Approval                             Case No. STK-CV-UOE-2018-0002270

1    approval of the settlement motion, and appear at the preliminary and final approval hearings. (Mara

2    Dec. ¶¶ 18, 21, 24).

3        All of the work performed was reasonable and necessary to the prosecution of this case. The

4    work performed was particularly justified, in light of the extraordinary result achieved.

5            **f.   Costs of Litigation**

6        Class Counsel seeks reimbursement of the litigation costs and expenses of $15,372.88.

7    These costs were all reasonable and necessary to the prosecution of this case and the results

8    achieved and are fair, reasonable, and unopposed by Defendant. (Mara Dec. ¶ 26, Exh. 1).

**VII.   THE   CLASS   REPRESENTATIVE   GENERAL   RELEASE   PAYMENT   IS
9          REASONABLE**

10       Class Counsel seeks approval of a general release payment to the named Plaintiff in the

11   sum of $10,000, which represents approximately 1.44%[11] of the $695,000 settlement. In agreeing

12   to the settlement, Plaintiff also agreed to a general release of his claims. The Joint Stipulation

13   provides, at paragraph III(K), that he will release the following claims in exchange for $10,000:

14       Plaintiff shall for himself and his respective spouse, heirs, successors and assigns,
15       forever release the Released Parties from any and all charges, complaints, claims,
         liabilities, obligations, promises, agreements, controversies, damages, actions,
16       causes of action, suits, rights, demands, costs, losses, debts, penalties and expenses
         of any nature whatsoever, from the beginning of time through the date of his
17       signature on this Agreement, known or unknown, suspected or unsuspected,
         whether in tort, contract, equity, or otherwise, for violation of any federal, state or
18       local statute, rule, ordinance or regulation, including but not limited to all claims
19       arising out of, based upon, or relating to his employment with Defendant or the
         remuneration for, or termination of, such employment. Plaintiff's Release of
20       Claims also includes a waiver of California Civil Code section 1542, which
21       provides as follows:

22       A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE
         CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT
23       TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE
24       RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE
         MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE
25       DEBTOR OR RELEASED PARTY.

26       This release excludes any release of any claims not permitted to be released by law.

27       It should be noted that when the Class Notices were sent out, the Class was informed that the

28

---

[11] $695,000 x 1.44% = $10,008

1   Class Representative would apply for this payment and not one Class Member objected.

2   Furthermore, Defendant does not oppose the request.

3       The requested class representative general release payment is also reasonable in light of

4   the benefits Plaintiff has conferred upon the entire Class, resulting in substantial payments

5   averaging $1,900.80 and highest payment of $3,033.32, the significant time spent assisting counsel

6   with the investigation and prosecution of these claims and consenting to the proposed Settlement.

7   Furthermore, in pursuing this action on behalf of the Class, Plaintiff risked a judgment entered

8   against him for attorneys' fees and costs in the event this matter had been lost.

9       Courts routinely approve service payments, or incentive awards, to compensate named

10  plaintiffs for the services they provide and the risks they incur during class litigation. See *In re*

11  *Cellphone Fee Termination Cases* (2010) 186 Cal. App. 4th 1380, 1393; see also *Bell v. Farmers*

12  *Ins. Exch.* (2004) 115 Cal. App. 4th 715, 725-26 (upholding service payments to class

13  representatives); Manual § 21.62 n.971 (noting that service payments are warranted). Based on the

14  foregoing, the $10,000 general release payment to each named Class Representative is fair,

15  appropriate and justified as part of the overall settlement.

16  **VIII.   THE ADMINISTRATION COSTS ARE REASONABLE**

17      The Parties agreed to hire CPT as the Administrator, and the Court approved this choice.

18  The Administrator was responsible for formatting, printing and mailing the Notice. It was also

19  responsible for updating addresses and re-mailing Notices returned as undeliverable, responding

20  to Class Member inquiries, providing weekly status reports, answering questions from Counsel for

21  the Parties, and providing a declaration to document its duties and responsibilities under the

22  settlement. Plaintiff now requests that the Court finally approve the $8,900 fee to CPT for services

23  rendered and to be rendered. (Valdez Dec. ¶ 14).

24      Following the grant of final approval, the Administrator's duties will continue in order to

25  calculate and mail the Individual Settlement Payment checks to Class Members, perform tax

26  reporting obligations, disburse other payments as ordered by the Court, and perform such other

27  duties as set forth in the Settlement Agreement. CPT's fee of $8,900 for services rendered and to

28  be rendered is fair and reasonable and should be granted.

---

## IX.    CONCLUSION

Based on the foregoing, Class Counsel respectfully requests the Court grant final approval of the Class Action Settlement, award Class Counsel's attorneys' fees in the sum of $231,435 and actual litigation costs of $15,372.88, award to the named Plaintiff a general release payment in the sum of $10,000, award to CPT Group, Inc. $8,900 for settlement administration services, and approve of a payment to the LWDA in the amount of $15,000.

Dated: September 20, 2019                    **MARA LAW FIRM, PC**

David Mara, Esq.
Jill Vecchi, Esq.
Matthew Crawford, Esq.
Nikki Trenner, Esq.
Representing plaintiff ARMANDO BAUTISTA, on behalf of himself, all others similarly situated, and on behalf of the general public

# EXHIBIT F



David Mara, Esq. (SBN 230498)
Jill Vecchi, Esq. (SBN 299333)
Matthew Crawford, Esq. (SBN 310230)
Nikki Trenner, Esq. (SBN 316007)
**MARA LAW FIRM, PC**
2650 Camino Del Rio North, Suite 205
San Diego, CA 92108
Telephone:    619-234-2833
Facsimile:    619-234-4048



OCT 1 6 2019

Attorneys for Plaintiff ARMANDO BAUTISTA,
on behalf of himself, all others similarly situated,
and on behalf of the general public

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN JOAQUIN

| | |
|---|---|
| ARMANDO BAUTISTA, on behalf of himself, all others similarly situated, and on behalf of the general public | Case No. STK-CV-UOE-2018-0002270 |
| | [Assigned for All Purposes to: Hon. Michael Mulvihill] |
| Plaintiff, | |
| v. | MJM<br>[~~PROPOSED~~] ORDER GRANTING **PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, ATTORNEYS' FEES, COSTS, GENERAL RELEASE PAYMENT, AND ENTERING OF FINAL JUDGMENT** |
| RED ROBIN INTERNATIONAL, INC. DBA RED ROBIN BURGER AND SPIRITS EMPORIUMS; and DOES 1-100, | |
| | FILE BY FAX |
| Defendants. | Date: October 16, 2019<br>Time: 9:00 a.m.<br>Judge: Hon. Michael Mulvihill<br>Dept.: 10C |
| | **Complaint Filed: February 26, 2018**<br>**Trial Date: None Set** |

1       This matter came on for hearing on October 16, 2019, at 8:30 a.m., in Department 10C of

2 the above-captioned Court on Plaintiff's Unopposed Motion for Final Approval of Class Action

3 Settlement, Attorneys' Fees, Costs, Class Representative General Release Payment, and Entering

4 of Judgment pursuant to: (1) California Rule of Court 3.769(g); (2) the Order Granting Plaintiff's

5 Motion for Preliminary Approval of Class Action Settlement, Conditional Certification, Approval

6 of Class Notice, Setting of Final Approval Hearing Date (hereinafter referred to as the "Preliminary

7 Approval Order") filed June 21, 2019; and (3) the Joint Stipulation of Class Action Settlement and

8 Release (hereinafter referred to as the "Settlement Agreement").

9       Having received and considered the Settlement Agreement, the supporting papers filed by

10 the Parties, and the evidence and argument received by the Court in conjunction with the Motion

11 for Preliminary Approval of Class Action Settlement; and Plaintiff's Motion for Final Approval,

12 Attorneys' Fees, Costs, Class Representative General Release Payment, and Entering of Judgment,

13 the Court grants final approval of the Settlement and HEREBY ORDERS AND MAKES THE

14 FOLLOWING DETERMINATIONS:

15       1.     Pursuant to the Preliminary Approval Order, the Notice of Class Action Settlement

16 (hereinafter referred to as the "Notice") was mailed to all members of the Class by first-class U.S.

17 mail. The Notice informed the Class of the terms of the Settlement, of their right to receive their

18 proportional Settlement Payment, of their right to request exclusion from the Class and the

19 Settlement, of their right to comment upon or object to the Settlement and to appear in person or

20 by counsel at the final approval hearing and of the date set for the Final Approval hearing.

21 Adequate periods of time were provided by each of these procedures.

22       2.     In response to the Notice, no members of the Class filed a written objection to the

23 Settlement and no class members have stated an intention to appear at the final approval hearing.

24 Only one member of the Class requested to be excluded from the Settlement. No member of the

25 Class filed a dispute regarding the Settlement.

26

27

3.     The Court finds and determines that this notice procedure afforded adequate protections to Class Members and provides the basis for the Court to make an informed decision regarding approval of the Settlement based on the Class Members' response. The Court finds and determines that the Notice provided in conjunction with preliminary approval was the best notice practicable, which satisfied the requirements of law and due process.

4.     The Court further finds and determines that the terms of the Settlement Agreement are fair, reasonable and adequate to the Class and to each Class Member and that the settlement is ordered finally approved, and that all terms and provisions of the Settlement Agreement should be and hereby are ordered to be consummated.

5.     The Court has certified a Class, as that term is defined in and by the terms of the Settlement Agreement, and the Court deems this definition sufficient for purposes of California Rule of Court 3.765(a).

6.     The Court hereby approves the terms set forth in the Settlement Agreement and finds that the Settlement is, in all respects, fair, adequate, and reasonable, and directs the Parties to effectuate the settlement according to its terms. The Court finds that the settlement was reached as a result of informed and non-collusive arm's-length negotiations facilitated by a neutral mediator. The Court further finds that the Parties conducted extensive investigation, research, and discovery and that their attorneys were able to reasonably evaluate their respective positions. The Court also finds that settlement will enable the Parties to avoid additional and potentially substantial litigation costs, as well as delay and risks if the Parties were to continue to litigate the case. The Court has reviewed the monetary recovery provided as part of the settlement and recognizes the significant value accorded to the Class.

7.     The Court hereby confirms David Mara, Jill Vecchi, and Matthew Crawford of Mara Law Firm, PC (formerly The Turley & Mara Law Firm, APLC) as Class Counsel in this action.

1    8.    The Court hereby confirms the Plaintiff Armando Bautista as the Class
2    Representative in this action.

3    9.    The Court finds and determines that the individual Settlement Payments provided
4    for by the terms of the Settlement Agreement to be paid to Participating Class Members are fair
5    and reasonable. The Court hereby gives final approval to and orders the payment of those amounts
6    be made to the Participating Class Members in accordance with the terms of the Settlement.

7    10.    The Court finds and determines that payment to the California Labor and
8    Workforce Development Agency of $15,000 as its share of the settlement of civil penalties in this
9    case is fair, reasonable, and appropriate. The Court hereby gives final approval to and orders that
10   the payment of that amount be paid in accordance with the Settlement.

11   11.    The Court finds and determines the Class Representative General Release Payment
12   in the sum of $10,000 to Plaintiff Armando Bautista is fair and reasonable. The Court hereby orders
13   the Administrator to make this payment to the Plaintiff/Class Representative in accordance with
14   the terms of the Settlement Agreement.

15   12.    The Court finds and determines that the payment to be paid to the Settlement
16   Administrator, CPT Group, Inc., in the sum of $8,900 for its fee and expenses incurred is fair and
17   reasonable. The Court hereby orders the Administrator to make this payment to itself in accordance
18   with the terms of the Settlement Agreement.

19   13.    Pursuant to the terms of the Settlement, and the authorities, evidence and argument
20   submitted by Class Counsel, the Court hereby awards Class Counsel attorneys' fees in the sum of
21   $231,435 and litigation costs of $15,372.88. The Court finds such amounts to be fair and
22   reasonable. The Court hereby orders the Settlement Administrator to make these payments in
23   accordance with the terms of the Settlement Agreement.

24   14.    Neither Defendant nor any related persons or entities shall have any further liability
25   for costs, expenses, interest, attorneys' fees, or for any other charge, expense, or liability, except
26   as provided for by the Settlement Agreement.

27

[PROPOSED] ORDER GRANTING PLAINTIFF'S
MOTION FOR FINAL APPROVAL                                    Case Number STK-CV-UOE-2018-0002270
4

15.     The Court finds and determines that the release contained in the Settlement Agreement is appropriate and shall bind all Class Members who did not timely opt out of the Settlement as required.

16.     Nothing in this Order shall preclude any action to enforce the Parties' obligations pursuant to the Settlement Agreement or pursuant to this Order, including the requirement that Defendant make payments to Participating Class Members in accordance with the Settlement Agreement.

17.     The Court hereby enters final judgment in this case in accordance with the terms of the Settlement Agreement, Preliminary Approval Order and this Order.

18.     The Parties shall bear their own costs and attorneys' fees except as otherwise provided for by the Settlement Agreement and this Court's Order Granting Final Approval.

19.     Without affecting the finality of this Order in any way, the Court retains jurisdiction of all matters relating to the interpretation, administration, implementation, effectuation and enforcement of this order and the Settlement.

## JUDGMENT

20.     This document shall constitute a judgment for purposes of California Rules of Court, Rule 3.769(h). In accordance with, and for the reasons stated in this Order, judgment shall be entered within the meaning and for purposes of Code of Civil Procedure sections 577, 904.1(a), and Rules 3.769, and 8.104 of the California Rules of Court whereby named Plaintiff/Class Representative and all Class Members shall take nothing from Defendant except as expressly set forth in the Settlement Agreement filed on May 3, 2019, in conjunction with Plaintiff's Motion for Preliminary Approval of the Class Action Settlement. The Court pursuant to California Rule of Court 3.769(h) shall retain jurisdiction over the parties to enforce the terms of the judgement.

Date: _October 16 7 2019_

By: _____
Honorable Michael Mulvihill
Judge of the Superior Court

[PROPOSED] ORDER GRANTING PLAINTIFF'S
MOTION FOR FINAL APPROVAL                                    Case Number STK-CV-UOE-2018-0002270

5

# EXHIBIT G

# SETTLEMENT AGREEEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is entered into by and between Eric Outlaw ("Named Plaintiff"), individually and on behalf of the current or former Red Robin Assistant Managers or Kitchen Managers, below the level of General Manager and below the level of any Assistant General Manager not dually titled Assistant General Manager/Kitchen Manager or Kitchen Manager/Assistant General Manager (collectively "AMs") employed by Red Robin at its corporate-owned locations in the United States who were paid as exempt and who filed consents opting in into the Litigation, and whose consents were not withdrawn or whose AM claims were not otherwise resolved by entry of judgment in the Litigation (collectively "Opt-in Plaintiffs"), as well as on behalf of a class of AMs employed and paid for AM work as exempt by Red Robin in New York from August 2, 2012 to the March 31, 2020 date by which AMs were reclassified to non-exempt, excluding: (1) any AM who participated in a prior settlement in *Rogers v. Red Robin International Inc., et al*, Case No. 511180/2016 (New York Supreme Court, Kings County) by timely submitting a signed Claim Form in that case and endorsing their settlement check, and who did not work for Red Robin as an AM after the applicable date covered by the release of their claims in *Rogers*; and (2) any AM whom Defendant warranted and represented to have signed an arbitration agreement with Defendant, agreeing to arbitrate their claims and waive participation in a class or collective action, where such agreement was signed by the AM prior to August 2, 2018 (the date the Complaint in the Litigation was filed) (collectively "Settlement Class"), and Defendant Red Robin International, Inc. d/b/a Red Robin ("Red Robin" or "Defendant") (together with Plaintiffs, the "Parties").

## RECITALS

**WHEREAS**, Named Plaintiff filed a Complaint in *Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357 (E.D.N.Y.), asserting individual and collective action claims against Defendant under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and individual and class action claims under New York Labor Law (the "Litigation");

**WHEREAS**, Outlaw worked for Red Robin as an AM in New York during the relevant period, and asserted New York law class claims as class representative;

**WHEREAS**, the purpose of this Agreement is to settle fully and finally all claims asserted in the Litigation and those claims that could have been asserted arising out of the facts pled in the Complaint;

**WHEREAS**, Defendant denies all of the allegations made by Named Plaintiff in the Litigation and denies that it is liable or owes damages to anyone with respect to the alleged facts or causes of action asserted in the Litigation. Nonetheless, without admitting or conceding any liability or damages whatsoever, Defendant has agreed to settle the Litigation on the terms and conditions set forth in this Agreement, to avoid the burden, expense, and uncertainty of continuing the Litigation;

WHEREAS, the Parties agreed in 2019 to engage in negotiation discussions regarding the possibility of a voluntary resolution of the claims asserted in the Litigation;

WHEREAS, in 2019, and later in 2021, the Parties participated in two separate mediation sessions of this matter, which were conducted by two separate experienced mediators, and after continued negotiations following the conclusion of the second full-day mediation session, reached an accord resulting in this Agreement; and

WHEREAS, Plaintiffs' Counsel analyzed and evaluated the merits of the claims made against Defendant in the Litigation, conducted interviews with Named Plaintiff and Opt-in Plaintiffs, obtained and reviewed documents relating to Defendant's compensation policies and practices, the manner in which Red Robin operates its stores, and the training practices of AMs, researched law relating to the overtime claims, potential defenses and exemptions, and the various methods for calculating damages, and analyzed voluminous payroll and employment data, and based upon their analysis and evaluation of a number of factors, and recognizing the substantial risks of litigation, including the possibility that the Litigation, if not settled now, might not result in any recovery or might result in a recovery less favorable, as well as the impact and possible future impact of the Covid-19 pandemic, and that any recovery would not occur for several years, Plaintiffs' Counsel is satisfied that the terms and conditions of this Agreement are fair, reasonable, and adequate and that this Agreement is in the best interests of the Plaintiffs,

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Agreement, as well as the good and valuable consideration provided for herein, the Parties agree to a full and complete settlement of the Litigation on the following terms and conditions.

## 1. DEFINITIONS

The defined terms set forth in this Agreement have the meanings ascribed to them below.

1.1 **"Agreement"** means this agreement and the exhibits hereto, which the Parties understand and agree set forth all material terms and conditions of the Settlement between them, and which is subject to Court approval.

1.2 **"Court"** means the United States District Court for the Eastern District of New York.

1.3 "**Collective Action Members**" mean current or former Red Robin Assistant Managers or Kitchen Managers, below the level of General Manager and below the level of any Assistant General Manager not dually titled Assistant General Manager/Kitchen Manager or Kitchen Manager/Assistant General Manager employed by Red Robin at its corporate-owned locations in the United States who were paid as exempt and who filed consents opting in into the Litigation (collectively "AMs"), whose consents were not withdrawn or whose AM claims

were not otherwise resolved by entry of judgment in the Litigation. The parties have identified 498 Collective Action Members covered by this settlement.

1.4 **"NY Class"** means the 73 individuals identified by the parties prior to mediation as AMs who were employed and paid for AM work as exempt by Red Robin in New York from August 2, 2012 to the March 31, 2020 date by which AMs were reclassified to non-exempt, excluding: (1) any AM who participated in a prior settlement in *Rogers v. Red Robin International Inc.*, et al, Case No. 511180/2016 (New York Supreme Court, Kings County), by timely submitting a signed Claim Form in that case and endorsing their settlement check, and who did not work for Red Robin as an AM after the applicable date covered by the release of their claims in *Rogers*; and (2) any AM whom Defendant warranted and represented to have signed an arbitration agreement with Defendant, agreeing to arbitrate their claims and waive participation in a class or collective action, where such agreement was signed by the AM prior to August 2, 2018 (the date the Complaint in the Litigation was filed).

1.5 **"Absent NY Class Members"** mean the 45 individuals identified by the parties prior to mediation as members of the NY Class who are not Opt-in Plaintiffs in the Litigation.

1.6 **"Settlement Member"** means any Named Plaintiff, Collective Action Member, or, as to Absent NY Class Members, any Absent NY Class Member who does not timely file a compliant exclusion from the class settlement as defined in this Agreement.

1.7 **"Class Period"** means August 2, 2012 through the March 31, 2020 date by which AMs were reclassified to non-exempt.

1.8 **"Collective Action Period"** means for each Collective Action Member the date three years preceding the filing date of the Collective Action Member's consent to join the litigation, as adjusted for tolling applied pursuant to the Parties' tolling agreement and the Court's tolling Order.

1.9 **"Defendant"** means Defendant Red Robin International, Inc. d/b/a Red Robin.

1.10 **"Gross Settlement Amount"** means Two Million Nine Hundred and Fifty Thousand Dollars ($2,950,000.00). The Gross Settlement Amount is the maximum amount that Defendant has agreed to pay to fully resolve and settle this Litigation and the claims of Settlement Members, including any claim for attorneys' fees and costs approved by the Court; the employer's share of taxes; the cost of settlement administration; and any Court-approved Service Payments. Defendant will not be required to pay any more than the gross total of Two Million Nine Hundred Fifty Thousand Dollars ($2,950,000.00).

1.11 **"Net Settlement Fund"** means the remainder of the Gross Settlement Amount after deductions/payments for Court-approved: (i) Settlement Administration

fees and costs; (ii) Plaintiff's Counsel's attorneys' fees and costs; (iii) Service Payments; and (iv) Employer Payroll Taxes.

1.12 **"Employer Payroll Taxes"** means all taxes and withholdings an employer is required to make arising out of or based upon the payment of employment/wage compensation resulting from the wage portion of payments under this settlement, including FICA, FUTA, and SUTA obligations.

1.13 **"Defendant's Counsel"** means Jeffrey W. Brecher, Esq. of Jackson Lewis P.C., 58 South Service Rd, Suite 250, Melville New York, 11747.

1.14 **"Plaintiff's Counsel"** means, Seth Lesser, Esq., of Klafter Lesser LLP, 2 International Drive, Suite 350, Rye Brook, New York, 10573, and C. Andrew Head, Esq., of Head Law Firm, LLC, 4422 Ravenswood Avenue, Suite 3, Chicago, IL 60640.

1.15 **"Effective Date"** means the date on which this Agreement becomes effective, which shall mean the later of (i) 30 days following the Court's Order Granting Final Approval of the Agreement if no appeal is taken of such Order, or (ii) the Court's entry of a final order and judgment after any appeals are resolved.

1.16 **"Last Known Address"** means the most recently recorded personal mailing address for a Settlement Member as shown in Defendant's records, as updated by Plaintiff's records containing any updated address information provided by Settlement Members to Plaintiff's counsel.

1.17 **"Order Granting Final Approval"** shall mean the final approval Order entered by the Court after the Fairness Hearing.

1.18 **"Order Granting Preliminary Approval"** shall mean the Order entered by the Court preliminarily approving, inter alia, the terms and conditions of this Agreement, the manner and timing of providing notice to the Class, and the time period for opt-outs and objections.

1.19 **"Qualified Settlement Fund" or "QSF"** means the account established by the Settlement Administrator from the Gross Settlement Amount paid by Defendant. The QSF will be controlled by the Settlement Administrator subject to the terms of this Agreement and the Court's order(s). Interest, if any, earned on any monies in the QSF will become part of the Net Settlement Fund.

1.20 **"Releasees"** means Defendant and its past, present, and future officers, directors, employees, agents, insurers, successors, predecessors, affiliates, parents, subsidiaries, attorneys, and other related entities or individuals, including any individual alleged to be an "employer" of Settlement Members for their AM work at issue in the Litigation.

1.21 **"Settlement Administrator"** means CPT Group.

**1.22** **"Individual Settlement Amount"** means each Settlement Member's proportionate share of the Net Settlement Fund calculated in accordance with this Agreement.

**1.23** **"Individual Settlement Check(s)"** means the check(s) issued to each Settlement Member for his or her proportionate share of the Net Settlement Fund calculated in accordance with this Agreement.

**1.24** **"Settlement Notice"** means the document entitled Notice of Settlement to be approved by the Court in the forms substantially similar to Exhibits A and B attached hereto.

**1.25** **"Eligible Weeks"** means weeks worked as AMs within the applicable period, except that it shall not include (i) weeks covered by such individual's release given by participating in a prior settlement in *Rogers v. Red Robin International Inc.*, et al, Case No. 511180/2016 (New York Supreme Court, Kings County) by timely submitting a signed Claim Form in that case and endorsing their settlement check, or (ii) weeks covered by such individual's release given as a settling class member in *Bautista v. Red Robin International, et al*, Case No. 2018-0002270 (Superior Court, CA, San Joaquin County).

## 2. APPROVAL AND NOTICE TO NY CLASS MEMBERS

**2.1** This Agreement is a binding agreement and contains all material agreed-upon terms for the Parties to seek a full and final settlement of the Litigation and the released claims set forth herein.

**2.2** **Preliminary Approval by the Court.** Within 21 days of the execution of this Agreement by all Parties, Plaintiff will submit to the Court a Motion for Preliminary Approval of the Class Action Settlement ("Preliminary Approval Motion"). In connection with the Preliminary Approval Motion, Plaintiff will submit to the Court, among other things: (a) a proposed Notice(s) of Settlement of the Class Action Lawsuit and Fairness Hearing which are appended hereto as Exhibits A and B, (b) a proposed Order Granting Preliminary Approval and certifying the New York Class pursuant to Fed. R. Civ. P. 23, attached hereto as Exhibit C; and (c) a Memorandum of Law in support of the Motion for Preliminary Approval. At least 14 days prior to submission Defendant will have an opportunity to review for Plaintiff's compliance with the terms of this Settlement Agreement and provide comments regarding same relating to the Preliminary Approval Motion. The Parties shall work together to finalize these documents in this manner. The Preliminary Approval Motion will include the findings required by Fed. R. Civ. P. 23(a) and 23(b)(3) and will seek the setting of dates for opt-outs, objections, and a Fairness Hearing. Defendant will not oppose the Preliminary Approval Motion so long as Plaintiff has complied with the terms of this Settlement Agreement.

**2.3** **Denial of Preliminary Approval**. If the Court denies the Motion for Preliminary Approval, then the Parties jointly agree to seek reconsideration of the

ruling or seek Court approval of a renegotiated settlement addressing the issues raised by the Court, including, if necessary, by involvement of mediator Michael Russell. Should reconsideration and/or the Parties' attempt to secure Court approval of a renegotiated settlement be denied, the case will proceed as if no settlement had been attempted, and Defendant retains the right to contest whether this case should be maintained as a class action or collective action, and to contest the merits of the claims being asserted by Settlement Members in this Litigation. In such a case, the Parties will negotiate and submit for Court approval a revised case management schedule.

**2.4**    The Settlement Administrator will be responsible for all aspects of properly administering this settlement in accordance with the Court's approval Order, including but not limited to: assigning individual User ID and passwords, creating an individually password-protected access settlement administration case website, promptly posting the Settlement Agreement, motions for approval, and orders related thereto on that website page allowing viewing access as stated in the class notice; preparing and mailing the Settlement Notice after updating last known addresses through the National Change of Address program certified by the United Postal Service and other standard skip trace methods; promptly notifying the parties of any undeliverable communication and seeking information or assistance required to assist with skip tracing; preparing, mailing, and upon request, reissuing, Individual Settlement Checks; distributing the approved Service Awards and attorneys' fees and expenses; calculating and paying all appropriate taxes and complying with all applicable tax reporting obligations, including preparing and filing all applicable tax forms (and, as to any state that refuses to accept payroll taxes from a QSF, coordinating with Defendant to arrange for such state payroll tax reporting and submittal however Defendant and the Settlement Administrator determine appropriate); retaining and providing a copy of the Individual Settlement Checks signed by NY Class Members to Plaintiff's and Defendant's Counsel; skip tracing for any checks remaining uncashed after the check void date, and contacting intended recipients to determine resolution; preparing and submitting a final accounting of the Settlement attested to by an Affidavit or Declaration in support of final approval of the settlement; processing check reissue requests; and remitting any uncashed settlement funds, after exhaustion of all reasonable attempts to communicate with the intended recipient regarding such uncashed funds, to their applicable state's unclaimed property department after a 90 day grace period following the expiration of the 90 day check void date; and such other administration duties necessary for implementation of the settlement notice process.

**2.5**    The Parties will have equal access to the Settlement Administrator. The Settlement Administrator will provide regular reports, at least bi-weekly, to counsel for the Parties regarding the status of the mailing of the Settlement Notice and Individual Settlement Checks, reports on distribution, responses, undeliverable communications, checks not negotiated, and updates from Plaintiff regarding contact information.

**2.6**     Within ten days following preliminary approval of the settlement, Defendant will provide the names and addresses of the NY Class Members (all of whom worked in NY for state tax reporting purposes), and will provide the names and payroll state worked data (for state tax reporting purposes) for the Collective Action Members, to the Settlement Administrator and Plaintiff's counsel, which shall be used only for the purpose of effectuating the settlement in this matter. Plaintiff's Counsel is already in possession of the addresses of the Collective Action Members.

**2.7**     Settlement Notices approved by the Court will be distributed to Settlement Members, via First Class United States mail by the Settlement Administrator within twenty (20) days of from the date of the Order preliminarily approving the settlement. If a mailed Settlement Notice is returned as undeliverable, the Settlement Administrator will send that Notice by email in addition to skip tracing and re-mailing to any updated address located. Before distributing the Settlement Notice to Absent NY Class Members, the Settlement Administrator will perform a skip trace on all Absent NY Class Members' addresses to obtain the most current address for each Class Member.

**2.8**     The Settlement Administrator shall take all reasonable steps to obtain the correct address for any Settlement Members for whom the Settlement Notice or Individual Settlement Checks are returned by the post office as undeliverable, including using the social security numbers to be provided by Defendant for tax reporting purposes to obtain better address information for Settlement Members about their current addresses and shall attempt re-mailings. Any Settlement Notices or Individual Settlement Checks returned as undeliverable shall be traced up to two times to obtain a new address and be re-mailed by First Class United States Mail and emailed to any updated email address(es). The Settlement Administrator, including for a 90 day grace period following the expiration of the 90 day check void date, shall exhaust all reasonable attempts to locate and communicate with the intended recipient regarding any such uncashed Settlement Checks, except as to the FLSA Payment issued to any Absent Class Member who submits their written notice of forfeiture under Section 2.13; and if the matter of the uncashed funds is not resolved by the conclusion of that 90 day grace period, shall remit their Individual Settlement Check amounts (other than, for Absent NY Class Members, any FLSA Payment forfeited in accordance with this Agreement which FLSA Payment amount shall be returned to Defendant), to their applicable state's unclaimed property department in a timely manner after that 90 day grace period.

**2.9**     The Settlement Administrator will periodically update Plaintiff's Counsel and Defendant's Counsel regarding returned mailings for which it is unable to obtain corrected addresses.

**2.10**     In the event that the Court fails to approve this Agreement, in addition to complying with the obligations of Section 2.3 above, the Parties (a) can attempt to renegotiate the Settlement for the purpose of obtaining Court approval of a renegotiated settlement and agreement and/or (b) any or all Parties may seek

reconsideration or appellate review of the decision denying approval of the Agreement.

**2.11 Objections**

(A) Any NY Class Member may object to this settlement, provided that such objections are made in writing filed with the Court and served on counsel for the Parties no later than 45 days after mailing of the first notice sent by the Settlement Administrator. Such objection shall not be valid unless it includes the information required for objections as specified in the Notice. The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection. No Plaintiff may be heard at the final settlement hearing who has not complied with this requirement. Any NY Class Member who fails to comply with this requirement will be deemed to have waived any right to object and any objection to the settlement.

(B) All NY Class Members who do not timely exclude themselves from the settlement will be bound by the final approval order, the judgment, and the releases set forth in this Agreement, except that no FLSA claims are released by Absent NY Class Members who timely comply with the requirements herein for forfeiture of their offered FLSA Payment or do not endorse their FLSA Payment Individual Settlement Check. The FLSA Payment portion of their total gross Individual Settlement amount is 50%.

(C) Unless they have timely asserted an objection to this Agreement, all Settlement Members shall be deemed to have waived all objections and opposition to its fairness, reasonableness, and adequacy.

(D) Upon receipt, counsel for the Parties shall promptly exchange with one another and file with the Court copies of all objections and/or challenges to the Settlement Agreement or any part thereof.

**2.12 Opt-Out**

(A) Any NY Class Member may request exclusion from the Class by "opting out." Any NY Class Member who chooses to do so must mail a written, signed statement to the Settlement Administrator that he or she is opting out of the Settlement ("Opt-Out Statement"). The Opt-Out Statement must contain the name, address, and telephone number of the Class Member to be valid. In order to be valid, it must also contain the words "I elect to exclude myself from the settlement in Outlaw v. Red Robin International, Inc." To be effective, such Opt-Out Statement must also be sent via mail and postmarked by a date certain to be specified on the Notice of Proposed Class Action Lawsuit and Fairness Hearing, which will be 45 calendar days after the date on which the Settlement Administrator mails the Notice. The 45-day period will begin to run from the first mailing, except for those NY Class Members whose first mailing was returned to the Settlement Administrator

as undeliverable in which case the 45-day period for any such Class Member will begin to run from the date of the second mailing to such Class Member, unless another period is set by the Court. The Settlement Administrator shall not attempt more than two skip traces and supplemental distribution of the Notice. The end of the "Opt-Out Period" shall be 45 days after the last day on which the Settlement Administrator makes a mailing to a Class Member, but in any case no later than 7 calendar days before the date of the Fairness Hearing. The Settlement Administrator shall, within 10 calendar days after the last day on which it makes such a mailing, notify Plaintiff's Counsel and Defendants' Counsel of the precise date of the end of the Opt-Out Period.

(B)     The Settlement Administrator shall stamp the postmark date on the original of each Opt-Out Statement that it receives and shall serve copies of each Statement on Plaintiff's Counsel and Defendants' Counsel not later than three calendar days after receipt thereof. The Settlement Administrator shall, within 24 hours of the end of the Opt-Out Period, send a final list of all Opt-Out Statements to Plaintiff's Counsel and Defendants' Counsel. The Settlement Administrator shall retain the stamped originals of all Opt-Out Statements and originals of all envelopes accompanying Opt-Out Statements in its files until such time as the Settlement Administrator is relieved of its duties and responsibilities under this Agreement.

## 2.13    Requesting Forfeiture of Offered FLSA Payment

NY Class Members who do not opt out of the settlement may accept their offered FLSA Payment (one-half of their allocated individual amount) by cashing, depositing or otherwise endorsing their FLSA Payment Individual Settlement Check and thereby opting in and accepting the FLSA Release by the check void deadline of 90 days from the check date, or the subsequent 90 day grace period.

NY Class Members who do not want to accept the offered FLSA Payment that is contingent upon releasing federal FLSA claims must submit a request in writing to the Settlement Administrator affirmatively stating that they choose to forfeit their individual offered FLSA Payment from Outlaw v. Red Robin International, Inc., Case No. 1:17-cv-07638-CM (S.D.N.Y.). That written request must include the NY Class Member's name, address, telephone number, and signature, as well as their employee ID number or the last four digits of their Social Security number for identity verification purposes, postmarked no later than 45 days after mailing of the first settlement notice sent by the Settlement Administrator, or received by the Settlement Administrator (if sent by e-mail) no later than [insert date no later than 7 calendar days before the date of the Fairness Hearing], to the Settlement Administrator.

NY Class Members who do not opt-out of the settlement will receive the one-half of their individually allocated amount from the net amount of the Total Gross Absent NY Class Member Fund for the release given for NY state law claims under

the settlement regardless of whether the NY Class Member forfeits his or her offered FLSA Payment.

**2.14** **Final Order and Judgment from the Court**.  Plaintiffs will seek to obtain from the Court, as a condition of settlement, a Final Order and Judgment in a form to be agreed upon by the Parties.  The proposed Final Order and Judgment will, among other things: (a) finally certify the NY Class for purposes of settlement, (b) enter Judgment in accordance with this Agreement, (c) approve the settlement as fair, adequate, reasonable, and binding on all Collective Action Members and NY Class Members who have not timely opted out, (d) dismiss the Litigation with prejudice, (e) enter an order permanently enjoining all NY Class Members who do not opt out from pursuing and/or seeking to reopen claims that have been released by this Agreement and by the FLSA consents to join filed in connection with this Litigation both to date and as further contemplated herein, and (f) incorporate the terms of this Settlement and Release.  At least 14 days prior to submission Defendant will have an opportunity to review for compliance with the terms of this Settlement Agreement and provide comments regarding same relating to the Motion for Judgment and Final Approval and the proposed Final Order and Judgment. The Parties will meet and confer in good faith to draft these submissions.

**2.15** **Motion for Judgment and Final Approval.**  No earlier than 91 days after filing the request for preliminary approval of the settlement, in compliance with the Class Action Fairness Act, but no later than 14 calendar days before the Fairness Hearing, Plaintiff will submit a Motion for Judgment and Final Approval; however, Plaintiff's counsel's request for approval of attorney's fees and costs will be filed and posted on the Settlement Administrator's password-protected access website at least seven (7) days before the expiration of the period to submit written objections.  The Fairness Hearing shall be held at the Court's convenience, but in no event earlier than 90 days from the date the Preliminary Approval Order is signed in accordance with the Class Action Fairness Act.

**3.** **SETTLEMENT TERMS**

**3.1** **Settlement Payments**

  i.  Defendant agrees to pay the Gross Settlement Amount into the QSF.

  ii.  Within 10 days of the Effective Date, Defendant shall deposit the funds to satisfy the payments in Section 3.1(i) into the QSF.

  iii.  Within 30 days of the Effective Date, the Settlement Administrator will distribute the money by making the following payments:

    (a)  Paying the participating Settlement Members their Individual Settlement Amounts, as described in Section 3.4.

       (b)     Paying Plaintiff's Counsel's Court-approved attorneys' fees and costs as described in Section 3.2.

       (c)     Paying the Court-approved Service Awards as described in Section 3.3.

       (d)     Paying the fees of and costs incurred by the Settlement Administrator, which the Settlement Administrator has estimated at $28,021.45 but agreed to cap at a fee of $23,500, in the amount approved by the Court.

       (e)     Paying the Employer's Payroll Taxes.

    iv.    Any amount from the FLSA Payment portion of the Total Net Absent NY Class Members Amount allocated to the Absent NY Class Members not claimed by any Absent NY Class Member shall revert to Defendant, with all adjustments to tax reporting required for non-payment of those wages to be made by the Settlement Administrator.

**3.2    Settlement Amounts Payable as Attorneys' Fees and Costs.**

    i.    The parties agree that Plaintiff's Counsel will seek approval of, and Defendant will not oppose, one-third of the Gross Settlement Amount as payment of attorneys' fees from the common fund. In addition, Plaintiff's Counsel shall seek, and Defendant will not oppose, reimbursement of reasonable actual case-related costs and expenses from the Gross Settlement Amount in the present amount of $39,865.27, plus any of Plaintiff's Counsel's additional case-related costs and expenses incurred from the date of this Agreement through the effective date of the Final Approval Order which Plaintiff's Counsel presently estimates will not exceed $1,000. These amounts shall constitute full satisfaction of any claim for attorneys' fees or costs for any claims released herein, and the Settlement Members agree that they shall not seek, nor be entitled to, any additional attorneys' fees or costs under any theory or from any source, incurred in relation to this case.

    ii.    The substance of Plaintiff's Counsel's application for attorneys' fees and costs is not part of this Agreement and is to be considered separately from the Court's consideration of the fairness, reasonableness, adequacy, and good faith of the Settlement and this Agreement. The outcome of any proceeding related to Plaintiff's Counsel's application for attorneys' fees and costs shall not terminate this Agreement or otherwise affect the Court's ruling on the Approval Motion. In the event that the Court (or any appellate court) awards less than the requested amounts, only the awarded amounts shall be paid and shall constitute full satisfaction of the obligations of this Section and full payment hereunder. Any money requested for

attorneys' fees or costs that is not approved by the Court shall thereby become part of the Net Settlement Fund to be allocated to the participating Settlement Members.

**3.3     Service Award to Named Plaintiff.**

     i.     In their Approval Motion, Named Plaintiff will apply to the Court to receive $10,000 from the Gross Settlement Amount for the services rendered to the Settlement Members. Named Plaintiff, in consideration for and contingent upon approval of the Service Award, agrees to a full general release.

     ii.    The Service Award is separate and apart from, and in addition to, Named Plaintiff's recovery from the Net Settlement Fund as a Settlement Member. The substance of the Named Plaintiff's application for a Service Award is to be considered separately from the Court's consideration of the fairness, reasonableness, adequacy and good faith of the Settlement and this Agreement. The outcome of the Court's ruling on the application for a Service Award shall not terminate this Agreement or otherwise affect the Court's ruling on the Approval Motion. Any Service Award money not approved by the Court shall thereby become part of the Net Settlement Fund to be allocated to the participating Settlement Members.

**3.4     Distribution of Payments to Settlement Members.**

     i.     Payments to participating Settlement Members, exclusive of a Settlement Member's Court-approved Service Award, will be made from the Net Settlement Fund.

     ii.    The Total Gross Absent NY Class Members Fund amount allocated from the Gross Settlement Fund shall be the amount of $150,000. The NY Absent Class Members who do not timely opt-out shall receive, from the Net Settlement Fund, a pro-rata share of the amount of the Total Gross Absent NY Class Members Fund amount remaining after payment of $50,000 for one-third attorneys' fees and deduction of an approximate pro rata amount as reasonably estimated by the Administrator for the pro rata share of costs and expenses, and Service Award payments attributable to the Total Gross Absent NY Class Members Fund amount ("Total Net Absent NY Class Members Fund"), determined based on the number of Eligible Weeks during the Class Period worked as AMs by each Absent NY Class Member as set forth in Defendants' payroll data as reported prior to the mediation, qualifying as weeks covered by the NY Class definition (the Absent NY Class Member "covered weeks"), which weeks the Parties agree shall be final and controlling with respect to Individual Settlement Amount calculations.    The Individual Settlement Amount for each Absent NY Class Member

shall be determined as follows, except as adjusted so that no Absent NY Class Member shall receive less than $250.00:

(a)     Total covered weeks worked by each Absent NY Class Member during the Class Period shall be identified.

(b)     The aggregate number of covered weeks worked recorded by all Absent NY Class Member during the Class Period shall be identified.

(c)     The number of covered weeks recorded for each individual Absent NY Class Member as a percentage of the total aggregate covered weeks shall be identified.

(d)     Each Absent NY Class Member will be allocated a pro-rata share of the Total Net Absent NY Class Members Fund based on the percentage of the covered weeks from the aggregate number of covered weeks for the Absent NY Class Members and adjusted, if necessary, such that no Absent Class Member receives less than $250.00.

(e)     50% of the individual amount allocated to each Absent NY Class Member from that Total Net Absent NY Class Members Fund shall be deemed consideration for release of FLSA claims, and 50% shall be for release of NY state law claims for covered weeks; accordingly should any Absent NY Class Member comply with the requirements for forfeiting their FLSA Payment or fail to deposit or otherwise endorse their Individual Settlement Check for the FLSA Payment bearing endorsement language requiring opt-in acceptance of the FLSA release, and thus, fail to opt into the FLSA collective action, that 50% of the individual amount allocated to that Absent NY Class Member for the FLSA Payment from the Total Net Absent NY Class Members Fund shall revert to Defendant.

iii.     The pro-rata share of the remaining Net Settlement Fund, after deduction of the Total Net Absent NY Class Members Fund amount, for each Collective Action Member will be determined based on the number of Eligible Weeks worked by each Collective Action Member as set forth in Defendants' payroll data provided prior to the mediation, which the Parties agree shall be final and controlling with respect to Individual Settlement Amount calculations. The Individual Settlement Amount for each Collective Action Member shall be determined as follows, except as adjusted so that no Collective Action Member shall receive less than $250.00:

(a) Total Eligible Weeks worked by each Collective Action Member during the Collective Action Period shall be identified (the Collective Action Member "covered weeks").

(b) The aggregate number of covered weeks recorded by all Collective Action Members during the Collective Action Period shall be identified.

(c) The number of covered weeks recorded for each individual Collective Action Member as a percentage of the total aggregate covered weeks shall be identified.

(d) Each Collective Action Member will be allocated a pro-rata share of the Net Settlement Fund remaining after the individual payments allocated under the above subsection (ii), based on the percentage of the covered weeks from the aggregate number of covered weeks for the Collective Action Members and adjusted, if necessary, such that no Collective Action Member receives less than $250.00.

iv.    Payroll Tax Responsibility and Tax Characterization of Payments.

(a) For tax purposes, 50% of the Individual Settlement Amounts to participating Settlement Members pursuant to this Agreement shall be treated as back wages and 50% of such payment shall be treated as interest, any applicable penalties, liquidated damages and other non-wage relief.

(b) Employer Share of Payroll Taxes shall be paid from the Gross Settlement Fund.

(c) Payments treated as back wages shall be made net of all applicable employment taxes, including, without limitation, federal, state and local income tax withholding and the employee share of the FICA tax, and shall be reported to the Internal Revenue Service ("IRS") and the payee under the payee's name and social security number on an IRS Form W-2.  Payments treated as a Service Award, interest, penalties, liquidated damages and other non-wage relief shall be made without withholding and shall be reported to the IRS and the payee, to the extent required by law, under the payee's name and social security number on an IRS Form 1099.  The Settlement Administrator shall be responsible for determining the appropriate number of exemptions to be used in calculating payroll tax and withholding, deciding the appropriate tax rate, issuing the Individual Settlement Checks and Service Award, and issuing IRS Forms W-2 and Form 1099.  Payments of attorneys' fees and costs pursuant to

Section 3.2 shall be made to Plaintiff's Counsel Klafter Lesser, LLP, without withholding, and be reported to the IRS and to Plaintiffs' Counsel Klafter Lesser, LLP, under the payee's name and taxpayer identification number, which Plaintiff's Counsel shall provide for this purpose, on an IRS Form 1099.

(d)     The employee portion of all applicable income and payroll taxes will be the sole responsibility of the individual Settlement Members receiving an Individual Settlement Check or Service Award, except that normal withholdings will be made from the W-2 wage portion of the Individual Settlement Checks. The Parties make no representations, and it is understood and agreed that the Parties have made no representations, as to the taxability of any portions of the settlement payments to any Settlement Members, the payment of any costs or award of attorneys' fees, or any payments to the Named Plaintiff. The Settlement Notice will advise Settlement Members to seek their own tax advice prior to acting in response to that Settlement Notice. Neither Plaintiff's Counsel nor Defendant's Counsel intend anything contained herein to constitute legal advice regarding the taxability of any amount paid hereunder, nor will it be relied upon as such.

None of the amounts paid to the Settlement Members shall create any credit for, be included in, or otherwise affect the calculation or the accrual of any employee benefits in any plans, programs, agreements or policies sponsored, maintained or contributed to by Defendant, including for purposes of any bonus of any kind.

## 4.    RELEASE OF CLAIMS

4.1     Release by Settlement Members:  Conditioned upon the Court's entry of the Final Approval Order, and in exchange for the monetary consideration recited in this Agreement, the Named Plaintiff, all Collective Action Members, and all Absent NY Class Members who do not opt-out, shall release Releasees from: (i) all FLSA claims, including any regulations applicable to FLSA claims, during the Class Period (for NY Class Members) or Collective Action Period (for Collective Action Members), respectively, and for the maximum applicable state law statute of limitations, all violations of state or local wage and hour laws, including any regulations applicable to state or local wage and hour laws, for the maximum applicable state law statute of limitations, including, but not limited to claims for minimum wage, overtime, off-the clock work, recordkeeping violations, and any derivative claims applicable to violations of state or local wage and hour laws, whether known or unknown, that were or could have been asserted in the Litigation or this matter, arising out of that Settlement Member's Eligible Weeks worked as an AM paid as exempt during that period of time; except that Absent NY Class Members who do not endorse their Individual Settlement Check for the

offered FLSA Payment or forfeit their FLSA Payment will not release any FLSA claims; and (ii) all claims for wages, penalties, liquidated damages, interest, attorneys' fees, costs or litigation expenses based on the claims listed in (i) above during the applicable period, except that Absent NY Class Members who do not endorse their Individual Settlement Check for the offered FLSA Payment will not release any FLSA claim for liquidated damages, interest, attorney's fees, or costs of litigation expenses; excluding claims for retaliation. The claims being released thereby are referred to in this Agreement as "Released Claims." The Parties agree that the only claims released are the Released Claims, and a Settlement Member's assertion of, and entry of judgment approving the release of, Released Claims shall have no collateral estoppel, claim splitting, res judicata, waiver, or other claim preclusion effect as to claims not explicitly released herein (including, for Absent NY Class Members who do not endorse their Individual Settlement Check for the offered FLSA Payment, FLSA claims).

**4.2**     All Individual Settlement Checks for the offered FLSA Payment to Absent NY Class Members who do not timely comply with the requirements herein to request forfeiture of their offered FLSA Payment contingent on the FLSA Release shall contain, on the back of the check (which shall be filed with the Court) the following limited endorsement on the check:

> By accepting this payment, I consent to join the action, ***Outlaw v. Red Robin International, Inc.,*** and agree to waive any remaining right to bring suit for federal and New York wage claims including overtime under the Fair Labor Standards Act or New York state and local laws therein for weeks worked as an exempt-paid Assistant Manager or Kitchen Manager **from August 2, 2012, to March 31, 2020**. I agree that by accepting this payment, I have settled my claims for any unpaid wages, overtime, liquidated damages, interest, and associated fees and penalties for those weeks arising through the present.

**4.3**     Release by Named Plaintiff: Named Plaintiff additionally waives, releases and discharges Releasees from all demands, claims and actions, whether known or unknown, arising before the date the release is effective, relating to his employment or termination of employment with Defendant, including but not limited to claims under the Americans With Disabilities Act, National Labor Relations Act, Fair Labor Standards Act (including but not limited to claims for overtime compensation) Equal Pay Act, Employee Retirement Income Security Act of 1974, Worker Adjustment and Retraining Notification Act, Title VII of the Civil Rights Act of 1964, Civil Rights Acts of 1866, 1871 and 1991, Family and Medical Leave Act, and any other federal, state or local statute, regulation, and order, and in common law, through the date the Named Plaintiff signs this Agreement; provided, however, that Named Plaintiff does not waive the right to file a charge or complaint with any administrative agency. Named Plaintiff is not waiving any rights that he may have to: (a) his own vested accrued employee benefits under Defendant's health, welfare, or retirement benefit plans as of his termination date; (b) benefits and the right to seek benefits under applicable

workers' compensation and unemployment compensation statutes; (c) pursue claims which by law cannot be waived by signing this Agreement; (d) enforce this Agreement; and (e) challenge the validity of this Agreement. Nothing in this Agreement prohibits or prevents the Named Plaintiff from filing a charge with or participating, testifying, or assisting in any investigation, hearing, whistleblower proceeding or other proceeding before any federal, state, or local government agency (e.g., EEOC, NLRB, SEC., etc.). However, to the maximum extent permitted by law, the Named Plaintiff agrees that if such an administrative claim is made, they shall not be entitled to recover any individual monetary relief or other individual remedies related to a claim released by this Section.

## 5. PUBLICITY

**5.1** Neither Party nor their counsel will issue a press release or affirmatively contact the media regarding settlement of this action or the Agreement.

## 6. PARTIES' AUTHORITY

**6.1** The signatories hereto hereby represent that they are fully authorized to enter into this Agreement and to bind the Parties hereto to the terms and conditions hereof.[1]

**6.2** It is agreed that because the Plaintiffs are so numerous, it is impossible or impractical and not required to have each Plaintiff execute this Settlement Agreement. The Notice(s) will advise all Settlement Members of the binding nature of any release(s) as applicable under this Settlement Agreement and such shall have the same force and effect as if this Settlement Agreement were executed by each Settlement Member. Each person executing this Settlement Agreement on behalf of any corporate Defendant warrants and represents that such person has the authority to do so.

## 7. MUTUAL COOPERATION

**7.1** The Parties agree to reasonably cooperate with each other and to take all steps necessary and appropriate to obtain the Court's approval (and any other required court's approval) of this Agreement and all of its terms and to effectuate the terms of this Agreement, including but not limited to, execution of such documents and to take such other action as may reasonably be necessary to implement the terms of this Agreement, including but not limited to Plaintiff's counsel seeking additional approval from the bankruptcy court as to any claim subject to the bankruptcy court's control for which counsel has been appointed Special Counsel. The Parties to this Agreement shall use their commercially reasonable efforts, including all efforts contemplated by this Agreement and any other efforts that

---

[1] Plaintiff's counsel has been appointed by the bankruptcy court as Special Counsel in the matter of one opt-in's claims, and has been authorized by the Chapter 7 Trustee in that matter to proceed with this settlement, which as to allocated settlement of that debtor's claim in this Litigation remains contingent upon bankruptcy court approval after Court approval.

may become necessary by order of the Court, or otherwise, to effectuate this Agreement and the terms set forth herein. As soon as practicable after execution of this Agreement, and in accordance with its terms, Plaintiffs' Counsel shall, with the assistance and cooperation of Defendant and its counsel, take all necessary steps to secure the Court's approval of this Agreement.

## 8.   NOTICES

8.1   Defendant shall submit any required notices to applicable government officials under the Class Action Fairness Act within ten (10) days after the proposed settlement is filed for preliminary approval in the Litigation.

8.2   Unless otherwise specifically provided herein, all notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly given as of the third business day after mailing by United States registered or certified mail, return receipt requested, addressed as follows:

To Plaintiff and/or Plaintiffs:

> Seth R. Lesser
> KLAFTER LESSER, LLP
> Two International Drive, Suite 350
> Rye Brook, NY 10573
> Tel: (914) 934-9200
> Fax: (914) 934-9220
> Email: seth@klafterlesser.com
>
> C. Andrew Head (admitted *pro hac vice*)
> HEAD LAW FIRM, LLC
> 4422 N. Ravenswood Ave., Suite 3
> Chicago, IL 60640
> Tel: (404) 924-4151
> Fax: (404) 796-7338
> Email: ahead@headlawfirm.com

To Defendant:

> Jeffrey W. Brecher
> Jackson Lewis P.C.
> 58 S. Service Road, Suite 250
> Melville, NY 11747
> (631) 247-4652
> Email: jeffrey.brecher@jacksonlewis.com

## 9.   NO ADMISSION OF LIABILITY

**9.1**   Defendant denies all of the allegations made by Named Plaintiff in the Litigation and denies that it is liable or owes damages to anyone with respect to the alleged facts or causes of action asserted in the Litigation. Nothing herein will be deemed or used as an admission that a collective action should be finally certified or a class action certified under Fed. R. Civ. P. 23. Nonetheless, without admitting or conceding any liability or damages whatsoever, Defendant has agreed to settle the litigation on the terms and conditions set forth in this Agreement, to avoid the burden, expense, and uncertainty of continuing the Litigation.

## 10.   INTERPRETATION AND ENFORCEMENT/MISCELLANEOUS TERMS

**10.1**   Further Acts.  Each party, upon the request of any other party, agrees to perform such further acts and to execute and deliver such other documents as are reasonably necessary to carry out the provisions of this Agreement.

**10.2**   No Assignment.  Named Plaintiff represents and warrants that he has not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim or any portion thereof or interest therein, including, but not limited to, any interest in the litigation, or any related action, and any attempt to do so shall be of no force or effect.

**10.3**   Entire Agreement.  This Agreement constitutes the entire agreement between the Parties with regard to the subject matter contained herein, and all prior and contemporaneous negotiations and understandings between the Parties shall be deemed merged into this Agreement.

**10.4**   Binding Effect.  This Agreement shall be binding upon the Parties and, with respect to Defendant, its affiliates, parents, subsidiaries, predecessors, successors, employees and agents; and, with respect to Plaintiffs, their spouses, children, representatives, heirs, administrators, executors, beneficiaries, conservators, attorneys and assigns.

**10.5**   Arms' Length Transaction; Materiality of Terms.  The Parties have negotiated all the terms and conditions of this Agreement at arms' length.  All terms and conditions of this Agreement in the exact form set forth in this Agreement are material to this Agreement and have been relied upon by the Parties in entering into this Agreement, unless otherwise expressly stated.

**10.6**   Captions.  The captions or headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall have no effect upon the construction or interpretation of any part of this Agreement.

**10.7**   Construction.  The determination of the terms and conditions of this Agreement has been by mutual agreement of the Parties.  Each party participated jointly in the drafting of this Agreement, and therefore the terms and conditions of this

Agreement are not intended to be, and shall not be, construed against any party by virtue of draftsmanship.

**10.8** Governing Law. This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of New York, without regard to choice of law principles, except to the extent that the law of the United States governs any matter set forth herein, in which case such federal law shall govern.

**10.9** Continuing Jurisdiction. The Court shall retain jurisdiction over the interpretation and implementation of this Agreement as well as any and all matters arising out of, or related to, the interpretation or implementation of this Agreement and of the Settlement contemplated thereby.

**10.10** Notice and Opportunity to Cure. In the event that a Party believes that any provision in this Agreement has been violated, the Party must, within twenty-one (21) days of discovering the facts underlying that belief, provide the allegedly breaching Party and the Party's lead counsel of record in the Action as of the date of this Agreement with ten (10) days prior written notice specifying the alleged violation with sufficient detail to allow the recipient to investigate the allegation and the opportunity to reasonably cure or refute the alleged violation by an objective reasonable person standard (including, without limitation, by deleting, taking down, or restricting public access to, the allegedly impermissible media communication, social media post, or website information) prior to filing any action or claim alleging breach of the provision, and may not file any action or claim alleging breach of the provision if the receiving Party has reasonably cured or refuted the alleged violation by an objective reasonable person standard within that ten (10) day period.

**10.11** Waivers, etc. to Be in Writing. No waiver, modification or amendment of the terms of this Agreement, whether purportedly made before or after the Court's approval of this Agreement, shall be valid or binding unless in writing, signed by or on behalf of all Parties, and then only to the extent set forth in such written waiver, modification or amendment, with any required Court approval. Any failure by any party to insist upon the strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of future performance of the same provisions or of any of the other provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreement

**10.12** Counterparts. The Parties may execute this Agreement in counterparts, and execution in counterparts shall have the same force and effect as if all Parties had signed the same original instrument.

**10.13** Facsimile and E-mail Signatures. Any party may execute this Agreement by signing, including by electronic means, or by causing its counsel to sign on the designated signature block below and transmitting that signature page via facsimile or e-mail to counsel for the other party. Any signature made and

transmitted by facsimile or e-mail for the purpose of executing this Agreement shall be deemed an original signature for purposes of this Agreement and shall be binding upon the party whose counsel transmits the signature page by facsimile or e-mail.

**WE AGREE TO THESE TERMS.**

DATED:

05/31/2022

**RED ROBIN INTERNATIONAL, INC.**

By: _Michael R. Kp_
Title: CLO

DATED:
May 27, 2022

**ERIC OUTLAW**

_Eric Outlaw (May 27, 2022 15:22 EDT)_

EXHIBIT A

*Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357
**United States District Court for the Eastern District of New York**

**A federal court authorized this notice. This is not a solicitation from a lawyer.**

- The Settlement affects the rights of certain Red Robin ("Red Robin") employees who worked as salary-paid Assistant Managers or Kitchen Managers (both referred to as "AMs" herein) in New York within the covered period, as described in more detail below.

- Your legal rights are affected whether you act or don't act. Read this notice carefully.

| **Your legal rights and options in this Settlement:** | |
|---|---|
| **Receive a payment** | You are eligible to receive a settlement payment. If you do not exclude yourself and the settlement receives the Court's final approval, you will be issued a settlement check. If you do not take any action at this time, you will receive an estimated payment of $XX under the settlement as payment for your federal law ("FLSA") and New York state law overtime claims released by this settlement. Unless you follow the procedures explained below to forfeit your offered FLSA Payment, your settlement check will contain endorsement language releasing your FLSA claims. |
| **Forfeit the offered FLSA Payment** | You may forfeit your offered FLSA Payment (one-half of your estimated payment amount above) by following the required procedures as explained below. If you do so, you forfeit your offered FLSA Payment which was contingent upon releasing FLSA claims. |
| **Exclude yourself** | You may exclude yourself or "opt out" if you do not wish to participate in the settlement. If you choose this option, you get no payment and will not release any claims against Red Robin. |
| **Comment (including Object)** | You have the right to write to tell the Court what you think about the settlement. You do not need to do this to receive a payment. |
| **Go to the hearing** | If you would like, you may ask to speak in Court about the fairness of the settlement. You do not need to do this to receive a payment. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.
- The Court in charge of this case still has to decide whether to approve the settlement. Payments will be made if the Court approves the settlement and after appeals, if any, are resolved. Please be patient.
- This is not a lawsuit against you. Your participation in this Litigation and acceptance of money from the settlement will not affect your employment status in any way.

## What This Notice Contains

BASIC INFORMATION ....................................................................................................3
   1. Why did I get this notice package? ............................................................ 3
   2. What is this Litigation about? .................................................................... 3
   3. Why is this a class action? ......................................................................... 3
   4. Why is there a settlement? ......................................................................... 3

WHO IS IN THE SETTLEMENT ......................................................................................4
   5. How do I know if I am part of the settlement? ........................................... 4

THE SETTLEMENT BENEFITS—WHAT YOU GET .........................................................4
   6. What does the settlement provide? ............................................................ 4
   7. How was my settlement payment calculated? ........................................... 5
   8. What can I get from the settlement? .......................................................... 5

HOW YOU GET A PAYMENT—ENDORSING YOUR CHECK ..........................................5
   9. How can I get a payment? ......................................................................... 5
   10. When would I get my payment? ................................................................ 6
   11. What am I giving up to get a payment or stay in the Class? ...................... 6

EXCLUDING YOURSELF FROM THE SETTLEMENT .........................................................7
   12. How do I get out of the settlement? .......................................................... 7
   13. If I exclude myself, can I get money from this settlement? ........................ 8

YOUR PRIVACY ...........................................................................................................8
   14. Will my manager (or if Red Robin) my Red Robin manager know whether or how I responded to this Notice? ............................................................... 8

THE LAWYERS REPRESENTING YOU .............................................................................8
   15. Do I have a lawyer in this case? ................................................................ 8
   16. How will Class Counsel and the Named Plaintiff be paid? ....................... 8

COMMENTING ON (INCLUDING OBJECTING TO) THE SETTLEMENT ............................9
   17. How do I tell the Court that I like or don't like the settlement? ................. 9
   18. What's the difference between objecting and excluding? .......................... 9

THE COURT'S FAIRNESS HEARING ...............................................................................9
   19. When and where will the Court decide whether to approve the settlement?...... 9
   20. Do I have to come to the hearing? .......................................................... 10
   21. May I speak at the hearing? .................................................................... 10

IF YOU DO NOTHING ................................................................................................10
   21. What happens if I do nothing at all? ....................................................... 10

GETTING MORE INFORMATION .................................................................................11
   22. Are there more details about the settlement? .......................................... 11

# **Basic Information**

## 1.    Why did I get this notice package?

The purpose of this Notice is to let you know that there has been a class action settlement in the Litigation pending in the United States District Court, Eastern District of New York, entitled *Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357 (the "Litigation"). You are receiving this Notice because you are eligible to receive a payment from the settlement of class action claims for AMs brought under New York law. The settlement provides a dedicated gross settlement fund of $150,000 for New York class action members who did not previously file consents to join ("NY Fund"), from which (after deduction for fees and costs) you are eligible to be paid your pro rata share for releasing NY and FLSA claims (unless you exclude yourself from the settlement or (as to releasing federal FLSA claims) forfeit your offered FLSA Payment by timely following the proper exclusion/forfeiture procedures defined in this Notice).

The Court authorized that you be sent this Notice because you have a right to know about a proposed settlement of the Litigation, and about your options, before the Court decides whether to grant final approval of the settlement. If the Court approves it and after any objections and appeals are resolved, a third-party Settlement Administrator appointed by the Court and paid from the settlement fund will make the payments that the settlement allows. You will be informed of the progress of the settlement.

This Notice package explains the Litigation, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them. If you wish to receive money from, comment upon (including object to), or exclude yourself from the settlement, you must do so following the procedures described below.

## 2.    What is this Litigation about?

In the Litigation, former Red Robin employee Eric Outlaw ("Plaintiff") claimed that (i) Red Robin misclassified Assistant Managers and Kitchen Managers (collectively referred to herein as "AMs") as exempt from the overtime pay requirements of federal and New York state law until those positions were reclassified to hourly-paid overtime eligible in approximately March, 2020. The Litigation asked the Court to require Red Robin to pay overtime backpay, interest and/or liquidated damages, and other payments. Red Robin denies that it did anything wrong and contends that, among other things, that it has complied at all times with applicable federal and New York law.

## 3.    Why is this a class action?

In a class action, an individual called a Class Representative (in this case, former New York AM Eric Outlaw), has filed suit on behalf of people who have similar state law claims. All these people with similar claims are Class Members. One court resolves the issues for all Class Members, except for those who exclude themselves from the Class. The Honorable Gary R. Brown, United States District Judge, is presiding over this class and collective action.

## 4.    Why is there a settlement?

The Court did not decide in favor of either party. Instead, both sides agreed to a settlement, which, if approved, brings the litigation to an end. That way, Plaintiff and Red Robin

avoid the cost, delay, and uncertainty of moving forward in litigation to trial and possible appeals, and the Class Members will get compensation. The Class Representative and the attorneys for both sides think that the settlement is fair, reasonable, adequate and in the best interests of the members of the class and all parties.

## Who is in the Settlement

To see if you are eligible to get money from this settlement, you first have to determine if you are a Settlement Class Member.

### 5. How do I know if I am part of the settlement?

If you are receiving this Notice, it means that Red Robin's records show that you are a Settlement Class Member, defined as Assistant Managers or Kitchen Managers, below the level of General Manager (and below the level of any Assistant General Manager not dually titled Assistant General Manager/Kitchen Manager or Kitchen Manager/Assistant General Manager), who were employed and paid for AM work as exempt by Red Robin in New York from August 2, 2012 to the date AMs were reclassified to non-exempt in or about March, 2020, excluding: (1) any AM who participated in a prior settlement in *Rogers v. Red Robin International Inc., et al*, Case No. 511180/2016 (New York Supreme Court, Kings County) by timely submitting a signed Claim Form in that case and endorsing their settlement check, and who did not work for Red Robin as an AM after the applicable date covered by the release of their claims in *Rogers*; and (2) any AM whom Defendant warranted and represented to have signed an arbitration agreement with Defendant, agreeing to arbitrate their claims and waive participation in a class or collective action, where such agreement was signed by the AM prior to August 2, 2018 (the "Class").

## The Settlement Benefits—What You Get

### 6. What does the settlement provide?

Red Robin has agreed to pay a $150,000 fund amount to resolve the claims of the NY Class members who did not previously file a consent in the Litigation, as part of a Gross Settlement Fund of $2,950,000 ("Settlement Fund") to resolve the NY Class claims and the claims of opt-in Plaintiffs employed nationwide, which total amount includes (i) the NY Fund allocated from the Settlement Fund in the gross amount of $150,000, from which NY Class Members are allocated their individual pro rata share of the NY Fund amount remaining after payment of $50,000 for one-third attorneys' fees, and deduction of an approximate pro rata amount as reasonably estimated by the Settlement Administrator for the pro rata share of costs expenses, and service payments attributable to the Total Gross NY Class Members Fund amount; (ii) payments to the FLSA Collective members who joined the Litigation, as well as (iii) all other attorneys' fees, costs and expenses approved by the Court; the employer's share of taxes, the cost of settlement administration; and any Court-approved Service Award.

The settlement provides a dedicated gross settlement fund of $150,000 for New York class action members who did not previously opt-in ("NY Fund"), from which (after deduction for Court-approved fees and costs) you are eligible to be paid if you timely follow the proper procedures defined in this Notice to receive a share of that dedicated amount. You may choose to

accept or forfeit the offered FLSA Payment as explained below. Any forfeited FLSA Payment amounts from the $150,000 dedicated NY Fund will be returned to Red Robin.

| 7. | **How was my settlement payment calculated?** |
|---|---|

The amount of each Class Member's individually allocated amount from the NY Fund was calculated based on the number of covered and eligible weeks worked as AMs in New York, as adjusted to ensure that no Class Member's total allocated amount was less than $250. For full details on the methodology used to calculate your settlement payment, you may view the complete Settlement Agreement at the password-protected settlement website [www.[ADMINISTRATOR URL]/OutlawvRedRobin] by entering your individually assigned User ID [insert User ID] and password [insert assigned password], and/or by contacting the Settlement Administrator at 1-[PHONE].

| 8. | **What can I get from the settlement?** |
|---|---|

Your total estimated individual share of the settlement from the NY Fund is the gross amount of $XX before employment taxes and withholdings, consisting of an offered FLSA Payment (one-half) and an New York state law payment (one-half). If you follow the proper procedure to receive your full payment, and if the settlement is granted final approval, then you will be issued two checks for your offered share of the settlement: one-half of your individually allocated amount for your offered FLSA payment, contingent on releasing FLSA claims by endorsing that check, and one-half of your amount for the release given for New York state law claims by the Court's final approval order. If you forfeit your FLSA payment by the procedures defined below, you will be issued a check for only your (one-half) New York state law payment.

# How You Get a Payment

| 9. | **How can I get a payment?** |
|---|---|

According to Red Robin's records, you worked covered weeks as an AM within New York and have not yet opted in to this action. You now have the opportunity to participate in the settlement and receive a payment. To accept the offered FLSA Payment (one-half of your allocated individual amount) you must cash, deposit or otherwise endorse the settlement check containing your offered FLSA Payment check and thereby accept the FLSA Release by opting in before the check void deadline of ninety (90) days from the check issue date.

If you do not want to accept the offered FLSA Payment that is contingent upon releasing federal FLSA claims as part of your settlement payment, you must submit a request in writing to the Settlement Administrator affirmatively stating that you choose to forfeit your offered FLSA Payment from *Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357 (E.D.N.Y.). You must include your name, address, telephone number, and your signature, as well as your employee ID number or the last four digits of your Social Security number for identity verification purposes, postmarked no later than [insert date no later than 7 calendar days before the date of the Fairness Hearing], or received by the Settlement Administrator (if sent by e-mail) no later than [date], to:

> *Outlaw v. Red Robin* Settlement Administrator
> [CONTACT INFORMATION]

You cannot request to forfeit your offered FLSA Payment by phone. If you submit a timely request to forfeit your offered FLSA Payment, you will not receive your FLSA Payment amount in your settlement payment and you will not release FLSA claims, though your claim period may expire or be reduced by the continued running of the applicable statute of limitations on your claims.

Regardless of whether you forfeit your offered FLSA Payment, you will receive the other one-half of your individually allocated amount from the NY Fund for the release given for New York state law claims under the settlement unless you exclude yourself from the settlement (see Excluding Yourself from the Settlement below).

## 10.    When would I get my payment?

The Court will hold a hearing on [HEARING DATE], to decide whether to approve the settlement. If Judge Brown approves the settlement, and there are no appeals, we estimate that checks will be mailed after approximately [DATE]. However, because it is always possible for there to be unexpected delays or appeals, it is possible that the payments will be delayed by a year or more, or that an appeals court will determine that the payments cannot be made. Please be patient, and refer to the Settlement Administrator case website for status updates.

## 11.    What am I giving up to get a payment or stay in the Class?

**According to Red Robin's records, you performed work as a salary-paid AM within New York.** Unless you exclude yourself, you will remain as part of the Class and receive a payment, which means that you cannot sue, continue to sue, or be part of any other Litigation against Red Robin over the specific <u>state-law</u> wage and hour issues in this case. If you do not follow the procedures described herein to affirmatively forfeit your offered FLSA Payment and you endorse your settlement check, you cannot sue, continue to sue, or be part of any other Litigation against Red Robin over the specific <u>federal</u> wage and hour issues in this case under the Fair Labor Standards Act ("FLSA"). If you do not exclude yourself from the settlement, it means that all of the Court's orders will apply to you and legally bind you. In other words, you agree to the Released Claims below, which describes the legal claims that you give up if you get settlement benefits.

<u>Released Claims</u>: NY Class Members who do not exclude themselves (opt out) from the settlement shall release Releasees from: (i) all FLSA claims, including any regulations applicable to FLSA claims, during the Class Period (for NY Class Members), and for the maximum applicable state law statute of limitations, all violations of state or local wage and hour laws, including any regulations applicable to state or local wage and hour laws, for the maximum applicable state law statute of limitations, including, but not limited to claims for minimum wage, overtime, off-the-clock work, recordkeeping violations, and any derivative claims applicable to violations of state or local wage and hour laws, whether known or unknown, that were or could have been asserted in the Litigation or this matter, arising out of that Settlement Member's Eligible Weeks worked as an AM paid as exempt during that period of time; except that NY Class Members who do not endorse their Individual Settlement Check for the offered FLSA Payment or forfeit their FLSA Payment will not release any FLSA claims; and (ii) all claims for wages, penalties, liquidated damages, interest, attorneys' fees, costs or litigation expenses based on the claims listed in (i) above during the applicable period, except that NY Class Members who do not endorse their Individual Settlement Check for the offered FLSA

Payment will not release any FLSA claim for liquidated damages, interest, attorney's fees, or costs of litigation expenses; excluding claims for retaliation. The claims being released thereby are referred to in this Agreement as "Released Claims." The Parties agree that the only claims released are the Released Claims, and a Settlement Member's assertion of, and entry of judgment approving the release of, Released Claims shall have no collateral estoppel, claim splitting, res judicata, waiver, or other claim preclusion effect as to claims not explicitly released herein (including, for NY Class Members who do not endorse their Individual Settlement Check for the offered FLSA Payment, FLSA claims).

"Releasees" means Red Robin and its past, present, and future officers, directors, employees, agents, insurers, successors, predecessors, affiliates, parents, subsidiaries, attorneys, and other related entities or individuals, including any individual alleged to be an "employer" of Plaintiff and the NY Class Members.

If you do not follow the procedures described herein to affirmatively forfeit your offered FLSA Payment, your Individual Settlement Check for the offered FLSA Payment amount will contain the following required endorsement language which becomes effective by depositing, cashing, or otherwise endorsing your settlement check:

> By accepting this payment, I consent to join the action, ***Outlaw v. Red Robin International, Inc.****,* and agree to waive any remaining right to bring suit for federal and New York wage claims including overtime under the Fair Labor Standards Act or New York state and local laws therein for weeks worked as an exempt-paid Assistant Manager or Kitchen Manager **from August 2, 2012 to March 31, 2020**. I agree that by accepting this payment, I have settled my claims for any unpaid wages, overtime, liquidated damages, interest, and associated fees and penalties for those weeks arising through the present.

# Excluding Yourself From the Settlement

If you do not want a payment from this settlement, and you want to keep the right to sue or continue to sue Red Robin separately from the Litigation for the legal claim specifically described in the Released Claims above, then you must submit a timely and compliant request for exclusion to opt-out of this settlement pursuant to the opt-out procedures in this Notice. This is called excluding yourself from – or opting out of – the settlement Class. If you have a pending lawsuit or litigation against Red Robin, speak to your lawyer in that case immediately, because you may have to exclude yourself from this Class to continue your own case.

## 12.   How do I opt out of the settlement?

To exclude yourself from (opt out of) the settlement and its payment and not release any claims, you must send a letter saying that you want to be excluded from *Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357 (E.D.N.Y.), and that you understand that you will not receive money from it. You must include your name, address, telephone number, and your signature, as well as your employee ID number or the last four digits of your Social Security number for identity verification purposes. You must submit your exclusion (or opt-out) request, postmarked no later than [insert date no later than 7 calendar days before the date of the Fairness Hearing], or received by the Settlement Administrator (if sent by e-mail) no later than [date], to:

*Outlaw v. Red Robin* Settlement Administrator
[==CONTACT INFORMATION==]

You cannot exclude yourself (opt out) by phone. If you submit a timely request to be excluded, you will not get any settlement payment, and you cannot object to the settlement. You will not be legally bound by anything that happens in this Litigation. You may be able to sue (or continue to sue) Red Robin in the future, though your claim period may expire or be reduced by the continued running of the applicable statute of limitations on your claims.

| 13. | If I exclude myself, can I get money from this settlement? |
|-----|---|

No. If you exclude yourself, you will not receive money from this settlement. But you may sue, continue to sue, or be part of a different case against Red Robin for the legal claim specifically described in the Released Claims above.

## Your Privacy

| 14. | Will my employer or (if Red Robin) my Red Robin manager know whether or how I responded to this Notice? |
|-----|---|

Settlement administration and processing of settlement checks are being handled by an independent, experienced Settlement Administrator. Exclusion requests or comments on the settlement (including objections) are to be sent to the Settlement Administrator. The Settlement Administrator will report to Red Robin's lawyers (as well as the lawyers for the Class, called Class Counsel) regarding which exclusion requests and comments (including objections) were submitted and which checks were endorsed.

## The Lawyers and Class Representative Representing You

| 15. | Do I have a lawyer in this case? |
|-----|---|

The Court appointed the following attorneys to represent you and the other Class Members: C. Andrew Head and Bethany Hilbert of Head Law Firm, LLC, and Seth R. Lesser and Christopher Timmel of Klafter & Lesser, LLP.

Together, the lawyers are called Class Counsel or Plaintiffs' Counsel. You will not be charged for these lawyers' work in securing the settlement benefits for you and the other Class Members. If you want to be represented by your own lawyer, you may hire one at your own expense.

| 16. | How will Class Counsel and the Named Plaintiff be paid? |
|-----|---|

Class Counsel will ask the Court to approve payment from the settlement fund of attorneys' fees of one third (1/3) of the Settlement Fund, in addition to reimbursement of reasonable actual case-related costs and expenses from the Settlement Fund in the present amount of $39,865.27, plus any of Class Counsel's additional expenses through the effective date of final approval which Class Counsel presently estimates will not exceed $1,000. The

attorneys' fees and costs, as awarded by the Court, shall be paid from the Settlement Fund created by the settlement. In addition, Class Counsel will apply to the Court for approval of a service payment to the Named Plaintiff/Class Representative of $10,000. This service payment is being requested in recognition of the time, effort, and risk incurred by the Plaintiff in securing this settlement for you and the other class and collective action settlement participants. Class Counsel's motion for Court approval of attorney's fees, costs, and service payment will be posted on the password-protected settlement website at least 7 days before the deadline for filing objections listed below, and you may review that motion by entering your individually assigned User ID and password as listed above.

# **Commenting on (Including Objecting to) the Settlement**

You can tell the Court what you think about the settlement, including the settlement of New York claims, the settlement of FLSA claims (which you would only release if you choose not to forfeit your offered FLSA payment), or any other aspect of the settlement.

## 17.  How do I tell the Court that I like or don't like the settlement?

If you're a NY Class Member and you decide not to exclude yourself from the settlement, you can comment on (including objecting to) the settlement. You can give reasons why you think the Court should or should not approve it.

The Court cannot order a larger settlement; it can only approve or deny the settlement. If the Court denies approval, there will be no settlement at this time, no settlement payments will be sent out, and the Litigation will continue. If that is what you want to happen, you should object.

You may comment on and object to the proposed settlement in writing. You may also appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for paying that attorney. All written comments and objections and supporting papers must (a) clearly identify the case name and number (*Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357 (E.D.N.Y.), (b) in the case of an objection, state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection, (c) be submitted to the Court either by mailing them to the Court Clerk, United States District Court for the Eastern District of New York, 225 Cadman Plaza East, Brooklyn, NY 11201, or by filing them in the Civil Clerk's office of the United States Courthouse for the Eastern District of New York located at the address listed above, with a copy served on the Settlement Administrator, and (d) be filed or postmarked on or before [DATE].

## 18.  What's the difference between objecting and excluding?

Objecting is simply telling the Court that you do not like something about the settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court that you do not want to be part of the Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

# The Court's Fairness Hearing

The Court will hold a fairness hearing to decide whether to approve the settlement. You may attend and you may ask to speak, but you do not have to.

### 19.   When and where will the Court decide whether to approve the settlement?

The Court will hold a fairness hearing at [TIME] on [DATE], in Courtroom 940, 100 Federal Plaza Central Islip, NY 11722-9014, before the Honorable Gary R. Brown, United States District Judge. At this hearing the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. Judge Brown will listen to people who have asked to speak at the hearing, if any. The Court may also decide how much to pay Class Counsel, and/or any service payment or payment of litigation or settlement administration costs from the Settlement Fund. After the hearing, the Court will decide whether to approve the settlement. We do not know how long these decisions will take. The fairness hearing may be postponed without further notice to the Class. If you plan to attend the hearing, you should check Judge Brown's Proceedings Calendar to confirm that the hearing date has not been changed, at https://www.nyed.uscourts.gov/cal/calPDF.cfm?prid=6186737.

### 20.   Do I have to come to the hearing?

No. Class Counsel represents you and will answer questions the Court may have. But you are welcome to come at your own expense. If you send a comment (including an objection), you do not have to come to Court to talk about it. As long as you mailed it on time, the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

### 21.   May I speak at the hearing?

You may ask the Court for permission to speak at the fairness hearing. To do so, you must send a letter to the Settlement Administrator at the address listed in section 12, saying that it is your "Notice of Intention to Appear at the Fairness Hearing in *Outlaw v. Red Robin.*" You must include your name, address, telephone number, and signature. Your Notice of Intention to Appear must be postmarked or emailed no later than [DATE]. This requirement may be excused by the Court upon a showing of good cause.

You cannot speak at the hearing if you excluded yourself, because the case no longer affects you.

# If You Do Nothing

### 22.   What happens if I do nothing at all?

**According to Red Robin's records, you performed salary-paid AM work within New York. If you do nothing, you will receive your offered FLSA Payment and your New York Payment and release the FLSA claims (upon endorsing your FLSA Payment check) and the New York state law claims from the Released Claims described above in section 11.**

You are not required to take any action or not take any action. It is your choice.

# **Getting More Information**

**23.    Are there more details about the settlement?**

This Notice is intended to be a summary of the terms of the Settlement. You may also obtain this information by contacting the Settlement Administrator at 1-[PHONE], Class Counsel at Head Law Firm, LLC (312) 690-7765 or Klafter & Lesser, LLP at (914) 934-9200, or by accessing the Court docket in this case through the Court's Public Access to Court Electronic Records (PACER) system at https://pacer.uscourts.gov/file-case/court-cmecf-lookup/court/NYEDC.

**PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS.**

Issued by order of the United States District Court for the Eastern District of New York.

Dated:   [DATE]

# EXHIBIT B

*Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357
**United States District Court for the Eastern District of New York**

**A federal court authorized this notice. This is not a solicitation from a lawyer.**

- The Settlement affects the rights of certain Red Robin ("Red Robin") employees who worked as salary-paid Assistant Managers or Kitchen Managers (both referred to as "AMs" herein) within the covered period, as described in more detail below.

- Your legal rights are affected. Read this notice carefully.

- The Court in charge of this case still has to decide whether to approve the settlement. Payments will be made if the Court approves the settlement and after appeals, if any, are resolved. Please be patient.

- This is not a lawsuit against you – this is a lawsuit you joined by filing a Consent to opt in to the collective action. Your participation in this lawsuit and acceptance of money from the settlement will not affect your employment status in any way.

## Basic Information

### 1.     Why did I get this notice package?

The purpose of this Notice is to let you know that there has been a class and collective action settlement in the Fair Labor Standards Act ("FLSA") and New York class action lawsuit pending in the United States District Court, Eastern District of New York, entitled *Outlaw v. Red Robin International, Inc.*, Case No. 2:18-cv-04357 (the "Litigation"). You are receiving this Notice because you filed a Consent to opt in as a plaintiff in the Litigation (i.e., you are a "FLSA Collective member"), and you will therefore receive a payment from the settlement of your claims in the Litigation as a FLSA Collective member.

The Court preliminarily approved the settlement on [DATE]. The Court will hold a fairness hearing at [TIME] on [DATE], in Courtroom 940, 100 Federal Plaza Central Islip, NY 11722-9014, before the Honorable Gary R. Brown, United States District Judge. At this hearing the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections from any NY Class Members who did not opt-in to join this Litigation, the Court will consider them. Judge Brown will listen to people who have asked to speak at the hearing, if any. The Court may also decide how much to pay Class Counsel, and/or any service payment or payment of litigation or settlement administration costs from the Settlement Fund. After the hearing, the Court will decide whether to approve the settlement. We do not know how long these decisions will take. The fairness hearing may be postponed without further notice to the Class. You will be represented by Class Counsel at the fairness hearing, and you do not need to attend. **As a FLSA Collective member you are automatically a participant in this settlement, and you do not need to take any action in order to participate in this settlement and receive your final settlement payment if the Court gives final approval to the settlement.**

## 2.        What is this Litigation about?

In the Litigation, former Red Robin employee Eric Outlaw ("Plaintiff") claimed that (i) Red Robin misclassified Assistant Managers and Kitchen Managers (collectively referred to herein as "AMs") as exempt from the overtime pay requirements of federal and New York state law until those positions were reclassified to hourly-paid overtime eligible in approximately March, 2020. The Litigation asked the Court to require Red Robin to pay overtime backpay, interest and/or liquidated damages, and other payments. Red Robin denies that it did anything wrong and contends that, among other things, that it has complied at all times with applicable federal and New York law.

## 3.        Why is this a class and collective action?

The Court conditionally certified the Lawsuit to proceed as a collective action under the FLSA. You joined that collective action by submitting a signed Consent form. The Court also preliminarily approved this settlement as a New York class action. In a class action, an individual called a Class Representative (in this case, former New York AM Eric Outlaw), has filed suit on behalf of people who have similar state law claims. All these people with similar claims are Class Members. One court resolves the issues for all Class Members, except for those who exclude themselves from the Class. The Honorable Gary R. Brown, United States District Judge, is presiding over this class and collective action.

## 4.        Why is there a settlement?

The Court did not decide in favor of either party. Instead, both sides agreed to a settlement, which, if approved, brings the litigation to an end. That way, Plaintiff and Red Robin avoid the cost, delay, and uncertainty of moving forward in litigation to trial and possible appeals, and the Class Members will get compensation. The Class Representative and the attorneys for both sides think that the settlement is fair, reasonable, adequate and in the best interests of the members of the class and all parties.

# The Settlement Benefits

## 5.        What does the settlement provide?

Red Robin has agreed to pay a Gross Settlement Fund of $2,950,000 ("Settlement Fund") to resolve the NY Class claims and the claims of opt-in Plaintiffs employed nationwide, which total amount includes (i) the NY Fund allocated from the Settlement Fund in the gross amount of $150,000, from which NY Class Members who did not opt-in to the Litigation are allocated their individual pro rata share of the NY Fund amount remaining after payment of $50,000 for one-third attorneys' fees, and deduction of an approximate pro rata amount as reasonably estimated by the Settlement Administrator for the pro rata share of costs expenses, and service payments attributable to the Total Gross NY Class Members Fund amount; (ii) payments to the FLSA Collective members who joined the Litigation, as well as (iii) all other attorneys' fees, costs and expenses approved by the Court; the employer's share of taxes, the cost of settlement administration; and any Court-approved Service Award. Any forfeited FLSA Payment amounts from the $150,000 dedicated NY Fund will be returned to Red Robin.

### 6.    How was my settlement payment calculated?

The amount of each Settlement Class Member's individually allocated amount was calculated based on the number of covered and eligible weeks worked as AMs during the relevant time period, as adjusted to ensure that no Settlement Class Member's total allocated amount was less than $250. For full details on the methodology used to calculate your settlement payment, you may view the complete Settlement Agreement at the password-protected settlement website [www.[ADMINISTRATOR URL]/OutlawvRedRobin] by entering your individually assigned User ID [insert User ID] and password [insert assigned password], and/or by contacting the Settlement Administrator at 1-[PHONE].

### 7.    What will I get from the settlement?

Your total estimated individual share of the settlement is the gross amount of $XX before employment taxes and withholdings. After final approval, you will be issued a check for your share of the settlement.

### 8.    When will I get my payment?

The Court will hold a fairness hearing on [HEARING DATE], to decide whether to approve the settlement. If Judge Brown approves the settlement, and there are no appeals, we estimate that checks will be mailed after approximately [DATE]. However, because it is always possible for there to be unexpected delays or appeals, it is possible that the payments will be delayed by a year or more, or that an appeals court will determine that the payments cannot be made. Please be patient, and refer to the Settlement Administrator case website for status updates.

### 9.    What am I giving up to get my payment?

As a FLSA Collective Member, all of the Court's orders will apply to you and legally bind you. In other words, you agree to the Released Claims below, which describes the legal claims that you give up in exchange for the settlement benefits.

Released Claims: FLSA Collective Members release Releasees from: (i) all FLSA claims, including any regulations applicable to FLSA claims, during the Class Period (for NY Class Members) or Collective Action Period (for FLSA Collective Members), respectively, and for the maximum applicable state law statute of limitations, all violations of state or local wage and hour laws, including any regulations applicable to state or local wage and hour laws, for the maximum applicable state law statute of limitations, including, but not limited to claims for minimum wage, overtime, off-the clock work, recordkeeping violations, and any derivative claims applicable to violations of state or local wage and hour laws, whether known or unknown, that were or could have been asserted in the Litigation or this matter, arising out of that Settlement Member's Eligible Weeks worked as an AM paid as exempt during that period of time; and (ii) all claims for wages, penalties, liquidated damages, interest, attorneys' fees, costs or litigation expenses based on the claims listed in (i) above during the applicable period; excluding claims for retaliation. The claims being released thereby are referred to in this Agreement as "Released Claims." The Parties agree that the only claims released are the Released Claims, and a Settlement Member's assertion of, and entry of judgment approving the release of, Released Claims shall have no collateral estoppel, claim splitting, res judicata, waiver, or other claim preclusion effect as to claims not explicitly released herein.

"Releasees" means Red Robin and its past, present, and future officers, directors, employees, agents, insurers, successors, predecessors, affiliates, parents, subsidiaries, attorneys, and other related entities or individuals, including any individual alleged to be an "employer" of the FLSA Collective Members.

## **The Lawyers and Class Representative Representing You**

**10.    Do I have a lawyer in this case?**

By filing your Consent to join the Lawsuit, you retained the following attorneys representing you and the other FLSA Collective Members in the Litigation: C. Andrew Head and Bethany Hilbert of Head Law Firm, LLC, and Seth R. Lesser and Christopher Timmel of Klafter & Lesser, LLP (collectively "Class Counsel").

**11.    How will Class Counsel and the Named Plaintiff be paid?**

Class Counsel will ask the Court to approve payment from the settlement fund of attorneys' fees of one third (1/3) of the Settlement Fund, in addition to reimbursement of reasonable actual case-related costs and expenses from the Settlement Fund in the present amount of $39,865.27, plus any of Class Counsel's additional expenses through the effective date of final approval which Class Counsel presently estimates will not exceed $1,000. The attorneys' fees and costs, as awarded by the Court, shall be paid from the Settlement Fund created by the settlement. In addition, Class Counsel will apply to the Court for approval of a service payment to the Named Plaintiff/Class Representative of $10,000. This service payment is being requested in recognition of the time, effort, and risk incurred by the Plaintiff in securing this settlement for you and the other class and collective action settlement participants. Class Counsel's motion for Court approval of attorney's fees, costs, and service payment will be posted on the password-protected settlement website at least 7 days before the deadline for filing objections listed below, and you may review that motion by entering your individually assigned User ID and password as listed above.

## **Getting More Information**

**12.    Are there more details about the settlement?**

This Notice is intended to be a summary of the terms of the Settlement. You may also obtain this information by contacting the Settlement Administrator at 1-[PHONE], Class Counsel at Head Law Firm, LLC (312) 690-7765 or Klafter & Lesser, LLP at (914) 934-9200, or by accessing the Court docket in this case through the Court's Public Access to Court Electronic Records (PACER) system at https://pacer.uscourts.gov/file-case/court-cmecf-lookup/court/NYEDC.

**PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS.**

Issued by order of the United States District Court for the Eastern District of New York.

Dated:  [DATE]

# EXHIBIT H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

ERIC OUTLAW, Individually and on behalf of  :
himself and all others similarly situated,      :     No. 18-CV-4357 (GRB)(LGD)
                                                 :

                   Plaintiff,       :
                                                 :

v.                                               :
                                                 :

RED ROBIN INTERNATIONAL, INC.,      :
                                               :

                 Defendant.   :
                                                 :
                                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT, FOR AWARD OF
ATTORNEYS' FEES AND EXPENSES, FOR APPROVAL OF A SERVICE PAYMENT TO
THE REPRESENTATIVE PLAINTIFF AND FOR PAYMENT OF THE SETTLEMENT
ADMINISTRATOR'S COSTS AND EXPENSES**

**KLAFTER LESSER, LLP**
Seth R. Lesser
Christopher M. Timmel
Two International Drive, Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200
Facsimile: (914) 934-9220
E-mail: seth@klafterlesser.com
christopher.timmel@klafterlesser.co

**HEAD LAW FIRM, LLC**
C. Andrew Head⋆
Bethany A. Hilbert⋆
422 Ravenswood Avenue
Chicago, IL 60640
Telephone: (404) 924-4151
Facsimile: (404) 796-7338
E-mail: ahead@headlawfirm.com
bhilbert@headlawfirm.com

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

INTRODUCTION ..............................................................................................................1

I.     RELEVANT PROCEDURAL HISTORY..........................................................2

II.    FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE..............................3

      A.    The Settlement Is Fair, Reasonable, and Adequate ...................................3

            1.    Litigation Through Trial Would Be Complex, Costly, and Long (*Grinnell* Factor 1) ..........................................................................................4

            2.    The Reaction of the Class Has Been Positive (*Grinnell* Factor 2) ...............4

            3.    The Parties Engaged in Sufficient Discovery to Resolve the Case Responsibly (*Grinnell* Factor 3) ....................................................................5

            4.    Plaintiff Would Face Real Risks of Establishing Liability and Damages If the Case Proceeded (*Grinnell* Factors 4 and 5) ..............................6

            5.    Establishing and Maintaining the Class Through Trial Presents Risk (*Grinnell* Factor 6) .........................................................................................7

            6.    Defendants' Ability to Withstand a Greater Judgment Is Not Determinative (*Grinnell* Factor 7) ...........................................................8

            7.    The Settlement Fund Is Substantial, Even in Light of the Best Possible Recovery and the Attendant Risks of Litigation (*Grinnell* Factors 8 and 9)..9

III.    PLAINTIFF'S REQUESTS FOR ATTORNEYS' FEES, COSTS, AND SERVICE PAYMENTS ARE REASONABLE AND SHOULD BE APPROVED ........................10

      A.    The Percentage Method is the Preferred Method in the Second Circuit for Awarding Attorneys' Fees in a Common Fund Case ...............................10

      B.    Plaintiff's Request for Attorneys' Fees Is Reasonable.............................11

            1.    Class Counsel Have Expended Significant Time and Labor......................12

            2.    The Magnitude and Complexity of the Litigation .....................................13

             3.    The Risk of Litigation...............................................................................13

i

4.  The Class Members are Represented by Class Counsel with Significant Experience in Wage and Hour Litigation ....................................................14

5.  This Circuit Has Awarded Similar Requests for Attorneys' Fees................15

6.  Public Policy Considerations Favor The Fee Requested ...........................15

C.  The Lodestar Cross Check Further Supports an Award to Class Counsel of One-Third of the Settlement Fund ....................................................................16

D.  The Court Should Approve Payment of Costs and the Settlement Expenses from the Settlement Fund ..................................................................................18

E.  Service Payments to Named Plaintiff Should Be Approved ..................................19

CONCLUSION.........................................................................................................20

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                     <u>Page</u>

*Ballinger v. Advance Magazine Publrs., Inc.,*
   2014 U.S. Dist. LEXIS 179538 (S.D.N.Y. Dec. 29, 2014) ........................................ 5

*Banford v. Entergy Nuclear Operations, Inc.,*
   649 F. App'x 89 (2d Cir. 2016) ................................................................................... 7

*Beckman v. KeyBank, N.A.,*
   293 F.R.D. 467 (S.D.N.Y. 2013) .............................................................. 12, 13, 16, 17

*Cagan v. Anchor Sav. Bank FSB,*
   1990 U.S. Dist. LEXIS 11450 (E.D.N.Y. May 17, 1990) ......................................... 10

*Chambery v. Tuxedo Junction Inc.,*
   2014 U.S. Dist. LEXIS 101939 (W.D.N.Y. July 25, 2014) ...................................... 19

*Cheeks v. Freeport Pancake House, Inc.,*
   796 F.3d 199 (2d Cir. 2015) ......................................................................................... 3

*Corzine v. Whirlpool Corp.,*
   2019 U.S. Dist. LEXIS 223341(N.D. Cal. Dec. 31,2019)........................................18

*D'Amato v. Deutsche Bank,*
   236 F.3d 78 (2d Cir. 2001) ........................................................................................... 4

*Delijanin v. Wolfgang's Steakhouse Inc.,*
   2021 U.S. Dist. LEXIS 27462  (S.D.N.Y. Feb. 12, 2021)............................................8

*Detroit v. Grinnell Corp.,*
   495 F.2d 448 (2d Cir. 1974) ......................................................................................... 3

*Dupler v. Costco Wholesale Corp.,*
   705 F. Supp. 2d 231 (E.D.N.Y. 2010) ................................................................. 5, 10

*Emeterio v. A&P Rest. Corp.,*
   2022 U.S. Dist. LEXIS 14598 (S.D.N.Y. Jan. 26, 2022)............................................8

*Fisher v. SD Prot. Inc.,*
   948 F.3d 593 (2d Cir. 2020)...................................................................................15, 17

*Frank v. Eastman Kodak Co.,*
   228 F.R.D. 174 (W.D.N.Y. 2005) ............................................................................... 8

*Gilliam v. Addicts Rehab. Ctr. Fund,*
   2008 U.S. Dist. LEXIS 23016 (S.D.N.Y. Mar. 24, 2008) ......................................... 4

*Goldberger v. Integrated Res.,*
   209 F.3d 43 (2d Cir. 2000) ........................................................................ 11, 12, 13, 16

*Granada Invest., Inc. v. DWG Corp.,*
   962 F.2d 1203 (6th Cir. 1992) .................................................................................. 6

*Henry v. Little Mint, Inc.,*
   2014 U.S. Dist. LEXIS 72574 (S.D.N.Y. May 23, 2014) ........................................ 3

*In re Austrian & German Bank Holocaust Litig.,*
   80 F. Supp. 2d 164 (S.D.N.Y. 2000) ............................................................. *passim*

*In re Glob. Crossing Sec. & ERISA Litig.,*
   225 F.R.D. 436 (S.D.N.Y. 2004) .............................................................................. 14

*In re Indep. Energy Holdings Pub. Ltd. Co. Sec. Litig.,*
   302 F. Supp. 2d 180 (S.D.N.Y. 2003) ...................................................................... 19

*In re Ira Haupt & Co.,*
   304 F. Supp. 917 (S.D.N.Y. 1969) ............................................................................ 6

*In re Painewebber Ltd. P'ships Litig.,*
   171 F.R.D. 104 (S.D.N.Y. 1997) ................................................................................ 6

*In re Painewebber Ltd. P'ship Litig.,*
   999 F. Supp. 719, 725 (S.D.N.Y. 1998) ................................................................... 17

*In re Prudential Sec. Inc. Ltd. P'ship Litig.,*
   912 F. Supp. 97 (S.D.N.Y. 1996) ............................................................................. 13

*In re Ramp Corp. Sec. Litig.,*
   2008 U.S. Dist. LEXIS 213 (S.D.N.Y. Jan. 3, 2008) .............................................. 11

*In re Sumitomo Copper Litig.,*
   74 F.Supp.2d 393 (S.D.N.Y. 1999) .................................................................... 11, 15

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.,*
   746 Fed. Appx. 655 (9th Cir. 2018) ......................................................................... 18

*In re Warfarin Sodium Antitrust Litig.,*
   391 F.3d 516 (3d Cir. 2004) ...................................................................................... 5

*Johnson v. Brennan,*
   2011 U.S. Dist. LEXIS 105775 (S.D.N.Y. Sept. 16, 2011) ......................... 11, 13, 16

*Knapp v. Badger Techs., Inc.,*
   2015 U.S. Dist. LEXIS 77186 (W.D.N.Y. June 15, 2015) ...................................... 15

*Maley v. Del Global Techs. Corp.,*
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ........................................................................ 5

*McEarchen v. Urban Outfitters, Inc.,*
   2017 U.S. Dist. LEXIS 144203 (E.D.N.Y. Sep. 6, 2017) ........................................ 7

*McMahon v. Olivier Cheng Catering & Events, LLC,*
   2010 U.S. Dist. LEXIS 18913 (S.D.N.Y. Mar. 2, 2010) ...................................... 15

*Nelson v. Sabre Cos. L.L.C.,*
   2018 U.S. Dist. LEXIS 122325 (N.D.N.Y. July 23, 2018) ...................................... 7

*Overnight Motor Transp. Co. v. Missel,*
   316 U.S. 572 (1942) .................................................................................................... 7

*Parker v. Jekyll & Hyde Entm't Holdings, LLC,*
   2010 U.S. Dist. LEXIS 12762 (S.D.N.Y. Feb. 9, 2010) ....................................... 20

*Reyes v. Bakery & Confectionery Union & Indus. Int'l Pension Fund,*
   281 F. Supp. 3d 833 (N.D. Cal. 2017) ................................................................... 18

*Scott v. Chipotle Mexican Grill, Inc.,*
   954 F.3d 502 (2d Cir. 2020) ....................................................................................... 7

*Sewell v. Bovis Lend Lease LMB, Inc.,*
   2012 U.S. Dist. LEXIS 53556 (S.D.N.Y. Apr. 16, 2012) ....................................... 4

*Stefaniak v. HSBC Bank USA, NA,*
   2008 U.S. Dist. LEXIS 53872 (W.D.N.Y. June 28, 2008) .................................... 19

*Strauch v. Comput. Scis. Corp.,*
   2018 U.S. Dist. LEXIS 192713 (D. Conn. Nov. 9, 2018) ....................................... 7

*Strougo v. Bassini,*
   258 F. Supp. 2d 254 (S.D.N.Y. 2003) ...................................................................... 7

*Tiro v. Pub. House Invs., LLC,*
   2013 U.S. Dist. LEXIS 129258 (S.D.N.Y. Sept. 10, 2013) .............................. 14, 16

*Wal-Mart Stores, Inc. v. Visa USA Inc.,*
   396 F.3d 96 (2d Cir. 2005) .................................................................................. 10, 11

*Yuzary v. HSBC Bank USA, N.A.,*
   2013 U.S. Dist. LEXIS 144327 (S.D.N.Y. Oct. 2, 2013) ....................................... 16

*Zeltser v. Merrill Lynch & Co.,*
   2014 U.S. Dist. LEXIS 135635 (S.D.N.Y. Sept. 23, 2014) .................................... 16

STATUTES, RULES, AND OTHER CITATIONS

Fed. R. Civ. P. 23 ................................................................................................................ 1, 3, 7, 13

## INTRODUCTION

Plaintiff seeks final approval of the parties' settlement of this class and collective action lawsuit against Red Robin International, Inc. d/b/a Red Robin ("Red Robin" or "Defendant"). The case involves misclassification claims filed on behalf of current and former Assistant Managers and Kitchen Managers (collectively, "AMs") as an opt-in collective ("FLSA Collective") and as a Rule 23 state law class action for AMs employed in New York (the "New York Class") (the FLSA Collective and New York Class members shall be jointly referred to as "Settlement Members").[1]

As previously set forth in Plaintiff's preliminary approval motion papers (ECF No. 112)("Preliminary Approval Motion") – which the Court granted on September 23, 2022 – the Settlement here is an excellent one. It was reached after nearly three years of litigation and resolves not only the wage and hour claims of the named Plaintiff, but also the claims of those similarly situated in a class and collective, for a Gross Settlement Amount of $2,950,000. As previously set forth, and, as set forth below, the settlement satisfies all the approval criteria for a Fair Labor

---

[1] Precisely stated, the Settlement Members include:

Red Robin's current or former Assistant Managers or Kitchen Managers, below the level of General Manager and below the level of any Assistant General Manager not dually titled Assistant General Manager/Kitchen Manager or Kitchen Manager/Assistant General Manager (collectively "AMs") employed by Red Robin at its corporate-owned locations in the United States who were paid as exempt and who filed consents opting into the Litigation, and whose consents were not withdrawn or whose AM claims were not otherwise resolved by entry of judgments [ECF Nos. 103-104] in this civil action, as well as on behalf of a class of AMs employed and paid for AM work as exempt by Red Robin in New York from August 2, 2012 to the March 31, 2020 date by which AMs were reclassified to non-exempt, who do not file a timely and compliant request to exclude themselves from settlement.

Excluded, however: are (1) any AM who participated in a prior settlement in *Rogers v. Red Robin International Inc., et al*, Case No. 511180/2016 (New York Supreme Court, Kings County) by timely submitting a signed Claim Form in that case and endorsing their settlement check, and who did not work for Red Robin as an AM after the applicable date covered by the release of their claims in *Rogers*; and (2) any AM whom Defendant warranted and represented to have signed an arbitration agreement with Defendant, agreeing to arbitrate their claims and waive participation in a class or collective action, where such agreement was signed by the AM prior to August 2, 2018 (the date the Complaint in the Litigation was filed).

Standards Act ("FLSA") collective and for a New York Labor Law ("NYLL") class action because it resolves a *bona fide* dispute, was reached after contested litigation, resulted from arm's-length negotiations between counsel well-versed in wage and hour law, and satisfies all other criteria for approving a FLSA and class action settlement. *See* ECF No. 112-1 at 10-18.

Accordingly, Plaintiff now requests that the Court: (1) grant final approval of the Settlement Agreement and Release ("Settlement Agreement") attached as Exhibit A to the Declaration of Seth Lesser in Support of Plaintiff's Unopposed Motion for Preliminary Approval of Settlement (ECF No. 112-3) as adequate, fair and reasonable; (2) grant final certification of the New York settlement class; (3) grant approval to pay the Settlement Administrator, CPT Group, in the amount of $23,500.00; (4) grant approval of attorney's fees and costs in the amount agreed upon in the Settlement Agreement (attorneys' fees of $983,333.00, and costs and expenses of $40,865.27); and (5) grant approval of the service payment to the named Plaintiff in the amount of $10,000.

## I.     RELEVANT PROCEDURAL HISTORY

Plaintiff recited the extensive history of this case, as well as the terms of the settlement and the form and content of the notice, in the preliminary approval motion. Plaintiff incorporates his brief and the accompanying documents here.

Under the Court's Order, the period for filing timely objections ended on December 27, 2022. *See* Declaration of Seth R. Lesser ("Lesser Decl."), filed concurrently herewith, at ¶ 2. There were no objections filed within the Court-ordered objection period (or to date). *Id.* Of the 543 total NY and FLSA class and collective members, no individual filed a request for exclusion from the settlement. *Id.* The settlement was approved by 100% of the eligible settlement participants. *Id.*

Also, on July 8, 2022, Defendant served all required government officials with the notices required by the Class Action Fairness Act ("CAFA"). Lesser Decl. at ¶ 3. The 90-day period for those CAFA notice recipients to lodge objections to the settlement concluded on October 6, 2022.

2

*Id.* There have been no objections from any government officials in response to CAFA notices. *Id.*

## II.     FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE

### A.     The Settlement Is Fair, Reasonable, and Adequate

The settlement involves FLSA collective action and New York class action claims. Plaintiff's counsel believes, based on extensive experience, that this settlement represents an excellent result. Lesser Decl. at ¶ 8. The Settlement Agreement complies with the Second Circuit's guidance in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015): (a) the Agreement has no restrictive confidentiality provisions that would conflict with the FLSA's remedial purposes; (b) the proposed release is narrowly tailored to the FLSA claims alleged here; and (c) the attorneys' fees, which equate to one-third of the total settlement amount, are fair and consistent with the retainer agreement between Plaintiff and his counsel.

When evaluating the fairness of a Rule 23 settlement, Second Circuit courts consider the nine factors in *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).[2] Consideration of those factors here support settlement approval. The factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund, given the best recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery, given all the attendant risks of litigation. *Id.* at 463.

---

[2] Because "the standard for approval of an FLSA settlement is lower than for a Rule 23 settlement," satisfaction of the *Grinnell* factor analysis will, necessarily, satisfy the standards of approval of the FLSA settlement. *Henry v. Little Mint, Inc.*, 2014 U.S. Dist. LEXIS 72574, at *18 (S.D.N.Y. May 23, 2014) (citations omitted).

1. **Litigation Through Trial Would Be Complex, Costly, and Long (*Grinnell* Factor 1)**

By settling prior to trial, Plaintiff will avoid further expense and delay in obtaining a recovery for the class. "Most class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub. nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001). Particularly in complex wage and hour litigation like this one, involving both federal and state statutory rights, protracted litigation is costly and burdensome, and includes motion practice and potential appeals over class certification. *Gilliam v. Addicts Rehab. Ctr. Fund*, 2008 U.S. Dist. LEXIS 23016, at *10-11 (S.D.N.Y. Mar. 24, 2008).

Barring settlement, the parties would expect extensive pre-trial motion practice as to dispositive motions, class certification and decertification motions, motions *in limine*, and oppositions thereto. Discovery, trial witness and expert depositions will certainly also take place, which could have led to further document productions, depositions, and discovery motions. Moreover, to establish the nature of the AM position and the applicability of exemptions to the FLSA and NYLL, a complicated trial would have been necessary, featuring extensive testimony by Red Robin managers and executives, Plaintiff and Class Members, and possibly experts.

This settlement provides monetary relief to Class Members in a prompt and efficient manner. Thus, the first factor weighs in favor of judicial approval of the settlement. *See, e.g., Sewell v. Bovis Lend Lease LMB, Inc.*, 2012 U.S. Dist. LEXIS 53556, at *19 (S.D.N.Y. Apr. 20, 2012) ("Litigating the claims of hundreds of putative class members would undoubtedly yield expensive litigation costs that can be curbed by settling the action.") (citation omitted).

2. **The Reaction of the Class Has Been Positive (*Grinnell* Factor 2)**

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant

factor to be weighed in considering its adequacy." *Maley v. Del Global Techs. Corp.,* 186 F. Supp.
2d 358, 362-63 (S.D.N.Y. 2002). Here, no Class member objected to the settlement or requested
exclusion from the settlement, and no absent New York Class members who had not opted into the
litigation requested exclusion. The settlement was thus approved by 100% -- or certainly not
objected to by *any* -- of the settlement participants. Lesser Decl. at ¶ 2.

This positive response to the settlement strongly favors judicial approval. *See, e.g., Dupler v.
Costco Wholesale Corp.,* 705 F. Supp. 2d 231, 239-240 (E.D.N.Y. 2010) (with 127 opt outs and 24
objections in class of over 11 million, the court stated, "[g]iven the relatively small number of class
members who opted out or objected to the Settlement, the Court finds that the reaction of the class
has been overwhelmingly positive, which strongly weighs in favor of Settlement approval.").

### 3. The Parties Engaged in Sufficient Discovery to Resolve the Case Responsibly (*Grinnell* Factor 3)

On this factor, the question is "whether counsel had an adequate appreciation of the merits
of the case before negotiating." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d
Cir. 2004). "[T]he pretrial negotiations and discovery must be sufficiently adversarial that they are
not designed to justify a settlement . . . [, but] an aggressive effort to ferret out facts helpful to the
prosecution of the suit." *In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d at 176
(citation and internal quotations omitted); *see also Ballinger v. Advance Magazine Publrs., Inc.,*
2014 U.S. Dist. LEXIS 179538, at *4-5 (S.D.N.Y. Dec. 29, 2014) (granting approval where case
"settled before depositions were conducted, . . . [but] both sides were well acquainted with the facts
and the nature of the various internships at issue").

The discovery the parties conducted satisfies this standard. The parties engaged in
discovery and produced documents, and Defendant prepared for settlement purposes a
spreadsheet reflecting dates in the relevant positions for each of the Opt-ins, the salary of each of

the Named Plaintiff and Opt-ins, and the number of weeks worked during the relevant time

periods. Lesser Decl. at ¶ 4. Plaintiff's counsel also confidentially surveyed approximately 350 opt-

in plaintiff clients regarding the number of hours they were expected to work, the number of hours

they actually worked, and whether and how often they took uninterrupted lunch breaks, in order

to prepare for mediation. *Id.* The parties were well-positioned to evaluate the strength of their

respective positions and potential damages recoverable. This factor favors approval. *See, e.g.,*

*Sewell*, 2012 U.S. Dist. LEXIS 53556, at *18 (granting final approval where parties exchanged

documents and plaintiff's counsel interviewed class members).

### 4. Plaintiff Would Face Real Risks of Establishing Liability and Damages If the Case Proceeded (*Grinnell* Factors 4 and 5)

"Litigation inherently involves risks." *In re Painewebber Ltd. P'ships Litig.,* 171 F.R.D.

104, 126 (S.D.N.Y. 1997). Though Plaintiff believes that his, and the Class's, case is strong, it is

subject to risk. "[i]f settlement has any purpose at all, it is to avoid a trial on the merits because of

the uncertainty of the outcome." *In re Ira Haupt & Co.,* 304 F. Supp. 917, 934 (S.D.N.Y. 1969).

In assessing the risks of liability and damages, the court "must only weigh the likelihood of success

by the plaintiff class against the relief offered by the settlement." *In re Austrian & German Bank*

*Holocaust Litig.,* 80 F. Supp. 2d at 177 (internal quotations and citation omitted).

Here, Plaintiff recognizes the risks of proceeding to trial, even assuming that class certification was

obtained and maintained (*see* next point below). A trial might not result in any recovery or result in a

recovery less favorable to the settlement class and collective members. Plaintiff would have to

prevail at trial and on appeal. But even the possibility that the class "might have received more if

the case had been fully litigated is no reason not to approve the settlement." *Granada Invest., Inc.*

*v. DWG Corp.,* 962 F.2d 1203, 1206 (6th Cir. 1992) (quotation omitted). The proposed

settlement "provides for relief now, not some wholly speculative payment of a hypothetically larger

amount years down the road." *Strougo v. Bassini,* 258 F. Supp. 2d 254, 260 (S.D.N.Y. 2003).

Besides the risks of proving the merits of the claim and maintaining a class and collective action through trial, Plaintiff would also face risk in determining the proper method for calculating damages.[3] The parties dispute whether overtime should be calculated at half- time rates or time-and-a-half rates. Defendant's position is that AMs were exempt; but even if damages awarded, they could only be calculated by the diminishing half-time method of dividing weekly salary by all hours worked then multiplying that rate – which decreases with each overtime hour worked – by .5 for any hours over 40, relying on its interpretation of *Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572 (1942); *Banford v. Entergy Nuclear Operations, Inc.,* 649 F. App'x 89 (2d Cir. 2016). Plaintiff, thus, would face risk that even if liability were proven, any awarded damages would be calculated at a rate significantly reducing any recovery.

5. **Establishing and Maintaining the Class Through Trial Presents Risk (*Grinnell* Factor 6)**

Although Plaintiff obtained conditional certification of the FLSA collective action by stipulation after contested motion practice, it was by no means guaranteed to maintain certification at the decertification stage, much less obtain class action certification under the more stringent analysis that applies to Rule 23 non-settlement classes. *See, e.g., McEarchen v. Urban Outfitters, Inc.,* 2017 U.S. Dist. LEXIS 144203 (E.D.N.Y. Sep. 6, 2017) (decertifying manager collective action and denying Rule 23 class action certification); *Scott v. Chipotle Mexican Grill,*

---

[3] Some district courts have ruled that damages must be calculated at the default time-and-a-half method of dividing salary by the 40 non-overtime hours in a week to determine regular non-overtime rate, then multiplying that rate by 1.5 for all overtime hours worked. *See, e.g., Strauch v. Comput. Scis. Corp.,* 2018 U.S. Dist. LEXIS 192713 (D. Conn. Nov. 9, 2018). Other district courts have held it to be a jury question. *See, e.g., Nelson v. Sabre Cos. L.L.C.,* 2018 U.S. Dist. LEXIS 122325 (N.D.N.Y. July 23, 2018) (dispute over total hours the annual salary intended to cover created a triable issue for jury determination, opining that damages calculation method for misclassification cases "remains unsettled in this circuit" and declining to rule that half-time FWW methodology must be applied in such cases).

*Inc.*, 954 F.3d 502 (2d Cir. 2020) (affirming denial of class certification but vacating decertification of collective in similar hybrid misclassification case). The settlement of these claims ensures that the class and collective will avoid the associated risks, delays, and dismissals that could result from decertification and contested class certification proceedings.

6.   **Defendants' Ability to Withstand a Greater Judgment Is Not Determinative (*Grinnell* Factor 7)**

As described previously in Plaintiff's preliminary approval motion (ECF No. 112 at 16-17), Plaintiff's settlement valuation analysis appropriately considered Defendant's financial position, including its most recent SEC filings, in which it reported financial circumstances that reflect detrimental impact from the Covid-19 pandemic, compounded by current labor shortage and supply chain issues – which, due to Defendant's size, was ineligible for any Covid-19 related government assistance for restaurants (including the Restaurant Revitalization Fund or the Paycheck Protection Act); *see, e.g., Emeterio v. A&P Rest. Corp.*, 2022 U.S. Dist. LEXIS 14598, at *24-25 (S.D.N.Y. Jan. 26, 2022) (approving class and collective settlement paying 25% of potential damages and noting impact of coronavirus pandemic); *Delijanin v. Wolfgang's Steakhouse Inc.*, 2021 U.S. Dist. LEXIS 27462, at *14-15 (S.D.N.Y. Feb. 12, 2021) (in light of the COVID-19 pandemic "a 28% recovery of the total alleged damages ... represents a substantial and reasonable amount for Plaintiff[s] to recover via settlement"). Regardless, a "defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 178 n.9 (internal brackets omitted)). The settlement eliminates any risk of collection at a future date by requiring Red Robin to pay the full settlement amount promptly following the settlement effective date.

7.    **The Settlement Fund Is Substantial, Even in Light of the Best Possible Recovery and the Attendant Risks of Litigation (*Grinnell* Factors 8 and 9)**

The settlement amount represents substantial value given the risks of litigation. Determining whether a settlement amount is reasonable "is not susceptible of a mathematical equation yielding a particularized sum." *In re Austrian & German Holocaust Litig.*, 80 F. Supp. 2d at 178 (quotations omitted). "Instead, 'there is a range of reasonableness . . . a range which recognized the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Henry*, 2014 U.S. Dist. LEXIS 72574, at *25 (citations and quotation omitted).

Here, the $2,950,000 settlement is reasonable because it is a substantial compromise of disputed matters, providing significant benefits to members of the FLSA collective and NY Class. *First*, as a matter of the closest apples-to-apples comparison that exists, the settlement is no less favorable than Red Robin's prior settlements of similar claims in *Rogers* (for all AMs nationwide excluding California) and in *Bautista* (for all California Kitchen Managers). The average gross collective settlement amount was $1,610 in *Rogers*, and here it is $5,433 per Settlement Member. Hilbert Decl. ECF 112-4 at ¶ 12. As to *Bautista*, the Settlement here provides an average gross amount 147% of the per person *Bautista* amount. *Id.* Moreover, based on Plaintiff's calculations, even if the jury credited AMs with working 50 hours per week for on average 42 weeks a year with no regular breaks (i.e., twice the weekly overtime hours upon which *Rogers* was based), *and* assuming that the case went to trial as a certified class and collective action, *and* if Plaintiff prevailed on the core misclassification merits issue but failed to carry the burden of proving that misclassification was willful, then the unliquidated damages would be $2,013,607.99 under Defendant's preferred half-time calculation method. *Id.* at ¶ 13. In addition to this FLSA Collective amount, the Absent NY Class Members, even under the NYLL's six-year limitations

period (reduced to essentially three years by the 2017 *Rogers* nationwide settlement release

effective dates), would be owed a maximum possible $259,440.60 in unpaid overtime wages. *Id.* at

¶ 14. The gross settlement therefore represents approximately 100% of the combined maximum

possible unpaid overtime wage amounts for the FLSA Settlement Collective and absent NY Class

Members and an additional 30% of their maximum possible additional liquidated damages for

those periods under those assumptions. *Id.* at ¶15. By nearly any criteria in a wage and hour

misclassification case, that is an extremely good result.

Plaintiff thus submits that such a settlement is an excellent result, and, in applying the

standards for approval, there is certainly can be nothing suspect about a class action lawsuit that

achieves a recovery for FLSA collective and New York Class Members of approximately 100% of

their maximum claimed unpaid overtime. *See, e.g., Cagan v. Anchor Sav. Bank FSB*, 1990 U.S.

Dist. LEXIS 11450, at *34 (E.D.N.Y. May 17, 1990) (approving $2.3 million class settlement over

objections that the "best possible recovery would be approximately $121 million").

## III. PLAINTIFF'S REQUESTS FOR ATTORNEYS' FEES, COSTS, AND SERVICE PAYMENTS ARE REASONABLE AND SHOULD BE APPROVED

### A. The Percentage Method is the Preferred Method in the Second Circuit for Awarding Attorneys' Fees in a Common Fund Case

In class action wage lawsuits, "public policy favors [a common fund] award" of attorneys' fees.

*Frank*, 228 F.R.D. at 189. Although there are two ways to compensate attorneys for successful

prosecution of statutory claims – the percentage of the fund method and the lodestar method – in

common fund cases like this, courts in this Circuit prefer to award fees as a percentage of the fund.

*Dupler*, 705 F. Supp. 2d at 242 (*quoting Wal-Mart Stores, Inc. v. Visa USA Inc.*, 396 F.3d 96, 121

(2d Cir. 2005) ("'The trend in this Circuit is toward the percentage method, which directly aligns the

interests of the class and its counsel and provides a powerful incentive for efficient prosecution and

early resolution of litigation'")). There are several reasons for this. First, the percentage method

"directly aligns the interests of the class and its counsel" because it provides an incentive to attorneys to resolve the case efficiently and to create the largest common fund out of which payments to the class can be made. *Wal-Mart Stores, Inc.*, 396 F.3d at 121 (internal quotation marks omitted); *see also Asare v. Change Grp. of N.Y., Inc.*, 2013 U.S. Dist. LEXIS 165935, at *43-45 (S.D.N.Y. Nov. 15, 2013); *In re Ramp Corp. Sec. Litig.*, 2008 U.S. Dist. LEXIS 213, at *7 n.2 (S.D.N.Y. Jan. 3, 2008). The lodestar method, by contrast, "create[s] an unanticipated disincentive to early settlements, [and] tempt[s] lawyers to run up their hours..." *Wal-Mart Stores,* 396 F.3d at 121

The percentage method is also preferred because it "spares the court and the parties the cumbersome, enervating, and often surrealistic process of lodestar computation." *Davis*, 827 F. Supp. 2d at 184 (quotation omitted). The "primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyes review of line-item fee audits." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 438-49 (2d Cir. 2000). The percentage method, therefore, preserves judicial resources, and frees the Court from engaging in meticulous review of billing records.

Finally, the percentage method "mimics the compensation system actually used by individual clients to compensate their attorneys." *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393, 397 (S.D.N.Y. 1999); *see also Sewell*, 2012 U.S. Dist. LEXIS 53556, at *29 ("[The percentage] method is similar to private practice where counsel operates on a contingency fee, negotiating a reasonable percentage of any fee ultimately awarded").

**B.      Plaintiff's Request for Attorneys' Fees Is Reasonable**

Class Counsel seek an award of attorneys' fees for $983,333.00, which represents one-third of the $2,950,000.00 common settlement fund, and which Defendant does not oppose. Lesser Decl. at ¶ 5. In *Goldberger*, the Second Circuit articulated six factors for courts to consider in determining

the reasonableness of fee applications: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement, and (6) public policy considerations. The *Goldberger* factors weigh in favor of approving the fee request.

### 1.    Class Counsel Have Expended Significant Time and Labor

Class Counsel has prosecuted this litigation for over three years. In furtherance of their efforts, Class Counsel together expended 1,151.4 hours of professional time for an aggregate lodestar of $630,989.25. Lesser Decl. at ¶ 5. The hours are reasonable for a case of this complexity, magnitude, and length, and were compiled from time records duly maintained by each attorney, paralegal, and support staff. *Id.*; *see also* Declaration of C. Andrew Head ("Head Decl."), filed concurrently herewith, at ¶¶ 16-20. Time records are attached to the counsel's declarations.

Class Counsel communicated regularly to ensure no unnecessary time was incurred, nor duplication of effort. Activities conducted by Class Counsel include, among many other things, interviewing clients; analyzing relevant law; learning details of Defendant's corporate policies and potential defenses; propounding and responding to discovery requests; negotiating and drafting case management plans; preparing damages models; preparing for and attending mediation; and negotiating settlement. *See* Lesser Decl. at ¶ 11.

Besides the work to date, Class Counsel will also have to perform additional work to effectuate the settlement's administration. *See, e.g.*, *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013) ("Class Counsel is often called upon to perform work after the final approval hearing, including answering class member questions, answering questions from the claims administrator, and negotiating and sometimes litigating disagreements with defendants about administering the settlement and distributing the fund."). Conservatively assuming that the majority of this time will be paralegal time (with some associate time), it is reasonable to expect another 75

12

hours of post-settlement time, or, roughly, $40,000 in lodestar. Lesser Decl. at 9.

### 2. The Magnitude and Complexity of the Litigation

The size and difficulty of the issues in a case are significant factors to be considered in making a fee award. *See Goldberger*, 209 F.3d at 50; *In re Prudential Sec. Inc. Ltd. P'ship Litig.*, 912 F. Supp. 97, 100-01 (S.D.N.Y. 1996). "Among FLSA cases, the most complex type is the 'hybrid' action brought here, where state wage and hour violations are brought as an 'opt out' class action pursuant to Federal Rule of Civil Procedure 23 in the same action as the FLSA 'opt in' collective action pursuant to 29 U.S.C. § 216(b)." *Johnson v. Brennan*, 2011 U.S. Dist. LEXIS 105775, at *49 (S.D.N.Y. Sept. 16, 2011). "Because the same set of operative facts is being applied and analyzed under both statutory frameworks, justice is served and consistency and efficiency are achieved by having the litigation in one forum." *Id.*

The class certification questions at the heart of this litigation are complex. The ultimate merits question of whether AMs are correctly classified as "Executives" under the FLSA is a complex, mixed question of law and fact, particularly when brought in an aggregate proceeding. *See Henry,* 2014 U.S. Dist. LEXIS 72574, at *34-36 (awarding fees equal to one-third of the settlement fund in hybrid manager misclassification case under the FLSA and state law covering multiple locations); *Beckman*, 293 F.R.D. at 479 (same). This factor supports an award of one-third of the settlement fund.

### 3. The Risk of Litigation

As discussed at pages 3-11, in discussing the *Grinnell* factors, Plaintiff faces considerable risk in continuing to litigate the case, and it is axiomatic that even with the most vigorous efforts, success is never guaranteed as to the challenges of proving liability, obtaining and retaining a class, and maximizing damages in the face of risks such as differing damage methodologies.

Counsel undertook to prosecute this action without any assurance of payment for their

services, litigating this case on a wholly contingent basis in the face of significant risk. Lesser Decl. at ¶9; Head Decl. at ¶19. Class and collective wage and hour cases of this type are, by their nature, complicated, time-consuming, and subject to risk. Due to the contingent nature of the fee arrangement, lawyers make this investment with the real possibility of an unsuccessful outcome -- and no fee. This risk is illustrated by Class Counsel's own experience in litigating other cases that resulted in either no recovery (and no fee award) or a substantially lower recovery (and lower fees) than anticipated. *Id.* This factor supports an award of one-third of the settlement fund.

4. **The Class Members are Represented by Class Counsel with Significant Experience in Wage and Hour Litigation**

Plaintiff submits that the quality of lawyering has been high on both sides. "To determine the 'quality of the representation,' courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the case." *Tiro v. Pub. House Invs., LLC*, 2013 U.S. Dist. LEXIS 129258, at *42 (S.D.N.Y. Sept. 10, 2013). The Class Members are represented by experienced counsel who have invested substantial time and resources into the prosecution of this litigation. *See* Lesser Decl. at ¶¶ 5-7 and at Exhibit A thereto (KL Firm Resume); Head Decl. at ¶¶ 16-21. Class Counsel have served as class counsel in numerous class and collective actions, including many significant wage and hour overtime cases involving retail assistant managers, and have tried and successfully resolved many such cases. *Id.*

Defendant is represented by Jackson Lewis, a highly-respected law firm with a well-known employment and labor law practice. "The quality of opposing counsel is also important in evaluating the quality of Class Counsel's work," and Defendant's counsel vigorously defended Red Robin. *Tiro*, 2013 U.S. Dist. LEXIS 129258, at *42-43 (quoting *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004)); Lesser Decl. at ¶ 7. These factors weighs in favor of approving the requested fees.

14

### 5. This Circuit Has Awarded Similar Requests for Attorneys' Fees

Class Counsel's request for a one-third fee is "consistent with the norms of class litigation in this circuit." *McMahon v. Olivier Cheng Catering & Events, LLC*, 2010 U.S. Dist. LEXIS 18913, at *20 (S.D.N.Y. Mar. 2, 2010). "'In class settlement funds like this one, a one-third award of the settlement proceeds [for attorneys' fees] is considered typical and reasonable . . . because "[t]he attorneys' fees requested were entirely contingent upon success. Class Counsel risked time and effort and advanced costs and expenses, with no ultimate guarantee of compensation." *Knapp v. Badger Techs., Inc.*, 2015 U.S. Dist. LEXIS 77186, at *15 (W.D.N.Y. June 15, 2015) (quotations omitted). Here, as well, Class Counsel's time and effort was on a contingent basis, with no guarantee of payment (in whole or part). Lesser Decl. at ¶9; Head Decl. at ¶19.

### 6. Public Policy Considerations Favor The Fee Requested

Public policy considerations weigh in favor of granting Counsel's requested fees. In rendering attorneys' fee awards, "the Second Circuit and courts in this district also have taken into account the social and economic value of class actions, and the need to encourage experienced and able counsel to undertake such litigation." *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d at 399. Indeed, the Second Circuit has emphasized recently in *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 605 (2d Cir. 2020), how "[f]ee awards in wage and hour cases should 'encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel.'" The Court likened FLSA fees to actions in the public interest, like civil rights litigation, where the public interest goals are "'perhaps most meaningfully served by the day-to-day private enforcement of these rights, which secures compliance and deters future violation,'" which is why "'Congress meant reasonable attorney's fees to be available to the private attorneys general who enforce the law, not only to those whose cases make new law.'" *Id.* at 605 (quoting *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 426 (2d Cir. 1999)); *see also Fisher*, 948 F.3d

15

at 600-605 (addressing these points at length); *see also Johnson*, 2011 U.S. Dist. LEXIS 105775, at

*56 ("[a]dequate compensation for attorneys who protect those rights by taking on such litigation

furthers the remedial purpose of those statutes.").

> ### C. The Lodestar Cross Check Further Supports an Award to Class Counsel of One-Third of the Settlement Fund

The trend in the Second Circuit has been to apply the percentage method, and then loosely

use the lodestar method as a baseline or "cross check" of the reasonableness of the requested fee.

*Goldberger*, 209 F.3d at 50; *Tiro*, 2013 U.S. Dist. LEXIS 129258, at *46 (citation omitted). As part

of the cross check, the lodestar is determined by multiplying the number of hours reasonably

expended on a client's case by a reasonable hourly billing rate for such services. *See Johnson*, 2011

U.S. Dist. LEXIS 105775, at *58 (citation omitted). "[W]here [the lodestar method is] used as a

mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the

district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's

familiarity with the case." *Goldberger v. Integrated Res.*, 209 F.3d 43, 50 (2d Cir. 2000).

Counsel's fee request for one-third of the settlement amount, or $983,333.00, is

approximately 1.55 times their lodestar of $630,989.25. Lesser Decl. at ¶¶ 5, 10. Counsel's request is

reasonable: not only did counsel secure an excellent result, with no objections, but a multiplier of

1.55 is significantly less than what is typically approved in FLSA settlements. Courts in this Circuit

regularly award lodestar multipliers from two to six times lodestar, with some courts approving fee

requests that are "up to eight times the lodestar, and in some cases, even higher...." *Beckman*, 293

F.R.D. at 477 (fee of 6.3 times lodestar in overtime class action approved). *See also, e.g., Wal-Mart*,

396 F.3d at 123 (3.5 multiplier deemed reasonable, citing cases involving multipliers between 1.35

and 4.5); *Zeltser v. Merrill Lynch & Co.*, 2014 U.S. Dist. LEXIS 135635, at *22-23 (S.D.N.Y.

Sept. 23, 2014) (multiplier of 5.1 "falls within the range granted by courts"); *Yuzary v. HSBC Bank*

*USA, N.A.*, 2013 U.S. Dist. LEXIS 144327, at *29-30 (S.D.N.Y. Oct. 2, 2013) (awarding multiplier of 7.6 in wage and hour misclassification class action); *Sewell*, 2012 U.S. Dist. LEXIS 53556, at *18, at *38 ("Courts commonly award lodestar multipliers between two and six."); *In re Lloyd's Am. Trust Fund Litig.*, 2002 U.S. Dist. LEXIS 22663, at *81 (S.D.N.Y. Nov. 26, 2002) (noting that a "multiplier of 2.09 is at the lower end of the range of multipliers awarded by courts within the Second Circuit"); *Maley*, 186 F. Supp. 2d at 371 (S.D.N.Y. 2002) (concluding that "modest multiplier" of 4.65 was "fair and reasonable"); *In re Painewebber Ltd. P'ship Litig.*, 999 F. Supp. 719, 725 (S.D.N.Y. 1998) (approving multiplier of 1.4). A 1.55 multiplier is well within the range of reasonability, particularly for a case in which the Class Members' reaction has been so positive, not one Class Member objected to the fee request explained in the Notice, and the result obtained a high proportion of possible recovery.

Further, in the recent *Fisher* decision, the Second Circuit made it clear how FLSA cases can sometimes have attorneys' fees that exceed the value of the claims, and in light of that consideration, as well as those otherwise set forth by the decisions in the preceding paragraph, we would respectfully submit that a 1.6 multiplier is, indeed, not just reasonable but, given the results here, exceedingly modest.

Furthermore, the multiplier that Counsel seek will diminish over time as Counsel spends additional time on this litigation in connection with implementing and monitoring the settlement. *See Sewell*, 2012 U.S. Dist. LEXIS 53556, at *38. Among other things, Counsel will prepare for and attend the final fairness hearing, answer class member questions (especially after the fund is distributed), respond to inquiries from the claims administrator, and negotiate and possibly litigate disagreements with Defendants about the administration of the settlement and distribution of the fund. In light of the fact that Counsel will likely perform additional work after the final approval hearing, their request is "even more reasonable than it appears at first glance." *Beckman,* 293

F.R.D. at 482; *see also Clark v. Ecolab Inc.*, Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2010 U.S. Dist. LEXIS 47036, at \*29 (S.D.N.Y. May 11, 2010) (holding that fee request was supported by fact that it would compensate class counsel not only "for time and effort already expended, but also "for time that they will be required to spend administering the settlement going forward").

As discussed above (at 14), Class Counsel reasonably estimate an additional 75 hours of services provided post-settlement, or, roughly, $40,000 of additional lodestar. Including that additional lodestar lowers the multiplier from 1.56 to 1.47. And that time should be properly considered; indeed, "[e]xcluding such time . . . would misapply the lodestar methodology and needlessly penalize class counsel." *In re Equifax Inc. Customer Data Security Breach Litig.*, No. 1:17-md-2800-TWT, 2020 U.S. Dist. LEXIS 7841, at \*264 (N.D. Ga. Jan. 13, 2020), *aff'd in relevant part and reversed in part on other grounds, Shiyang Huang v. Equifax Inc. (In re Equifax Customer Data Sec. Breach Litig.)*, 999 F.3d 1247 (11th Cir. 2021) (affirming fee award).[4]

In sum, the fee request here should, we respectfully submit, be approved.

### D.    The Court Should Approve Payment of Costs and the Settlement Expenses from the Settlement Fund

Class Counsel also seeks reimbursement for litigation expenses of $40,865.27 from the settlement fund, and payment of the notice and settlement costs to the Claims Administrator, CPT

---

[4] *See also, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 746 Fed. Appx. 655, 659 (9th Cir. 2018) ("[t]he district court did not err in including projected time in its lodestar cross-check; the court reasonably concluded that class counsel would, among other things, defend against appeals and assist in implementing the settlement"); *Reyes v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 281 F. Supp. 3d 833, 856 (N.D. Cal. 2017) (including, over the defendants' objection, "125 anticipated future hours" to be spent on "communicating with the settlement administrator and responding to inquiries from class members" in the lodestar calculation); *Corzine v. Whirlpool Corp.*, 2019 U.S. Dist. LEXIS 223341, at \*31-32 (N.D. Cal. Dec. 31, 2019) (including "an estimate of 250 hours for future work to complete Settlement's claims process through 2026" in the lodestar calculation); *In re Equifax Inc. Customer Data Security Breach Litig.*, No. 1:17-md-2800-TWT, 2020 U.S. Dist. LEXIS 7841, at \*242-43 (N.D. Ga. Jan. 13, 2020) (including in the lodestar calculation, over a class member's objection, class counsel's estimate of an anticipated 10,000 hours to be spent in the future to implement and administer a class action settlement).

Group. Lesser Decl. ¶¶ 13-14, 17-18. "Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients." *In re Indep. Energy Holdings Pub. Ltd. Co. Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (quotation omitted). As stated in the Lesser Declaration (at ¶¶ 13-14), Class Counsel's expenses are monies they invested at their own expense to meet the costs of the litigation, and they totaled $40,865.27 through the date of final calculations before issuance of settlement notice, which is less than the total expenses that Class Counsel will actually incur through and after the Final Approval hearing, as there are usually costs incurred in helping class and collective members post-settlement. The costs were reasonable and incurred in the prosecution of this matter. They include expenses such as filing fees, postage, on-line research, and mediation. *Id.* The expenses were incurred to benefit the Class Members, and Class Counsel may be reimbursed for them. *See, e.g., Stefaniak v. HSBC Bank USA, NA*, 2008 U.S. Dist. LEXIS 53872, at *11 (W.D.N.Y. June 28, 2008); *Chambery v. Tuxedo Junction Inc.*, 2014 U.S. Dist. LEXIS 101939, at *26-27 (W.D.N.Y. July 25, 2014). No objections were received to the expense request. Declaration of Emilio Cofinco at CPT Group ("CPT Decl."), filed concurrently herewith, at ¶ 16.

As to its costs and expenses, CPT Group has provided notice as directed by the Court. Going forward should the Court finally approve this settlement, the Settlement Administrator will make settlement payments, confirm final calculations of payroll taxes, and issue W-2 and 1099 forms to all participating Settlement Class Members. Settlement Agreement at ¶ 2.4. CPT Group has incurred notice administration costs and has estimated that its total expenses after handling the settlement administration to completion will be no more than $23,500.00, CPT Decl. at ¶ 17. Based on Class Counsel's experience, this amount is reasonable. Lesser Decl. at ¶ ¶ 17-18.

### E.     Service Payments to Named Plaintiff Should Be Approved

Courts routinely approve service payments in wage and hour class and collective actions. *See,*

*e.g., Frank*, 228 F.R.D. at 187 ("[S]uch awards are particularly appropriate in the employment context. In employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers.").

Without opposition from any class or collective member, Plaintiff seeks a service payment of $10,000 to the Named Plaintiff. The request is reasonable given the contributions Plaintiff made to advance the prosecution and resolution of this case: aiding Class Counsel's investigation and prosecution of the claims, providing information and documents to Class Counsel, discussing the strategy, prosecution, and settlement of the cases, and participating in discovery. Lesser Decl. at ¶¶ 15-16. Mr. Outlaw's efforts – which exposed him to risk – substantially aided the prosecution of this case on behalf of the Class Members and warrant recognition. *Id.*

The requested service award amount to 0.34% of the total recovery, which is a reasonable percentage. *See, e.g., Parker v. Jekyll & Hyde Entm't Holdings, LLC*, 2010 U.S. Dist. LEXIS 12762, at *6 (S.D.N.Y. Feb. 9, 2010) (finding that service awards totaling 11% of the total recovery are reasonable "given the value of the representatives' participation and the likelihood that class members who submit claims will still receive significant financial awards"). The service award being requested here is well within the range of typical awards in similar cases.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court grant Plaintiff's Unopposed Motion for Final Approval of Settlement, for Award of Attorneys' Fees and Expenses, for Approval of A Service Payment to the Representative Plaintiff and for Payment of the Settlement Administrator's Costs and Expenses, and enter the Proposed Final Order and Judgment submitted contemporaneously with this memorandum.

Dated: January 13, 2023
      Rye Brook, New York

Respectfully submitted,

**KLAFTER LESSER LLP**

/s/ Seth R. Lesser
Seth R. Lesser
Christopher Timmel
Two International Drive, Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200
Facsimile: (914) 934-9220
E-mail: Seth@klafterlesser.com
      Christopher.timmel@klafterlesser.com


**HEAD LAW FIRM, LLC**
C. Andrew Head*
Bethany A. Hilbert*
4422 Ravenswood Avenue
Chicago, IL 60640
Telephone: (404) 924-4151
Facsimile: (404) 796-7338
E-mail: ahead@headlawfirm.com
      bhilbert@headlawfirm.com

*Attorneys for Plaintiff, the Collective, and the New York Class*


*admitted *pro hac vice*

# EXHIBIT I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
ERIC OUTLAW, Individually and on behalf of   :
himself and all others similarly situated,   :      No. 18-CV-4357 (GRB)(LGD)
                                             :
                Plaintiff,                   :
                                             :
v.                                           :
                                             :
RED ROBIN INTERNATIONAL, INC.,               :
                                             :
                Defendant.                   :
                                             :
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
```

**FILED
CLERK**

2:29 pm, Apr 18, 2023

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

## [PROPOSED] FINAL APPROVAL ORDER AND JUDGMENT

The Court, having considered Plaintiff's Unopposed Motion for Final Approval of Settlement, for Award of Attorneys' Fees and Costs and Expenses, for Approval of Service Payment to the Representative Plaintiff, and for Payment of the Claims Administrator's Costs and Expenses ("Motion") and all other materials properly before the Court, and having conducted an inquiry pursuant to Section 216(b) of the Fair Labor Standards Act and Rule 23 of the Federal Rules of Civil Procedure, hereby finds and orders as follows:

1. The Court has jurisdiction over the subject matter of this action, the named Plaintiff, the FLSA collective members, the New York class members, and Defendant Red Robin International, Inc.

2. The Court finds that the Settlement was the product of protracted, arms-length negotiations between experienced counsel. The Court grants final approval of the Settlement as fair, reasonable, and adequate as to the parties, the FLSA Collective Members, the named Plaintiff, and the New York settlement class.

4.      There were no objections filed within the Court-ordered objection period, and no objections filed to date.  Of the 543 members of the Settlement class, no one has requested to be excluded from the Settlement.

5.      The Court finds that the procedures for notifying the FLSA collective members about the Settlement and the New York class members, including the Notices and related documents, constituted the best notice practicable under the circumstances to all FLSA collective members and New York class members, and fully satisfied all necessary requirements of due process.  Based on the evidence and other materials submitted to the Court, the notices to the FLSA collective members and New York class members provided adequate, due, sufficient, and valid notice of the Settlement.

6.      The Court finds, for settlement purposes only, that the New York class satisfies the applicable standards for certification under Fed. R. Civ. P. 23.

7.      The action is dismissed on the merits and with prejudice, permanently barring Plaintiffs, all other claimants, and the New York class members from filing, commencing, prosecuting, or pursuing the claims released as part of this Settlement whether or not on a class or collective action basis, or participating in any class or collective action involving such claims.

8.      Class Counsel's request for attorneys' fees and litigation costs and expenses in this action is approved.  Class Counsel are hereby awarded $933,333.00 for attorneys' fees, to be divided between Class Counsel pursuant to agreements between Class Counsel, and $40,856.27 for reimbursement of litigation costs and expenses, which the Court finds were reasonably incurred in prosecution of this case.  The attorneys' fees and expenses so awarded shall be paid from the Settlement sum pursuant to the terms of the Settlement Agreement.

9.      The service award for the representative Plaintiff in the amount of $10,000 is approved to reimburse him for his unique services in initiating and maintaining this litigation, to be paid from the Settlement sum pursuant to the terms of the Settlement Agreement.

10.      The costs and expenses incurred involving notice administration and incurred to date or incurred for finalization of the Settlement by the Settlement Administrator, capped at $23,500, are granted for payment, and the Settlement Administrator can disburse to itself from the Settlement funds such payments upon approval by Class Counsel.

11.      Nothing relating to this Order, or any communications, papers, or orders related to the Settlement shall be cited to as, construed to be, admissible as, or deemed an admission by Defendant of any liability, culpability, negligence, or wrongdoing toward Plaintiff, the FLSA collective members, the New York class members, or any other person, or that class or collective action certification is appropriate in this or any other matter.  There has been no determination by any Court as to the merits of the claims asserted by Plaintiff against Defendant or as to whether a class or collective should be certified, other than for settlement purposes only.

9.      The Court shall have exclusive and continuing jurisdiction over this action for the purposes of supervising the implementation, enforcement, construction, administration, and interpretation of this Final Approval Order.

10.      This document shall constitute a judgment for purposes of Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.
Dated: ~~January~~ April 18 2023

/s/ Gary R. Brown
The Honorable Gary R. Brown

# EXHIBIT J

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG SMITH and MICHELLE AYALA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RED ROBIN INTERNATION, dba RED ROBIN BURGER AND SPRITS EMPORIUMS, a Nevada Corp., and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 14cv01432 JAH-BGS<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFCATION [Doc. No. 39]** |

Plaintiffs move to certify this action seeking relief for failure to pay overtime wages, failure to timely pay wages at separation, failure to provide accurate itemized wage statements, unfair business practices and violations of the Private Attorneys General Act of 2004 ("PAGA"). Defendants oppose the motion. After a thorough review of the parties' submissions, the Court DENIES Plaintiff's motion.

## BACKGROUND

Plaintiffs, Greg Smith and Michelle Ayala, originally filed a complaint in Superior Court of California, County of San Diego, and filed an amend complaint on April 30, 2014,

against Red Robin International, Inc. for failure to pay overtime wages in violation of California Labor Code sections 204, 510, 1194, 1198; failure to timely pay wages at separation in violation of California Labor Code sections 201-203; failure to provide accurate itemized wage statements in violation of California Labor Code section 226; unfair business practices in violation of Unfair Competition Law ("UCL"), California Business and Professions Code sections 17200-17208; and violations of PAGA, California Labor Code sction 2698, *et. seq.* Plaintiffs allege Defendant misclassified certain managers, and those with similar title and duties, as exempt from overtime pay, resulting in non-payment of overtime compensation. First Amended Complaint ("FAC") ¶¶ 1, 2 (Doc. No. 1-3). Defendant removed the action to federal court on June 12, 2014.

Plaintiffs now seek class certification. Defendant filed an opposition to the motion and Plaintiffs filed a reply. Finding the motion suitable for hearing without oral argument, the Court took the matter under submission pursuant to Local Rule 7.1.

## DISCUSSION

Plaintiffs seek to certify the following class:

All Defendant's California restaurant managers classified as exempt, reporting to a General Manager, from March 25, 2010 to the date of trial.

Plaintiffs also seek to certify the following subclasses:

Overtime Subclass:

All members of the Plaintiff Class not paid the legally required overtime rate for all hours worked in excess of eight (8) hours per workday or forty (40) hours per workweek.

Waiting Time Subclass:

All members of the Plaintiff Class who separated from their employment voluntarily or involuntarily, to whom Defendants knowingly failed to timely pay all wages due.

Wage Statement Subclass:

All members of the Plaintiff Class to whom Defendants knowingly and intentionally failed to provide accurate itemized wage statements showing all hours actually caused or suffered to work and the corresponding regular and overtime wages to be paid.

UCL Subclass:

All members of the "Overtime Subclass," who (1) were subject to unlawful, illegal, unfair and/or deceptive business acts /and or practices by Defendants and (2) are entitled to restitution of unpaid wages from Defendants based on conduct occurring at any time during the Class Period.

They contend they meet the criteria of Rules 23(a) and 23(b)(3).

## I. Legal Standard

Whether to grant class certification is within the discretion of the court. Montgomery v. Rumsfeld, 572 F.2d 250, 255 (9th Cir. 1978). A cause of action may proceed as a class action if a plaintiff meets the threshold requirements of Rule 23(a) of the Federal Rules of Civil Procedure: numerosity, commonality, typicality, and adequacy of representation. FED.R.CIV.P. 23(a). In addition, a party seeking class certification must meet one of the three criteria listed in Rule 23(b). Pursuant to Rule 23(b)(3) a party may maintain a class action if the court finds that the questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy.

Courts should certify a class only if they are "satisfied, after a rigorous analysis," that Rule 23 prerequisites have been met. General Telephone Co. Of Southwest v. Falcon, 457 U.S. 147, 161 (1982). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim," which "cannot be helped." Wal–Mart Inc. v. Dukes, 564 U.S. 338, 351 (2011). However, examination of the merits is limited to determining whether certification is proper and "not to determine whether class members

14cv01432 JAH-BGS

could actually prevail on the merits of their claims."  Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 n. 8 (9th Cir. 2011) (citation omitted).

## II.  Analysis

### 1.  Numerosity

Rule 23 requires that the class be "so numerous that joinder of all members is impracticable."  FED.R.CIV.P. 23(a)(1).  Plaintiffs contend the proposed class numbers more than 500 members and satisfies any standard for numerosity.

Defendants do not address this factor.

Plaintiffs meet the numerosity requirement.

### 2.  Commonality

Questions of law or fact must be common to the class.  See FED.R.CIV.P. 23(a)(2). This requires the plaintiffs' claims be dependent on a common contention which is capable of class-wide resolution "in one stroke."  Dukes, 564 U.S. at 350.

Plaintiffs argue there are numerous common questions, including, (1) whether all Red Robin restaurants in California are required to operate in such a similar manner that Intermediate Managers cannot exercise the requisite discretion and independent judgment more than 50% of their working time to be exempt; (2) whether Red Robin had a policy or practice requiring putative class members to work overtime, but has failed to perform the analysis necessary to classify them as exempt; (3) whether Red Robin can meet its burden to show the Intermediate Manager positions are properly classified as exempt; (4) whether Red Robin policies or practices require Intermediate Managers to spend less than 50% of their work time performing managerial tasks; and, (5) whether Red Robin policies or practices require Intermediate Managers to spend more than 50% of their work time performing hourly tasks.  Plaintiffs further argue whether Red Robin is liable for damages, penalties and restitution pursuant to the California Labor Code and the UCL are all issues which can be resolved on a class-wide basis.

Defendant argues Plaintiffs class certification argument is premised on an incorrect theory of liability.  Defendant maintains Plaintiffs wrongly assert, as a common issue,

Managers are misclassified because they cannot spend more than half their time exercising discretion and independent judgment and Plaintiffs confuse the requirement that an exempt employee regularly exercise discretion with the requirement that more than 50% of an exempt employee's time is engaged in exempt duties. Defendant argues proper classification as an exempt employee does not require that employees exercise discretion and independent judgment more than 50% of their time, rather, it only requires that the employee is engaged in exempt duties more than 50% of the time.

Defendant further argues the other common questions asserted by Plaintiffs fail to resolve any issues central to the validity of their claims. Even assuming their questions constitute the proper inquiry to determine exempt status, Defendant argues, none of them yield common answers capable of resolving Plaintiffs' class claims in one stroke, due to dissimilarities among Managers. Defendant contends there is no liability for performing an insufficient analysis regarding classification or, *per se*, for misclassification. Instead, Defendant contends, liability arises from failure to pay overtime to a nonexempt employee. Defendant argues courts have rejected the notion advanced by Plaintiffs that the determination of whether employees have been misclassified as exempt can be made by common proof by evaluating an employer's policies and procedures. Defendant maintains although Managers all have the same job description in California, their duties may vary by restaurant based upon the circumstances of the location.

Defendant also argues Red Robin's use of a labor model scheduling tool does not provide common proof as to how Managers spend their time. Defendant maintains standardized times for how long team members' tasks should take are used only by "Watson", Red Robin's labor-model scheduling tool, to assist Managers in effectively scheduling team members. Defendant further maintains Watson schedules are based on forecasting done by managers. Defendant contends the "standardized" program Plaintiffs suggest makes Red Robin locations the same, considering restaurant differences, is information that is unique per location based on eight or nine variables per location, such as average party size. Additionally, Defendant contend Plaintiffs assert that Watson shows

Managers perform hourly work, but their cited evidence actually shows that when calculating its labor models, Red Robin ensured that not a single hourly task was assigned to a manager.

In reply, Plaintiffs argue answering whether Intermediate Managers were properly classified will resolve an issue that is central to the validity of each of Plaintiffs' claims in one stroke.

Plaintiffs' action seeks relief for the alleged misclassification of certain Managers as exempt from overtime pay. Their "common questions" address Defendant's conduct and policies in allegedly misclassifying the Managers. Plaintiffs demonstrate common questions of law, including whether Defendant can meet its burden to show the Intermediate Manager positions are properly classified as exempt. However, class treatment requires more than raising common questions. What matters is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Wang v. Chinese Daily News, Inc., 737 F.3d 538, 543 (9th Cir. 2013). To answer the question of whether Defendant misclassified Managers as exempt requires a determination of whether Managers spent more than 50% of their time engaged in nonexempt tasks. Plaintiffs fail to demonstrate a common answer to the question.

Even if Plaintiffs meet the commonality requirement with their assertion of common questions, Plaintiff fail to meet the predominance requirement. Predominance requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." FED.R.CIV.P 23(b)(3). Meeting the commonality requirement is insufficient to fulfill the predominance requirement. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998).

Plaintiffs submit evidence of a policy common to all restaurants classifying Managers as exempt. They also demonstrate that the job descriptions for Intermediate Managers, which are identical in every restaurant, require them to perform hourly tasks in addition to their managerial duties. However, whether the Managers actually performed those duties to such an extent that there positions were misclassified as exempt is not

14cv01432 JAH-BGS

subject to common proof. A uniform policy of exemption, alone, is insufficient to "facilitate common proof on the otherwise individualized issues." In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 959 (9th Cir. 2009). Plaintiffs assert evidence of the examination of corporate documents and testimony describing the duties and testimony from a random sample of Managers are common proof. However, the evidence submitted demonstrates Defendant does not track the hours worked by Intermediate Managers, and the Watson scheduling tool does not provide that Managers routinely performed hourly workers' tasks. Whether Managers are actually performing the nonexempt work is individualized and not subject to common proof. As such, Plaintiffs fail to demonstrate the common questions predominate over individual questions to support the predominance requirement and fail to meet the requirements for class certification.

**3. Remaining Requirements**

Because the Court finds Plaintiff fails to meet the commonality and predominance requirements, it will not address the remaining requirements for class certification.

<b>CONCLUSION AND ORDER</b>

Based on the foregoing, IT IS HEREBY ORDERED Plaintiffs' motion for class certification is **DENIED without prejudice**.

DATED:    March 31, 2017

JOHN A. HOUSTON
United States District Judge

# EXHIBIT K

**Thursday, November 30, 2023 at 21:18:04 Pacific Standard Time**

**Subject:** Thank you for your Proposed Settlement Submission
**Date:**    Thursday, November 30, 2023 at 9:04:03 PM Pacific Standard Time
**From:**    DIR PAGA Unit
**To:**      Rebecca Peterson-Fisher
11/30/2023 09:03:41 PM

Thank you for your submission to the Labor and Workforce Development Agency.

Item submitted: Proposed Settlement
If you have questions or concerns regarding this submission or your case, please send an email to
pagainfo@dir.ca.gov.

DIR PAGA Unit on behalf of
Labor and Workforce Development Agency

Website: http://labor.ca.gov/Private_Attorneys_General_Act.htm

1 of 1

# EXHIBIT L

**IMPORTANT NOTICE ABOUT YOUR EMPLOYMENT WITH RED ROBIN**

**RECEIPT AND ACKNOWLEDGEMENT FORM**

Red Robin International, Inc. ("Red Robin") has various internal procedures for resolving employment related complaints or disputes. Where we cannot resolve the matter internally, Red Robin believes that arbitration is more effective in resolving the dispute versus court litigation. Attached is Red Robin's Mutual Agreement to Arbitrate ("Agreement"), which describes this arbitration program in detail, including:

- A mutual agreement that you and Red Robin will arbitrate claims covered by the Agreement **instead of pursuing them using court action or jury trial**;

- An option for you and Red Robin to try and resolve claims covered by the Agreement using a process called voluntary mediation;

- A mutual agreement that you and Red Robin will pursue claims covered by the Agreement on an individual basis, and not through a multi-party, class, collective, or representative action; and a mutual waiver of the right to bring, or be a party to, multi-party, class, collective or representative actions for covered claims;

Being bound by this Agreement is **voluntary** in that Red Robin is offering a one-time option for you to opt out of (i.e., not be bound by) this Agreement. To properly opt out of the Agreement, **no later than the date 30 calendar days after your first day of employment**, you must provide Red Robin (by e-mail to: ArbitrationOptOut@redrobin.com or by hand delivery to your General Manager) with a letter, signed by you, that says "I opt out of the Mutual Agreement to Arbitrate." To properly opt out of the Agreement, you must hand write or type a letter that says "I opt out of the Mutual Agreement to Arbitrate," sign it, scan it, and send it to this e-mail address: ArbitrationOptOut@redrobin.com or hand deliver it to your General Manager, no later than 30 calendar days after your first day of employment. You will not be retaliated against for opting-out of the Agreement under this Paragraph.

- **IF YOU DO NOT PROPERLY SUBMIT AN OPT-OUT NOTICE AS INSTRUCTED ABOVE OR IF IT IS RECEIVED AFTER THE 30TH DAY OF EMPLOYMENT WITH RED ROBIN, YOU AND RED ROBIN WILL BE BOUND BY THE AGREEMENT.**

You should take time to carefully review this Acknowledgement and the attached Agreement. If you have questions, contact the Red Robin Human Resources Department by calling 1-888-733-7621 or by sending an e-mail addressed to opendoor@redrobin.com. You may consult a lawyer about the effect and meaning of the Agreement.

Red Robin agrees that by issuing the Agreement, it agrees to be bound by it without signing it or this Acknowledgement with respect to those who did not properly opt out as instructed.

**By signing, I acknowledge I have received and read or have had the opportunity to read this Mutual Agreement to Arbitrate and that I may opt out of the Agreement as instructed above. I understand that this Agreement requires that claims/disputes covered by this Agreement be submitted to arbitration pursuant to the Agreement rather than to a judge or jury in court. I further understand that the requirement to arbitrate claims covered by this Agreement exists even if those claims are not submitted to mediation.**

Full Name: _____     Location: _____

Signature: █████████████████     Date: _____

**MUTUAL AGREEMENT TO ARBITRATE**

Red Robin International, Inc. ("Red Robin") has various internal procedures for resolving employment related complaints or disputes. Where we cannot resolve the matter internally using those processes, this Mutual Agreement to Arbitrate ("Agreement") provides for resolution of matters covered under it through a process called arbitration.  This Agreement is between Red Robin and you (the employee, the employee's heirs, administrators, executors, and assigns is hereafter referred to as "you").

**Unless you properly opt out of this Agreement pursuant to Paragraph J below, you and Red Robin agree to resolve any and all claims arising out of or related to your relationship or employment with Red Robin (that are not resolved via mediation) exclusively through final and binding arbitration rather than in court.**

**A.  Matters Covered By the Agreement**

You and Red Robin agree to arbitrate any and all legal or equitable claims, disputes, or controversies which could otherwise be raised in a court ("claims") that Red Robin may have against you or that you may have against Red Robin, its current or former affiliates, subsidiaries, divisions, successors, assigns and its or their agents, officers, directors, and/or employees.  Claims covered by the Agreement include those arising out of or relating to your relationship or employment (for example, claims about your application for employment or the hiring process, the terms and conditions of your employment, leaves of absence, reasonable accommodation, wages, compensation, discrimination or harassment in employment, termination of employment, theft, misappropriation of trade secrets) with Red Robin.  Claims covered by this Agreement include, but are not limited to, those under the Age Discrimination in Employment Act; Title VII of the Civil Rights Act of 1964; the Fair Labor Standards Act; the Family and Medical Leave Act; the Americans with Disabilities Act; Sections 1981 through 1988 of Title 42 of the United States Code; any state or local anti-discrimination or anti-harassment laws (for example, the New Jersey Law Against Discrimination); any other federal, state, or local law, ordinance or regulation relating to the employment relationship; any public policy, contract, tort, or common law; or any claim for damages, costs, fees, or other expenses or legal or equitable relief, including attorneys' fees.  Claims against an agent, officer, director, manager or co-worker, which arise out of or relate to your employment, are also covered by this Agreement and shall be resolved through arbitration.

**Arbitration and not a trial by a jury or court shall be the exclusive method for resolving any claim covered by this Agreement that is not resolved via mediation.**

**B.   Matters Not Covered By the Agreement**

Certain claims are not covered by this Agreement: (i) claims for workers' compensation benefits; (ii) claims for unemployment compensation benefits; (iii) claims based upon Red Robin's stock option plans, or based upon employee pension and/or welfare benefit plans, if those plans contain some form of a grievance, arbitration, or other procedure for the resolution of disputes under the plan; (iv) claims which by federal law may not be subject to mandatory binding pre-dispute arbitration, such as certain claims under the Dodd-Frank Wall Street Reform Act; and (v) representative claims under California's Private Attorneys General Act of 2004, California Labor Code §§ 2698, *et seq.*, but only to the extent federal law prohibits enforcement of the representative action/class action/collective action waiver (discussed in Paragraph C below) with respect to these types of claims; (vi)  any lawsuit filed in state or federal court by you individually prior to the date you received this Agreement; (vii) any class, collective or representative action filed in state or federal court prior to the date you received this Agreement where you are a current or putative member of such pending class, collective or representative action. This Agreement does apply, however, to any lawsuits that are filed after the date you received this Agreement and any existing lawsuit that is amended after the date you received this Agreement that, though such amendment, would include you within its scope, including any amended multi-party, class, collective, or representative actions.

Notwithstanding any other provision of this Agreement, any party may apply to any court of competent jurisdiction for temporary, preliminary, or emergency injunctive relief that is necessary to preserve the status quo, i.e., the rights of that party pending the arbitration. The Agreement also does not prohibit any party from filing a motion in court to compel arbitration.  This Agreement does not prohibit the filing of administrative charges with a federal, state, or local administrative agency such as the National Labor Relations Board (NLRB) or the Equal Employment Opportunity Commission (EEOC).  However, any claim that is not resolved administratively through such an agency or via mediation shall be subject to arbitration pursuant to this Agreement.

**C.  Multi-Party, Class, Collective, and Representative Action Waiver**

You and Red Robin agree that, except where prohibited by federal law, claims covered by this Agreement must be brought on an individual basis only, and not as part of a multi-party, class, collective, or representative action, and arbitration on an individual basis is the exclusive remedy for those claims.  Neither you nor Red Robin may submit a multi-party, class, collective, or representative action for resolution under this Agreement and you and Red Robin agree that the arbitrator shall have no authority to arbitrate any form of a multi-party, class, collective, or representative proceeding, consolidate the claims of multiple individuals, agree to hear the claims of

2

multiple individuals in a single action, order, require, participate in or facilitate production of class-wide contact information or notification to others of potential claims, unless all parties consent to consolidation of the multiple actions, and grant the arbitrator the authority to hear a consolidated action. The parties waive their right to commence or be a party to any multi-party, class, collective, or representative claims, or to bring jointly any claim covered by the Agreement against the other with any other person.

Nothing in this Agreement limits your right or the right of others acting collectively to challenge the enforceability of any aspect of this Agreement. To the extent the filing of such an action is protected concerted activity under the National Labor Relations Act, such filing will not result in retaliation, discipline or discharge. However, in the event that such a challenge is made, Red Robin will ask a court to enforce each individual's agreement to arbitrate claims on an individual basis.

**D.   Severability and Related Issues**

A court (and not any arbitrator) has the exclusive authority to resolve disputes about the interpretation, applicability, enforceability, or formation of the class, collective, or representative action waiver in Paragraph C above, including but not limited to, any claim that the multi-party, class, collective, or representative action waiver is void or voidable. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of any other provision of this Agreement including, but not limited to, any claim that any other part of this Agreement is void or voidable or otherwise unenforceable due to any contract defenses such as, for example, waiver or unconscionability. If a court rejects the provision barring multi-plaintiff, class, collective, or representative actions, or any portion of such a provision, with respect to any claim, then the rejected provision or portion of the provision shall be severed and the claim not subject to the waiver shall proceed forward in court. If any other provision or portion of a provision of this Agreement is found to be unenforceable, the provision or portion of the provision shall be severed and/or the Agreement shall be interpreted or modified to the extent necessary for it to be enforceable, subject to the preceding three sentences of this Paragraph. Neither the AAA (defined below) nor the arbitrator shall have power under this Agreement to modify or alter the Agreement so as to permit the arbitrator or the AAA to consolidate claims and/or to hear a multi-party, class, collective, or representative action.

**E.   The Arbitration Process**

This Agreement is governed by and shall be enforced pursuant to the Federal Arbitration Act (the "FAA"). The arbitration will be heard by a neutral arbitrator and will be administered by the American Arbitration Association ("AAA"), pursuant to the Employment Arbitration Rules of the AAA. A copy of the Employment Arbitration Rules of the AAA may be obtained from Red Robin's Human Resources Department or downloaded from www.adr.org. The parties may agree upon an individual arbitrator or follow the AAA Employment Arbitration Rules relating to selection of an arbitrator. The arbitration will take place in a location determined by the arbitrator, not to exceed 50 miles from the location where you work or last worked for Red Robin. The arbitrator shall have the power to award any type of individual legal or equitable relief available in a court of competent jurisdiction including, but not limited to, attorneys' fees, to the extent available under applicable law. The arbitrator must issue a written award and decision. Any arbitral award may be entered as a judgment in any court of competent jurisdiction, as permitted by and in accordance with the FAA.

To initiate arbitration, either you or Red Robin must submit a written demand for arbitration to the AAA (Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043; tel. 877-495-4185; fax 877-304-8457; casefiling@adr.org) and to the other party or parties within the statute of limitations applicable to the claims asserted in the demand for arbitration. Any demand for arbitration will be timely only if brought within the statute of limitations applicable to the claim or claims in the demand. Within the same time frame, the parties also should send a copy of the demand for arbitration to the other party. Red Robin will send demands for arbitration to you at the address it has on file for you. Likewise, you should send demands for arbitration to Red Robin directed to the Human Resources Department, Attention: SVP HR.

Red Robin will pay the arbitration fees and costs of the AAA and of the arbitrator, including his/her travel expenses, if any, and will reimburse you for any fees you may be required to pay for filing the demand for arbitration, even if the arbitration is initiated by you. Except for those fees, which will be paid by Red Robin, each party will otherwise pay its own costs and fees associated with the arbitration, including its own attorneys' fees and costs (if any), except that, as part of any remedy that may be awarded, the arbitrator shall have the authority to award the parties his, her, or its attorneys' fees and costs where required or permitted by law.

**F.   Modification to AAA Employment Rules**

The arbitrator shall apply the Federal Rules of Civil Procedure (except for Rule 23) and the Federal Rules of Evidence as interpreted in the jurisdiction where the arbitration is held. In adjudicating the claim(s), the arbitrator shall apply the substantive laws of the state in which you are employed or were last employed by Red Robin. To the extent any of the provisions in this Agreement conflict with the Federal Rules of Civil Procedure, the AAA Employment Arbitration Rules, or any other rules of the AAA, this Agreement shall prevail: for

3

CONFIDENTIAL

**DEF001280**

example, this Agreement's multi-party, class, collective, and representative action waiver shall apply even in the event of a contrary AAA rule.

**G.** <u>Mediation</u>

Prior to (or during the course of) an arbitration, either party may initiate a request to mediate, which is an attempt to resolve the claim before a neutral mediator, rather than through arbitration. To initiate mediation, a written request for mediation must be submitted to the other party/parties. Mediation will only occur in the event that all parties voluntarily agree to mediate. Unless otherwise agreed to by the parties, participation in mediation does not toll any applicable statute of limitations for filing a demand for arbitration. Submitting a request to mediate is separate and distinct from submitting a demand to arbitrate. A mediation request does not satisfy the request to arbitrate requirements, which must be submitted independent of any mediation request. If both parties agree to mediate, they may proceed with mediation by jointly agreeing upon and selecting a mediator without the administrative oversight of the AAA. However, in the event that the parties decide to mediate through the AAA, they may select a mutually agreed-upon mediator or follow the process set forth by the AAA. If a claim covered by the Agreement is not resolved through mediation, a party wishing to pursue such claim must do so through arbitration pursuant to this Agreement rather than in court. Nothing herein limits the right of the arbitrator to order the parties back to mediation under any terms/conditions the arbitrator deems appropriate.

**H.** <u>Other Provisions of this Agreement</u>

This Agreement contains the complete agreement between you and Red Robin regarding the matters covered in it and supersedes any prior or inconsistent agreements that might exist between you and Red Robin. You may request a copy of this Agreement from the Human Resources Department at any time.

Nothing in this Agreement is intended to create a contract of employment for a specific duration. Unless otherwise provided in an agreement signed by the Chief Executive Officer of Red Robin (on an individual or collective basis), your employment with Red Robin remains at will. This means that employment is voluntarily entered into, and that you and Red Robin may terminate the employment relationship at any time, for any reason, with or without notice or cause.

**I.** <u>The Consideration for this Agreement</u>

This is a mutual and voluntary agreement to arbitrate and to be bound by the decision of the arbitrator. Employment with the Company is contingent upon signing the Agreement, but employees may opt out of the Agreement pursuant to Paragraph J below. Further, Red Robin agrees that if it prevails at the arbitration it shall not seek or pursue costs from you, even if at law it would otherwise be entitled to pursue such costs; however, distinct from costs, Red Robin retains any rights it may have to recover its attorneys' fees: e.g., for frivolous claims. The parties agree that the consideration described herein is wholly adequate to support this Agreement.

**J.** <u>The Opt-Out Option</u>

Red Robin is offering a one-time option for you to opt out of (i.e., not be bound by) this Agreement. However, to do so, no later than the date 30 calendar days after your first day of employment, you must provide Red Robin (by e-mail to: <u>ArbitrationOptOut@redrobin.com</u> or by hand delivery to your General Manager) with a letter, signed by you, that says "I opt out of the Mutual Agreement to Arbitrate." This means that to properly opt out of the Agreement, you must hand write or type a letter that says "I opt out of the Mutual Agreement to Arbitrate," sign it, scan it, and send it to this e-mail address: <u>ArbitrationOptOut@redrobin.com</u> or hand deliver it to your General Manager, no later than 30 calendar days after your first day of employment. You will not be retaliated against for opting-out of the Agreement under this Paragraph.

**RED ROBIN AGREES THAT BY ISSUING THIS AGREEMENT, IT AGREES TO BE BOUND BY IT WITHOUT SIGNING IT OR THE ACKNOWLEDGEMENT WITH RESPECT TO THOSE WHO DID NOT PROPERLY OPT OUT AS INSTRUCTED IN PARAGRAPH J ABOVE.**

**YOU UNDERSTAND YOU HAVE 30 CALENDAR DAYS AFTER YOUR FIRST DAY OF EMPLOYMENT TO OPT OUT PURSUANT TO PARAGRAPH J ABOVE. YOU MAY SEEK INDEPENDENT LEGAL COUNSEL REGARDING THE MEANING AND EFFECT OF THIS AGREEMENT.**

CONFIDENTIAL               DEF001281

# EXHIBIT M

**Summary of Class Counsel's Lodestar**

*Steven Miller v. Red Robin International, Inc.*

Case No. 22-CV-02574-JCS, ND California

| Attorney and/or Staff | Position | Hours | Rate | Fees |
|---|---|---|---|---|
| Jennifer Liu | Partner | 45.6 | $1,000.00 | $45,600.00 |
| Rebecca Peterson-Fisher | Partner | 234.1 | $880.00 | $206,008.00 |
| Logan Talbot | Associate | 22.7 | $660.00 | $14,982.00 |
| Leah Kennedy | Associate | 236.8 | $440.00 | $104,192.00 |
| Justin Wilck | Senior Paralegal | 131.4 | $340.00 | $44,676.00 |
| **Totals** | | **670.6** | | **$415,458.00** |

# EXHIBIT N

DocuSign Envelope ID: 8AED230A-578A-4DA6-9AF2-66E82F9A3D68

Rebecca Peterson-Fisher (SBN 255359)
Jennifer Liu (SBN 279370)
C. Leah Kennedy (SBN 346306)
KATZ BANKS KUMIN LLP
150 California Street, 16th Floor
San Francisco, CA 94111
Tel: 415.813.3260
Fax: 415.813.2495
Email: Peterson-Fisher@katzbanks.com
Liu@katzbanks.com
Kennedy@katzbanks.com

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVEN MILLER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RED ROBIN INTERNATIONAL, INC. dba RED ROBIN BURGER AND SPIRITS EMPORIUMS, and DOES 1-100, inclusive,<br><br>Defendants. | Case No. 22-CV-02574-JCS<br><br>**DECLARATION OF STEVEN MILLER**<br><br>Before the Hon. Joseph C. Spero<br><br>Hearing: January 5, 2024, 9:30 AM<br>Location: Courtroom D, 15th Floor<br>Filed: April 27, 2022 |

DocuSign Envelope ID: 6AED230A-578A-4DA6-9AF2-66E82F9A2D68

I, STEVEN MILLER, declare as follows:

1.     I am a party in the above-entitled action.  I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     I was employed by Red Robin International, Inc. from 2013 until April 28, 2021, holding, at different times, the job titles Assistant Manager I, Kitchen Manager, and Assistant General Manager at Red Robin's Brentwood, Sun Valley Mall, Solano Mall, and Pleasanton restaurants in California.

### MY WORK ON THIS CASE

3.     I have spent significant time working on this case since January 2022, when I first spoke with Rebecca Peterson-Fisher regarding my potential claims against Red Robin.

4.     My work has included participating in numerous telephone consultations with my attorneys; extensively searching my electronic and paper records to gather documents relevant to the case; providing detailed responses to my attorneys' inquiries regarding Red Robin's policies and practices; reviewing the PAGA letter and complaint in this case; helping my attorneys prepare discovery responses and reviewing and signing discovery responses; helping my attorneys prepare for the mediation in the case; attending a substantial part of the mediation; being available by telephone during the entire mediation session; communicating frequently with my attorneys during the process of negotiating the settlement in this case; and reviewing the settlement agreement.

5.     When I decided to become a named plaintiff in this case, I understood that I would likely have to have my deposition taken and respond to written discovery requests.  I also understood and that the preparation for the deposition and the deposition itself would likely require me to take one to two days off work.  Although it would have been difficult for me to take one to two days off work, I was willing to take on this responsibility.

6.     According to my best estimate, I have spent 16 to 25 hours working on this case.

1

**I TOOK A GREAT RISK BY FILING THIS LAWSUIT**

2      7.      Participating in this case was risky for me, because of the possibility that my

3   current or future employers might discover that I have served as a named plaintiff in this case

4   and retaliate against me.  I continue to work in management in the restaurant industry, and Red

5   Robin has been the subject of media attention in the past, particularly in restaurant industry

6   publications.

7      8.      To date, I have not received any personal benefit from my participation in this

8   case, but I chose to serve as a named plaintiff because I believe strongly that it is necessary to

9   stand up for other employees besides myself.

10      I declare under penalty of perjury under the laws of the State of California and the United

11   States of America that the foregoing is true and correct.  Executed on _11/30/2023_____, in

12   _Antioch_____, California.

13

14

15                                                 DocuSigned by:

16                                          _____

                                            Steven Miller

17

18

19

20

21

22

23

24

25

26

27

28

2

# EXHIBIT O

### DECLARATION OF ANDREW MEYER IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL

I, Andrew Meyer, declare as follows:

1.     I am a Business Development Consultant for Rust Consulting, Inc. ("Rust"). My business address is 920 2nd Ave. South, Suite 400, Minneapolis, MN  55402. My telephone number is (612) 987-8835. I am over twenty-one years of age and am authorized to make this declaration on behalf of Rust and myself.

2.     Rust has extensive experience in class action matters, having provided services in class action settlements involving antitrust, securities fraud, property damage, employment discrimination, employment wage and hour, product liability, insurance and consumer issues. We have provided notification and/or claims administration services in more than 7,000 projects. Of these, approximately 3,500 were Labor & Employment cases.

3.     Rust's internal data security practices meet or exceed today's exacting industry standards. Our enterprise-class data security measures are founded on standard business processes including a vigorous employee screening program, ongoing employee security training and a hardened production data center hosted at a Tier 1 network carrier, all designed for ensuring data integrity and security.

4.     Rust is being engaged by Counsel to provide services in the settlement *Miller v. Red Robin International* (the "Settlement"). Duties will include: a) preparing, printing and mailing of the Notice of Class Action Settlement ("Class Notice"); b) tracking of requests for exclusion; c) drafting, mailing and tax reporting for Settlement Award checks to Class Members; and for such other tasks as the Parties mutually agree or the Court orders Rust to perform.

5.     Rust has no business and/or relationship to any of the Counsel.

6.     Rust is routinely audited for compliance with data and security measures and carries adequate insurance levels for fraud, E&O, theft, etc.

7.     Rust will provide Project Management and Technical Consulting staff to manage all aspects of the administration and be available to Counsel.

8.     The total cost for the administration of this Settlement is estimated to not exceed

- 1 -

**DECLARATION OF ANDREW MEYER FOR RUST CONSULTING, INC.**

$11,500 unless the class size (approx. 252) provided by counsel is materially different as that is the basis on which the estimate is provided. The costs are comprised of the combination of the transactional costs for print, postage, banking activities, telephone support, website set-up, as well as the hourly fees to carry out the administrative duties.

       I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct to the best of my knowledge and that this Declaration was executed this 15th day of November 2023, at Minneapolis, MN.

_/s/ Andrew Meyer_____
Andrew Meyer, Declarant

**DECLARATION OF ANDREW MEYER FOR RUST CONSULTING, INC.**

# EXHIBIT P



**Settlement Administration Estimate**
**Miller v. Red Robin Settlement**
**September 5, 2023**

Prepared by:
**Andrew Meyer**
**Business Development Consultant**
**612-987-8835**
**ameyer@rustconsulting.com**

## EXPERIENCE
With experience on approximately 3,500 labor and employment cases, we are the nation's largest labor and employment settlement administrator.  We have managed employment settlements with class sizes ranging from dozens to multi-million class members.  In fact, we've been trusted to administer many of the nation's largest settlements, including the nation's top wage-and-hour cases in recent years.

## DATA SECURITY
Our internal data security practices meet or exceed today's exacting industry standards.  Our enterprise-class data security measures are founded on standard business processes including a vigorous employee screening program, ongoing employee security training and a hardened production data center hosted at a Tier 1 network carrier, all designed for ensuring data integrity and security.

## DEDICATED SPECIALISTS
Our labor and employment case team is strictly dedicated to managing settlement administration for cases involving matters such as wage-and-hour, FLSA, discrimination and ERISA.  They're specialists, not generalists, with an industry reputation for responsiveness and expertise in relevant areas such as the applicable banking and tax regulations.  We are confident that Rust is the best choice for the administration of your settlement.

**Project Summary**

| | | |
|---|---|---|
| Estimated Class Size | 252 | |
| | | |
| Project Cost | | |
| Mailed Notice | $ | 2,697 |
| Telephone Support | $ | - |
| Processing and Administration | $ | 300 |
| Fund Distribution & Tax Reporting | $ | 3,206 |
| Project Management | $ | 6,040 |
| Other Out-of-pocket Expenses | $ | 125 |
| Total Project Cost | $ | 12,367 |
| Discount | $ | 900 |
| Total Estimated Fees (assumes scope within) | $ | 11,467 |

| | |
|---|---|
| **TOTAL NOT TO EXCEED AMOUNT** | **$   11,500** |

**Key Assumptions**
*Notice mailing and Emailed notice
*Text messages sent that stats notices have been mailed/emailed
No Claims Process
*Posting of relevant documents to Rust's website
120 Payment void date
Class & PAGA payments
Single Distribution
One state tax ID (CA)
Uncashed to State Controller's Office

**NOT INCLUDED:** Telephone support, Website, Translation, Reminder Postcards

**Thank you for considering Rust Consulting, Inc. as your administrator -- we appreciate the opportunity to submit this estimate.**

Privileged and Confidential



**Settlement Administration Estimate**
**Miller v. Red Robin Settlement**
**September 5, 2023**

Prepared by:
**Andrew Meyer**
**Business Development Consultant**
**612-987-8835**
**ameyer@rustconsulting.com**

| Key Assumptions Used to Prepare this Estimate | | | | Standard Hourly Rates* | |
|---|---|---|---|---|---|
| Class Size | 205 | | | | |
| PAGA class payments | 47 | | | | |
| Initial Mailed Notice: | | | | SVP | $175-$275 |
| Mailed Notice | 205 | 100.0% | | Program Manager | $160-$180 |
| Forwarded Notices | 5 | 2.5% | | Project Manager | $100-$140 |
| Undeliverable Notices | 31 | 15.0% | | Technical Consultant | $110-$180 |
| Re-Mailed Notices after Trace | 25 | 80.0% | | Call Center Manager | $125 |
| | | | | CSR | $ 43-$ 50 |
| Telephone Support: | | | | Processor | $ 43-$ 50 |
| Number of Telephone Contacts | - | 15.0% | | Other | $ 43-$125 |
| Connect Minutes per Call - CSRs | - | | | *Subject to change | |
| | | | | | |
| Claimant Communications: | | | | | |
| forms received | - | 0.0% | | | |
| Payments | 252 | 100.0% | | | |

<u>Additional Administration Assumptions Used to Prepare this Estimate:</u>

Database Development: Receive and Process Database assumes that the data provided is complete with respect to the data components needed to mail and calculate settlement payments.  Data that includes multiple records for individuals or work history that needs to be accumulated and totaled by individual generally requires additional efforts to bring to a point where it is final settlement data.  These additional efforts can take a significant amount of time and should be considered when setting key settlement dates, especially the mailed notice deadline.  Data must be provided in a complete, consistent, standardized electronic format.  Rust's standard format is ASCII fixed width complete with field layout.  Other formats may be accepted at Rust's discretion.  Resources used to enhance or further develop non-standardized data will be billed on a time and materials basis according to Rust's Current Standard Hourly Rates.

CASS/NCOA/LACS:  CASS - Coding Accuracy Support System; NCOA - National Change of Address; LACS - Locatable Address Conversion System.

Notice Package: Print and Mail per unit price is estimated.  Actual prices will be provided after form is finalized prior to mailing.  Notice package includes notice and exclusion form.

Telephone Support is NOT included.

Processing & Administration: Receipt and Process Forms includes open, date stamp, label and data capture a 1-page form with up to five fields.

Project Management: Project Management fees are estimated and will be billed on actual time expended based on the rates found in the Current Standard Hourly Rates section above.  The rates included in the estimate are a blended estimate of the rates listed above.

Out of Pocket Expenses: Includes post office box rental, overnight shipments, postage, labels, travel, long distance and other miscellaneous charges and expenses.

**Pricing good for 90 days.**

Privileged and Confidential



**Settlement Administration Estimate**
**Miller v. Red Robin Settlement**
**September 5, 2023**

Prepared by:
**Andrew Meyer**
**Business Development Consultant**
**612-987-8835**
**ameyer@rustconsulting.com**

| Administrative Task | Estimated Quantity | | Per Unit | | Task Amount | | Total |
|---|---|---|---|---|---|---|---|
| **Database Development** | | | | | | | |
| Receive and Process Database | 1.50 | Hours @ | $ | 175 | $ | 263 | $ | 263 |
| Additional Efforts to Finalize Settlement Data | | | | | *As Incurred* | | |
| **Initial Mailed Notice** | | | | | | | |
| CASS / NCOA / LACS Processing | | | | | $ | 200 | |
| Email set-up / deployment of emailed notices | 1 | Fee @ | $ | 500 | $ | 500 | |
| Text message set-up / deployment of texts | 1 | Fee @ | $ | 600 | $ | 600 | |
| Print and Mail Notice Package | 205 | Notices @ | $ | 4.00 | $ | 820 | |
| Postage - 1 Ounce First Class | 205 | Notices @ | $ | 0.66 | $ | 135 | $ | 2,255 |
| **Follow-up to Initial Notice** | | | | | | | |
| Receive Undeliverable Notices and Update Database | 31 | Notices @ | $ | 1.25 | $ | 38 | |
| Address Trace | 31 | Traces @ | $ | 1.00 | $ | 31 | |
| Remail Notice Package | 30 | Notices @ | $ | 3.00 | $ | 90 | |
| Remail Postage - 1 Ounce First Class | 30 | Notices @ | $ | 0.66 | $ | 20 | $ | 179 |
| **Telephone Support** | | | | | | | *NOT INCLUDED* |
| **Processing and Administration** | | | | | | | |
| Posting of relevant documents to Rust's website | | | | | | | $ | 300 |
| Receipt, Process, and Validate Forms | - | Forms @ | $ | - | $ | - | $ | - |
| *Additional Administrative Services Requested by Client* | | | | | | | *As Incurred* |
| **Fund Distribution** | | | | | | | |
| Print and Mail Payments | 252 | Payments @ | $ | 4.50 | $ | 1,134 | |
| Postage - 1 Ounce First Class | 252 | Payments @ | $ | 0.66 | $ | 166 | |
| Check Processing | 252 | Payments @ | $ | 0.22 | $ | 55 | |
| FDIC fees | | | | | $ | 200 | |
| Monthly Bank Account Fee | 4 | Months @ | $ | 100 | $ | 400 | $ | 1,956 |
| **Tax Reporting** | | | | | | | |
| Annual Fee -Qualified Settlement Fund | 1 | Year @ | $ | 750 | $ | 750 | |
| Individual Income Tax Reporting (W2 & 1099) | 1 | Year @ | $ | 500 | $ | 500 | $ | 1,250 |
| **Project Management** | | | | | | | |
| Senior Vice President | 2 | Hours @ | $ | 225 | | *waived* | |
| Project Management | 25 | Hours @ | $ | 175 | $ | 4,375 | |
| Technical Consulting | 9 | Hours @ | $ | 185 | $ | 1,665 | $ | 6,040 |
| **Other Charges and Out-of-pocket Costs** | | | | | | | |
| | | | | | | | $ | 125 |
| **Total Settlement Administration Estimate** | | | | | | | **$ 12,367** |



**Settlement Administration Estimate**
**Miller v. Red Robin Settlement**
**September 5, 2023**

Prepared by:
**Andrew Meyer**
**Business Development Consultant**
**612-987-8835**
**ameyer@rustconsulting.com**

### Terms and Conditions

All claims administration services to be provided by Rust Consulting to Customer shall be subject to the following terms and conditions:

1. Services.  Subject to the terms hereof, Rust Consulting agrees to provide the Customer with claims administration services (hereinafter, "Claims Services") as specified in the Proposal provided to Customer to which these Terms and Conditions are attached.

2. Term.  The terms of this agreement will remain in effect until completion of the Claims Services, unless earlier terminated in accordance with Section 10 hereof.

3. Charges for Services.  Charges to the Customer for Claims Services shall be on a time and materials basis at our prevailing rates, as the same may change from time to time.  Any fee estimates set forth in the proposal are estimates only, based on information provided by Customer to Rust Consulting.  Actual fees charged by Rust Consulting to Customer may be greater or less than such estimate, and Customer shall be responsible for the payment of all such charges and expenses in accordance with Section 4 hereof.  Furthermore, Customer will be responsible for payment of all state and local sales and use taxes, if any, levied upon the charges payable by the Customer hereunder. Charges incurred related to resolving post distribution withholdings and related corrective files due to voids and re-issues of payments and related correspondence with state and federal taxing authorities will not be charged to the Customer to the extent that funds are received from the taxing authorities offset these charges.  Rust Consulting may derive financial benefits from financial institutions in connection with the deposit and investment of settlement funds with such institutions, including without limitation, discounts on eligible banking services and fees, and loans at favorable rates.

4. Payment of Charges.  Payment by Customer of Rust Consulting's monthly invoices shall be due upon receipt thereof.  Amounts unpaid after thirty (30) days are subject to a service charge at the rate of 1.5% per month or, if less, the highest rate permitted by law.  Decisions of the court and actions of the parties, including disapproval or withdrawal of a settlement, do not affect the Customer's liability to Rust Consulting for payment of Claims Services.  Claims Services are not provided on a contingency fee basis.

5. Confidentiality.  Rust Consulting agrees to implement and maintain reasonable and appropriate security measures and safeguards to protect the security and confidentiality of Customer data provided to Rust Consulting by Customer in connection herewith.  Should Rust Consulting ever be notified of any judicial order or other proceedings in which a third party seeks to obtain access to the confidential data created by or for the Customer, Rust Consulting will promptly notify the Customer, unless prohibited by applicable law.  The Customer shall have the option to (1) provide legal representation at the Customer's expense to avoid such access or (2) promptly reimburse Rust Consulting for any of its costs, including attorneys' fees, reasonably incurred in avoiding, attempting to avoid or providing such access and not paid by the entity seeking the data.  If Rust Consulting is required, pursuant to a court order, to produce documents, disclose data, or otherwise act in contravention of the obligations imposed by this Agreement, or otherwise, with respect to maintaining the confidentiality, proprietary nature and secrecy of the produced documents or disclosed data, Rust Consulting will not be liable for breach of said obligation.

6. Standard Banking Procedures.  In accordance with Rust Consulting's standard banking procedures, Rust Consulting will establish a demand deposit checking account (i.e. non-interest bearing) for funds received related to a distribution, unless directed otherwise in writing by the parties or unless the settlement agreement stipulates otherwise.  When directed to invest funds in an interest bearing or investment accounts, Rust Consulting intends to invest all funds in U.S. government backed securities, unless directed by the parties in writing or the settlement agreement or distribution plan to invest in other types of securities; however, even in cases where funds are temporarily placed in interest bearing or investment accounts, funds will eventually be migrated to a demand deposit checking account prior to a fund distribution.

7. Rights in Data.  Rust Consulting does not convey nor does the Customer obtain any right in the programs, system data, or materials utilized or provided by Rust Consulting in the ordinary course of business in the performance of this Agreement.

8. Document Retention.  Unless directed otherwise in writing by Customer, Rust Consulting will destroy undeliverable notice mail on the effective date of the settlement or the date that the disposition of the case is no longer subject to appeal or review, whichever is later.  Rust will maintain claim forms and other correspondence for one year after final distribution of funds or benefits, or until the date that the disposition of the case is no longer subject to appeal or review, whichever is later.  Rust Consulting will retain all bank and tax documents for such period of time as it determines is required to maintain compliance with various federal and state requirements.

9. Limitation of Liability: Disclaimer of Warranty.  Rust Consulting warrants that our services will be performed with reasonable care in a diligent and competent matter.  Our sole obligation will be to correct any non-conformance with this warranty.  Rust Consulting shall not be liable, whether under theories of contract, negligence or other tort, statutory duty or other theories of liability in an amount exceeding the total charges to the Customer for the specific work affected by the error or omission.  Rust Consulting will not be liable for any incidental, special, indirect, consequential or exemplary damages of any kind; or for any lost profits, lost opportunities, business interruption or for any liability incurred by the Customer or others to any third party. THE WARRANTIES SET FORTH HEREIN ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE FOR PARTICULAR PURPOSE.

10. Termination.  The Claims Services to be provided under this Agreement may be terminated, at will by the Customer upon at least 30 calendar days' prior written notice to Rust Consulting.  The Customer's obligation to pay for services or projects in progress at the time of notice of withdrawal shall continue throughout that 30 day period.  Rust Consulting may terminate this Agreement (i) with 10 calendar days' prior written notice, if the Customer is not current in payment of charges or (ii) in any event, upon at least 3 months' prior written notice to the Customer.

11. Notice.  Any notice required or permitted hereunder shall be in writing and shall be delivered personally, by, or sent by registered mail, postage prepaid, or overnight courier service to the responsible officer or principal of Rust Consulting or the Customer, as applicable, and shall be deemed given when so delivered personally, or, if mailed, five days after the date of deposit in United States mail, or, if sent by courier, one business day after delivery to such courier service.

12. Force Majeure.  To the extent performance by Rust Consulting of any of its obligations hereunder is substantially prevented by reason of any act of God or by reason of any other matter beyond Rust Consulting's reasonable control, then such performance shall be excused and this Agreement, at Rust Consulting's option, be deemed suspended during the continuation of such condition and for a reasonable time thereafter.

13. Nonwaiver of Rights.  No failure or delay on the part of a party in exercising any right hereunder will operate as a waiver of, or impair, any such right.  No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right.  No waiver of any such right will be effective unless given in a signed writing.

14. Jurisdiction.  The parties hereto irrevocably and unconditionally submit to the jurisdiction of the Court of the applicable case for purposes of any suit, action or proceeding to enforce any provision of, or based on any right arising out of, this Agreement. The parties hereto hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding in the Court.

15. Survival.  All accrued payment obligations hereunder, any remedies for breach of this Agreement, this Section and the following Sections will survive any expiration or termination of this Agreement: Section 7 (Rights in Data); Section 5 (Confidentiality), Section 9 (Limitation of Liability; Disclaimer of Warranty), and Section 14 (Jurisdiction).

16. Entire Agreement.  These Terms and Conditions and the proposal embody the entire agreement between the parties with respect to the subject matter hereof, and cancels and supersedes all prior negotiations, representations, and agreements related thereto, either written or oral, except to the extent they are expressly incorporated herein.  No changes in, additions to, or waivers of, the terms and conditions set forth herein will be binding upon any party, unless approved in writing by such party's authorized representative.

# EXHIBIT Q



# System Security 2023

## Contents

Overview.................................................................................................................................... 2

General Controls...................................................................................................................... 3

Data Backup & Recovery Controls........................................................................................... 3

Disaster Recovery Controls ..................................................................................................... 3

Processing Controls................................................................................................................. 4

Access Controls....................................................................................................................... 4

Change Controls...................................................................................................................... 6

Antivirus Controls.................................................................................................................... 7

Risk Management..................................................................................................................... 7

System Security....................................................................................................................... 9

Application Security ................................................................................................................. 9

Web Security .......................................................................................................................... 10

Check Printing & Distribution ................................................................................................. 10

Data Receipt And Control Process......................................................................................... 11

Data Intake Process Flow ...................................................................................................... 12



# Overview

The security of systems and applications and confidentiality of data are of utmost importance to Rust, our clients, the parties to engagements we administer, and members of the public impacted by our operations. Thus Rust actively protects its systems and mitigates potential threats by adhering to a comprehensive assortment of security best practices, certifications, and audits that we refer to collectively as our "unified compliance posture."

As part of our unified compliance posture, Rust:

- Has received from two federal agencies (CFPB and FTC) Authority to Utilize Controlled Unclassified Information under the guidelines of FISMA, NIST 800-171, and NIST 800-153, and Authority to Operate under FISMA from the SEC.
- Undergoes an annual SSAE18 SOC 2 Type II Report audit of our data and system security controls and protocols.
- Complies with applicable laws, such as the Sarbanes-Oxley Act (SOX), Gramm-Leach-Bliley Act (GLBA) and the Health Insurance Portability and Accountability Act (HIPAA).
- Complies with and adheres to the controls formerly known as the EU-U.S. Privacy Shield.
- Adheres to documented and audited processes.
- Maintains a business continuity plan to ensure uninterrupted, secure service.
- Has implemented controls to prevent unauthorized access or disclosure, maintain data accuracy, and ensure the appropriate use and confidentiality of information, either for its own purposes or on behalf of our clients.
- Has put in place appropriate physical, electronic, and managerial procedures to safeguard and secure the information we process.
- Processes personal information only in ways compatible with the purpose for which it was collected or subsequently authorized to do.

This documentation highlights security-related components in several key categories, including:

- General Controls
- Data Backup and Recovery Controls
- Disaster Recovery Controls
- Processing Controls
- Access Controls
- Change Controls
- Antivirus Controls

- Risk Management
- Data Intake Process Flow
- Application Security
- Check Printing & Distribution
- Web Security
- Data Receipt and Control Process
- System Security

The sections below describe the security and control features in each of these categories.

# General Controls

Rust has formal policies to ensure that:

- All required documentation is received, maintained and available for use. Compliance is monitored and issues are dealt with promptly and appropriately.
  - ▫ Operations, technical, and user documentation (including source code) is kept current and made available to appropriate personnel. Documentation is maintained and used when installing and/or maintaining the network, servers, executable applications and databases.
  - ▫ All computer output is adequately controlled and disposed of properly. Media of all forms is securely destroyed onsite prior to disposal.
- Strategic planning occurs on at least a yearly basis and meets the needs of the business.
  - ▫ The entity's data structures have been defined and implemented in a manner that is consistent with information systems plans and management's intentions. Management reviews systems performance reports, monitors to ensure that adequate action is taken upon identification of inefficient performance, and formulates and implements solutions.
- Proper security measures have been implemented to protect the corporate network. Compliance is monitored and issues are dealt with promptly and appropriately.
  - ▫ Facilities housing production data operate in an environmentally controlled location and are protected by a computer-safe fire extinguishing system.
  - ▫ Employees are adequately trained in safety procedures to follow in case of system activation.
  - ▫ An uninterruptable power supply (UPS) and back-up generator are utilized to prevent interruptions in power that could cause data loss, delays in processing, or processing failure.
  - ▫ The data center and network closets are uncluttered and hazard-free. Appropriate maintenance records for the physical components of a facility that are related to security (such as hardware, walls, doors, and locks) exist and are retained.

# Data Backup & Recovery Controls

Rust has formal policies to ensure that backups for all critical systems are accomplished, and that media is secured and available for use in an emergency. Management monitors compliance to ensure that issues are handled promptly and in the appropriate manner.

- All media are stored in a secured environmentally-controlled location. Backups completed daily and replicated to a secondary company-controlled site in a geographically separate location.
- Access to on-site backup media is limited to authorized personnel.
- Ongoing readability of backup and retained data is tested periodically through restoration or other methods.

# Disaster Recovery Controls

Rust maintains a business continuity plan (BCP), a construct of leadership teams, pre-arranged assignments of responsibilities, and communication flows intended to allow for an effective return to business operations in the



event of a substantial interruption. The BCP also functions as a disaster recovery plan for reconstitution of mission-critical applications and data in the event of a severe systems failure or compromise to an operational facility. The plan complies with various medical, financial, and federal government client requirements; it meets or exceeds the requirements of the DOJ, the FTC, and the 15 largest financial institutions in the U.S.

Disaster recovery procedures and contingency plans are tested and reviewed by management at least yearly to ensure they meet current operating conditions. Alternative processing methods have been established in the event of loss or interruption of the primary means to do business. Our recovery time objective (RTO) (i.e., the amount of time we estimate it would take us to recover our systems in the event of a disaster) is 3-45 days. Our RPO, or recovery point objective, is one day: this is the maximum amount of data that we estimate could be lost in a disaster, because Rust performs backups on a daily basis.

As part of our Authority to Operate under FISMA from the SEC, Rust adheres to the standards outlined in NIST 800-153 which require that the plan is formally reviewed on an annual basis by a third party. In addition, as part of our Authority to Utilize Controlled Unclassified Information under the guidelines of FISMA from the FTC and the CFPB, Rust adheres to the standards outlined in NIST 800-171, which requires that the following controls be reviewed on an annual basis:

- Contingency Planning Policy and Procedure
- Contingency Plan
- Contingency Plan Update
- Contingency Training
- Contingency Plan Testing and Exercises

## Processing Controls

Rust has formal policies to ensure that computing processing occurs in a secure and reliable manner.

- A processing schedule exists and is understood by users and operations staff. Automated scheduling tools have been implemented to ensure the authorization and completeness of the flow of processing.
- Terminal or station codes exist so that transactions are linked to the transaction originator.
- Batch and online processing procedures are defined to ensure that jobs and/or transactions are processed to normal completion or are recovered and reprocessed. Processing is monitored by management to ensure successful and timely completion, including a review and resolution of any exceptions. Exceptions to normal processing are logged, reviewed by management, and promptly resolved.

## Access Controls

Rust has formal policies in place to ensure that access to data is controlled in a secure manner that allows business operations to continue and that these controls are reviewed on a regular basis. These controls are monitored by management to ensure compliance with corporate security standards and to ensure that issues are dealt with promptly and in the appropriate manner.



In addition, Rust has established formal policies to ensure that all contractors and subcontractors who receive, process, or transmit data on the entity's behalf implement safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of confidential information.

## Separation of Duties

- Appropriate segregation of duties exists between data submission, approval, and authorization of data entry. Access to production processing control language and executable programs is defined to restrict the ability to execute, modify, delete, or create to appropriate individuals. Responsibility for administration and definition of database components is assigned to appropriate personnel.
- IT personnel are prohibited from initiating or authorizing transactions. Duties are adequately segregated between IT employees responsible for maintaining the production data library, the production programs, the programming documentation, and the operating system and associated utilities.
- The authority to administer information security is limited to appropriate personnel. Use of all privileged access is defined and limited to appropriate personnel, logged and reviewed.

## Security

- Unauthorized internal and external attempts to access information resources and authorized access to sensitive data are logged and included in security reports. The logs and reports are regularly reviewed and any necessary action is taken. Access logs are reviewed regularly for appropriate access levels and are protected from alteration. Network and critical applications are programmed to lock out users after three unsuccessful log-on attempts.
- Third-party system vendor access is restricted, as well as monitored.
- Adequate safeguards are in place to prevent unauthorized remote access. Information security tools and techniques are used to restrict access to information resources. Management reviews and approves the implementation and configuration of information security tools and techniques.
- Sensitive data is adequately encrypted during transmission by the entity, contractors, and subcontractors.
- IT employees do not have access to employee passwords, or to view employee passwords in clear text within the system(s).
- Terminals and workstations are protected by time-out session controls which are activated after a predetermined time period of inactivity has elapsed.

## User Administration

- Access privileges for users are reviewed on a regular basis.
- Proper approval is documented for all setup or changes of employee access to the company system(s), and employees have access to only those areas required to perform their specific job functions.
- Users are required to have a unique user identifier in order to distinguish one user from another and establish accountability. "Guest" or other "generic" user IDs and passwords are not used.



- Passwords adhere to stringent security guidelines and are changed periodically. The security administrator is notified of employees who have changed roles and responsibilities, transferred, or been terminated. Access privileges of such employees are immediately changed to reflect their new status.

## Physical Access

- Physical access to the building and immediate surroundings of computer equipment is monitored and is restricted to individuals who require such access to perform their job functions. A physical access control mechanism is used to restrict and record access to protected areas and authority to change physical access control mechanisms is limited to appropriate personnel. This includes access to:
  - Office areas.
  - Server rooms.
  - Check printing rooms.
  - Media storage.
- Criminal background checks that include felony, misdemeanor, and federal criminal records (for all states and counties lived in the last 10 years) are required for all employees. Essential applicants are run through a Department of Treasury database marshaled by the Office of Terrorism and Financial Intelligence to avoid transactions with individuals designated by the Office of Foreign Asset Control as being on a "watch list" for certain unacceptable activities.
- Social Security checks are performed on all employees.

## Change Controls

Rust has formal policies to ensure that before changes are made to application systems, data structures, network and communication software, systems software and hardware, or the environment in which they operate, all affected parties are contacted and the timing of such modifications is coordinated with them, to ensure minimum impact on other processing activities.

## Approval

- The impact of proposed hardware, application system, data structure, and system software changes is assessed and reviewed by management before implementation into production in order to minimize disruptions to operations.
- Requests for changes to the entity's production computing environment are fully documented and approved by both Business and IT management. Changes are monitored by management and approved documentation should demonstrate consistency with information system plans and management's intentions.
- Systems software changes, including upgrades, modifications, and test results, are reviewed and approved by management prior to integration into the production environment.



## Testing

- Changes to application systems, data structures, network infrastructure, communication software, system hardware, and system software are developed, installed, evaluated and tested in a test environment prior to implementation. This test environment is separated from the production environment. Development is loaded into a subset of data.
- Analysis container requires real data.
- The following are tested in accordance with test plans that include, as appropriate, system and unit testing, interface testing, parallel testing, capacity testing and user acceptance testing:
  - New application systems and modifications to application systems.
  - New data structures and modifications to data structures.
  - New network and communication software and modifications to network and communication software.
  - New systems software and modifications to systems software.

## Separation of Duties

Only appropriate personnel have the ability to:
- Change data through the use of utility programs.
- Move changes from development to production environments.
- Make modifications to system security parameters.

These authorizations restrict developers from access to production systems and include management approval.

## Monitoring

- With respect to the implementation of modifications to existing hardware, application systems, data structures, network and communication software, and systems software, management monitors to ensure that the project meets the objectives specified, is completed on budget, and meets the time requirements.
- Change management procedures ensure synchronization between source and executable code.

## Antivirus Controls

Rust has formal policies to ensure antivirus systems are in place and properly maintained to protect the corporate computing environment. Antivirus software is loaded on all of the entity's computers and servers and on any computer that is authorized to connect to the entity's network. Such software is configured to regularly scan for viruses, and scan whenever installing or downloading data or programs, opening a data file, or executing a program. Compliance with this policy is mandatory and monitored.

## Risk Management

Rust develops, disseminates, and periodically reviews 1) a formal, documented information security policy, which includes risk management, security awareness, security training, and incident response; 2) formal, documented



procedures to facilitate the implementation of the policy and associated risk assessment controls; and 3) annual training of all employees for certification.

In the event a third party is used for a portion of the processing, such as printing, Rust obtains satisfactory assurances that the third-party business associates will adhere to Rust's security standards and will appropriately safeguard information in compliance with the terms of the contract or confidentiality agreement.

## Access

- Access to financial information is restricted to ensure only authorized access, access is documented, and isolating clearing house functions from other functions.
- The organization implements an appropriate method to encrypt and decrypt electronic financial information.

## Processing

- Processing of financial information is isolated to reduce risk and vulnerabilities.
- Financial information that is processed, stored, or transmitted is categorized and handled according to the system security plan.
- Vulnerability scans using appropriate tools and techniques are conducted regularly.
- Evaluations (both technical and non-technical) are performed based upon standards implemented and responsive to environmental or operational changes affecting the security of financial information and processing.

## Security Awareness and Training

- All users, including managers and senior executives, are exposed to basic information system security awareness materials before authorizing access to the system and on a regular basis thereafter.
- Rust identifies personnel with significant information system security roles and responsibilities, documents those roles and responsibilities, and provides appropriate security training before authorizing access to the system and on a regular basis thereafter.
- Rust documents and monitors individual information system security training activities including basic security awareness training and specific information system security training.

## Incident Management

- Rust implements an incident handling capability for security incidents that includes preparation, detection and analysis, containment, eradication, and recovery.
- Rust tracks and documents information system security incidents on an ongoing basis.
- Rust promptly reports incident information to appropriate authorities.

## Facility

- Rust obtains satisfactory assurances that third party business associates will adhere to appropriate physical security standards to safeguard information entrusted to them for service.



- Rust monitors physical access to information systems to detect and respond to incidents.
- Rust controls physical access to information systems by authenticating visitors before authorizing access to facilities or areas other than areas designated as publicly accessible.
- Rust maintains a log of visitor access to facilities.
- Rust controls physical and electronic access to financial information to prevent unauthorized individuals from observing the electronic information and documents.
- Rust's facilities are monitored by CCTV and recordings are preserved for a minimum of 90 days.

## System Security

To ensure data integrity and system security at Rust, appropriate hardware and tools have put in place to maintain the highest level of security, including:

- Elimination of unnecessary services.
- Regular software updates.
- A state-of-the-art Cisco/AlienVault firewall solution with Intrusion Prevention and Detection Services.
- Placement of externally facing web services in a firewall DMZ from which access to the internal network is controlled.
- Centrally controlled anti-virus engines on all PCs and servers configured with automated definition update system.
- Encrypted authentication.
- Passwords stored with non-reversible encryption.
- Password complexity and expiration.
- Zoned physical security for server rooms, and an off-site hardened Tier 3 Data Center for core and production servers.

In order to maintain readiness, Rust has vulnerability scans run by a third party on a quarterly basis.

## Application Security

- Databases are configured so that modifications can only be made to data through programs; individuals are not allowed direct access to underlying production databases.
- Only designated individuals with security clearances at Rust can access data used in completing distributions.
- If an individual has security clearance to make changes in data (e.g., an address), the original is automatically maintained by system along with the identity of the individual who made the change.
- Duties are segregated:
  - Award amounts are performed through programmatic system calculations and cannot be altered by individuals.
  - Award calculations are separate from submission of file to the bank.
  - Check printing is done in a different department or facility, or outsourced to a check printing vendor.
- With the above processes in place, no individual could affect more than one process.



# Web Security

Components of Rust's web security and bot projection capabilities include Telerik RadCaptcha and F5 Application Security Module.

Telerik RadCaptcha features three modes:

- Protection Mode – text or audio that must be typed by a human placed at key points of the dynamic web pages.
- Invisible Textbox – decoy text box that bots will use and will never validate an entry. Humans see and use another text box.
- Minimum Timeout – rapid entries not validated.

The F5 Application Security Module (ASM) is Load Balancer placed as a web proxy-providing Web Application Firewall. It offers signature-based intrusion detection and prevention, as well as protection against the Open Web Application Security Project (OWASP) top 10:

- A1 – Injection
- A2 – Broken Authentication and Session Management
- A3 – Cross-Site Scripting (XSS) A3 – Cross-Site Scripting (XSS)
- A4 – Insecure Direct Object References
- A5 – Security Misconfiguration
- A6 – Sensitive Data Exposure
- A7 – Missing Function Level Access Control
- A8 – Cross-Site Request Forgery (CSRF)
- A9 – Using Known Vulnerable Components
- A10 – Unvalidated Redirects and Forwards

# Check Printing & Distribution

- A "positive pay file" (PPF) is used for clearing checks at the bank, and is provided to the bank separately from the physical checks themselves. Banks are instructed to clear only checks matching entries in the positive pay file and for the amount in the file.
  - The PPF is generated in a separate area and sent directly to the bank through secured systems.
  - If someone were to steal check stock, they would have no practical ability to draw on funds at the bank without access to the data files for distribution.
  - Any altered or stolen check would be stopped by the bank.
  - Debit filters are used to prevent unauthorized wire transfers from the settlement account.
- Check stock and printed checks are stored in a secured area. Generally, checks are printed just in time for mailing. Only authorized personnel are allowed access to the check area for printing and performing quality controls.
  - No account information or MICR line is included on any blank check stock.



- When checks are printed, a reconciliation report is provided which lists the total number of checks and sequenced numbers are printed. These totals are compared to the total records from the payment file to confirm all checks were printed.
- When checks are inserted into the envelopes, total mailing pieces are compared to batch totals to confirm all checks have been prepared for mailing.
- When mailing pieces are delivered to the post office, postal receipts are compared to the totals on the reconciliation report to confirm that all printed checks were mailed.
- Security features on check stock are used, which include void pantographs to prevent copying, micro printed signature lines, and watermarks embedded in the stock.
- Positive identification procedures are printed above the endorsement block on the back of the sheet.
- Debit filters are used to prevent unauthorized wire transfers from the settlement account.

# Data Receipt and Control Process

Data can be received by Rust from the client in a number of modalities (e.g., SFTP, secure MFT, encrypted hard drives, email, CD, tape, DVD). Data delivered to Rust may be sent via email to data@rustconsulting.com or mailed to:

Rust Consulting, Inc.
Attn: Data Receipting
920 2nd Ave. S., Suite 400
Minneapolis, MN 55402

The acceptable delivery methods are:
- SFTP or secure MFT
- Encrypted hard drive
- CD/DVD/Hard drive with PGP encryption
- Secure email

The preferred file formats are:
- Tab delimited text file with no text qualifiers
- Excel files
- Fixed width text file with record layout
- Access databases
- SQL server backup files

The general process for data receipt is:
- The data receipting team receipts and catalogues the source data files.
- The data receipting team loads and secures the source data onto a repository on the network folder. Physical media is stored in our secured library. Access to the network folder is restricted.



- The data receipting team alerts the appropriate project team members of the arrival of the data and where to find copies for analysis.

# Data Intake Process Flow

All data is loaded through a standard and consistent process on our SQL servers. Key control points are:

- Business and technical requirements:
  - Project managers, business analysts, and business systems analysts develop business and technical requirements defining expected file layouts, record counts, and the data processing needed with each set of data. Downstream teams use these requirements to complete and QC the work.
- Data intake:
  - Data files are loaded by database analysis to a staging environment based on mappings within the requirements.
  - Includes standard cleansing:
    - All fields – capitalize, remove special characters such as carriage returns, line feeds, and tabs, and remove extra spaces.
    - Specific field validation rules are run on email, TIN, phone number, zip code, dates, and numeric data.
  - Any other required custom work, such as parsing or merging of data elements, deduplication of data, or preliminary calculations, is completed.
  - Names and addresses are sent through the National Change of Address (NCOA) database, from which Rust receives updated and standardized addresses to be mailed.
- Load data to a project specific application database:
  - Database analysts load data to a test database based on the business and technical requirements.
  - Once the load to the test database is approved, the application promotion system administrators promote that load to a production environment.
- Create mail files:
  - Data is extracted based on business and technical requirements from the production database and delivered to print vendors for printing and mailing.
- Quality assurance:
  - A separate quality assurance analyst reviews completed work at every step of data processing to ensure that it matches the business and technical requirements to ensure data integrity, that all records are accounted for, that no data is lost, and that all data is formatted and ends up in the appropriate destination within our environments.

